**2015-1244**

# United States Court of Appeals
# for the Federal Circuit

ENFISH, LLC,

*Plaintiff – Appellant,*

*v.*

MICROSOFT CORPORATION, FISERV, INC., INTUIT, INC.,
SAGE SOFTWARE, INC., and JACK HENRY & ASSOCIATES, INC.,

*Defendants – Appellees.*

Appeal from the United States District Court for the
Central District of California in No. 2:12-cv-07360-MRP-MRW,
Senior Judge Mariana R. Pfaelzer.

**PLAINTIFF-APPELLANT ENFISH, LLC'S PRINCIPAL BRIEF**

COOLEY LLP

James P. Brogan
Orion Armon
Matthew Leary
Janna K. Fischer
380 Interlocken Crescent, Suite 900
Broomfield, CO 80021
Phone: (720) 566-4000
Facsimile: (720) 566-4099

*Attorneys for Plaintiff-Appellant*

July 10, 2015

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT
ENFISH, LLC v. MICROSOFT CORPORATION, 2015-1244

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 27(a)(7) and 47.4(a), counsel for Plaintiff-Appellant Enfish, LLC hereby certifies the following:

1. The full name of every party or amicus represented by me is:

   Enfish, LLC

2. The name of the real party in interest (if the real party named in the caption is not the real party in interest) represented by me is:

   N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are:

   No publicly-held corporation owns 10% or more of Enfish, LLC stock.

4. The names of all firms and the partners or associates that appeared for the party or *amicus* now represented by me in the trial court or agency or are expected to appear in this court are:

   Cooley LLP: James P. Brogan, Orion Armon, Matthew J. Leary, Janna K. Fischer, Britton F. Davis, J. Adam Suppes, Mark R. Schafer, Peter Sauer, Robyn Gould, Sarah J. Guske, Thomas J. Friel, Jr.

Dated: July 10, 2015

Respectfully submitted,
*/s/   Orion Armon*
Orion Armon
COOLEY LLP
Attorneys for Appellant

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ........................................................ x

STATEMENT OF JURISDICTION ........................................................... 1

STATEMENT OF THE ISSUES ................................................................ 1

STATEMENT OF THE CASE .................................................................... 2

I.    STATEMENT OF FACTS ................................................................... 3

    A.    Enfish's patents-in-suit ............................................................. 3

    B.    The district court's claim construction order ............................ 8

SUMMARY OF THE ARGUMENT ......................................................... 8

I.    INVALIDITY ...................................................................................... 8

    A.    Section 101 of the Patent Act .................................................... 8

    B.    Anticipation under 35 U.S.C .................................................... 12

II.   ESTOPPEL UNDER 35 U.S.C .......................................................... 14

III.  NON-INFRINGEMENT ................................................................... 15

ARGUMENT ........................................................................................... 17

I.    STANDARDS OF REVIEW ............................................................. 17

    A.    Summary judgment ................................................................. 17

    B.    Claim construction ................................................................. 18

    C.    Patent eligibility under § 101 ................................................. 18

II.   THE CLAIMS COVER PATENT-ELIGIBLE SUBJECT
    MATTER ........................................................................................... 19

    A.    The district court erred by granting summary judgment of
        invalidity under § 101 ............................................................. 19

        1.    Legal standard for § 101 ................................................. 19

            a.    Patent-eligible subject matter ............................. 19

            b.    Burden of proof .................................................. 19

            c.    The *Alice* decision ............................................. 20

# TABLE OF CONTENTS
### (continued)

**Page**

2. The appealed claims are not directed to abstract ideas ............................................................................ 21

3. The district court's characterization of the patents was too broad ................................................................. 26

4. There is no risk of preemption ...................................... 27

5. "Logical table" does not make the inventions abstract ........................................................................ 28

6. Precedents by the Supreme Court and this Court show the appealed claims are not abstract ................... 29

7. The district court erred by finding the claimed inventions "conventional" ........................................... 30

8. The appealed claims satisfy § 101 ................................ 32

B. The district court erred in granting summary judgment of anticipation of claims 31 and 32 ........................................... 34

1. The district court erred by ignoring the factual dispute whether Excel 5.0's pivot table and the data table on which it is based are the same "logical table" ................................................................ 34

 a. Claims 31 and 32 require OID equality within a single table ........................................... 34

 b. The district court's decision relied on a "pivot table" meeting the single-table requirement of claims 31 and 32 ....................... 36

 c. Enfish presented facts showing that the pivot table is a separate logical table from the data on which the pivot table is based ....................... 37

 d. The district court erred by failing to accept as true Enfish's facts regarding the operation of pivot tables .................................................... 40

# TABLE OF CONTENTS
(continued)

2.   The district court erred by ignoring a factual dispute regarding whether a column name alone is information "defining" a column ................................. 42

   a.   The district court did not construe what information is required to "define" a column ..... 42

   b.   The district court's decision relied solely on Excel's column names as disclosing the "information defining each of said logical columns" of claims 31 and 32 ........................... 43

   c.   Enfish presented facts showing that Excel's column names are not values that "define" a column ............................................................... 43

   d.   The district court erred by failing to accept as true Enfish's facts that a column name does not define a column .................................... 47

3.   The district court erred by ignoring a factual dispute regarding whether Excel discloses a table where "at least one of said logical rows has an OID equal to the OID of a corresponding one of said logical columns" .......................................................... 48

   a.   The OID equality limitation requires that a row "corresponding" to a column contain information defining that column ...................... 48

   b.   The district court's decision relied solely on Excel pivot tables disclosing superficial OID equality between rows and corresponding columns and did not address true "correspondence" .............................................. 50

   c.   Enfish presented facts showing that pivot tables do not meet the OID equality requirement ........................................................ 51

# TABLE OF CONTENTS
(continued)

**Page**

      d.    The district court erred by failing to accept as true Enfish's facts that a pivot table does not disclose the OID equality requirement ......... 53

III.   THIS CASE REQUIRES REMAND FOR THE DISTRICT COURT TO DETERMINE WHETHER THE IPR FINAL WRITTEN DECISION ESTOPS MICROSOFT FROM ASSERTING EXCEL 5.0 ............................................................... 54

    A.   The policy behind the America Invents Act and this Court's precedents require estoppel to extend to proceedings on remand ........................................... 54

    B.   There is a question of fact about whether Microsoft could have asserted Excel 5.0 in the IPRs and is estopped .............. 56

IV.   THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT OF NON-INFRINGEMENT OF CLAIM 17 ....................................................................... 58

    A.   The district court erred in construing "means for indexing" to exclude disclosed algorithmic structures ........... 59

        1.   This Court should review the district court's construction de novo .................................................... 59

        2.   Enfish urged a construction encompassing multiple algorithmic structures .................................................. 59

        3.   The district court erred in construing "means for indexing" to contain only one structure ........................ 60

        4.   The district court erred by requiring ADO.NET to practice all covered structures ...................................... 64

        5.   This Court should reverse the district court's claim construction and properly construe "means for indexing" ...................................................................... 65

    B.   The district court ignored a factual dispute as to whether ADO.NET "stores" keywords in an index as part of step 2 of the "means for indexing" ................................................. 65

# TABLE OF CONTENTS
(continued)

**Page**

C.    The district court ignored a factual dispute as to whether ADO.NET practices bi-directional pointers as part of Step 3 of the "means for indexing" ........................................ 69

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ................... 71

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014)........................................................................ *passim*

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................ 18

*Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.*,
206 F.3d 1440 (Fed. Cir. 2000) ............................................... 61

*CLS Bank Int'l v. Alice Corp. Pty. Ltd.*,
717 F.3d 1269 (Fed. Cir. 2013) (*en banc*) .............................. 21

*Conroy v. Reebok Int'l, Ltd.*,
14 F.3d 1570 (Fed. Cir. 1994) ..................................................... 70

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) .......................................... *passim*

*Dealertrack, Inc. v. Huber*,
674 F.3d 1315 (Fed. Cir. 2012) .................................................. 65

*Diamond v. Diehr*,
450 U.S. 175 (1981)..................................................................... 27

*Enfish, LLC v. Microsoft Corp.*,
56 F. Supp. 3d 1168 (C.D. Cal. 2014) ...................................... 3

*France Telecom S.A. v. Marvell Semiconductor Inc.*,
39 F. Supp. 3d 1080 (N.D. Cal. 2014)................................. 28, 29

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
721 F.3d 1330 (Fed. Cir. 2013) ................................... 14, 55, 56

*Funk Bros. Seed Co. v. Kalo Inoculant Co.*,
333 U.S. 127 (1948)..................................................................... 27

*Furnace v. Sullivan*,
    705 F.3d 1021 (9th Cir. 2013) ................................................................ 17

*Grober v. Mako Prods., Inc.*,
    686 F.3d 1335 (Fed. Cir. 2012) .............................................................. 17

*Hilgraeve Corp. v. McAfee Assocs., Inc.*,
    224 F.3d 1349 (Fed. Cir. 2000) ........................................................ 18, 67

*Ishida Co. v. Taylor*,
    221 F.3d 1310 (Fed. Cir. 2000) ........................................................ 15, 60

*In re Klopfenstein*,
    380 F.3d 1345 (Fed. Cir. 2004) .............................................................. 58

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    132 S. Ct. 1289 (2012)................................................................... *passim*

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
    344 F.3d 1205 (Fed. Cir. 2003) .............................................................. 41

*Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*,
    248 F.3d 1303 (Fed. Cir. 2001) .............................................................. 46

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
    778 F.3d 1021 (Fed. Cir. 2015) .............................................................. 24

*Research Corp. Techs., Inc. v. Microsoft Corp.*,
    627 F.3d 859 (Fed. Cir. 2010) .................................................................. 9

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015)...................................................................... 18, 59

*Thomas v. Newton Int'l. Enters.*,
    42 F.3d 1266 (9th Cir. 1994) .................................................................. 18

*Ultramercial, Inc. v. Hulu, LLC*,
    722 F.3d 1335 (Fed. Cir. 2013) .............................................................. 19

*Va. Innovation Scis., Inc. v. Samsung Elecs. Co.*,
    983 F. Supp. 2d 713 (E.D.Va. 2014) ...................................................... 54

**Statutes**

28 U.S.C.
    § 1295 ................................................................................... 1
    § 1331 ................................................................................... 1
    § 1338 ................................................................................... 1

35 U.S.C.
    § 101 ........................................................................... *passim*
    § 102(b).............................................................. 3, 12, 14, 57
    § 112 ............................................................................ 3, 16
    § 311(b)........................................................................ 15, 56
    § 315(e)(2) ........................................................ 1, 14, 54, 56
    § 318(a) ........................................................................... 54

**Other Authorities**

157 Cong. Rec. S131 (daily ed. Jan. 25, 2011) ........................... 55

157 Cong. Rec. S1326 (daily ed. Mar. 7, 2011) ......................... 55

*Microsoft Excel Developer's Kit: Version 5 for Microsoft*
    *Windows and Apple Macintosh* ("Excel Developer's Kit") ................... 57

U.S. Patent No. 6,151,604 ................................................... *passim*

U.S. Patent No. 6,163,775 ................................................... *passim*

## STATEMENT OF RELATED CASES

In accordance with Federal Circuit Rule 47.5, counsel for Plaintiff-Appellant Enfish, LLC states:

1.      There are no, nor have there been, any other appeals in or from this same civil action or proceeding in the lower court before this or any other appellate court.

2.      The patents-in-suit are the subject of *inter partes* review in Case Nos. IPR2013-0059, IPR2013-00560, IPR2013-00561, IPR2013-00562, and IPR2013-00563, now pending appeal to this Court. *Microsoft Corp. v. Enfish LLC*, Nos. 15-1734, -1736, -1737, -1738, -1739, -1740, -1741, and -1742.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338. On December 24, 2014, Enfish appealed from the final judgment entered on November 26, 2014. (Joint Appendix ("A") A346-48.) This Court has jurisdiction under 28 U.S.C. § 1295.

## STATEMENT OF THE ISSUES

1.      Did the district court err in granting Defendants' motion for summary judgment of invalidity of claims 17, 31, and 32 of U.S. Patent No. 6,151,604 and claims 31 and 32 of U.S. Patent No. 6,163,775 ("the patents-in-suit") under 35 U.S.C. § 101?

2.      Did the district court err in granting in part Defendants' motion for summary judgment of anticipation of claims 31 and 32 of the patents-in-suit?

3.      Does this case require remand to determine if Microsoft is estopped under 35 U.S.C. § 315(e)(2) from asserting invalidity based on Excel 5.0 against claim 32 of the patents-in-suit?

4.      Did the district court err in construing "means for indexing" in claim 17 of the '604 patent by excluding from its construction certain alternative structures disclosed in the patents-in-suit?

5.      Did the district court err in granting Defendants' motion for summary judgment of non-infringement as to claim 17 of the '604 patent?

1

## STATEMENT OF THE CASE

This appeal involves U.S. Patent Nos. 6,151,604 and 6,163,775. The patents relate to database technology that Enfish developed while building the DEXIS database engine for its award-winning products, Enfish Find, Enfish Tracker, and Enfish Professional. Enfish developed the DEXIS database engine because the then-available database technologies were too inflexible and unable to store the varied types of structured and unstructured data that computer users needed to ENter, FInd and SHare ("Enfish"). *Investor's Business Daily* named Tracker the Best Software of 1998 (A20,021), and Enfish's DEXIS-based products received accolades from others including computing pioneer Gordon Bell and leaders within Microsoft. (A8531-32; A8545-46; A8563; A8751.)

Enfish filed suit on August 28, 2012, accusing products built on Microsoft's ADO.NET "middleware" software that provides data from underlying data sources to application software in a standard format. Enfish asserted claims 1, 2, 16, 17, 31, 32, 46, and 47 of the '604 patent and claims 31, 32, and 47 of the '775 patent. (A3065.)

The district court allowed only limited discovery related to claim construction and then entered a *Markman* order in July 2013. (A262-72.) Without opening discovery, the court scheduled motions for summary judgment on invalidity. It then held that claims 1, 2, and 16 of the '604 patent were invalid

under 35 U.S.C. § 112. (A289-95.) Next, the district court invalidated claims 31, 32, 46, and 47 of the '604 patent and claims 31, 32, and 47 of the '775 patent as anticipated by Microsoft Excel 5.0 under 35 U.S.C. § 102(b). (A273-88.) The district court ordered Defendants to seek summary judgment of invalidity based on 35 U.S.C. § 101 and found all asserted claims unpatentable under 35 U.S.C. § 101. *Enfish, LLC v. Microsoft Corp.*, 56 F. Supp. 3d 1168 (C.D. Cal. 2014). (A309-32.) It also granted summary judgment that ADO.NET does not infringe claim 17 of the '604 patent. (A333-45.) Enfish appeals from the district court's summary judgments of invalidity and non-infringement on claims 17, 31, and 32 of the '604 patent, and claims 31 and 32 of the '775 patent (the "appealed claims").

## I.    STATEMENT OF FACTS

### A.    Enfish's patents-in-suit

Patent No. 6,151,604, titled "Method And Apparatus For Improved Information Storage And Retrieval System," and Patent No. 6,163,775, titled "Method And Apparatus Configured According To A Logical Table Having Cell And Attributes Containing Address Segments" "relate[] generally to a method and apparatus for storing, retrieving, and distributing various kinds of data, and more particularly, to an improved database architecture and method for using the same." (A218, 1:18-21.)

The patents-in-suit share a specification. Discussing the state of the art, the specification notes that "[t]he currently existing database management systems comprise two main types, those that follow the relational model and those that follow the object oriented model." (*Id*. 1:31-40.)

The specification identifies aspects of prior art relational databases that constrained their functionality, including "guidelines for organizing data items, such as data normalization . . . which require that each data item be uniquely classified as a particular instance of a 'relation' " . . . with "each set of relations [] stored in a distinct [i.e., separate] table." (*Id*. 1:42-48.) It also explains that limitations in the relational model placed restrictions on data stored in a Relational Database Management System ("RDBMS"):

> [E]ach data item cannot have attributes other than those columns described for the table. Further, an item cannot point directly to another item. Instead, 'primary keys' (unique identifiers) must be used to reference other items. Typically, these restrictions cause RDBMS databases to include a large number of tables that require a relatively large amount of time to search. Further, the number of tables occupies a large amount of computer memory.

(*Id*. 1:51-60.) The specification recounts similar limitations in object-oriented databases: "[t]he object oriented database model, derived from the object-oriented programming model, is an alternative to the relational model. Like the relational model, each data item must be classified uniquely as belonging to a single class, which defines its attributes." (*Id*. 1:61-65.)

The Background of the Invention describes the benefits of the claimed hybrid database structure: "The present invention overcomes the limitations of both the relational database model and object oriented database model by providing <u>a database with increased flexibility, faster search times and smaller memory requirements and that supports text attributes</u>. Further, the <u>database of the present invention does not require a programmer to preconfigure a structure to which a user must adapt data entry</u>." (*Id*. 2:23-29 (emphasis added).)

"The present invention improves upon prior art information search and retrieval systems by employing a flexible, self-referential table to store data. The table of the present invention may store any type of data, both structured and unstructured, and provides an interface to other application programs such as word processors that allows for integration of all the data for such application programs into a single database." (*Id*. 2:44-51.)

"The table of the present invention comprises a plurality of rows and columns. . . . <u>To enhance searching and to provide for synchronization between columns, columns are entered as rows in the table and the record corresponding to a column contains various information about the column. This renders the table self referential and provides numerous advantages</u>." (*Id*. 2:53-65 (emphasis added).)

"FIG. 3 illustrates the table structure of the database of the present invention." (A219, 3:30-31 (reproduced from Defendants' annotated tutorial and emphasizing the single-table, self-referential structure).)



(A20,360.)

Claim 31 of the '604 patent recites:

31. A method for storing and retrieving data in a computer memory, comprising the steps of:

configuring said memory according to a logical table, said logical table including:

a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information;

a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column; and wherein

at least one of said logical rows has an OID equal to the OID to a corresponding one of said logical columns, and at least one of said logical rows includes logical column information defining each of said logical columns.

For the issues in this appeal, this claim is representative of claim 31 of the '775 patent.

Claim 17 of the '604 patent is the other independent claim:

17. A data storage and retrieval system for a computer memory, comprising:

means for configuring said memory according to a logical table, said logical table including:

a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information;

a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column; and means for indexing data stored in said table.

Claim 32 of each patent-in-suit adds the requirement that a column within the table must contain information for enabling determination of object identification numbers ("OIDs") from text entry.

## B.    The district court's claim construction order

The district court construed these terms:

**"Logical table"**: "a table with a data structure that is logical as opposed to physical, and therefore does not need to be stored contiguously in memory." (A266.)

**"Logical column information defining"** or **"attribute set information defining"**: "at least one row with values defined for each column." (A268.)

**"Object identification number"**: "a unique array of bits assigned to each row and each column in the logical table. The bit length (the number of bits used) is constant throughout a single database but may vary between databases." (*Id.*)

**"[means for] configuring said memory according to a logical table"**: "configuring said memory according to a logical table. Exhibit 19 and equivalents thereof." (A270.)

**"[means for] indexing data stored in said table"**: "indexing data stored in said table. Exhibit 21 and equivalents thereof." (A266.)

## SUMMARY OF THE ARGUMENT

## I.    INVALIDITY

### A.    Section 101 of the Patent Act

The district court erred in ruling that the database system claimed in the '604 and '775 patents is directed to a patent-ineligible abstract idea. The appealed claims cover a tangible computer-implemented invention (a single-table, self-

8

referential database) that improves the functioning of computers by providing a database with (1) increased flexibility, (2) faster search times, (3) smaller memory requirements, and (4) that does not require a programmer to preconfigure a structure to which a user must adapt data entry. (A218, 2:23-29.) The Supreme Court and this Court recognize that patent claims that "improve the functioning of the computer itself," or "effect an improvement in any other technology or technical field" rarely fall afoul of § 101 for abstractness. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2359 (2014); *Research Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010) ("[I]nventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract that they override the statutory language and framework of the Patent Act.").

The district court erred by characterizing the claimed invention in an overly simplistic manner that is inconsistent with the patent disclosure, the district court's own claim construction, and the undisputed facts. The district court found that "the claims are addressed to the abstract purpose of storing, organizing, and retrieving memory in a logical table." (A345.) Then it generalized more: "[i]n essence, the claims capture the ***concept*** of organizing information using tabular formats." (*Id.*) The district court's characterizations bear no resemblance to what the patents actually claim.

Defendants acknowledged and the district court repeatedly observed that the database system claimed in the '604 and '775 patents comprises a <u>self-referential, single-table</u> database. (A200, Abstract; A11,314 ("According to the patents, '[t]he [alleged] invention improves upon prior art information search and retrieval systems by employing a flexible, self-referential table to store data.'"); (A334 ("The patents improve upon prior art by employing a flexible, self-referential table to store data.").) Defendants emphasized that the claimed invention is "a self-referential table" in their technology tutorial:



(A20,360.) The improvements in computer functioning covered by the appealed claims are undisputed.

The claimed single-table, self-referential database has a particular structure that makes the database self-referential. The specification explains how it works: "The table of the present invention comprises a plurality of rows and columns. Each row has an object identification number (OID) and each column also has an OID. A row corresponds to a record and a column corresponds to an attribute such that the intersection of a row and a column comprises a cell that may contain data for a particular record related to a particular attribute. . . . <u>To enhance searching and to provide for synchronization between columns, columns are entered as rows in the table and the record corresponding to a column contains various information about the column</u>. This renders the table self referential and provides numerous advantages, as will be discussed in this Specification." (A218, 2:53-65 (emphasis added).)

The appealed claims satisfy § 101's eligibility requirements because they do not preempt an abstract idea. They cover a concrete database structure for storing information in computer memory that overcame specific problems in prior art databases—thereby "improve[ing] the functioning of the computer itself." *Alice*, 134 S. Ct. at 2359; *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014) ("[T]he claimed solution is necessarily rooted in computer technology . . . to overcome a problem specifically arising in the realm of computer networks.").

11

Even if this Court accepts the district court's erroneous characterization of the invention (i.e., "the **concept** of organizing information using tabular formats"), reversal is still warranted. The claimed single-table, self-referential database is an inventive concept that amounts to "significantly more" than "organizing information using tabular formats." (A321.)

There is no risk that the specific structures covered by the appealed claims would preempt the field of computer database technology. This fact is underscored by Defendants' failure to even argue the issue of preemption and the absence of evidentiary support for the court's preemption finding.

## B.    Anticipation under 35 U.S.C. § 102(b) by Excel 5.0

The district court erred in granting summary judgment that Excel 5.0 anticipates claims 31 and 32 of the patents-in-suit. The court erred by failing to acknowledge three different, independent disputes of material fact:

(1) Whether Excel's "pivot table" feature discloses OID equality within the *same, single* table;

(2) Whether a pivot table discloses a logical row that "has an OID equal to the OID of a *corresponding* one of said logical columns"; and

(3) Whether column names in Excel 5.0 "define" a column.

Any one of these disputes is sufficient to warrant reversal.

Contrary to well-settled law, the district court in granting summary judgment ignored Enfish's evidence. The district court's order regarding claims 31 and 32 lacks *any* reference to Enfish's expert testimony, the facts he presented, or to Enfish's statement of disputed facts. The court refers only to Defendants' Statement of Facts. (A283:23-84:10.)

Enfish moved the district court to reconsider its grant of summary judgment based on the disputes identified as (1) and (3) above. In denying reconsideration, the district court concluded that "Enfish's expert failed to provide an analysis of Excel 5.0 in light of the Court's [claim construction] ruling." (A305 n.1.) The district court <u>still</u> failed to address the factual disputes raised by Enfish. And the district court's comment regarding claim construction was incorrect; the district court did not construe the specific terms on which the disputes focused ("table," "corresponding," and "defining").

The summary judgment briefing raised classic disputes where the differences in opinion between experts should have precluded summary judgment. *Hilgraeve Corp. v. McAfee Assocs., Inc.*, 224 F.3d 1349, 1352 (Fed. Cir. 2000) (conflicting expert opinions left a material issue of fact). These disputes are especially relevant here, where the testimony of Enfish's database expert, Dr. H.V. Jagadish, drew heavily on factual evidence and provided significant analysis of that evidence. Dr. Jagadish is the Galler Collegiate Professor of Electrical

Engineering and Computer Science at the University of Michigan and director of its software systems laboratory. Dr. Jagadish is the world's most published author in Very Large Database research, a Fellow of the Association for Computing Machinery, and the former Director of Database Research at AT&T Labs. (A8812-16.)

## II.    ESTOPPEL UNDER 35 U.S.C. § 315(E)(2)

Microsoft asserted invalidity of claim 32 of both patents-in-suit based on Excel 5.0 under 35 U.S.C. § 102(b). (A6953.) Microsoft also filed <u>nine</u> petitions for *inter partes* review (IPR) of the patents-in-suit. The Patent Trial and Appeal Board instituted review of both patents in five IPRs. The final written decisions found claim 32 of both patents, as well as other claims, valid. (A22,185-231, A22,232-83). Microsoft's requests for rehearing on claim 32 were denied. (A22,284-9, A22,292-99.) The final written decisions estop Microsoft from re-litigating grounds it could have asserted in the IPRs. 35 U.S.C. § 315(e)(2). The final written decisions came after the district court judgment but still trump that judgment. *Fresenius USA, Inc. v. Baxter Int'l, Inc*., 721 F.3d 1330, 1343 (Fed. Cir. 2013).

Microsoft asserted Excel 5.0 as grounds for invalidity using printed publications and other evidence under 35 U.S.C. 102(b). If it reasonably could have presented Excel 5.0 using only printed publications, it is estopped from

14

asserting Excel 5.0 as grounds for invalidity in this case. 35 U.S.C. § 315(e)(2). On this record, there are factual questions about whether Microsoft could have reasonably raised Excel 5.0 through printed publications alone. 35 U.S.C. § 311(b). This Court should remand this case for the district court to determine whether Microsoft reasonably could have raised Excel 5.0 in the IPR proceedings as a ground for invalidating claim 32 in each patent. If so, estoppel applies.

## III.    NON-INFRINGEMENT

The district court found that ADO.NET does not infringe claim 17 of the '604 patent because ADO.NET does not perform what the court called algorithmic Step 2 ("storing key words") and Step 3 ("bi-directional pointers")[1] of the "means for indexing" limitation. The district court erred for three reasons.

First, the district court erred in construing "means for indexing" as encompassing a single algorithmic structure that requires "bi-directional pointers" that ADO.NET allegedly lacks. Where—as here—a patent's specification identifies multiple structures that independently perform the recited function of a means-plus-function claim, 35 U.S.C. § 112(f) encompasses all of the structures. *Ishida Co. v. Taylor*, 221 F.3d 1310, 1316 (Fed. Cir. 2000). Disregarding this

---

[1] Step 3 also includes a single-direction pointer requirement not at issue here. Pointers are references from one software object to another. When both objects reference (point to) each other, the pointers are bidirectional. (*See, e.g.*, A10,629.)

precedent, the district court held that the "means for indexing" limitation required "bi-directional pointers" in every embodiment.

Enfish's expert explained that the bi-directional portion of algorithmic Step 3 was relevant only to certain 'alternative' embodiments, and thus not present in all of the § 112(f) structures for the means for indexing. (A10,589-91, ¶ 33 (citing A222, 9:38-44).) Defendants' expert did not dispute this fact, but the district court disregarded Enfish's unrebutted evidence.

Enfish also submitted a declaration from co-inventor Scott Wlaschin, who authored the DEXIS source code filed with the patents. That code was submitted with the claim-construction briefing and it discloses some of the § 112(f) structures. Mr. Wlaschin testified that the indexing embodiments disclosed in that code did not require the bi-directional pointers of Step 3. (A10,939 ¶ 7.) The district court disregarded this unrebutted evidence too.

Second, the district court compounded its error by requiring ADO.NET to practice *all* of the alternative structures disclosed in the patent as "means for indexing." This was error. To infringe, "the accused product need not contain equivalent structure to all the algorithms disclosed in [the patent], but only equivalent structure to *at least one* of the distinct and alternative structures for performing the claimed function." *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1330 (Fed. Cir. 2012).

16

Third, the district court ignored genuine disputes of material fact regarding whether ADO.NET practices Steps 2 and 3 of the "means for indexing." The first dispute was whether, to a person of skill in the art (POSITA), ADO.NET "stores" key words in an index as required for Step 2. Enfish's expert presented evidence that ADO.NET uses a storage method common to object-oriented programs ("storage by reference") that meets the "storing" limitation. (A10,630-35.) Defendants argued ADO.NET does not meet the limitation but cited no evidence. (A11,264-66.)

The second dispute was whether ADO.NET performed Step 3, which requires "bi-directional pointers." Under a proper construction, ADO.NET need not use bi-directional pointers to infringe. Even so, Enfish's expert showed that ADO.NET's use of pointer chains meets the limitation of Step 3, both literally and by equivalents, even if "bi-directional pointers" are required. (A10,624-30.)

## ARGUMENT

## I.  STANDARDS OF REVIEW

### A.  Summary judgment

This Court reviews a grant of summary judgment under the law of the regional circuit. *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1344 (Fed. Cir. 2012). The Ninth Circuit reviews a grant of summary judgment *de novo. Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013).

"In deciding a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Disagreements between experts can create genuine issues of material fact that warrant denial of summary judgment. *Hilgraeve*, 224 F.3d at 1352. In *Hilgraeve*, experts disputed the operation of an accused product. The district court relied on the moving party's expert description of the accused product's operation and granted summary judgment. This Court reversed because "the conflicting allegations of experts leaves material factual questions unanswered." *Id.*; *Thomas v. Newton Int'l. Enters.*, 42 F.3d 1266, 1270 (9th Cir. 1994) ("Expert opinion evidence is itself sufficient to create a genuine issue of disputed fact.").

### B.    Claim construction

This Court reviews a district court's factual findings regarding claim construction for clear error. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). "Nonetheless, the ultimate question of construction [remains] a legal question." *Id.* at 842. Here, the trial court relied on intrinsic evidence only and the Court reviews claim construction *de novo. Id.* at 841.

### C.    Patent eligibility under § 101

This Court reviews determinations of patent eligibility under 35 U.S.C. § 101 *de novo. DDR*, 773 F.3d at 1255.

## II.    THE CLAIMS COVER PATENT-ELIGIBLE SUBJECT MATTER

### A.    The district court erred by granting summary judgment of invalidity under § 101

It is undisputed that the appealed claims of the patents-in-suit, which claim systems and methods for storing and retrieving data in a computer memory, fall within the categories for patent eligibility recited by § 101.

#### 1.    Legal standard for § 101

##### a.    Patent-eligible subject matter

"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. "[L]aws of nature, natural phenomena, and abstract ideas are not patentable." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012).

##### b.    Burden of proof

The district court applied the "clear and convincing" burden of proof in its § 101 analysis but expressed "misgivings about the [clear and convincing] standard's relevance to § 101." (A311 n.3.) It noted that the Supreme Court vacated *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1339 (Fed. Cir. 2013), which held that the clear and convincing standard applied to § 101 inquiries. (*Id.*) Enfish had cited *Ultramercial* and argued that the clear and convincing standard

applies to § 101 inquiries. (A11,380.) Defendants did not address burdens of proof,

waiving the right to dispute the "clear and convincing" standard on appeal.

### c.    The *Alice* decision

The Supreme Court clarified the test for the subject matter eligibility of

claims under 35 U.S.C. § 101 in *Mayo*. In *Alice*, the Court summarized the *Mayo*

standard: "[f]irst, we determine whether the claims at issue are directed to one of

those patent-ineligible concepts. If so, we then ask, 'what else is there in the claims

before us?' To answer that question, we consider the elements of each claim both

individually and 'as an ordered combination' to determine whether the additional

elements 'transform the nature of the claim' into a patent-eligible application."

*Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1297-98).

While *Alice* did not attempt to define a patent-ineligible abstract idea, it

provided examples of the subject matter of claims that are often ineligible. *Alice*,

134 S. Ct. at 2355-58. But the Supreme Court indicated that patent claims satisfy

§ 101's requirements if they "improve the functioning of the computer itself," or

"effect an improvement in any other technology or technical field." *Id*. at 2359.

This Court recently held in *DDR* that patent claims satisfied § 101 because "the

claimed solution is necessarily rooted in computer technology in order to overcome

a problem specifically arising in the realm of computer networks." 773 F.3d at

1257.

### 2. The appealed claims are not directed to abstract ideas

As the Federal Circuit summarized in its *en banc* plurality decision in *CLS Bank*, the "preliminary question in applying the exceptions to [§ 101] is whether the claim raises § 101 abstractness concerns at all. Does the claim pose any risk of preempting an abstract idea? In most cases, the answer plainly will be no." *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1282 (Fed. Cir. 2013) (*en banc*), *aff'd* 134 S. Ct. 2347 (2014). The answer to this threshold question is "no" here.

The essence of the claimed invention is a <u>single-table, self-referential database</u>. Defendants' technology tutorial acknowledged the data structures that render the claimed invention self-referential. The two graphics below illustrate how the claimed invention, <u>which stores metadata defining columns in rows in the same single-table database that includes user data</u>, differed from prior art databases (shown first), which stored metadata defining columns *separately* from user data in other tables:



(A20,357-58.)

Defendants annotated Figure 3 to highlight how entering column-defining information in rows enables the table to reference itself, literally making the claimed database "self-referential":



(A20,360.) As the patent disclosure and these illustrations demonstrate, the appealed claims are directed to a specific table structure that "may store any type of data, both structured and unstructured," that "overcomes the limitations of both the relational database model and object oriented database model by providing a database with increased flexibility, faster search times, and smaller memory requirements and that supports text attributes." (A218, 2:23-29 and 2:46-48.) The improvements in computer functioning covered by the appealed claims are undisputed.

The specification uses unequivocal language to describe "the invention," unmistakably conveying that the appealed claims cover only a specific database structure. The Abstract begins, "[t]he information management and database system of the present invention comprises a flexible, self-referential table that stores data." (A200, Abstract (emphasis added).) The Summary of the Invention reiterates that "[t]he present invention improves upon prior art information search and retrieval systems by employing a flexible, self-referential table to store data." (A218, 2:44-46 (emphasis added).) These statements unmistakably limit the claimed invention. *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1024-25 (Fed. Cir. 2015) ("When a patentee describes the features of the present invention as a whole, he alerts the reader that this description limits the scope of the invention.").

The patents are similarly direct regarding the structure that makes the claimed single-table database "self-referential." This structure is introduced in the Summary of the Invention: "[t]o enhance searching and to provide for synchronization between columns, columns are entered as rows in the table and the record [row] corresponding to a column contains various information about the column. This renders the table self referential . . ." (A218, 2:60-64.) The Detailed Description of the Invention provides an even fuller explanation:

> Each column has an associated column definition, which determines the properties of the column, such as the domain of the column, the name of

the column, whether the column is required and other properties that may relate to a column. . . . The column definition is stored as a record in the table 100 of Fig. 3. For example, the 'Employed By' column 126 has a corresponding row 136. The addition of rows that correspond to columns renders the table 100 self-referential. New columns may be easily appended to the table 100 by creating a new column definition record.

(A221, 7:10-23.)

The appealed claims incorporate the self-referential structures described above. In addition to the unmistakable characterizations of "the present invention" in the specification, the claims expressly recite limitations that create self-referentiality. In claim 17 of the '604 patent, the algorithms include structure for rendering the table self-referential, including:

"2: Assign each row and column an object identification number (OID) that, when stored as data, can act as a pointer to the associated row or column and that can be of variable length between databases," and

"3: For each column, store information about that column in one or more rows, rendering the table self-referential, the appending, to the logical table, of new columns that are available for immediate use being possible through the creation of new column definition records." (A272, citing A2540-49, A2550-70.) Similarly, claim 31 of the patents-in-suit requires "at least one of said logical rows has an OID equal to the OID to a corresponding one of said logical columns." (A229, 23:27-28.) The district court previously recognized the effect of this limitation in

25

its claim construction order, noting that the limitation "renders the claimed 'logical table' self-referential." (A266 n.2.)

In light of the disclosures of the structure and benefits of the appealed claims, this Court should hold that the claims satisfy § 101's requirements. They "effect an improvement in [the database technology] . . . field" and improved the functioning of computers by providing a database with (1) increased flexibility, (2) faster search times, (3) smaller memory requirements, and (4) that does not require a programmer to preconfigure a structure to which a user must adapt data entry. *Alice*, 134 S.Ct. at 2359; (A218, 2:23-29). As in *DDR*, the appealed patent claims satisfy § 101 because "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer [databases]." 773 F.3d at 1257.

### 3. The district court's characterization of the patents was too broad

The district court overlooked the specific structure and benefits of the claimed invention and overbroadly characterized the claims as relating to "the *concept* of organizing information using tabular formats." (A321.) This characterization is inconsistent with the patent disclosure and the court's claim constructions, which acknowledged that the claimed invention relates to a self-referential table. (A266 n.2.)

"Any claim can be stripped down, simplified, generalized, or paraphrased to remove all of its concrete limitations, until at its core, something that could be characterized as an abstract idea is revealed. Such an approach would 'if carried to its extreme, make all inventions unpatentable because all inventions can be reduced to underlying principles of nature which, once known, make their implementation obvious.'" *CLS Bank*, 717 F.3d at 1298 (quoting *Diamond v. Diehr*, 450 U.S. 175, 189 n.12 (1981)). The district court took this path and concluded that Enfish's claims preempt "the pervasive concept of tables." (A321.) It found preemption where none existed by defining the claimed invention to encompass vast swaths of prior art, including the flat file, relational, and object-oriented database architectures that Enfish distinguished in the Background of the Invention. (A218, 1:30-2:15.) The district court's preemption finding lacks any evidentiary basis. <u>The Defendants did not even assert that Enfish's claims pose preemption risk</u>.

### 4. There is no risk of preemption

The sole justification for judicially created exceptions to § 101 is that patent claims should not preempt the fundamental tools of discovery that must remain "free to all . . . and reserved exclusively to none." *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948). There is no risk of preemption here. The self-referential, single-table database recited in the appealed claims is a specific

data structure that is patentably distinct from pure relational and object-oriented databases, which were, and are, the "two main types" of database management systems. (A218, 1:38.)

The appealed claims are analogous to the error-correction coding claims that the Northern District of California considered in a § 101 analysis. *France Telecom S.A. v. Marvell Semiconductor Inc.*, 39 F. Supp. 3d 1080, 1092 (N.D. Cal. 2014). That court concluded: "[t]hese claims will not preempt all applications of an abstract idea. They are limited to one method for 'error-correction coding of source digital data elements' . . . . [defendant] has provided no evidence that the steps recited are inherent in error-detection coding or decoding." *Id*. The same conclusion is warranted here. Defendants provided no evidence that the structures of the appealed claims are inherent in database architectures and did not even argue preemption.

### 5.    "Logical table" does not make the inventions abstract

The district court concluded that using "logical table" to describe the claimed invention "demonstrates abstractness." (A321.) That finding is contradicted by the court's claim construction, which requires a physical structure. The Court construed "logical table," to be "a table with a data structure that is logical as opposed to physical, and ***therefore does not need to be stored contiguously in memory***." (A266 (emphasis added).) The district court's

28

construction reflects the specification, which uses the term "logical" to explain that, when a data structure is stored in memory, not every bit of data must be stored contiguously. *Id*. The district court's fact findings based on its own research reinforce that Enfish used "logical table" as a term of art for non-contiguous data storage—not to preempt the field. (A323.)

### 6.    Precedents by the Supreme Court and this Court show the appealed claims are not abstract

In *DDR*, this Court collected examples of certain principles that help delimit the contours of the "abstract ideas" category, including that "mathematical algorithms, including those executed on a generic computer, are abstract ideas," and so are "fundamental economic and conventional business practices." *DDR*, 773 F.3d at 1256. The Enfish patent claims do not fall into any of the categories identified in *DDR*. Despite a lengthy search, counsel for Enfish was unable to find a single reported case in which any court or administrative agency (including the Patent Office) has found claims drawn to computer database structures akin to Enfish's invention to be invalid under § 101. For example, the patents ruled invalid in the following cases cited by Defendants were directed at business methods and only incidentally recited generic database or data storage limitations. *Data Distribution Techs., Inc., v. Brer Affiliates, Inc*., 12-4878, 2014 WL 4162765, at *2 (D.N.J. Aug. 19, 2014); *Cyberphone Sys., LLC v. Cellco P'ship*, 885 F. Supp. 2d 710, 712-13 (D. Del. 2012).

Finding patent claims covering concrete improvements in computer database architecture to be unpatentable under § 101 would negatively impact the computing industry. In its *amicus* brief to the Supreme Court in *Alice*, Microsoft recounted the major contributions true computer-implemented inventions have made to our society and argued that it is vitally important that the Patent Act continue to provide incentives for innovation in computer technology. Microsoft's arguments underscore why reversal is appropriate and consistent with the policies underlying § 101. (A11,382-84, A11,469-514.)

### 7.    The district court erred by finding the claimed inventions "conventional"

In *Mayo* step 2, the district court erred again by concluding that the claimed single-table, self-referential database was wholly "conventional." Even if this Court adopts the district court's characterization of the claimed inventions (which Enfish disputes), it should still find the appealed claims patent-eligible. According to the district court, "the claims capture the ***concept*** of organizing information using tabular formats." (A321.) This characterization is flawed for the reasons explained above. But if it is adopted, the Court should account for the novelty of the self-referential, single-table structure that is actually claimed, and credit it as an "inventive concept—an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon

the [ineligible concept] itself'." *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1294).

No evidence supports the district court's finding that the claimed single-table, self-referential database structure was or is "conventional." "Conventional" means "generally accepted" or "prevalent." There is no evidence in the record showing that single-table, self-referential databases with the structures recited in the appealed claims were known or used prior to Enfish's invention date. The district court undertook independent research to invalidate Enfish's claims and still found none. (A320-23.)

The district court concluded that the appealed claims are "conventional" by equating a "hand-drawn" table containing a "header" row to the claimed "self-referential" computer database. (A325-26.) That conclusion was technically flawed and lacked evidentiary support.

The patent disclosure describes a specific structure that makes the claimed single-table database self-referential to a computer. Annotated Figure 3 shown in Argument § II.A.7 above at 23 illustrates this structure, and the patent specification explains it in detail. (A203, Fig. 3; A218, 2:53-65; and A221, 7:10-22.) The district court confused this structure (which produces self-referentiality by creating internal references to column-defining information within the single-table database) with a separate limitation appearing in claim 31 of the '604 and '775

31

patents. That limitation reads: "at least one of said logical rows includes logical column information defining each of said logical rows." (A229, claim 31.) This second limitation refers to a table structure that could be a "header" row, and that, as depicted in Figure 3, may play a role in the assignment of column labels or OIDs. But it does not by itself render the table "self-referential." The district court's conclusion otherwise is factually unsupported and technically inaccurate.

Second, the district court's analysis overlooked that the appealed claims recite systems and methods "for storing and retrieving data in a computer memory," (A229, claim 31), and "the operations are machine operations." (A219, 4:46-49.) The court's analysis reflects how a human benefited by education and a human brain might interpret a header row in a hand-drawn table, but that analysis is irrelevant to the § 101 inquiry. The claimed invention covers structures for improving the operation of computers. The simplistic tables referenced by Defendants and the district court would be non-functional in a computer. (A11,309-34, A11,358-64, A11,365-68, A325.)

### 8.    The appealed claims satisfy § 101

The appealed claims do not "consist of well-understood, routine, conventional activity already engaged in by the scientific community; [which,] when viewed as a whole, add[s] nothing significant beyond the sum of their parts taken separately." *Mayo*, 132 S. Ct. at 1298. Instead, the claims recite a particular

single-table, self-referential database structure that overcame the limitations of rigid prior art database structures and allowed the database to be revised or expanded on the fly and to store any type of data, structured or unstructured, without the time or cost of taking the database offline to allow a database architect to modify it. The claims do not simply recite an abstract idea and say "apply it." (A218, 2:23-29.)

In a very real sense, the claims of the patents-in-suit embody Enfish's raison d'être—creating a database that would make it easier for people to ENter, FInd, and SHare data. The specification and claims of the patents-in-suit recite concrete structures for configuring computer memory to achieve that result, and those data structures have real-world benefits. This Court should reverse the district court and hold that the appealed claims are not directed to a patent-ineligible abstract idea.

**B.    The district court erred in granting summary judgment of anticipation of claims 31 and 32**

    **1.    The district court erred by ignoring the factual dispute whether Excel 5.0's pivot table and the data table on which it is based are the same "logical table"**

Claim 31 (and dependent claim 32) of both patents-in-suit[2] include what the parties identified as the "OID [object identifier] equality" limitation. (*E.g.*, A9493:8-20.) This limitation is:

> wherein at least one of said logical rows has an OID equal to the OID of a corresponding one of said logical columns.

    **a.    Claims 31 and 32 require OID equality within a single table**

Claims 31 and 32 of the patents-in-suit require that the OID equality limitation be met within a *single* table. Claim 31 of the '604 patent recites (emphasis added):

> 31. A method…comprising the steps of:
>
> configuring said memory according to ***a*** logical table, ***said*** logical table including:
>
> a plurality of logical rows . . .
> a plurality of logical columns . . .

---

[2] For purposes of this section, Enfish refers only to the claim terms of the '604 patent. For purposes of this appeal, the analysis for the '604 patent is applicable to the '775 patent.

. . . wherein at least one of said logical rows has an OID equal to the OID of a corresponding one of said logical columns.

Enfish emphasized this "single table requirement" in its Motion for Reconsideration, and Defendants did not dispute it. (A9470:22-24; A9493:6-17.) Defendants acknowledged that the invention addresses a single table. (A508:14-20 ("the specification explains how the single logical table of the alleged invention is 'self-referential'. . . The table is self-referential because the table's columns are defined by rows in the same table.")) [3]

The district court's construction for "logical table" does not affect the single-table requirement. The court construed "logical table" as "a table with a data structure that is logical as opposed to physical, and therefore does not need to be stored contiguously in memory." (A271.) Thus, the requirement for a single *logical* table also requires a single table. Enfish's expert used the court's construction in his analysis. (A8765 ¶ 16.)

---

[3] In its claim-construction order, the district court noted that the "logical table" is inherently self-referential as a result of claim elements such as "at least one of said logical rows has an OID equal to the OID of a corresponding one of said logical columns." (A266 n.2).

35

**b.    The district court's decision relied on a "pivot table" meeting the single-table requirement of claims 31 and 32**

The first factual dispute is whether the sole Excel feature on which the district court's decision relied for the OID equality limitation is disclosed within a single table. That feature is Excel's "pivot table." (A283:27-A284:4.) The six lines comprising the district court's conclusion for this issue rely solely on Defendants' Statement of Facts ("SOF") ¶ 65, which alleged that Excel's pivot table disclosed the OID equality limitation. Defendants' SOF stated that pivot tables contained a column created from the "information entered in a row on the same or a different spreadsheet," resulting in a row and a column with allegedly 'equal' OIDs. (A284.) SOF ¶ 65 relied on an example by Defendants' expert, Dr. Gray:



(A7256-57 ¶ 110-111; annotation added.) Dr. Gray opined that the "pivot table appears in the first eight rows and the remaining rows are the data that was used to

create the pivot table." (*Id.*) Based on Dr. Gray's opinion, Defendants asserted that the pivot table satisfied the OID equality limitation. (A6934:2-5.)

The district court concluded that Excel disclosed the limitation because a column name in the pivot table (e.g., "Dairy") was an OID that was 'equal' to the same-named label of a row of the data table below the pivot table. (A283:27-A284:4.) Consequently, the court ruled that Excel anticipated claims 31 and 32. (*Id.*)

Enfish, however, presented evidence establishing a dispute of material fact as to whether a pivot table satisfied the OID equality limitation. Specifically, the dispute was whether a pivot table was part of the same, single table on whose data the pivot table was based.

> **c.    Enfish presented facts showing that the pivot table is a separate logical table from the data on which the pivot table is based**

Enfish's expert, Dr. Jagadish, explained that the pivot table is a separate table from any other tables, and thus does not meet the OID equality limitation. (A8794-95 ¶¶ 68–69; A8806-09 ¶¶ 85–89; A8519.) He grounded his opinion on Excel documentation, which characterized the pivot table as separate from the table on which the pivot table is based:



(A8794-95 ¶ 68 (citing A8904); annotation added.)

Dr. Jagadish testified that Dr. Gray's example created the respective column and row labels (on which the court relied for OID equality) in different tables. (A8806 ¶ 86.) Dr. Jagadish provided an annotated version of the same example used by Dr. Gray (*id*.):



Dr. Jagadish explained that the columns (on which the court's opinion relied) were "created in a **separate** table." (*Id*.) Confirming this, Defendants' expert acknowledged that to create his pivot table, he manually placed the pivot table and

data together into the same spreadsheet to create the superficial appearance of a single table. (A7256-57 ¶ 110 ("the link to the data was <u>not functioning</u>, and so I copied the data that appeared to be the source for the pivot table into the same sheet.") (emphasis added).)

Dr. Jagadish also consulted Microsoft documentation and reported that it described a pivot table as "providing a summarized view of data in <u>another</u> table, not as the type of self-referential table that the Asserted Claims are directed at." (A8794-95 ¶ 68 (citing A7627; emphasis added).

Based on his own analysis and testing and Microsoft's documentation, Dr. Jagadish concluded that the pivot table in memory is a separate logical table from the data table, regardless of whether the tables are copied into the same spreadsheet on screen. (A8794-95 ¶ 68.) To confirm his opinion, Dr. Jagadish cited The Excel User's Guide, which describes the pivot table as having redundant cell number ranges from the data table (A8806-07 ¶¶ 86-87):



The separate cell ranges (1-127 in the top table and 1-7 in the lower table) prove that the pivot table and the data table are two separate tables, not the single table required by the claims. (A8794-95 ¶¶ 68-69, A8806-07 ¶¶ 85-89.) As such, a "PHOSITA would not understand [the pivot and data tables] to be a single table." (A8807 ¶ 87.)

Finally, Dr. Gray could not say that Excel's pivot and data tables are a single table and admitted that they could be fairly characterized as two tables (emphasis added):

> Q. So you don't have a position one way or the other as to exactly what portions of the figure on page 52 are "logical tables"?

> A. So I would say that—that—the row—between <u>rows 4 and 9 up through column 5 could be seen as a table.</u> Columns 11—I mean <u>row 11 through 70—column 7 could also be seen as a table.</u> So I'm not quite sure—<u>but I'm not sure if the combination is a table</u>—a logical table as used by the patent or not.

(A20,628-29.) The district court did not acknowledge any of this contradictory evidence. (A284:2-4.)

### d.    The district court erred by failing to accept as true Enfish's facts regarding the operation of pivot tables

The district court did not acknowledge that Enfish and its expert disputed (and disproved) that a pivot table and its underlying data are part of the same table, or even that Defendants' expert retreated from his opinions. (A8519.)

In denying Enfish's Motion for Reconsideration, the district court concluded that Enfish's expert disputed the court's claim construction, not the "facts offered by Defendants as stated by the Court." (A305:7-17.) The court was mistaken. Dr. Jagadish applied the facts to the district court's construction of "logical table," and using that construction, presented facts showing that the Excel features on which Defendants and the district court relied do not meet the claims' requirement of a single table.[4] The district court did not identify what portion of the claim construction Enfish and its expert allegedly disputed.

Based on this dispute of material fact alone, this Court should reverse the summary judgment of anticipation of claims 31 and 32 in the '604 and '775 patents. "The question of what a reference teaches and whether it describes every element of a claim is a question for the finder of fact." *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1221 (Fed. Cir. 2003) (reversing grant of summary judgment of no invalidity).

---

[4] Defendants, on the other hand, argued the singularity of the pivot and data tables by referencing a "matrix of cells," a phrase that they had proposed (and the court rejected), and which is not part of the district court's construction of "logical table." (A9493.)

41

**2.    The district court erred by ignoring a factual dispute regarding whether a column name alone is information "defining" a column**

Claims 31 and 32 recite "at least one of said logical rows includes *logical column information defining* each of said logical columns." The district court erred by failing to credit Enfish's evidence that an Excel column name alone is not "column defining" information. Defendants framed this dispute as an attempt to reconstrue the Court's claim construction. (A9489:17-18.) But the district court did not construe what is required to "define" a column, and Enfish provided evidence that—to the POSITA—more than a column name is required.

**a.    The district court did not construe what information is required to "define" a column**

The district court ruled that "logical column information defining" meant "at least one row with values defined for each column." (A271.) As to this limitation, the court's construction resolved whether a *single* row must have values (information) defining *all* of the columns, or whether that column-defining information can be spread through multiple rows with each row having column-defining information for just one column. (A267.) The district court concluded the former interpretation was correct, and held that the limitation "requires that at least one row contain column defining information." (*Id.*; A284:5-6.)

**b.    The district court's decision relied solely on Excel's column names as disclosing the "information defining each of said logical columns" of claims 31 and 32**

The grant of summary judgment rested solely on Defendants' SOF ¶¶ 63 and 64. Those SOFs alleged that Excel tables include a header row containing "column names that defined the type of data entered in each column." (A284:5-10.) Because the district court failed to credit Enfish's facts showing that Excel column names—without more—do not define columns in a database within the meaning of the patents, it concluded that column names were "column defining information."

**c.    Enfish presented facts showing that Excel's column names are not values that "define" a column**

Enfish provided evidence from Dr. Jagadish that the POSITA would understand that a column name, by itself, does not define a column. Instead, defining a column "requires information about the properties of the column such as the type of data it contains, the length of the values in the column, and/or whether cells in the column can be null, and possibly other properties." (A8796 ¶ 71.) He explained that "[c]olumn names in a header are not 'column defining information' because they at most identify—not define—columns." (A8807-08 ¶ 89.) At best, a column name "performs a descriptive role, and likely only a partial role at that." (A8798 ¶ 74.)

Enfish presented evidence that Microsoft's "Table Definition" feature (packaged with Excel) is what *actually* defined columns in Excel, and that the

feature required *more* than a column name to define a column—it also required at least column ("Field") type (e.g., field type "CHAR" circled below in red for the ORDER_ID column) (A8797 ¶ 72):



Defendants' expert, Dr. Gray, did not identify any evidence that supported the assertion that a column name alone defines a column. And his testimony contradicted Defendants' arguments. Dr. Gray agreed that column name and column type are both required to define a column. (A20,655:19–657:21 ("[Y]ou need to identify the name and the data type when you define a new column in any of those databases as far as I'm aware.").)

Defendants' expert and Statements of Fact failed to even assert that a column name *alone* defined a column. Instead, they dodged the claim language, arguing that a column name "identified" or "helped to define" a column. (A7245-46 ¶ 85 ("names are typically provided to columns to <u>identify</u> the data in the rows beneath") (emphasis added); A7003 ¶ 63 ("a user was free to define one or two rows to <u>identify</u>, point to, or correspond to a particular column") (emphasis added); *see also* A9357:4-8.)

Defendants' attempts to buttress their evidence on this issue when opposing Enfish's Motion for Reconsideration further confirmed that more than a name is required to define a column. Defendants pointed for support to the "header row" of Figure 10 of the patents:



(A94918-9; annotated in red and reproduced in part.) Defendants argued that Figure 10's "header row" was an example of a row using only column names as column-defining information. (*Id*.)

45

But for each of the data columns TYPE through FOLDERCHILDREN, Figure 10 shows that the header row contained not just a column name, but also an OID reference to a row that included definitional information for that column.[5] Figure 10 specifically describes the referenced rows as containing column "definitions." And each of those definition rows/records includes a column type (e.g., FIELD) along with a column label.

Defendants also argued that the italicized part of "***at least one*** of said logical rows includes logical column information defining . . ." allows for methods in which multiple rows are employed to provide column-defining information, so long as one row has at least *some* information relevant to each column. Specifically, Defendants contend that "[w]hen two or more fully populated rows are used, the column defining information that any one row stores for a given column is less than all of such information for that column in the table." (A9490:13-15.) Even if that were true, Defendants pointed to only a <u>single</u> Excel row for anticipation and presented no evidence that Excel provided column-

---

[5] Defendants added a sentence noting that the annotation "OBJECTID" in the left-most corner does not have a separate OID reference. However, Defendants presented no evidence as to the meaning of that annotation. It is well established that patent figures are illustrative. *Medtronic, Inc. v. Adv. Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1315 (Fed. Cir. 2001).

defining information in that single row, much less across <u>multiple</u> rows. (A9489-92.)

> **d.** **The district court erred by failing to accept as true Enfish's facts that a column name does not define a column**

Enfish's Statement of Genuine Disputed Facts identified the dispute over whether column names defined columns and pointed for support to Dr. Jagadish's presentation of evidence. (A8518-19.) The district court did not address or acknowledge this dispute. Instead, its six-line opinion relied solely on Defendants' SOF ¶¶ 63 and 64. (A284:5-10.)

Later, in its denial of Enfish's Motion for Reconsideration, the district court wrote in a footnote:

> with respect to the 'logical column information defining' term, Enfish's expert failed to provide an analysis of Excel 5.0 in light of the Court's ruling that the term 'requir[es] at least one row with values defined for each column.' "

(A305 n.1.) The district court was mistaken. Dr. Jagadish stated that his analysis used the court's construction for the "logical column information defining" limitation. (A8764 ¶ 16.) The district court held that the "row defining column limitation requires that at least one row contain column defining information." (A284:5-6.) Applying that requirement to Excel 5.0, Dr. Jagadish determined that Excel did <u>not</u> disclose column-defining information in a single row. (A8795-98 ¶¶ 70-74.)

In light of Enfish's evidence, a genuine issue of material fact exists whether a column name alone is sufficient to <u>define</u> a column. On this basis alone, this Court should reverse the district court's grant of summary judgment of anticipation of claims 31 and 32 in each of the '604 and '775 patents.

> **3.**    **The district court erred by ignoring a factual dispute regarding whether Excel discloses a table where "at least one of said logical rows has an OID equal to the OID of a *corresponding* one of said logical columns"**

Claims 31 and 32 require not only a row whose OID is equal to the OID of a column, but also that the row's OID be "equal to the OID of a ***corresponding***" column (the "OID equality" limitation). (A229, claim 31.)

> **a.**    **The OID equality limitation requires that a row "corresponding" to a column contain information defining that column**

The district court declined to construe the OID equality term. (A269:19-21.) But Defendants' claim construction arguments, the court's *Markman* order, and the patents all confirm that a row "corresponding" to a column must contain information *about* that column, and specifically information that *defines* the column.

First, Defendants' claim-construction arguments confirm that "corresponding" rows contain definitional information about the corresponding columns. Defendants agreed that "for a record to 'correspond' to an attribute set, the record must <u>define</u> the attribute set." (A522:11-12 (emphasis added).) The '775

patent refers to "attribute sets" instead of columns and "records" instead of rows. (*Id.*) Thus, in the '604 patent, the corresponding <u>row</u> must define the <u>column</u>.

Second, the *Markman* order confirmed that the OID equality element "itself renders the claimed 'logical table' self-referential." (A266 n.2.) The district court also confirmed that the logical table is self-referential because "the record corresponding to a column contains information about the column." (A265:13-15.)

Third, the patents confirm that OID equality requires "corresponding" rows to contain definitional information about the corresponding column. "[C]olumns are entered as rows in the table and the record corresponding to a column contains various information about the column. This renders the table self referential." (A218, 2:61-64.) The invention implements this "correspondence" by having columns refer (using the same OID) to a corresponding row that contains the column's "definition record." (A221, 7:16-23.) The patents cite to Figure 3 in which the "Employed By" column 126 includes the OID (#1019) of row 136, and row 136 contains the label and type ("FIELD") definition of the column (*id.* 7:16-23; A8804):

FIG. 3

As Figure 3 illustrates, the information in the row "corresponding" to a column must define that column. (*Id.*)

> **b.    The district court's decision relied solely on Excel pivot tables disclosing superficial OID equality between rows and columns and did not address true "correspondence"**

The district court's order relied solely on Defendants' SOF ¶ 65 for the OID equality limitation. That SOF alleged that in Excel pivot tables, "information that appeared in a row in a spreadsheet might end up appearing in a column of the spreadsheet." (A7003-04 ¶ 65.) However, the district court ignored evidence that Excel failed to disclose equality between <u>corresponding</u> rows and columns because the rows do not provide information defining the columns. Indeed, its six-line conclusion said only that "[a]ny column created using the pivot table function

50

would share the same unique primary key or header as the row used to create it." (A284:2-4.) "Correspondence" was not mentioned. In other words, instead of showing that Excel actually disclosed the required <u>functionality</u> of a single-table, self-referential database, Defendants merely showed that data in Excel might be "flipped" and presented redundantly in both rows and columns. And the district court accepted this as satisfying the "row corresponding to a column" limitation without determining whether the row information actually defined an associated column.

<div style="text-align:center"><strong>c.    Enfish presented facts showing that pivot tables do not meet the OID equality requirement</strong></div>

Enfish presented expert testimony and evidence that pivot tables lack "rows [with] an OID equal to the OID of a corresponding one of said logical columns" as required in claims 31 and 32. Enfish showed that the allegedly "corresponding" rows do not provide definitional information about the columns, and that the row/column identifiers pointed to by Defendants are not OIDs.

Dr. Jagadish analyzed pivot tables and declared that they do not meet the OID equality limitation. (A8794-95 ¶¶ 67-69; A8493-94.) The pivot table on which Dr. Gray relied reveals that superficially "corresponding" rows do not provide <u>any</u> definitional information about the columns (A8795 ¶ 69; A7256-57 ¶¶ 110-111):

<div style="text-align:center">51</div>



Instead, as Dr. Jagadish explained, the pivot table simply shows one or more rows in one table that are rotated or "pivoted" (the lower oval in the figure above) and presented as a column in a second pivot table (the upper oval). (A8794 ¶ 68.) No definitional information for the "Housewares" column exists in either column 4 or row 70 of the above example.

Dr. Jagadish also noted that pivot tables do not show OID equality because the names in the "Product" column of the lower table in the figure directly above are not unique and thus cannot be OIDs. (A8794-95 ¶ 69.) The names are also not OIDs because the names vary in length within the same table. (A8784-85 ¶ 53.) The district court's construction required OIDs to have a "unique array of bits assigned to each row and each column in the logical table." (A268.) However,

names like "Dairy" and "Produce" occur multiple times in Dr. Gray's example and cannot be OIDs. (A8794-95 ¶ 69.)

The pivot table also lacks meaningful correspondence between row/column labels for an additional important reason. The row/column labels are directed only at the human user; they do not programmatically link columns to column definitions, which a computer requires to use column-defining information. (A8790-91 ¶ 62.)

> ### d. The district court erred by failing to accept as true Enfish's facts that a pivot table does not disclose the OID equality requirement

Defendants included only a single sentence regarding pivot tables in their opening Summary Judgment brief. (A6968:2-5.) And facing the evidence described above and Dr. Jagadish's testimony, Defendants dropped the pivot table argument on reply, failing to mention the feature. (A9355-56.) Yet the district court concluded that pivot tables met the OID equality requirement and ignored Enfish's evidence proving that pivot tables fail to satisfy the "equal to the OID of a *corresponding*" column limitation.

This error alone also warrants reversal of the district court's grant of summary judgment of anticipation of claims 31 and 32 in each of the '604 and '775 patents.

## III. THIS CASE REQUIRES REMAND FOR THE DISTRICT COURT TO DETERMINE WHETHER THE IPR FINAL WRITTEN DECISION ESTOPS MICROSOFT FROM ASSERTING EXCEL 5.0

### A. The policy behind the America Invents Act and this Court's precedents require estoppel to extend to proceedings on remand

A petitioner in an IPR cannot assert "in a civil action arising in whole or in part under section 1338 of title 28 . . . that the claim is invalid on any ground that the petitioner raised or *reasonably could have raised* during that inter partes review." 35 U.S.C. § 315(e)(2) (emphasis added).

Estoppel sets in immediately when the PTAB enters a final written decision. The petitioner in an IPR proceeding that "results in a final written decision" as defined in 35 U.S.C. § 318(a) is estopped. 35 U.S.C. § 315(e)(2). Section 318(a) reads: "If an inter partes review is instituted and not dismissed under this chapter, the Patent Trial and Appeal Board shall issue a final written decision." The "final written decision" is the PTAB's determination, not a reexamination certificate after Federal Circuit review. In combination, Sections 315(e)(2) and 318(a) provide that the petitioner is estopped when the PTAB enters a final written decision. "[T]he preclusive effect of a PTAB final determination is triggered when the PTAB issues its final written decision—regardless of whether an appeal is taken to the Federal Circuit." *Va. Innovation Scis., Inc. v. Samsung Elecs. Co.*, 983 F. Supp. 2d 713, 753 (E.D. Va. 2014), *vacated on other grounds and remanded*, No. 14-1477, 2015 WL 3555700 (Fed. Cir. June 9, 2015).

Congress intended estoppel to promote finality in litigation. One of Congress's "three important goals . . . at the center of the patent reform debate" in creating the America Invents Act was to "provide more certainty in litigation." 157 Cong. Rec. S131 (daily ed. An. 25, 2011) (statement of Sen. Leahy). The AIA "preserves estoppel against relitigating in court those issues that an inter partes challenger reasonably could have raised in his administrative challenge." 157 Cong. Rec. S1326 (daily ed. Mar. 7, 2011) (statement of Sen. Sessions).

This Court's decisions confirm the policy of allowing Patent Office determinations of validity to control. This Court, in the reexamination context, ruled that a final Patent Office decision on validity trumps a final but appealable district court judgment. *Fresenius*, 721 F.3d at 1343. In *Fresenius*, this Court considered whether a district court judgment was "immune" to a final decision on validity by the Patent Office. *Id*. at 1341. Following a jury verdict of no invalidity and a Federal Circuit affirmance, the Patent Office found all patent claims at issue invalid in an *ex parte* reexamination. *Id.* at 1334–35. This Court held that the Patent Office's final decision controlled despite the judgment. *Id*. at 1343. A much stronger argument in favor of the finality of Patent Office decisions exists here, because the statute itself imposes the estoppel effect of a final written decision in an IPR.

*Fresenius* addressed a Patent Office invalidity determination. But its holding applies equally to a Patent Office validity determination. In *Fresenius*, this Court discussed *John Simmons Co. v. Grier Bros. Co.*, in which the Supreme Court held that its determination that a patent was valid overruled a final but appealable invalidity ruling by the Third Circuit. 258 U.S. 82, 91 (1922). This Court wrote that *Simmons* "demonstrates that the district court must apply intervening legal developments affecting the asserted patent's validity"—including developments that benefit the patentee instead of the accused infringer. *Fresenius*, 721 F.3d at 1342.

## B.    There is a question of fact about whether Microsoft could have asserted Excel 5.0 in the IPRs and is estopped

If Microsoft reasonably could have asserted Excel 5.0 as a ground for invalidity in the IPR proceedings, this litigation cannot proceed as to Excel 5.0. Under 35 U.S.C. § 311(b), the only grounds to challenge a patent in an IPR proceeding are on prior art "consisting of patents or printed publications." Because § 315(e)(2) estoppel applies to any prior art Microsoft could have raised in the IPR proceedings, estoppel applies if Microsoft could have included Excel 5.0 in its IPR petitions using only printed publications, as the AIA requires. *See* § 311(b).

On this record, it is unclear whether Microsoft could have petitioned on Excel 5.0 using only printed publications. Microsoft asserted another of its systems, Visual Basic, in three IPRs filed against the patents-in-suit through three

manuals: Programmer's Guide, a Language Reference, and a Professional Features guide. (A22,106, A22,136, and A22,166.) Because Microsoft relied on manuals to prove up Visual Basic, it likely could have done the same for Excel. The materials Microsoft used to support its invalidity arguments for Excel 5.0 included the following:

- Nine Excel software disks. (A6953; A6984 ¶ 14; A 6986-87 ¶¶ 19-22; A7001-02 ¶¶ 56, 58-60; A7008 ¶ 79; A7556 ¶¶ 20-22; A7560 ¶ 33.)

- A sample database called "Northwind" that was included on the disks. (A6955-58; A6964-67; A6984 ¶ 15; A6996 ¶ 42, A6998 ¶ 50; A7003 ¶ 64; A7004 ¶ 67; A7562 ¶¶ 38-39; A7569 ¶ 54; A7571-72 ¶ 66; A7575-76 ¶ 74; A76710-12 ¶¶ 85-87; A7714 ¶ 91.)

- A printed Excel User's Guide. (A6954-55, A6952; A6986 ¶ 17; A6987-88 ¶¶21, 23-25; A7002 ¶ 59; A7005 ¶ 71; A7009 ¶ 80; A7557-58 ¶¶ 24-25; A7560-61 ¶¶ 33, 35-37; A7688-89 ¶¶ 47-49; A7690-91 ¶ 55; A7698-99 ¶ 72.)

- Screen shots from a tutorial and other files included with Excel 5.0. (A6989-90 ¶ 30; A6993-94 ¶¶ 35-36; A6995 ¶ 40; A7003-04 ¶ 65; A7559-60 ¶¶ 32-33; A7563-64 ¶ 41; A7578 ¶ 77; A7697-98 ¶¶ 68-69; A7718-28 ¶¶ 105-113.)

- A book titled *Microsoft Excel Developer's Kit: Version 5 for Microsoft Windows and Apple Macintosh* ("Excel Developer's Kit"). (A6991-93 ¶¶ 32-34; A6994-95 ¶ 39, A7001 ¶ 57; A7009 ¶ 81; A7558 ¶ 26; A7564-65 ¶ 43; A7571-72 ¶¶ 63-64, 67; A7574 ¶ 72; A7677-80 ¶¶ 24-27; A7686-87 ¶¶ 43-44; A7689-90 ¶ 51; A7698 ¶ 71; A7731-32 ¶ 121.)

- Microsoft's online help files. (A7574 ¶ 70; A7577-78 ¶¶ 75-76; A7671-735 ¶¶ 30-31.)

The printed User's Guide and Excel Developer's Kit are undoubtedly printed publications under 35 U.S.C. § 102(b). But the software disks, Northwind

database, tutorial, and online help files are also printed publications despite being in electronic form. *In re Klopfenstein*, 380 F.3d 1345, 1348 n.2 (Fed. Cir. 2004) (a reference is a printed publication if publicly accessible "in whatever form it may have been recorded").

Although Microsoft relied on these printed publications, it also relied on operation of the Excel 5.0 software. (A7682, A7685, A7687 ¶¶ 33, 38, 45.) Because Microsoft used sources that do not qualify as printed publications, it is not possible on this record to determine whether it reasonably could have raised Excel 5.0 before the PTAB. This case requires remand for factual findings to determine if Microsoft reasonably could have raised Excel 5.0 as a proposed ground of invalidity in the IPRs as to claims 31 and 32 such that Defendants are now estopped from asserting Excel 5.0 against those claims. Also, to the extent Defendants other than Microsoft argue that they are not subject to estoppel, the district court would need to determine whether statutory or equitable estoppel extends to privies who are, and always have been, fully defended and indemnified by Microsoft.

## IV. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT OF NON-INFRINGEMENT OF CLAIM 17

This Court should reverse the district court's finding of non-infringement of claim 17 because there are factual disputes on whether ADO.NET performs steps 2

and 3 of the "means for indexing" limitation and because that term was erroneously construed. Enfish addresses the latter error first.

### A.    The district court erred in construing "means for indexing" to exclude disclosed algorithmic structures

#### 1.    This Court should review the district court's construction *de novo*

Because the district court relied solely on intrinsic evidence (A270:10-15; A338:11-39:19), review is *de novo*. *Teva*, 135 S. Ct. at 841.

#### 2.    Enfish urged a construction encompassing multiple algorithmic structures

Enfish articulated its proposed construction of "means for indexing" in Ex. 21 to its *Markman* brief. (A2123:19-23; A2540-49.) Because the patent implements the means in software, Enfish identified the following structures for "means for indexing": "The computer programmed to perform one or more of the <u>algorithms</u> disclosed in the specification and described in Exhibit 21; OR the computer programmed to perform one or more of the <u>algorithms</u> disclosed in the sources.sml file and described in Exhibit 22." (*Id*.; emphasis added.)

Enfish made clear that its construction in Ex. 21 encompassed a set of steps that—in various combinations—provide the structure of <u>multiple</u> algorithms for the "means for indexing." For example, in opposing Defendants' proposed construction, Enfish argued: "Defendants' construction fails to account for all but one of the types of indexing that are disclosed in the patent, and therefore violates

the principle that a means-plus-function claim construction should include all of the alternative structures that perform the claimed function. *Ishida*, 221 F.3d at 1316." (A2124:6-10.)[6]

The district court correctly rejected Defendants' proposed construction. But instead of adopting Enfish's, the court came up with its own construction that the "means for indexing" meant "Exhibit 21 and equivalents thereof." (A272.) By dropping Enfish's proposal that the structure include "the algorithms disclosed in the sources.sml [source code]," the court ignored the structural disclosure in the source code filed with the patents. And though it was not apparent until summary judgment briefing, the court had also decided that the means for indexing encompassed only a *single* algorithmic structure that required *every* step of Exhibit 21 for infringement. (A339:18-19 ("to meet the 'means for indexing' limitation, an accused structure must perform all three steps of the algorithm.")

### 3. The district court erred in construing "means for indexing" to contain only one structure

The district court erred by adopting a construction for "means for indexing" that excluded multiple alternative structures identified by Enfish. A construction of a means-plus-function claim that excludes a structure described in the specification

---

[6] Although Enfish sometimes referred to the steps in Ex. 21 as an "algorithm" (singular), Enfish's *Markman* briefing expressly argued that certain of the steps of that algorithm are optional depending on the embodiment at issue.

is erroneous. *Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1441 (Fed. Cir. 2000).

First, the district court's construction excludes the structure associated with one of the embodiments in the patents—an embodiment that does not require "bi-directional pointers" of Step 3. *See* Summary § III at 15, above. Enfish's expert identified this embodiment when he recited the steps of the means for indexing as follows:

> i) Extract key phrases or words from the applicable cells in the logical table;
>
> ii) Store the extracted key phrases or words in an index, ***which is itself stored in the logical table***;
>
> iii) ***Include, in text cells of the logical table, pointers to the corresponding entries in the index***, and include, in the index, pointers to the text cells.

(A10,589-90 ¶ 32 (citing Ex. 21).) As Dr. Jagadish explained, the POSITA "would understand from reading the '604 patent that various subparts of the above steps which I have italicized are optional in the sense that certain disclosed embodiments in the '604 patent may or may not require each of them."[7] (*Id*.) One such optional subpart is the italicized portion of Step 3, above. Dr. Jagadish referred to that subpart as the "bi-directional pointer" requirement. (A10,590 ¶ 33.)

---

[7] It is this construction—including the designation of the italicized portions as optional—that Enfish asks this Court to adopt on appeal.

The non-italicized part of Step 3 represents a "one-direction pointer"—e.g., a pointer from an index to text cells of the table. Including a requirement that the text cells have pointers back to the index would require "bi-directional pointers," which the evidence shows is not required in all embodiments in the '604 patent. (*Id*. ¶¶ 32-33.)

Dr. Jagadish presented evidence and explained that the algorithm that the '604 patent discloses for what it calls "associative searching" or (synonymously) "associative queries" is the only algorithm that includes the bi-directional pointer of Step 3. (A224, 14:10-54.) The patent identifies "associative searching" as a type of "extended search" capability that the patent says is an <u>alternative</u> embodiment. (A222, 9:38-44.) The reason that the italicized sub-step of Step 3 is optional is because bi-directional pointers are used in the patent only in the context of that optional "associative searching" feature, which is also referred to in the patent as a type of "extended searching." (*Id.*, 9:38-44; A219, 3:3-4 ("This two way [bi-directional pointer] association provides for extended queries.") Non-associative searching (simply finding a record that contains a key word) requires only one-direction pointers. (A224, 14:25-27; A8794 ¶ 33.)

Defendants' expert, Dr. Black, supported Enfish's position. He testified that the patent's "bi-directional pointers are used to enable what it calls 'extended searching' or 'associative queries.'" (A9,592-93 ¶ 119.) And Dr. Black could not

provide any other example of the use of bi-directional pointers other than their use in associative searching. (A21,394:9-21,395:18.)

Moreover, another of Microsoft's experts (in the IPRs related to this case) agreed that the '604 patent discloses embodiments whose related algorithms do not use bi-directional pointers. Specifically, he agreed that the indexing embodiment of Figure 11 shows only one-directional pointers. (A11,140-41 ("Q: Do you consider the three arrows [in Fig. 11] emanating from the word "Ventura" to be pointers? A: Yes, they're pointers of a form. Q: Are they one directional pointers? A: They are one directional pointers, yes.").)

Scott Wlaschin, co-inventor of the '604 patent, confirmed this interpretation. Mr. Wlaschin testified that "Figure 11 and the text associated with that figure illustrate an embodiment that includes indexing where cells do not have a pointer to corresponding entries in the index. The index list includes references to the cells, but the cells do not include references to the index list." (A10,936-42 ¶ 5.) Defendants provided nothing but attorney argument on this issue in their reply brief. (A11,255:20-25.)

The district court's construction also excludes the structure associated with the source code that is part of the '604 patent.[8] That code disclosed an embodiment that does not require bi-directional pointers, as the author of the code confirmed. (A10,940 ¶ 7.) Enfish provided an exhibit with its claim-construction briefing that included samples of the source code. (A2550-70.) The author of that code, Mr. Wlaschin, provided a declaration analyzing the code and explaining: "Dexis source code also includes such an embodiment where the index includes pointers to cells and where cells do not have a pointer to corresponding entries in the index." (A10,940 ¶ 7.) Despite this, the court's §112(f) construction failed to encompass the structures in the source code.

### 4. The district court erred by requiring ADO.NET to practice all covered structures

In applying its erroneous construction to its infringement analysis, the district court required that ADO.NET practice *all* of the alternative structures covered by Enfish's Exhibit 21. This is because the court's construction required ADO.NET to practice each and every step in Exhibit 21, the union of which is effectively all the structures.

---

[8] Defendants argued that the source code submitted with the '604 patent's parent was not part of the '604 patents' specification. (A529:20-26.) Enfish provided a supplemental brief showing why Defendants were wrong. (A2571-78.) Neither the district court nor Defendants addressed that brief.

This infringement analysis violates well-settled law. Infringement of a means-plus-function term requires the accused product to meet only <u>one</u>—not all—of the structural algorithms disclosed in the patent for the claim term. *Dealertrack*, 674 F.3d at 1329-1330.

### 5. This Court should reverse the district court's claim construction and properly construe "means for indexing"

The district court wrongly construed the term "means for indexing" as encompassing only a single structure and applied its incorrect construction to its analysis of the infringement of claim 17. The only elements the court found missing from ADO.NET were those associated with the wrongly construed "means for indexing." Thus, this Court should reverse the district court's claim construction, properly construe "means for indexing", and vacate the summary judgment order. Specifically, this Court should construe "means for indexing" as having optional sub-parts as Enfish described in Argument § IV.A.3 at 61, above, and as encompassing all structures disclosed in the specification or its source code appendix.

### B. The district court ignored a factual dispute as to whether ADO.NET "stores" keywords in an index as part of step 2 of the "means for indexing"

Step 2 of the "means for indexing" is "ii) *Store the extracted key phrases or words in an index*, which is itself stored in the logical table." (A2544.) The district court erred by ignoring a factual dispute as to whether ADO.NET "stores" the key

phrases/words ("keys") in the index. (A340:16-18.) "Store" was not construed. (A262-72.)

Defendants argued: "ADO.NET does not store key words in an index and therefore lacks the claimed indexing means." (A11,251:26-27.) But Enfish presented testimony from Dr. Jagadish and Mr. Wlaschin to show that ADO.NET does store keys in an index. (A10,540:14-42:26.) Dr. Jagadish formed his opinion based on his analysis of the source code for the accused ADO.NET product. (A10,630 ¶ 122.) He concluded that "the ADO.NET index stores its text keys in the index by reference using pointers consisting of row/column pairs" (A10,633-34 ¶ 132), and that ADO.NET stores that index within that same, single table whose data the index indexes.(A10,610-12 ¶¶ 85-87, A10,633 ¶ 132.)

Defendants' expert, Dr. Black, agreed that ADO.NET stores its text keys in the index by reference, and that ADO.NET contains references to the index within the table whose data is indexed. (A9,595 ¶ 135, A10,626 ¶ 115.) But the two experts disagreed on whether storage by reference meets the second step of the district court's construction of "means for indexing."

Dr. Black opined that storage by reference did not meet the second step of "means for indexing." (A9,601-02 ¶¶ 156-59.) But Dr. Jagadish explained that in object-oriented languages like C#—the language in which ADO.NET is written— the POSITA would consider information to be "stored in" or "contained in" an

object even if a copy of the information is not stored contiguously within the containing object. (A10,630-32 ¶¶ 123-128.) He illustrated this point with the following example that used pointers as references:



(A10,631 ¶ 125.)

Dr. Jagadish explained that the POSITA would recognize that the "Person" object contains (and stores) a first name and a last name, even though they are not stored contiguously in memory with the Person object. (A10,631 ¶ 125.) He also cited third-party extrinsic references showing that the POSITA would recognize "storage by reference" as storage. (A10,632 ¶¶ 127-128.) Some programming languages, *e.g.*, Java, only store information by reference. (*Id.*)

Mr. Wlaschin also explained that the original DEXIS database "stored its text keys by reference in its index" and that programmers considered that "storing." (A10,942 ¶ 16.)

This factual dispute should have precluded summary judgment. *Hilgraeve*, 224 F.3d at 1352. But the district court decided the fact issue itself. The district court decided that storage by reference could not be "storage" because that

implementation would allegedly satisfy both Steps 2 and 3 of the means for indexing. The district court concluded that "the only reasonable reading of step two is that the index must store a <u>copy</u> of the text itself." (A341:1-2 (emphasis added).) The district court accepted no briefing on the issue and instead based its conclusion solely on the conclusion that storing keys by reference (e.g., using pointers) for Step 2 rendered Step 3 superfluous because Step 3 requires the system to "include, in the index, pointers to the text cells."

The district court's conclusion ignores the evidence and is unsupported by its own construction. Step 3 requires the index to include pointers to <u>text cells</u>, not simply to the character strings in memory that comprise the text in those cells. Thus, storing text by reference using pointers to text in Step 2 is different from pointers to text <u>cells</u> in Step 3. Counsel for Enfish pointed out evidence distinguishing text cells from text in the summary judgment hearing. (A20,306:5-307:13.) Defendants did not rebut that evidence.

The district court ignored a genuine issue of material fact surrounding whether ADO.NET stores keywords in an index. The factual dispute requires reversal of the district court's grant of summary judgment of non-infringement of claim 17.

**C.    The district court ignored a factual dispute as to whether ADO.NET practices bi-directional pointers as part of Step 3 of the "means for indexing"**

Even if "means for indexing" requires bi-directional pointers in Step 3, summary judgment of non-infringement was erroneous because of the factual dispute over whether ADO.NET's pointer chains meet this limitation.

The district court based its non-infringement conclusion in part on its determination that ADO.NET "does not contain pointers directly from the text cells to the index." (A341:17.) But Dr. Jagadish presented six pages of evidence and analysis that the C# software object that represented text cells ("StringStorage") contains pointers to the object representing the ADO.NET index. (A10,623-630.) He presented the figure below, explaining that "[e]ach such StringStorage object also contains a pointer back to an Index object that is indexing the column. The pointer from the text cells to the Index comprises multiple pointers that, when traversed, provides a path of ADO.NET object references from the StringStorage object to the Index object." (A10,625)



**Figure 4**

Dr. Jagadish testified that this pointer chain results in a single pointer via "pointer math." (A10,628:22-29:6.) Defendants' expert confirmed the legitimacy of database pointer math and was unable to refute Dr. Jagadish. (A10,628:25-29:6 (citing A21,460:12-23).)

Despite this dispute, the district court concluded that because the patent did not show pointer chains, Enfish's expert was wrong. (A342:16-19.) That conclusion constituted an inappropriate fact finding and requires reversal. *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1577 (Fed. Cir. 1994).

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

Enfish respectfully requests that this Court construe "means for indexing" in claim 17 as having optional sub-parts as described in Argument § IV.A.3 at 61 and reverse the final judgment, including each of these sub-parts:

- judgment of patent ineligibility for all appealed claims under § 101,

- judgment of non-infringement of claim 17, and

- judgment of invalidity of claims 31 and 32 in each patent-in-suit.

This Court should also remand the case for a determination whether Microsoft reasonably could have raised Excel 5.0 in its petitions for IPR and is therefore estopped (along with the other defendants Microsoft is defending and indemnifying) from asserting invalidity defenses based on Microsoft Excel.

Dated: July 10, 2015                              COOLEY LLP


                                          By /s/ Orion Armon
                                                   Orion Armon

                                          Attorneys for Plaintiff-Appellant

# ADDENDUM

| Appendix Range | Title |
|---|---|
| A200 – A230 | U.S. Patent No. 6,151,604 |
| A231 – A261 | U.S. Patent No. 6,163,775 |
| A262 – A272 | **DKT. #86** CLAIM CONSTRUCTION ORDER by Judge Mariana R. Pfaelzer. (bp) (Entered: 07/16/2013) |
| A273 – A288 | **DKT. #241** MINUTES (IN CHAMBERS): Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment of Anticipation by Judge Mariana R. Pfaelzer: Having read and considered the briefs and arguments of the parties, the Court concludes that Claims 31, 32, 46, and 47 of the '604 Patent and Claims 31, 32, and 47 of the '775 Patent are anticipated under 35 U.S.C. 102 by Microsoft's Excel 5.0 software product. The Court finds that disputed issues of material fact exist as to whether steps (2) and (3) of the algorithm for the configuring step of the means-plus-function Claims 1, 2, 16, and 17 are performed by the Excel 5.0 product. The Court therefore GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment of Anticipation, 129 Motion for Summary Judgment. (bp) (Entered: 03/31/2014) |
| A309 – A332 | **DKT. #303** ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON INELIGIBILITY UNDER 35 U.S.C. SECTION 101 by Judge Mariana R. Pfaelzer: Based on the Supreme Court's precedents, this Court concludes that all asserted claims are unpatentable. Therefore, the Court grants the Defendants' Motion for Summary Judgment 298. See document for details. (gk) (Entered: 11/04/2014) |
| A333 – A345 | **DKT. #306** ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON NONINFRINGEMENT AS TO CLAIM 17 by Judge Mariana R. Pfaelzer: Because ADO.NET fails to meet the "means for indexing" limitation, the Court grants Defendants Motion for Summary Judgment on Noninfringement as to Claim 17 of the '604 Patent 262. ( MD JS-6. Case Terminated. ) (gk) (Entered: 11/21/2014) |
| A346 – A348 | **DKT. #309** FINAL JUDGMENT by Judge Mariana R. Pfaelzer: The Court hereby ORDERS, ADJUDGES AND DECREES that: Pursuant to the Court's Order, final judgment against Plaintiff Enfish, LLC shall be entered in favor of each Defendant, Microsoft Corporation; Fiserv, Inc.; Intuit, Inc.; Sage Software, Inc.; and Jack Henry & Associates, Inc., as a prevailing party. Enfish's Complaint, as amended, and all of its asserted causes of action are dismissed with prejudice and Enfish shall recover nothing in this action. Defendants' respective counterclaims for a declaration that the asserted claims of the '604 and '775 patents are invalid are granted. |

| Appendix Range | Title |
|---|---|
| | Defendants' respective counterclaims for a declaration that each Defendant has not infringed the '604 patent are granted as to claim 17. Except as expressly granted above, Defendants' respective counterclaims and defenses are dismissed without prejudice as moot. Defendants are entitled to recover their costs incurred in this action.(gk) (Entered: 11/26/2014) |



US006151604A

# United States Patent [19]

## Wlaschin et al.

| | |
|---|---|
| [11] Patent Number: | 6,151,604 |
| [45] Date of Patent: | *Nov. 21, 2000 |

[54] **METHOD AND APPARATUS FOR IMPROVED INFORMATION STORAGE AND RETRIEVAL SYSTEM**

[75] Inventors: **Scott Wlaschin; Robert M. Gordon**, both of Los Angeles; **Louise J. Wannier**, La Canada, all of Calif.; **Clay Gordon**, New York, N.Y.

[73] Assignee: **Dex Information Systems, Inc.**

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **09/035,510**

[22] Filed: **Mar. 5, 1998**

**Related U.S. Application Data**

[63] Continuation of application No. 08/383,752, Mar. 28, 1995, Pat. No. 5,729,730.

[51] Int. Cl.[7] ............................................. G06F 17/30
[52] U.S. Cl. ................................ 707/100; 707/102; 707/3
[58] Field of Search ....................... 707/3, 4, 100, 707/102

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 5,295,256 | 3/1994 | Bapat | 395/500 |
| 5,305,389 | 4/1994 | Palmer | 382/1 |
| 5,359,724 | 10/1994 | Earle | 395/425 |
| 5,375,237 | 12/1994 | Tanaka et al. | 395/650 |
| 5,421,012 | 5/1995 | Khoyi et al. | 395/650 |
| 5,459,860 | 10/1995 | Burnett et al. | 707/1 |
| 5,537,591 | 7/1996 | Oka | 707/4 |
| 5,537,633 | 7/1996 | Suzuki et al. | 707/3 |
| 5,553,218 | 9/1996 | Li et al. | 395/148 |
| 5,557,787 | 9/1996 | Shin et al. | 707/1 |
| 5,564,046 | 10/1996 | Nemoto et al. | 707/4 |
| 5,630,005 | 5/1997 | Hoover et al. | 707/3 |
| 5,729,730 | 3/1998 | Wlaschin et al. | 707/3 |

*Primary Examiner*—Thomas G. Black
*Assistant Examiner*—Frantz Coby
*Attorney, Agent, or Firm*—Morrison & Foerster LLP

[57]     **ABSTRACT**

The information management and database system of the present invention comprises a flexible, self-referential table that stores data. The table of the present invention may store any type of data, both structured and unstructured, and provides an interface to other application programs. The table of the present invention comprises a plurality of rows and columns. Each row has an object identification number (OID) and each column also has an OID. A row corresponds to a record and a column corresponds to a field such that the intersection of a row and a column comprises a cell that may contain data for a particular record related to a particular field; a cell may also point to another record. To enhance searching and to provide for synchronization between columns, columns are entered as rows in the table and the record corresponding to a column contains various information about the column. The table includes an index structure for extended queries.

**60 Claims, 17 Drawing Sheets**

| | 120 | 122 | 130 | 124 | | 134 | 126 | 132 | | 100 |
|---|---|---|---|---|---|---|---|---|---|---|
| 108— | OBJECT ID | TYPE [# 101] | | [#1012] LABEL | ADDRESS [#1013] | | EMPLOYED BY [#1019] | TITLE [#1033] | | AUTHOR [#1032] |
| 110— | #1100 | #1020 [COMPANY] | | DEXIS | 117 EAST COLORADO | | | N/A | | N/A |
| 138— | #1101 | #1010 [PERSON] | | SCOTT WLASCHIN | | | #1100 [DEXIS] | N/A | | N/A |
| | #1118 | #1030 [BOOK] | | | | | | | | #1122 |
| | #1122 | #1050 [MEMO] | | | | | | | | #1122 |
| | #1127 | #1060 [DOCUMENT] | | | C:\WORD\ PROJ.DOC | | | PROJECT PLAN | | #1101 |
| 136— | #1019 | # 210 [FIELD] | | EMPLOYED BY | | | | | | |
| 135— | # 210 | # 111 [TYPE] | | COLUMN | | | | | | |
| 140— | # 111 | # 111 [TYPE] | | TYPE | | | | | | |

133



*FIG. 1*



*FIG. 2*

*FIG. 3*

| OBJECT ID | TYPE [# 101] | [#1012] LABEL | ADDRESS [#1013] | EMPLOYED BY [#1019] | TITLE [#1033] | AUTHOR [#1032] |
|---|---|---|---|---|---|---|
| #1100 | #1020 [COMPANY] | DEXIS | 117 EAST COLORADO | | N/A | N/A |
| #1101 | #1010 [PERSON] | SCOTT WLASCHIN | | #1100 [DEXIS] | N/A | N/A |
| #1118 | #1030 [BOOK] | | | | | #1122 |
| #1122 | #1050 [MEMO] | | | | | #1122 |
| #1127 | #1060 [DOCUMENT] | | C:\WORD\ PROJ.DOC | | PROJECT PLAN | #1101 |
| #1019 | # 210 [FIELD] | EMPLOYED BY | | | | |
| # 210 | # 111 [TYPE] | COLUMN | | | | |
| # 111 | # 111 [TYPE] | TYPE | | | | |

108  110  138  136  135  140
120  122  130  124  126  134  132  100  133



FIG. 4



FIG. 5

FIG. 7b

FIG. 6





ADD AN OID TO THIS CELL
REMOVE AN OID FROM THIS CELL
MAKE A BACKUP OF THE ORIGINAL LIST OF OIDS
180
CHANGE THE LIST TO THE A NEW LIST AS REQUIRED BY THE ADD OR DELETE ACTION
182
184
IS THIS FIELD (F1) SYNCHRONIZED WITH ANOTHER FIELD (F2) ?
NO
186
UPDATE COMPLETE
YES
188
ARE WE ALREADY INSIDE A ACTIVE SYNCHRONIZATION PROCESS ?
YES
190
UPDATE COMPLETE
DETERMINE THE LIST OF OIDS THAT HAS CHANGED COMPARED TO THE ORIGINAL LIST. FOR EACH OID (O2) IN THIS LIST...
192
FIND THE RECORD (R2) CORRESPONDING TO THE OID (O2).
194
FIND THE CELL CORRESPONDING TO THE RECORD R2 AND SYNCHRONIZATION FIELD F2.
196
ADD OR REMOVE THE CURRENT OID (O1) FROM THE R2:F2 CELL
198
ALL OIDS PROCESSED
200
UPDATE COMPLETE
202

FIG. 7a

Case: 15-1244    Document: 34    Page: 94    Filed: 07/10/2015



FIG. 8a

FIG. 8b

FIG. 11

*FIG. 9*

DEFINITION FOR RECORDCONTENTS COLUMN

RECORDCONTENTS COLUMN IN USE

| OID | #101 [TYPE] | #2 [LABEL] | #1013 [ADDRESS] | #1019 [EMPLOYED BY] | #801 [RECORD CONTENTS] |
|---|---|---|---|---|---|
| #80 | COLUMN | RECORD CONTENTS | | | |
| #1100 | COMPANY | LEXIS | 117 E COLORADO | NA | 2 [LABEL]; 101 TYPE; 301 [PARENT FOLDER]; 1023 [TYPE OF BUSINESS]; 1013 [ADDRESS]; 1014 [CITY]; 1015 [STATE]; 1017 [PHONE]; 4 [COMMENT]. |
| #1101 | PERSON | SCOTT WLASCHIN | 777 N CHESTER | #1100 | 2 [LABEL]; 101 TYPE; 301 [PARENT FOLDER]; 1012 [NAME]; 1013 [ADDRESS]; 1014 [CITY]; 1015 [STATE]; 4 [COMMENT]; 1019 [EMPLOYED BY] |
| #1118 | BOOK | 1984 | NA | NA | 2 [LABEL]; 101 TYPE; 301 [PARENT FOLDER]; 1033 [TITLE]; 1032 [AUTHOR]; 4 [COMMENT] |

120  129  110  138  122  124  125  126  127  100

## FIG. 10

DEFINITIONS FOR FOLDER RELATED COLUMNS

| OBJECTID | #101 [TYPE] | #2 [LABEL] | #301 [PARENT FOLDER] | #320 [FOLDERCHILDREN] |
|---|---|---|---|---|
| #301 | FIELD | PARENT FOLDER | NA | NA |
| #320 | FIELD | FOLDERCHILDREN | NA | NA |
| #1100 | COMPANY | DEXIS | #1070 [CONTACTS] | NA |
| #1101 | PERSON | SCOTT WLASCHIN | #1070 [CONTACTS] | NA |
| #1070 | FOLDER | CONTACTS | NA | 1100 [DEXIS]; 1101 [SCOTT WLASCHIN]; 1102 [LOUISE WANNIER]; ETC. |

240

242

138

244

FOLDERCHILDREN IN USE AS AN ATTRIBUTE OF A FOLDER OBJECT



*FIG. 12*

*FIG. 13*



FIG. 14

FIG. 15



FIG. 16a

FIG. 16b

## FIG. 17

| OID | #101 [CLASS ID] | #2 [LABEL] | #621 [PARENT CONCEPT] | #701 [CONCEPT NAME] | #702 [SYNONYMS] | #703 [MORE SPECIFIC TERMS] | #704 [MORE GENERAL TERMS] | #705 [SEE ALSO] |
|---|---|---|---|---|---|---|---|---|
| 1203 | TERM | IBM | #1300 [IBM] | | | | | |
| 1204 | TERM | INTERNATIONAL BUSINESS MACHINES | #1300 [IBM] | | | | | |
| 1300 | CONCEPT | IBM | | #1203 [IBM] | #1203 [IBM]; #1204 [INTERNATIONAL BUSINESS MACHINES] | #1301 [IBM PC] WEIGHT=100% | #1303 [COMPUTER COMPANIES] WEIGHT=60% | #1302 [MICROSOFT] WEIGHT=70% |
| 1301 | CONCEPT | IBM PC | | | #1300 [IBM] WEIGHT=50% | | | |
| 1302 | CONCEPT | MICROSOFT | | | | | | #1300 [IBM] WEIGHT=70% |
| 1303 | CONCEPT | COMPUTER COMPANIES | | | | | #1300 [IBM] WEIGHT=100% | |
| | 372 | 122 | 124 | 352 | 354 | 356 | 358 | 360 | 362 |

364  366  350  368  370

*FIG. 18* <u>PRIOR ART</u>

RECORD #1103

<u>HTML</u> IS A STANDARD FOR HYPERTEXT

START=1, STOP=5 RECORDID=#1107

RECORD #1107

TITLE: ABOUT HTML
HTML STANDS FOR HYPERTEXT MARKUP LANGUAGE

RECORD #1103

<u>HTML</u> IS A STANDARD FOR HYPERTEXT

START=1, STOP=5 TERMID=#1207

TERM #1207

LABEL: CELLIDS

HTML: #1107:2; #1108:1002;

RECORD #1107

TITLE: ABOUT <u>HTML</u>
HTML STANDS FOR HYPERTEXT MARKUP LANGUAGE

RECORD #1108

ANOTHER NOTE ABOUT <u>HTML</u>

*FIG. 19*



FIG. 20a *PRIOR ART*

FIG. 20b *PRIOR ART*

FIG. 20c
*PRIOR ART*

FIG. 21

*FIG. 22a*
*PRIOR ART*

| KEY PHRASE | SORTED UNDER |
|---|---|
| 100 | '1' |
| 1984 | '1', THEN '9' |
| 20 | '2', THEN '0' |
| 3 | '3' |
| JOHN SMITH | 'J' |
| THE BIG OAK | 'T' |

*FIG. 22b*

| KEY PHRASE | SORTED UNDER |
|---|---|
| 3 | 3 |
| 20 | 20 |
| 100 | 100 |
| 1984 | 1984 |
| THE BIG OAK | 'B'—BIG |
| JOHN SMITH | 'J'—JOHN |
| 1984 | 'N'—NINETEEN EIGHTY FOUR |
| THE BIG OAK | 'O'—OAK |
| 100 | 'O'—ONE HUNDRED |
| 1984 | 'O'—ONE THOUSAND NINE HUNDRED... |
| JOHN SMITH | 'S'—SMITH |
| 3 | 'T'—THREE |
| 20 | 'T'—TWENTY |
| 2 | 'T'—TWO |

*FIG. 23*



6,151,604

1

# METHOD AND APPARATUS FOR IMPROVED INFORMATION STORAGE AND RETRIEVAL SYSTEM

This is a continuation of application Ser. No. 08/383,752 filed Mar. 28, 1995 and now U.S. Pat. No. 5,729,730.

## RELATED APPLICATIONS

The present application is related to the application entitled "Method and Apparatus for a Physical Storage Architecture for a Shared File Environment," filed Feb. 3, 1995, Ser. No. 08/383,752 now U.S. Pat. No. 5,729,730, which is herein incorporated by reference.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates generally to a method and apparatus for storing, retrieving, and distributing various kinds of data, and more particularly, to an improved database architecture and method for using the same.

### 2. Art Background

Over the past 30 years, computers have become increasingly important in storing and managing information. During this time, many database products have been developed to allow users to store and manipulate information and to search for desired information. The continuing growth of the information industry creates a demand for more powerful databases.

The database products have evolved over time. Initially, databases comprised a simple "flat file" with an associated index. Application programs, as opposed to the database program itself, managed the relationships between these files and a user typically performed queries entirely at the application program level. The introduction of relational database systems shifted many tasks from applications programs to database programs. The currently existing database management systems comprise two main types, those that follow the relational model and those that follow the object oriented model.

The relational model sets out a number of rules and guidelines for organizing data items, such as data normalization. A relational database management system (RDBMS) is a system that adheres to these rules. RDBMS databases require that each data item be uniquely classified as a particular instance of a 'relation'. Each set of relations is stored in a distinct 'table'. Each row in the table represents a particular data item, and each column represents an attribute that is shared over all data items in that table.

The pure relational model places number of restrictions on data items. For example, each data item cannot have attributes other than those columns described for the table. Further, an item cannot point directly to another item. Instead, 'primary keys' (unique identifiers) must be used to reference other items. Typically, these restrictions cause RDBMS databases to include a large number of tables that require a relatively large amount of time to search. Further, the number of tables occupies a large amount of computer memory.

The object oriented database model, derived from the object-oriented programming model, is an alternative to the relational model. Like the relational model, each data item must be classified uniquely as belonging to a single class, which defines its attributes. Key features of the object-oriented model are: 1) each item has a unique system-generated object identification number that can be used for

2

exact retrieval; 2) different types of data items can be stored together; and 3) predefined functions or behavior can be created and stored with a data item.

Apart from the limitations previously described, both the relational and object oriented models share important limitations with regard to data structures and searching. Both models require data to be input according to a defined field structure and thus do not completely support full text data entry. Although some databases allow records to include a text field, such text fields are not easily searched. The structural requirements of current databases require a programmer to predefine a structure and subsequent date entry must conform to that structure. This is inefficient where it is difficult to determine the structure of the data that will be entered into a database.

Conversely, word and image processors that allow unstructured data entry do not provide efficient data retrieval mechanisms and a separate text retrieval or data management tool is required to retrieve data. Thus, the current information management systems do not provide the capability of integrating full text or graphics data entry with the searching mechanisms of a database.

The present invention overcomes the limitations of both the relational database model and object oriented database model by providing a database with increased flexibility, faster search times and smaller memory requirements and that supports text attributes. Further, the database of the present invention does not require a programmer to preconfigure a structure to which a user must adapt data entry. Many algorithms and techniques are required by applications that deal with these kinds of information. The present invention provides for the integration, into a single database engine, of support for these techniques, and shifts the programming from the application to the database, as will be described below. The present invention also provides for the integration, into a single database, of preexisting files developed under various types of application programs such as other databases, spreadsheets and word processing programs. In addition, the present invention allows users to control all of the data that are relevant to them without sacrificing the security needs of a centralized data repository.

## SUMMARY OF THE INVENTION

The present invention improves upon prior art information search and retrieval systems by employing a flexible, self-referential table to store data. The table of the present invention may store any type of data, both structured and unstructured, and provides an interface to other application programs such as word processors that allows for integration of all the data for such application programs into a single database. The present invention also supports a variety of other features including hypertext.

The table of the present invention comprises a plurality of rows and columns. Each row has an object identification number (OID) and each column also has an OID. A row corresponds to a record and a column corresponds to an attribute such that the intersection of a row and a column comprises a cell that may contain data for a particular record related to a particular attribute. A cell may also point to another record. To enhance searching and to provide for synchronization between columns, columns are entered as rows in the table and the record corresponding to a column contains various information about the column. This renders the table self referential and provides numerous advantages, as will be discussed in this Specification.

The present invention includes an index structure to allow for rapid searches. Text from each cell is stored in a key

6,151,604

3

word index which itself is stored in the table. The text cells include pointers to the entries in the key word index and the key word index contains pointers to the cells. This two way association provides for extended queries. The invention further includes weights and filters for such extended queries.

The present invention includes a thesaurus and knowledge base that enhances indexed searches. The thesaurus is stored in the table and allows a user to search for synonyms and concepts and also provides a weighting mechanism to rank the relevance of retrieved records.

An application support layer includes a word processor, a password system, hypertext and other functions. The novel word processor of the present invention is integrated with the table of the present invention to allow cells to be edited with the word processor. In addition, the table may be interfaced with external documents which allows a user to retrieve data from external documents according to the enhanced retrieval system of the present invention.

These and numerous other advantages of the present invention will be apparent from the following description.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a functional block diagram illustrating one possible computer system incorporating the teachings of the present invention.

FIG. 2 is a block diagram illustrating the main components of the present invention.

FIG. 3 illustrates the table structure of the database of the present invention.

FIG. 4 is a flow chart for a method of computing object identification numbers (OID's) that define rows and columns in the table of FIG. 1.

FIG. 5 is a part of the table of FIG. 2 illustrating the column synchronization feature of the present invention.

FIG. 6 is a flow chart for a method of searching the table of FIG. 2.

FIG. 7a is a flow chart for synchronizing columns of the table of FIG. 2.

FIG. 7b illustrates the results of column synchronization.

FIG. 8a illustrates a reference within one column to another column.

FIG. 8b illustrates an alternate embodiment for referring to another column within a column.

FIG. 9 illustrates a "Record Contents" column of the present invention that indicates which columns of a particular record have values.

FIG. 10 illustrates a folder structure that organizes records. The folder structure is stored within the table of FIG. 2.

FIG. 11 illustrates the correspondence between cells of the table of FIG. 2 and a sorted key word index.

FIG. 12 illustrate the "anchors" within a cell that relate a word in a cell to a key word index record.

FIG. 13 illustrates key word index records stored in the table of FIG. 2.

FIG. 14 illustrates the relationship between certain data records and key word index records.

FIG. 15 illustrates the relationship of FIG. 14 in graphical form.

FIG. 16a illustrates an extended search in graphical form.

FIG. 16b illustrates a further extended search in graphical form.

4

FIG. 17 illustrates the thesaurus structure of the present invention stored in the table of FIG. 2.

FIG. 18 illustrates prior art hypertext.

FIG. 19 illustrates the hypertext features of the present invention.

FIG. 20a illustrates a character and word box structure of the word processor of the present invention.

FIG. 20b illustrates the word and horizontal line box structure of the word processor of the present invention.

FIG. 20c illustrates the vertical box structure of the word processor of the present invention.

FIG. 21 illustrates the box tree structure of the word processor of the present invention.

FIG. 22a illustrates the results of a prior art sorting algorithm.

FIG. 22b illustrates the results of a sorting alogrithm according to the present invention.

FIG. 23 illustrates the correspondence between cells of the table of FIG. 2 and a sorted date index.

NOTATION AND NOMENCLATURE

The detailed descriptions which follow are presented largely in terms of algorithms and symbolic representations of operations on data bits within a computer memory. These descriptions and representations are the means used by those skilled in the data processing arts to most effectively convey the substance of their work to others skilled in the art.

An algorithm is here, and generally, conceived to be a self-consistent sequence of steps leading to a desired result. These steps are those requiring physical manipulations of physical quantities. Usually, though not necessarily, these quantities take the form of electrical or magnetic signals capable of being stored, transferred, combined, compared, and otherwise manipulated. It proves convenient at times, principally for reasons of common usage, to refer to these signals as bits, values, elements, symbols, characters, terms, numbers, or the like. It should be borne in mind, however, that all of these and similar terms are to be associated with the appropriate physical quantities and are merely convenient labels applied to these quantities.

Further, the manipulations performed are often referred to in terms, such as adding or comparing, which are commonly associated with mental operations performed by a human operator. No such capability of a human operator is necessary, or desirable in most cases, in any of the operations described herein which form part of the present invention; the operations are machine operations. Useful machines for performing the operations of the present invention include general purpose digital computers or other similar digital devices. In all cases there should be borne in mind the distinction between the method operations in operating a computer and the method of computation itself. The present invention relates to method steps for operating a computer in processing electrical or other (e.g., mechanical, chemical) physical signals to generate other desired physical signals.

The present invention also relates to apparatus for performing these operations. This apparatus may be specially constructed for the required purposes or it may comprise a general purpose computer as selectively activated or reconfigured by a computer program stored in the computer. The algorithms presented herein are not inherently related to a particular computer or other apparatus. In particular, various general purpose machines may be used with programs written in accordance with the teachings herein, or it may

6,151,604

5

prove more convenient to construct more specialized apparatus to perform the required method steps. The required structure for a variety of these machines will appear from the description given below.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention discloses methods and apparatus for data storage, manipulation and retrieval. Although the present invention is described with reference to specific block diagrams, and table entries, etc., it will be appreciated by one of ordinary skill in the art that such details are disclosed simply to provide a more thorough understanding of the present invention. It will therefore be apparent to one skilled in the art that the present invention may be practiced without these specific details.

### System Hardware

Referring to FIG. 1, the hardware configuration of the present invention is conceptually illustrated. FIG. 1 illustrates an information storage and retrieval system structured in accordance with the teachings of the present invention. As illustrated, the information storage and retrieval system includes a computer 23 which comprises four major components. The first of these is an input/output (I/O) circuit 22, which is used to communicate information in appropriately structured form to and from other portions of the computer 23. In addition, computer 20 includes a central processing unit (CPU) 24 coupled to the I/O circuit 22 and to a memory 26. These elements are those typically found in most computers and, in fact, computer 23 is intended to be representative of a broad category of data processing devices.

Also shown in FIG. 1 is a keyboard 30 for inputting data and commands into computer 23 through the I/O circuit 22, as is well known. Similarly, a CD ROM 34 is coupled to the I/O circuit 22 for providing additional programming capacity to the system illustrated in FIG. 1. It will be appreciated that additional devices may be coupled to the computer 20 for storing data, such as magnetic tape drives, buffer memory devices, and the like. A device control 36 is coupled to both the memory 26 and the I/O circuit 22, to permit the computer 23 to communicate with multi-media system resources. The device control 36 controls operation of the multi-media resources to interface the multi-media resources to the computer 23.

A display monitor 43 is coupled to the computer 20 through the I/O circuit 22. A cursor control device 45 includes switches 47 and 49 for signally the CPU 24 in accordance with the teachings of the present invention. A cursor control device 45 (commonly referred to as a "mouse") permits a user to select various command modes, modify graphic data, and input other data utilizing switches 47 and 49. More particularly, the cursor control device 45 permits a user to selectively position a cursor 39 at any desired location on a display screen 37 of the display 43. It will be appreciated that the cursor control device 45 and the keyboard 30 are examples of a variety of input devices which may be utilized in accordance with the teachings of the present invention. Other input devices, including for example, trackballs, touch screens, data gloves or other virtual reality devices may also be used in conjunction with the invention as disclosed herein.

### System Architecture

FIG. 2 is a block diagram of the information storage and retrieval system of the present invention. As illustrated in the

6

Figure, the present invention includes an internal database 52 that further includes a record oriented database 74 and a free-text database 76. The database 52 may receive data from a plurality of external sources 50, including word processing documents 58, spreadsheets 60 and database files 62. As will be described more fully below, the present invention includes an application support system that interfaces the external sources 50 with the database 52.

To efficiently retrieve information stored in the database 52, a plurality of indexes 54 including a keyword index 78 and other types of indexes such as phonetic, special sorting for other languages, and market specific such as chemical, legal and medical, are used. The information provided by the database 52. To organize the information in the indexes 54, a knowledge system 56 links information existing in the indexes 54.

The organization illustrated in FIG. 2 is for conceptual purposes and, in actuality, the database 52, the indexes 54 and the knowledge system 56 are stored in the same table, as will be described more fully below. This Specification will first describe the structure and features of the database 52. Next, the Specification will describe the index 54 and its implementation for searching the database 52. The Specification will then describe the knowledge system 56 that further enhances the index 54 by providing synonyms and other elements. Finally, the Specification will describe an interface between the external application programs 50 and the database 52, including a novel structured word processor and a novel password scheme.

FIG. 3 illustrates the storage and retrieval structure of the present invention. The storage and retrieval structure of the present invention comprises a table 100. The structure of the table 100 is a logical structure and not necessarily a physical structure. Thus, the memories 26 and 32 configured according to the teachings of the present invention need not store the table 100 contiguously.

The table 100 further comprises a plurality of rows 110 and a plurality of columns 120. A row corresponds to a record while a column corresponds to an attribute of a record and the defining characteristics of the column are stored in a row 108. The intersection of a row and a column comprises a particular cell.

Each row is assigned a unique object identification number (OID) stored in column 120 and each column also is assigned a unique OID, indicated in brackets and stored in row 108. For example, row 110 has an OID equal to 1100 while the column 122 has an OID equal to 101. As will be described more fully below, the OID's for both rows and columns may be used as pointers and a cell 134 may store an OID. The method for assigning the OID's will also be discussed below.

As illustrated in FIG. 3, each row, corresponding to a record, may include information in each column. However, a row need not, and generally will not, have data stored in every column. For example, row 110 corresponds to a company as shown in a cell 130. Since companies do not have titles, cell 132 is unused.

The type of information associated with a column is known as a 'domain'. Standard domains supported in most database systems include text, number, date, and Boolean. The present invention includes other types of domains such as the OID domain that points to a row or column. The present invention further supports 'user-defined' domains, whereby all the behavior of the domain can be determined by a user or programmer. For example, a user may configure a domain to include writing to and reading from a storage medium and handling operations such as equality testing and comparisons.

6,151,604

<table>
<tr><td>7</td><td>8</td></tr>
</table>

According to the present invention, individual cells may be accessed according to their row and column OID's. Using the cell as the unit of storage improves many standard data management operations that previously required the entire object or record. Such operations include versioning, security, hierarchical storage management, appending to remote partitions, printing, and other operations.

### Column Definitions

Each column has an associated column definition, which determines the properties of the column, such as the domain of the column, the name of the column, whether the column is required and other properties that may relate to a column. The table 100 supports columns that include unstructured, free text data.

The column definition is stored as a record in the table 100 of FIG. 3. For example, the "Employed By" column 126 has a corresponding row 136. The addition or rows that correspond to columns renders the table 100 self-referential. New columns may be easily appended to the table 100 by creating a new column definition record. The new column is then immediately available for use in existing records.

### Dates

Dates can be specified numerically and textually. An example of a numerical date is "11/6/67" and an example of a textual date is "November 6, 1967." Textual entries are converted to dates using standard algorithms and lookup tables. A date value can store both original text and the associated date to which the text is converted, which allows the date value to be displayed in the format in which it was originally entered.

### Numbers

Numeric values are classified as either a whole number (Integer) or fractional number. In the preferred embodiment, Integers are stored as variable length structures, which can represent arbitrarily large numbers. All data structures and indexes use this format which ensures that there are no limits in the system.

Fractional numbers are represented by a <numerator/ denominator> pair of variable length integers. As with dates, a numeric value can store both the original text ("4½ inches") and the associated number (4.5). This allows the numeric value to be redisplayed in the format in which it was originally entered.

### Type Definitions

A record can be associated with a 'record type'. The record type can be used simply as a category, but also can be used to determine the behavior of records. For example, the record type might specify certain columns that are required by all records of that type and, as with columns, the type definitions are stored as records in the table 100. In FIG. 3, column 122 includes the type definition for each record. The column 122 stores pointers to rows defining a particular column type. For example, the row 136 is a "Field" type column and contains a pointer in a cell 133 to a row 135 that defines "Field" type columns. The "Type Column" 122 of the row 135 points to a type called "Type," which is defined in a row 140. "Type" has a type column that points to itself.

Record types, as defined by their corresponding rows, may constrain the values that a record of that type may contain. For example, the record type 'Person' may require that records of type 'Person' have a valid value in the 'Name'

column, the 'Phone' column, and any other columns. The type of a record is an attribute of the record and thus may change at any time.

### Creating a Unique OID

As previously described, the system must generate a unique OID when columns and rows are formed. FIG. 4 is a flow chart of the method for assigning OID's.

At block 200 of FIG. 4, the CPU 24 running the database program stored in the memory 26 requests a timestamp from the operating system. At block 210, the system determines whether the received timestamp is identical to a previous timestamp. If the timestamps are identical, block 210 branches to block 220 and a tiebreaker is incremented to resolve the conflict between the identical timestamps. At block 222, the system determines whether the tiebreaker has reached its limit, and, if so, the system branches to block 200 to retrieve a new time stamp. Otherwise, the system branches to block 214 where the system requests a session identification which is unique to the user session.

In the preferred embodiment, the session identification is derived from the unique serial number of the application installed on the users machine. For certain OID's which are independent of any particular machine, the session identification may be used to determine the type of object. For example, dates are independent of any particular machine, and so an OID for a date may have a fixed session identification.

Returning to block 210, if the timestamps are not identical, control passes to block 212 where the tiebreaker is set to zero and control then passes to block 214. As previously described, at block 214, the system requests a session identification which is unique to the user session. Control then passes to block 216 where the session identification, timestamp and tiebreaker are combined into a bit array, which becomes the OID. Since the OID is a variable length structure, any number of bits may be used, depending on the precision required, the resolution of the operating system clock, and the number of users. In the preferred embodiment, the OID is 64 bits long where the timestamp comprises the first 32 bits, the tiebreaker comprises the next 10 bits and the session identification comprises 22 bits.

The particular type of OID and its length is constant throughout a single database but may vary between databases. A flag indicating which type of OID to be used may be embedded in the header of each database.

### OID Domains

OID domains are used to store OID's, which are pointers to other records. An efficient query can use these OID's to go directly to another record, rather than searching through columns.

If a user wishes to search a column to find a record or records with a certain item in the column, and does not know the OID of the item, the present invention includes a novel technique for determining an OID from the textual description. Conversion from text to an OID may also be necessary when a user is entering information into a record. For example, in FIG. 3, the user may be entering information in the "Employed By" column 126, and wish to specify the text "DEXIS" and have it converted to OID #1100. For this purpose, special columns are required that provide a definition for how the search and conversion is performed.

FIG. 6 is a flow chart for searching the table 100 configured according to the structure illustrated in FIG. 5. At block

6,151,604

| 9 | 10 |

150, a user enters text through the keyboard 30 or mouse 45 for a particular column that the user wishes to search. At block 152, the system retrieves the search path for the column to be searched from the information stored in column 146 as illustrated in FIG. 5. Continuing with the above example, a cell 146 in the row 136 contains the search path information for the "Employed By" column 126 of FIG. 3. The search path information for the "Employed By" field indicates that the folders called "\contacts" and "\departments" should be searched for a company with the label "DEXIS."

Returning to FIG. 5, the system searches the table 100 according to the retrieved search path information. For each folder specified in the search path, the routine searches for a record that has an entry in the label column 124 of FIG. 2 that is the same as the text being searched for, and is of the same class, as indicated in column 122 of FIG. 3. Folders will be further described below.

At block 156, the system determines whether it has found any items matching the user's search text. If no items have been found, at block 158, the system prompts the user on the display screen 37 to create a new record. If the user wishes to create a new record, control passes to block 162 and the system creates a new record. At block 164, the OID of the new record is returned. If the user does not wish to create a new record, a "NIL" string is returned, as shown at block 160.

If the system has located at least one item, the system determines whether it has found more than one item, as illustrated in block 166. If only one item has been located, its OID is returned at block 168. If more than one item has been located, the system displays the list of items to the user at block 170 and the user selects a record from the list. At block 172, the OID of the selected record is returned, which, in the above example, is #1100, the OID of the record for the company "DEXIS."

In alternate embodiments, various features may be added to the search mechanism as described with reference to FIG. 6. For example, further restrictions may be added to the search; the search may be related by allowing prefix matching or fuzzy matching instead of strict matching; and the search may be widened by using the 'associative search' techniques described below.

Two Way Synchronized Links

Records may have interrelationships between related records and it is often desirable to maintain consistency between interrelated records. For example, a record including data for a company may include information regard employees of that company, as illustrated in row 110 of FIG. 3. Similarly, the employees that work for that company may have a record that indicates, by a pointer, their employer, as illustrated by row 138 of FIG. 3. Thus, the employee column of a company should point to employees whose employer column points to that company. The present invention includes a synchronization technique to ensure that whenever interrelated records are added or removed, the interrelationships between the columns are properly updated.

The system synchronizes interrelated records by adding a "Synchronize With" column 144 to the table 100 as illustrated in FIG. 5. Since the value in the columns defines the relatedness between records, the rows 136 and 139 corresponding to columns contain information within the "Synchronize With" column 144 that indicates which other columns are to be synchronized with the columns corresponding to rows 136 and 139. With reference to FIG. 5, the

"Employed By" column 126 is synchronized with the "Employees" column by an OID pointer in the "Synchronize With" column 144 to the "Employees" column, represented by row 139. Similarly, the "Employees" column is synchronized with the "Employed By" column 136 by a pointer in the "Synchronize With" column 144 to the "Employed by" column 134, represented by row 136. Thus, whenever an employee changes companies, such that the employee's "Employed By" column changes, the "Employee" column of the previous employer is updated to eliminate the pointer to the ex-employee and, correspondingly, the addition of the employee in the "Employed By" field of the new employer. Synchronization may need to occur whenever a column is changed, whether by addition or subtraction of a reference to another column, or when entire records are added or eliminated from the table 100.

FIG. 7a is a flow chart for synchronizing records when a user adds or deletes a record. At block 180, the system makes a backup of the original list of references to other rows, which are simply the OID's of those other rows, so that it can later determine which OIDS have been added or removed. Only these changes need to be synchronized. At block 182, the system generates a new list of references by adding or deleting the specified OID. At block 184, the system determines whether the relevant column is synchronized with another column. If it is not, then the system branches to block 186 and the update is complete. If the column is synchronized with another column, the system determines whether it is already in a synchronization routine. If this were not done, the routine would get into an endless recursive loop. If the system is already in a synchronization routine, the system branches to 190 and the update is complete.

Otherwise, the system performs actual synchronization. At block 192, the system finds an OID that has been added or subtracted from the column (C1) of the record (R1) being altered. The system retrieves the record (R2) corresponding to the added or subtracted OID at block 194. The system determines the synchronization column (C2) of the column (C1) at block 196 and locates that field in the added or subtracted OID. For example, if an employer is fired from a job, and the employer's "Employed By" field changed accordingly, the system would look up the value of the "Synchronize With" column 144 for the "Employees" column which is contained in the cell 147 as illustrated in FIG. 5. Since cell 147 points to the "Employed By" field, the system locates the "Employed By" field of the record for the fired employee. At block 198 of FIG. 7a, the located cell, (R2:C2), is updated by adding or subtracting the OID. Continuing with the above example, the "Employed By" field of the employee would be changed to no longer point to the previous employer by simply removing the employer's OID from that field. The system branches back to block 192 to update any other OID additions or subtractions. If the system has processed all of the OID's, then the routine exits as illustrated at blocks 200 and 202.

FIG. 7b illustrates the results of column synchronization of the "Employed By" field and the "Employees" field. As shown, the pointers in the records of these two columns are consistent with one another.

Columns Within Columns

A column may contain within it a reference to another column in the same record. For example, a 'name' column may contain a reference to both a 'first name' and a 'last name' column. The value of the 'name' column can then be

A222

6,151,604

| 11 | 12 |

reconstructed from the values of the other two columns. FIGS. 8a and 8b illustrate two possible implementations for reconstructing a value from one or more columns within the same record.

FIG. 8a illustrates a table 210 that includes a "First Name" column 220, a "Last Name" column 222 and a "Name" column 224. A record 226 for "John Smith" has the first name "John" in the "First Name" column 220 and the last name "Smith" in the column 222. The name field 224 returns the text "The name is John Smith" by referencing the fields in brackets, according to the format <fieldRef field= 'Column Name'> as shown in column 224.

FIG. 8b employs a variant of the referencing scheme illustrated in FIG. 8a. FIG. 8a illustrates a table 230 that includes a "First Name" column 232, a "Last Name" column 234 and a "Name" column 236. A record 238 for "John Smith" has the first name "John" in the "First Name" column 232 and the last name "Smith" in the column 234. The name field 236 returns the text "The name is John Smith" by referencing the fields by defined variables 'fn' and 'ln' as shown in column 236. The variables are defined according to the format variable :=fieldAt (parameter, 'Column Name') and the variables may be referenced in a return statement as shown in column 236.

### Record Contents

As previously described, a given row may contain values for any column. However, to determine all of the columns that might be used by a record would involve scanning every possible column. To avoid this problem, in the preferred embodiment, the table 100 illustrated in FIG. 3 includes a "RecordContents" column that indicates those columns within which a particular record has stored values.

FIG. 9 illustrates the table 100 with a "RecordContents" column 127 that includes pointers to the columns containing values for a particular record. For example, the "Record-Contents" column 127 for row 110 has pointers to the column 124 and a column 125 but does not have a pointer to the column 126 because the row 110 does not have a value for the column 126. As previously described, since every column has a corresponding row that defines the column, the "RecordContents" column 127 has a defining row 129. Like any cell, the cell containing the record contents can be versioned, providing the ability to do record versioning.

### Folders

To provide increased efficiency in managing information, the table 100 includes a data type defined as a folder. FIG. 10 illustrates the structure of a folder. As illustrated in the Figure, the table 100 includes a "Parent Folder" column 240 and a "Folder Children" column 242. A folder has a corresponding record. For example, a folder entitled "Contacts" has a corresponding row 244 as illustrated in FIG. 10. The "Folder Children" column 242 of the "Contacts" folder includes pointers to those records that belong to the folder. Similarly, those records that belong to a folder include a pointer to that folder in the "Parent Folder" column 240.

The folder structure illustrated in FIG. 10 facilitates searching. As previously described, a column may be searched according to a folder specified in the column definition. If a folder is searched, the system accesses the record corresponding to the folder and then searches all of the records pointed to by that folder.

Further, the synchronization feature described above may be used to generate the list of items in a folder. For example,

in FIG. 10, the 'Folder Parent' and 'Folder Children' columns may be synchronized. When the 'Folder Parent' field 240 for record 138 is set to reference the 'Contacts' folder represented by row 244, the list of items in the 'Contacts' folder ('FolderChildren') is automatically updated to store a reciprocal reference to record represented by row 138 by including its OID, 1100, in the "Folder Children" column 242.

### Text Indexing System

The present invention includes an indexing system that provides for rapid searching of text included in any cell in the table 100. Each key phrase is extracted from a cell and stored in a list format according to a predefined hierarchy. For example, the list may be alphabetized, providing for very rapid searching of a particular name.

FIG. 11 illustrates the extraction of text from the table 100 to a list 250. The list 250 is shown separately from the table 100 for purposes of illustration but, in the preferred embodiment, the list 250 comprises part of the table 100. The list 250 stores cell identification numbers for each word in the list where a cell identification number may be of the format <record OID, column OID>. For example, the word "Ventura" occurs in cells 252, 254 and 256 that correspond to different rows and different columns. The word "Ventura" in the list 250 contains a pointer, or cell identification number, to cells 252, 254 and 256.

Similarly, each cell stores the references to the key phrases within it using 'anchors'. As illustrated in FIG. 12, an anchor contains a location (such as the start and stop offset within the text), and an identification number. Both the text and the anchor are stored in the cell 252. Other kinds of domains also support anchors. For example, graphical images support the notion of 'hot spots' where the anchor position is a point on the image.

As previously described, each key phrase is stored as a record in the database and the OID of the record equals the identification number described with reference to FIG. 12. One column stores the name of the key phrase and another stores the list of cell identification numbers that include that phrase. Key phrases may have comments of their own, which may also be indexed.

The sorted list 250 as illustrated in FIG. 11 is stored as a Folder, as illustrated in FIG. 13. A cell identification field 274 maintains the cells that include the term corresponding to that record. The "Parent Folder" column 240 for each of the terms on the list 250 indicates that the parent folder is an index with a title "Natural." The "Natural" folder has a row 276 that has pointers in the "Folder Children" column 242 to all of the terms in the list 250.

The "Natural" folder corresponds to an index sorted by a specific type of algorithm. Computer programs generally sort using a standard collating sequence such as ASCII. The present invention provides an improvement over this type of sorting and the improved sorting technique corresponds to the "Natural" folder. Records in the "Natural" folder are sorted according to the following rules:
1) A key phrase may occur at more than one point in the list. In particular:
  1a) Key phrases may be permuted and stored under each permutation. For example: 'John Smith' can be stored under 'John' and also under 'Smith'. Noise words such as 'a' and 'the' are ignored in the permutation.
  1b) Key phrases which are numeric or date oriented may be stored under each possible location. For example: '1984' can be stored under the digit '1984' and also under 'One thousand, nine hundred . . .', and 'nineteen eighty four'.

6,151,604

**13**

2) Numbers are sorted naturally. For example, '20' comes after '3' and before '100'.

3) Prefixes in key phrases are ignored. For example, 'The Big Oak' is sorted under 'Big'.

4) Key phrases are stemmed, so that 'Computers' and 'Computing' map to the identical key phrase record.

The preferred embodiment of the routine for generating positions for entering the key phrases into the 'Natural' folder is as follows:

1) Capitalize the key phrase to avoid case sensitivity problems. For example: 'John Smith the 1st' becomes 'JOHN SMITH THE 1ST'.

2) Each word in the key phrases is stemmed using standard techniques. Eg "COMPUTERS" becomes "COMPUT".

3) Permute the key phrase. This results in a new set of multiple key phrases based on the original key phrase. For example 'JOHN SMITH THE 1ST' produces the set {'JOHN SMITH THE 1ST'; 'SMITH THE 1ST JOHN'; 'THE 1ST JOHN SMITH'; '1ST JOHN SMITH THE'}.

4) Noise prefixes are eliminated. In the example above, the third entry, 'THE 1ST JOHN SMITH', is eliminated. If no phrases are left after elimination, the original phrase is used. For example, an entry for 'TO BE OR NOT TO BE' would be preserved even if all noise words were eliminated.

5) For each result, numbers and dates are expanded to all possible text representations, and text representations are converted to numeric. For example: '1ST JOHN SMITH THE' generates the set: {'1ST JOHN SMITH THE'; 'FIRST JOHN SMITH THE'}

6) Finally, each modified key phrase is used to determine the position of a reference to the main key phrase record, and an entry is made in the folder accordingly. For example, '1ST JOHN SMITH THE' is stored between '1' and '2', while 'FIRST JOHN SMIT THE' is stored after 'FIR' and before 'FIS.'

FIG. 22*a* illustrates the results of a prior art sorting algorithm while FIG. 22*b* illustrates the results of a sorting algorithm according to the present invention.

### Extracting the Key Phrases

To generate a sorted list, the system must first extract the key phrases or words from the applicable cells. The combination of structured information and text allows various combinations of key phrase extraction to be used. In full text extraction, every word is indexed, which is typical for standard text retrieval systems. In column extraction, the whole contents of the column are indexed which corresponds to a standard database system. According to a third type of extraction, automatic analysis, the contents of the text are analyzed and key phrases are extracted based on matching phrases, semantic context, and other factors. Finally, in manual selection extraction, the user or application explicitly marks the key phrase for indexing.

### Date Indexing System

The date indexing scheme is very similar to the text indexing scheme as previously described. Important dates are extracted from the text and added to an 'Important Date' list. Each important date is represented by a 'Important Date' record. The 'Important Date' records are stored in a 'Important Date's' folder, which is sorted by date.

The important dates are extracted from the text. The system may search for numeric dates, such as '4/5/94' or date-oriented text, such as "Tomorrow", "next Tuesday" or "Christmas". FIG. 23 illustrates the correspondence between cells of the table of FIG. 2 and a sorted date index.

**14**

Important Date records are assigned special predetermined OIDS since they always have the same identity in any system. Assigning predetermined OID's to dates allows Important Dates to be shared across systems. The predetermined OID is generated by using a special session identification number that signifies that the OID is an Important Date. In this case, the timestamp represents the value of the Important Date itself, not the time that it was created.

### Associative Queries

As previously described, a sorted key word list is generated from the text in cells and list stored in a folder whose records point to the text cells. The associations between the list of records with text and the list of key phrases is two-way since the cells that include text point to the key words. FIG. 14 illustrates this two way correspondence. Each record can point to multiple key phrases, and each key phrase can point to multiple records.

FIG. 15 is a graphical representation of the two way association between records and the key word list. Each record in a plurality of records 298 through 300 may point to one or more important word entries 310 through 312. Similarly, each important word entry may point to one or more records. A single level search involves starting at one node (on either side of the graph) and following the links to the other side. For example, a user may wish to find the records including the word "Shasta." First, the important word index would be accessed to find the word "Shasta" and the records pointed to by this word would then be retrieved. This search is indicated by the arrows 314 and 316 where word "Shasta" corresponds to cell 318. Similarly, a user may wish to locate all of the important words included in a particular record, indicated by the arrows 320 and 322 in FIG. 15.

The search can be extended by repeatedly following the links back and forth to the desired level. FIG. 16*a* illustrates this concept. As an example, the term "Shasta" may correspond to a dog with extraordinary intelligence such that in one record, "Shasta" is described as a dog and another record, 'Shasta' is described as a genius. If the user wishes to find the words associated with 'Shasta', the system locates "Shasta" in the "Important Words" folder which points to the records including the word "Shasta." In turn, the records pointed to contain pointers to the "Important Words" list for each indexed word in the record. Since "Shasta" appears with "dog" and "genius" in the records, these words are retrieved by the system.

This type of searching may be extended indefinitely. FIG. 16*b* illustrates an additional level of searching. Continuing with the above example, the word "genius" may occur in records referring to Dirac, and the word "dog" associated with "Checkers," such that the multilevel search illustrated in FIG. 16*b* results in a retrieval of "Dirac" and "Checkers" when provided with the word "Shasta."

A relevance ranking can be created based on weights associated with each link and type of key word, and the records can be displayed in order of descending relevance. In the preferred embodiment, if two or more nodes are used as the starting point, the relevance is based on the distance from all nodes. In this way, only nodes which are near all the initial nodes will have a high relevance. Many other relevance rankings apart from distance may be used.

To refine the search, filters can be used to constrain the links that are followed. For example, the search may be filtered such that only the type "Person" is listed such that, in the above example, Shasta will be associated with Dirac but not Checkers.

6,151,604

15

### Knowledge Base and Thesaurus

The present invention includes a knowledge base and thesaurus to further improve searching capabilities.

Each important word record (term) included within the thesaurus contains a pointer to a 'concept' record. Each concept record contains pointers to other concept records, and to the terms that are included within the bounds of that concept. FIG. 17 illustrates the structure of the thesaurus. The table 100 includes a "Parent Concept" column 352, a "Concept Name" column 354, a "Synonyms" column 356, a "More Specific Terms" column 358, a "More General Terms" column 360 and a "See Also" column 362. A concept record 350 defines the concept "IBM" and the Synonyms column 356 points to records that are synonymous with IBM, a record 364 with a label field with the value "IBM" and a record 366 with a label field with the value "International Business Machines." The records 364 and 366 have pointers in the "parent concept" field that point to the parent concept record 350.

The thesaurus structure illustrated in FIG. 17 provides for greater flexibility than exact synonyms. The "More Specific Terms" column 358 of the concept record 350 associated with "IBM" points to a concept record 368 associated with the IBM PC with an assigned weight of 100%, where the weight percentage reflects the similarity between the initial term "IBM" and the related term "IBM PC." Similarly, the "More General Terms" column 360 of the concept record 350 associated with "IBM" points to a concept record 372 associated with Computer Companies with an assigned weight of 60%. The "See also" column points to a record 370 associated with the concept "Microsoft" with a weight of 70%, where the weight percentage reflects the similarity between the initial term "IBM" and the related term "IBM PC."

The Thesaurus illustrated in FIG. 17 enhances the searching mechanisms previously described with reference to FIGS. 14–16b. The system first locates the record associated with a key word and locates the parent concept record pointed to by the key word record. The system may then follow some or all of the pointers in the columns 356, 358, 360 and 352 and return of the OID's stored in the 'Concept Name' column 354.

Since key phrases and concepts are stored as records in this system, any other columns may be used to extend the knowledge and information stored therein. In particular, through the use of OID's, the system can store any kind of relationship, including relationsihps other than thesural relationships, between key phrases, concepts and other records.

### Application Support

The database of the present invention has been described without reference to its interface with applications that may use the invention as their primary storage and retrieval system. As previously described with reference to FIG. 2, the present database includes an interface to support applications programs. Components in the application support system include external document support, hypertext, document management and workflow, calendaring and scheduling, security and other features.

Further, the present invention includes various user interface components that allow have been developed to provide full access to the structure of the database of the present invention. In particular, a new kind of structured word processor will be presented. The Specification will describe each component of the application support system separately.

16

### External Documents

The present invention supports indexing of external documents. The table 100 stores the filenames of documents, such as word processor documents, where the contents of the files are not directly stored in the database. The documents names may be stored in a column with a specialized "External Document" domain. The external documents may reside in the mass memory 32 or on a multi-source that interfaces with the system through device control 36.

To index documents external to the table 100, prior to processing, an external document is converted into a plain text format. Key phrases are then extracted as previously described. In particular, fields in the text can be determined and mapped to fields within the database. For example, a 'Memo' document may contain the text: 'To: John Smith. From: Mary Doe'. This text can be mapped to the fields called 'to' and 'from', and the values of these fields set accordingly. The analysis of the text in this way can be changed for different types of external documents such as memos, legal documents, spread sheets, computer source code and any other type of document. For each extracted key phrase, a start and stop point within the text is determined. A list of anchors of the format previously described, <start, stop, key phrase> is generated by the parser and stored within the table 100 under the external document domain.

### Viewing External Documents

When a user views an external document on the display screen 37, the stored anchors are overlaid on top of the document such that it appears that the external document has been marked with hypertext. When the user clicks the switches 45 or 47 of the mouse 50 on a section of the external document display, the corresponding anchor is determined from the various start and stop coordinates. The OID of the key phrase corresponding to the anchor is stored within the anchor, and can be used for the purposes of retrieving the key phrase record or initiating a query as previously described.

### Dynamic Hypertext

The present invention supports Hypertext. Hypertext systems typically associate a region of text with a pointer to another record, as illustrated in FIG. 18. This creates a 'hard-coded' link between the source and the target. When s user clicks on the source region, the target record is loaded and displayed. If the target record is absent, the hypertext jump will fail, possibly with serious consequences.

The present system uses a new approach based on a dynamic association between records. In the preferred embodiment, each hypertext region is associated with a key phrase, not a normal record. When the user clicks the switches 45 or 47 of the mouse 50 on the source region, all the records associated with the key phrase are retrieved and ranked using any of the associative search techniques previously described. As illustrated in FIG. 19, the application can then display on the display screen 37 either the highest ranked item, or present all the retrieved items and allow the user to pick the one to access.

In certain applications, the user may want to access a single 'default' item. This item can be determined automatically, by picking the item at the top of the dynamically generated list, or manually, by letting the user pick the item explicitly and then preserving this choice in the anchor itself.

### The Generic Word Processor

The database of the present invention includes a novel Structured Word Processor that may be used in conjunction with the table 100.

6,151,604

<table>
<tr><td>

**17**

The structured word processor of the present invention uses the "boxes and glue" paradigm introduced by Donald Knuth in T$_E$X. According to this paradigm, a page of text is created by starting with individual characters and concatenating the characters to form larger units, called "boxes," and then combining these boxes into yet larger boxes. FIG. 20a illustrates three character boxes 400, 402 and 404 concatenated to form a word box 406. FIG. 20b illustrates four word boxes 410, 412, 414 and the word box 406 combined to form a horizontal line box 408. Horizontal boxes are used for words and other text tokens that are spaced horizontally inside another box, such as a line (or column width). FIG. 20c illustrates the combination of the horizontal line box 408 with another horizontal line box 4242 to form a vertical box 420. Vertical boxes are used for paragraphs and other objects that are spaced vertically inside other boxes, such as page height.

Boxes may be attached to other boxes with "glue." The glue can stretch or shrink, as needed. For example, in a justified sentence, the white space between words is stretched to force the words to line up at the right edge of the column. Glue can be used for between-character (horizontal) spacing, between-word (horizontal) spacing including "tab" glue, that "sticks" to tab markings. Glue may also be used for between-line (vertical) spacing and between-paragraph (vertical) spacing.

When a record of the table 100 is edited, each word and field definition is converted into boxes. The system organizes these boxes into a tree structure of line boxes and paragraph boxes, as illustrated in FIG. 21. Shown there is a record hierarchy 460, corresponding to the hierarchy of a record, and a layout hierarchy 470, corresponding to the hierarchy of a layout such as a document generated according to the word processor described with reference to FIGS. 20a–20c. The record structure hierarchy 460 represents the record structure of the table 100 where a record 462 corresponds to a row in the table 100 and the record 462 includes a plurality of attributes, including attribute 464, that correspond to the columns of the table 100. In turn, the attributes may include a variety of items. For example, the attribute 464 includes text, represented by block 466, field references represented by block 468 and other items as shown.

The layout hierarchy 470 comprises a document 472 which in turn comprises a plurality of pages, including page 474. The page 474 comprises a plurality of paragraphs including paragraphs 430 and 431 and the paragraph 430 comprises a plurality of lines, including lines 432 and 434. The paragraph 431 includes line 436.

The word processor of the present invention allows the document 472 to be inserted into the record 462 by providing a plurality of boxes, including boxes 438, 440 and 442, common to both the record structure hierarchy 460 and the layout hierarchy 470. For example, the box 438 corresponds to part of the line 432 and comprises part of the text of attribute 464 as illustrated by block 466. Similarly, the box 440 corresponds to part of the line 434 and may comprise a field reference as indicated by block 468. Thus, the shared box structure as illustrated in FIG. 21 allows any type of word processing document to interface with any record in the table 100.

Conceptually, each box is kept as a bitmap, and its height and width are known, so the system displays the tree structure 450 by displaying all of the bitmaps corresponding to the boxes in the tree. If the tree is changed, for example, by adding a new word, only the new word box and a relatively small number of adjacent boxes need be recalcu-

</td><td>

**18**

lated. Similarly, line breaks or restructuring of a paragraph does not alter most of the word boxes, which may be reused, and only the lineboxes need be recalculated.

To edit the tree structure 450 as illustrated in FIG. 21, a user may click a cursor on a part of the text. The system locates the word box or glue that is being edited by a recursively descending through the tree structure 450.

The word processor supports multiple fonts and special effects such as subscripts, dropcaps and other features including graphic objects. A word in a different font than a base font is in a different box and may have a different height from other boxes on a line. The height of a linebox the height of the largest wordbox within it. Effects within a word can be handled by breaking a word into subboxes with no glue between them. Again, the height of a wordbox is the height of the largest box within it. Graphic objects, such as bitmaps, may be treated and formatted as a fixed width box.

The word processor of the present invention may be used to edit records in the table 100. The text associated with each field in a record can be considered a "paragraph" for the purposes of inter-field spacing, text flow within a field, and other formatting parameters. Storing all the fields in the same way during text-editing allows the movement of text and "flow" to appear natural.

As previously described, the text being edited is divided into fields, with each field corresponding to a column in the underlying database. Unlike a traditional static data entry form, the positions and sizes of the attributes are not fixed but are dynamic and all the features of a word-processor such as fonts and embedded graphics are available to edit the record fields.

Similarly, all of the features of a database such as lookups and mailmerge are available to the word processor. All of the attributes that apply to data entry for a particular field are enforced by the word processor. Such attributes might include a mask (such as ###-####), existence requirements, range and value constraints, etc. The fields can be explicitly labelled, or hidden and implied.

The word processor of the present invention allows existing fields to be added by typing the prefix of a field name and pressing a button. The system then completes the rest of the field name automatically.

The word processor of the present invention supports other database features. For example, new fields can be created by a user by using a popup dialog box. Similarly, references to other records or important words can be added by a dialog box. With particular regard to the table 100 of the present invention, OID references may support fields within other fields and a particular field within other fields supports the use of 'templates,' where a template is a list of field references embedded in text. For example, the template "Enter the first name here <fieldref id =firstName> and the last name here <fieldref id=lastName>" would appear to the user as "Enter the first name here: John and the last name here: Doe." Templates allow a user to build dynamic forms quickly and easily without having to use complicated form drawing tools.

The user interface for the word processor of the present invention allows a user to switch between two modes of data entry. The word-processor of the present invention is used for flexible entry into one record at a time, while a columnar view is used for entering data in columns. The user can switch back and forth between these two views with no loss of data and switching from the word processor to the columnar view will cause the fields that were entered in the single item to become the columns to be displayed in the columnar view.

</td></tr>
</table>

6,151,604

**19**

Finally, the 'fields within fields' that are apparent in the word processor view become separated into columns in a columnar view. The user can then make changes in columnar mode, and then, when switching back to the word processor view, the columns become combined once again.

### Passwords

It is often required that access to particular data items be restricted to certain users. In order to apply these restrictions, an information management system must determine the identity of the user requesting access. This is currently done in two ways, physically measuring a unique quality of the uses of requesting information from the user, most current information management systems rely on the second approach, by using 'passwords'. However, to avoid security problems with a password system, three guidelines are applied to passwords:

    a) the password should not be made of common words, because an aggressor can use a brute force approach and a dictionary to guess the password;

    b) the password should be longer rather than shorter; and

    c) the password should be changed often, so that even if is stolen it will not be valid for long.

Finally, a password should never be written down or embedded into a login script and should always be interactive.

According to the present password system, a user's identity is determined through an extensive question and answer session. The responses to certain personal questions very quickly identify the user with high accuracy. Even an accurate mimic will eventually fail to answer correctly if the question and answer session is prolonged.

For example, sample questions might be: 'What is your favorite breakfast cereal?'; 'Where were you in April 1990?' 'What color is your toothbrush?'. These questions are wide ranging and hard to mimic. Furthermore, the correct responses are natural English sentences, with an extremely large solution space, so that a brute force approach is unlikely to be successful.

To improve the effectiveness of the response, an exact matching of user response and stored answer is not required and 'fuzzy' and 'associative' matching can be used according to the synonym, thesaurus and other features of the present invention.

According to the password system of the present invention, the user creates the list of questions and corresponding answers, which are then stored. Because the user has complete control over the questions, the user may find the process of creating the questions and answers enjoyable, and as a result, change the questions and answer list more frequently, further enhancing system security.

According to the preferred embodiment, a user creates a list of 50–100 questions and answers that are encrypted and stored. The questions can be entirely new, or can be based on a large database of interesting questions. When the user logs on the system, the system randomly selects one of the questions related to that user and presents the question to the user. The user then types in a response, which is matched against the correct answer. The matching can be fuzzy and associative, as described above. If the response matches correctly, access is allowed.

In an alternate embodiment, more security may be provided by repeatedly asking questions until a certain risk threshold is reached. For example, if the answer to 'What color is your toothbrush?' is the single word 'Red', then brute force guessing may be effective in this one case. In this scenario, repeatedly asking questions will diminish the probability of brute force success.

**20**

### Summary

While the invention has been described in conjunction with the preferred embodiment, it is evident that numerous alternatives, modifications, variations and uses will be apparent to those skilled in the art in light of the foregoing description. Many other adaptations of the present invention are possible.

We claim:

1. A data storage and retrieval system for a computer memory, comprising:

    means for configuring said memory according to a logical table, said logical table including:

        a plurality of logical rows, each said logical row having an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information;

        a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column having an OID to identify each said logical column; and wherein

        at least one of said logical rows has an OID equal to the OID of a corresponding one of said logical columns, and at least one of said logical rows includes logical column information defining each of said logical columns.

2. The system of claim 1 wherein said logical column information defines one of said logical columns to contain information for enabling determination of OIDs from text entry.

3. The system of claim 1 wherein said one of said logical columns contains information including a search path that references a folder, said folder including a group of logical rows of a similar type.

4. The system of claim 1 wherein:

    said logical column information defines one of said logical columns to contain information for synchronizing two logical columns reciprocally.

5. The system of claim 4 wherein said one of said logical columns contains information including reciprocal pointers to said two logical columns.

6. The system of claim 1 wherein:

    at least one of said plurality of logical rows includes information defining the type of a different logical row; and

    at least one of said plurality of logical rows includes a logical cell that contains a pointer to said logical row including logical row type information.

7. The system of claim 1 wherein at least one of said logical columns defines logical cells that include a plurality of pointers to other logical columns within the same record, said pointers indicating those logical columns within the same record that contain defined values.

8. The system of claim 1 wherein at least one of said logical rows is a folder type logical row, said folder type logical row including at least one logical cell that contains data and a plurality of pointers to a plurality of other logical rows included within said folder.

9. The system of claim 8 wherein said plurality of other logical rows included within said folder each includes a logical cell that contains a pointer to said folder type logical row.

10. The system of claim 1 wherein said OID's are variable length and include data related to a session identification number and a timestamp.

6,151,604

21

**11.** A data storage and retrieval system for a computer memory, comprising:

means for configuring said memory according to a logical table, said logical table including:

a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information;

a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column; and wherein

at least one of said plurality of logical rows contains a logical cell that contains a pointer to a different logical row and at least one of said plurality of logical rows includes information defining the type of a different logical row;

means for searching said table for said pointer.

**12.** A data storage and retrieval system for a computer memory, comprising:

means for configuring said memory according to a logical table, said logical table including:

a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information;

a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column; and wherein

at least one of said logical rows contains a logical cell that contains a pointer to a different logical row and at least one of said logical rows includes logical column information defining each of said logical columns; and

means for searching said table for said pointer.

**13.** The system of claim **12** wherein at least one of said logical columns defines logical cells that include a plurality of pointers to other logical columns within the same record, said pointers indicating those logical columns within the same record that contain defined values.

**14.** The system of claim **12** wherein at least one of said logical rows is a folder type logical row, said folder type logical row including at least one logical cell that contains data and a plurality of pointers to a plurality of other logical rows included within said folder.

**15.** The system of claim **14** wherein said plurality of other logical rows included within said folder each includes a logical cell that contains a pointer to said folder type logical row.

**16.** A data storage and retrieval system for a computer memory, comprising:

means for configuring said memory according to a logical table, said logical table including:

a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information; and

a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column, wherein said OID's are variable length.

**17.** A data storage and retrieval system for a computer memory, comprising:

means for configuring said memory according to a logical table, said logical table including:

22

a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information;

a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column; and

means for indexing data stored in said table.

**18.** The system of claim **17** wherein said means for indexing further comprises:

means for searching a plurality of logical cells within said table for a key word, said means capable of searching a logical column containing unstructured text and a logical column containing structured data; and

means for inserting a logical row corresponding to said key word into said table.

**19.** The system of claim **18** wherein:

said inserted logical row includes a logical cell that contains a pointer to a searched logical cell that contains the keyword corresponding to said inserted logical row; and

said searched logical cell that contains a keyword corresponding to said inserted logical row contains a pointer to said inserted logical row.

**20.** The system of claim **19** wherein said pointer to said searched logical cell includes the OID's of the logical column and logical row defining said searched logical cell.

**21.** The system of claim **19** wherein said searched logical cell includes an anchor that marks said key word.

**22.** The system of claim **17** wherein one of said plurality of logical rows of said table includes a folder type logical row that includes at least one pointer to said key word.

**23.** The system of claim **18** wherein said searching means further includes:

means for searching for every word in a text logical cell;

means for searching for every entry in a logical column;

means for searching for data based on automatic analysis; and

means for searching for data marked by a user.

**24.** A data storage and retrieval system for a computer memory, comprising:

means for configuring said memory according to a logical table, said logical table including:

a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information;

a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column; and wherein

at least one of said logical cells includes a pointer to an index record; and

means for indexing data stored in said table.

**25.** The system of claim **24** wherein said indexing means further comprises:

means for searching said table for a key word; and

means for creating an index record for said key word, said index record including one or more pointers to a logical cell in said table that contains said key word.

**26.** The system of claim **25** further including querying means, said querying means further including:

means for locating said index record according to the query of a user;

6,151,604

23

means for retrieving at least one logical cell in said table pointed to by said located index record.

**27**. The system of claim **26** wherein said index locating means includes means for locating index record pointed to by said at least one retrieved logical cell.

**28**. The system of claim **27** wherein said index locating means and said record retrieval means each includes weighing means for weighing key words and retrieved logical cells according to pre-defined search criteria.

**29**. The system of claim **27** wherein said index locating means and said record retrieval means each includes filtering means for filtering key words and retrieved logical cells according to pre-defined search criteria.

**30**. The system of claim **25** wherein said indexing means further includes means for indexing external documents.

**31**. A method for storing and retrieving data in a computer memory, comprising the steps of:

configuring said memory according to a logical table, said logical table including:

a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information;

a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column; and wherein

at least one of said logical rows has an OID equal to the OID to a corresponding one of said logical columns, and at least one of said logical rows includes logical column information defining each of said logical columns.

**32**. The method of claim **31** wherein said logical column information defines one of said logical columns to contain information for enabling determination of OIDs from text entry.

**33**. The method of claim **31** wherein one of said logical columns contains information including a search path that references a folder, said folder including a group of logical rows of a similar type.

**34**. The method of claim **31** wherein:

said logical column information defines one of said logical columns to contain information for synchronizing two logical columns reciprocally.

**35**. The method of claim **34** wherein said one of said logical columns contains information including reciprocal pointers to said two logical columns.

**36**. The method of claim **31** wherein:

at least one of said plurality of logical rows includes information defining the type of a different logical row; and

at least one of said plurality of logical rows includes a logical cell that contains a pointer to said logical row including logical row type information.

**37**. The method of claim **31** wherein at least one of said logical columns defines logical cells that include a plurality of pointers to other logical columns within the same record, said pointers indicating those logical columns within the same record that contain defined values.

**38**. The method of claim **37** wherein at least one of said logical rows is a folder type logical row, said folder type logical row including at least one logical cell that contains data and a plurality of pointers to a plurality of other logical rows included within said folder.

**39**. The method of claim **38** wherein said plurality of other logical rows included within said folder each includes a logical cell that contains a pointer to said folder type logical row.

24

**40**. The method of claim **31** wherein said OID's are variable length and include data related to a session identification number and a timestamp.

**41**. A method for storing and retrieving data in a computer memory, comprising the steps of:

configuring said memory according to a logical table, said logical table including:

a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information;

a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column; and wherein

at least one of said logical rows contains a logical cell that contains a pointer to a different logical row and at least one of said plurality of logical rows includes information defining the type of a different logical row; and

means for searching said table for said pointer.

**42**. A method for storing and retrieving data in a computer memory, comprising the steps of:

configuring said memory according to a logical table, said logical table including:

a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information;

a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column; and wherein

at least one of said logical rows contains a logical cell that contains a pointer to a different logical row and at least one of said logical rows includes logical column information defining each of said logical column; and

searching said table for said pointer.

**43**. The method of claim **42** wherein at least one of said logical columns defines logical cells that include a plurality of pointers to other logical columns within the same record, said pointers indicating those logical columns within the same record that contain defined values.

**44**. The method of claim **42** wherein at least one of said logical rows is a folder type logical row, said folder type logical row including at least one logical cell that contains data and a plurality of pointers to a plurality of other logical rows included within said folder.

**45**. The method of claim **44** wherein said plurality of other logical rows included within said folder each includes a logical cell that contains a pointer to said folder type logical row.

**46**. A method for storing and retrieving data in a computer memory, comprising the steps of:

configuring said memory according to a logical table, said logical table including:

a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information; and

a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column, wherein said OID's are variable length.

6,151,604

25

47. A method for storing and retrieving data in a computer memory, comprising the steps of:

configuring said memory according to a logical table, said logical table including:

a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information;

a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column; and

indexing data stored in said table.

48. The method of claim 47 wherein said step of indexing data further comprises the steps of:

searching a plurality of logical cells within said table for a key word, said searching element capable of searching a logical column containing unstructured text and a logical column containing structured data; and

inserting a logical row corresponding to said key words into said table.

49. The method of claim 48 wherein:

said inserted logical row includes a logical cell that contains a pointer to a searched logical cell that contains the keyword corresponding to said inserted logical row; and

said searched logical cell that contains a keyword corresponding to said inserted logical row contains a pointer to said inserted logical row.

50. The method of claim 49 wherein said pointer to said searched logical cell includes the OID's of the logical column and logical row defining said searched logical cell.

51. The method of claim 49 wherein said searched logical cell includes an anchor that marks said key word.

52. The method of claim 48 wherein one of said plurality of logical rows of said table includes a folder type logical row that includes at least one pointer to said key word.

53. The method of claim 48 wherein said step of searching a plurality of cells within said table for a key word further comprises the steps of:

searching for every word in a text logical cell;

searching for every entry in a logical column;

searching for data based on automatic analysis; and

searching for data marked by a user.

26

54. A method for storing and retrieving data in a computer memory, comprising the steps of:

configuring said memory according to a logical table, said logical table including:

a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information;

a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column; and wherein

at least one of said logical cells includes a pointer to an index record; and

indexing data stored in said table.

55. The method of claim 54 wherein said step of indexing data further comprises the steps of:

searching said table for a key word; and

creating an index record for said key word, said index record having one or more pointers to a logical cell in said table that contains said key word.

56. The method of claim 55 further comprising the steps of:

locating said index record according to the query of a user;

retrieving at least one logical cell in said table pointed to by said located index record.

57. The method of claim 56 wherein said step of locating said index record further comprises:

locating said index record pointed to by said at least one retrieved logical cell.

58. The method of claim 57 wherein said step of locating said index record further comprises:

weighing key words and retrieved logical cells according to pre-defined search criteria.

59. The method of claim 57 wherein said step of locating said index record further comprises:

filtering key words and retrieved logical cells according to pre-defined search criteria.

60. The method of claim 54 wherein said step of indexing data further comprises the step of:

indexing external documents.

*  *  *  *  *



US006163775A

# United States Patent [19]

## Wlaschin et al.

| [11] | Patent Number: | 6,163,775 |
|---|---|---|
| [45] | Date of Patent: | *Dec. 19, 2000 |

[54] **METHOD AND APPARATUS CONFIGURED ACCORDING TO A LOGICAL TABLE HAVING CELL AND ATTRIBUTES CONTAINING ADDRESS SEGMENTS**

[75] Inventors: **Scott Wlaschin; Robert M. Gordon,** both of Los Angeles; **Louise J. Wannier,** La Canada, all of Calif.; **Clay Gordon,** New York, N.Y.

[73] Assignee: **Enfish, Inc.,** Pasadena, Calif.

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **09/035,187**

[22] Filed: **Mar. 5, 1998**

### Related U.S. Application Data

[63] Continuation of application No. 08/383,752, Mar. 28, 1995, Pat. No. 5,729,730.

[51] Int. Cl.7 ..................................................... G06F 17/30
[52] U.S. Cl. ..................... 707/3; 707/1; 707/4; 707/100
[58] Field of Search .............................. 707/3, 4, 1, 100

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,201,046 | 4/1993 | Goldberg et al. | 707/1 |
| 5,295,256 | 3/1994 | Bapat | 707/500 |
| 5,305,389 | 4/1994 | Palmer | 382/1 |
| 5,359,724 | 10/1994 | Earle | 395/425 |
| 5,375,237 | 12/1994 | Tamaka et al. | 395/650 |
| 5,421,012 | 5/1995 | Khoyi et al. | 395/650 |
| 5,459,860 | 10/1995 | Burnett et al. | 707/100 |
| 5,537,591 | 7/1996 | Oka | 707/100 |
| 5,537,633 | 7/1996 | Suzuki et al. | 707/100 |
| 5,553,218 | 9/1996 | Li et al. | 395/148 |
| 5,557,787 | 9/1996 | Shin et al. | 707/3 |
| 5,560,005 | 9/1996 | Hoover et al. | 707/3 |
| 5,564,046 | 10/1996 | Nemoto et al. | 707/1 |
| 5,729,730 | 3/1998 | Wlaschin et al. | 707/3 |

Primary Examiner—Thomas G. Black
Assistant Examiner—Frantz Coby
Attorney, Agent, or Firm—Morrison & Foerster, LLP

[57] **ABSTRACT**

The information management and database system of the present invention comprises a flexible, self-referential table that stores data. The table of the present invention may store any type of data, both structured and unstructured, and provides an interface to other application programs. The table of the present invention comprises a plurality of rows and columns. Each row has an object identification number (OID) and each column also has an OID. A row corresponds to a record and a column corresponds to a field such that the intersection of a row and a column comprises a cell that may contain data for a particular record related to a particular field; a cell may also point to another record. To enhance searching and to provide for synchronization between columns, columns are entered as rows in the table and the record corresponding to a column contains various information about the column. The table includes an index structure for extended queries.

**60 Claims, 17 Drawing Sheets**

| | OBJECT ID | TYPE [# 101] | [#1012] LABEL | ADDRESS [#1013] | EMPLOYED BY [#1019] | TITLE [#1033] | AUTHOR [#1032] |
|---|---|---|---|---|---|---|---|
| 108 | | | | | | | |
| 110 | #1100 | #1020 [COMPANY] | DEXIS | 117 EAST COLORADO | | N/A | N/A |
| 138 | #1101 | #1010 [PERSON] | SCOTT WLASCHIN | | #1100 [DEXIS] | N/A | N/A |
| | #1118 | #1030 [BOOK] | | | | | #1122 |
| | #1122 | #1050 [MEMO] | | | | | #1122 |
| | #1127 | #1060 [DOCUMENT] | | C:\WORD\ PROJ.DOC | | PROJECT PLAN | #1101 |
| 136 | #1019 | # 210 [FIELD] | EMPLOYED BY | | | | |
| 135 | # 210 | # 111 [TYPE] | COLUMN | | | | |
| 140 | # 111 | # 111 [TYPE] | TYPE | | | | |

120  122  130  124  134  126  132  100

133

A231



FIG. 1



FIG. 2

## FIG. 3

| OBJECT ID (120) | TYPE [#101] (122, 130) | [#1012] LABEL (124) | ADDRESS [#1013] | EMPLOYED BY [#1019] (126, 134) | TITLE [#1033] (132) | AUTHOR [#1032] (100) |
|---|---|---|---|---|---|---|
| #1100 | #1020 [COMPANY] | DEXIS | 117 EAST COLORADO | | N/A | N/A |
| #1101 | #1010 [PERSON] | SCOTT WLASCHIN | | #1100 [DEXIS] | N/A | N/A |
| #1118 | #1030 [BOOK] | | | | | #1122 |
| #1122 | #1050 [MEMO] | | | | | #1122 |
| #1127 | #1060 [DOCUMENT] | | C:\WORD\ PROJ.DOC | | PROJECT PLAN | #1101 |
| #1019 | #210 [FIELD] | EMPLOYED BY | | | | |
| #210 | #111 [TYPE] | COLUMN | | | | |
| #111 | #111 [TYPE] | TYPE | | | | |

108  110  138  136  135  140  133



*FIG. 4*



FIG. 5

| OBJECTID | #1012 [LABEL] | #221 [SEARCH PATH] | #222 [RESTRICT TO TYPE] | #222 [SYNCHRONIZE WITH] |
|---|---|---|---|---|
| #1019 | EMPLOYED BY | \[ROOT FOLDER] | COMPANY | #1023 [EMPLOYEES] |
| #1023 | EMPLOYEES | \[ROOT FOLDER] | PERSON | #1019 [EMPLOYED BY] |

FIG. 7b

| OID | #2 [LABEL] | #1019 [EMPLOYED BY] | #1023 [EMPLOYEES] | #1101 [SCOTT WLASCHIN] | #1102 [LOUISE WANNIER] |
|---|---|---|---|---|---|
| #1100 | DEXIS | NA | NA | | |
| #1101 | SCOTT WLASCHIN | #1100 [DEXIS] | NA | | |
| #1102 | LOUISE WANNIER | #1100 [DEXIS] | NA | | |

A236

FIG. 6





FIG. 7a



FIG. 8a

FIG. 8b

FIG. 11

*FIG. 9*

DEFINITION FOR RECORDCONTENTS COLUMN

RECORDCONTENTS COLUMN IN USE — 100

| OID / #80 COLUMN | #101 [TYPE] | #2 [LABEL] | #1013 [ADDRESS] | #1019 [EMPLOYED BY] | #801 [RECORD CONTENTS] |
|---|---|---|---|---|---|
| #80 | COLUMN | RECORD CONTENTS | NA | NA | [RECORD CONTENTS] |
| #1100 | COMPANY | DEXIS | 117 E COLORADO | NA | 2 [LABEL]; 101 TYPE; 301 [PARENT FOLDER]; 1022 [COMPANY]; 1023 [TYPE OF BUSINESS]; 1013 [ADDRESS]; 1014 [CITY]; 1015 [STATE]; 1017 [PHONE]; 4 [COMMENT] |
| #1101 | PERSON | SCOTT WLASCHIN | 777 N CHESTER | #1100 | 2 [LABEL]; 101 TYPE; 301 [PARENT FOLDER]; 1012 [NAME]; 1013 [ADDRESS]; 1014 [CITY]; 1015 [STATE]; 4 [COMMENT]; 1019 [EMPLOYED BY] |
| #1118 | BOOK | 1984 | NA | NA | 2 [LABEL]; 101 TYPE; 301 [PARENT FOLDER]; 1033 [TITLE]; 1032 [AUTHOR]; 4 [COMMENT] |

120  129  110  138  122  124  125  126  127

## FIG. 10

DEFINITIONS FOR FOLDER RELATED COLUMNS

| OBJECTID | #101 [TYPE] | #2 [LABEL] | #301 [PARENT FOLDER] | #320 [FOLDERCHILDREN] |
|---|---|---|---|---|
| #301 | FIELD | PARENT FOLDER | NA | NA |
| #320 | FIELD | FOLDERCHILDREN | NA | NA |
| #1100 | COMPANY | DEXIS | #1070 [CONTACTS] | NA |
| #1101 | PERSON | SCOTT WLASCHIN | #1070 [CONTACTS] | NA |
| #1070 | FOLDER | CONTACTS | NA | 1100 [DEXIS]; 1101 [SCOTT WLASCHIN]; 1102 [LOUISE WANNIER]; ETC. |

240

242

FOLDERCHILDREN IN USE AS AN ATTRIBUTE OF A FOLDER OBJECT

138

244

A241

Case: 15-1244    Document: 34    Page: 128    Filed: 07/10/2015



FIG. 12

FIG. 13



FIG. 14

FIG. 15



FIG. 16a

FIG. 16b

FIG. 17

100

| OID | #101 [CLASS ID] | #2 [LABEL] | #621 [PARENT CONCEPT] | #701 [CONCEPT NAME] | #702 [SYNONYMS] | #703 [MORE SPECIFIC TERMS] | #704 [MORE GENERAL TERMS] | #705 [SEE ALSO] |
|---|---|---|---|---|---|---|---|---|
| 1203 | TERM | IBM | #1300 [IBM] | | | | | |
| 1204 | TERM | INTERNATIONAL BUSINESS MACHINES | #1300 [IBM] | | | | | |
| 1300 | CONCEPT | IBM | | #1203 [IBM] | #1203 [IBM]: #1204 [INTERNATIONAL BUSINESS MACHINES] | #1301 [IBM PC] WEIGHT=100% | #1303 [COMPUTER COMPANIES] WEIGHT=60% | #1302 [MICROSOFT] WEIGHT=70% |
| 1301 | CONCEPT | IBM PC | | | #1300 [IBM], WEIGHT=50% | | | |
| 1302 | CONCEPT | MICROSOFT | | | | | | #1300 [IBM], WEIGHT=70% |
| 1303 | CONCEPT | COMPUTER COMPANIES | | | | | #1300 [IBM], WEIGHT=100% | |
| | 372 | 122 | 124 | 352 | 354 | 356 | 358 | 360 | 362 |

364  370  350  368  366

A245

FIG.  18  _PRIOR ART_

RECORD #1103

_HTML_  IS A STANDARD  FOR HYPERTEXT

START=1, STOP=5 RECORDID=#1107

RECORD #1107

TITLE: ABOUT HTML
HTML STANDS FOR HYPERTEXT MARKUP LANGUAGE

RECORD #1103

_HTML_  IS A STANDARD  FOR HYPERTEXT

START=1, STOP=5 TERMID=#1207

TERM #1207

LABEL: CELLIDS

HTML: #1107:2;  #1108:1002;

RECORD #1107

TITLE:  ABOUT  _HTML_

HTML STANDS FOR HYPERTEXT MARKUP LANGUAGE

RECORD #1108

ANOTHER  NOTE  ABOUT  _HTML_

FIG.  19



FIG. 20a *PRIOR ART*

FIG. 20b *PRIOR ART*

FIG. 20c
*PRIOR ART*

FIG. 21

RECORD STRUCTURE HIERARCHY

LAYOUT HIERARCHY

*FIG. 22a*
PRIOR ART

| KEY PHRASE | SORTED UNDER |
|---|---|
| 100 | '1' |
| 1984 | '1', THEN '9' |
| 20 | '2', THEN '0' |
| 3 | '3' |
| JOHN SMITH | 'J' |
| THE BIG OAK | 'T' |

*FIG. 22b*

| KEY PHRASE | SORTED UNDER |
|---|---|
| 3 | 3 |
| 20 | 20 |
| 100 | 100 |
| 1984 | 1984 |
| THE BIG OAK | 'B'–BIG |
| JOHN SMITH | 'J'–JOHN |
| 1984 | 'N'–NINETEEN EIGHTY FOUR |
| THE BIG OAK | 'O'–OAK |
| 100 | 'O'–ONE HUNDRED |
| 1984 | 'O'–ONE THOUSAND NINE HUNDRED... |
| JOHN SMITH | 'S'–SMITH |
| 3 | 'T'–THREE |
| 20 | 'T'–TWENTY |
| 2 | 'T'–TWO |

*FIG. 23*



6,163,775

<table>
<tr><td>1</td><td>2</td></tr>
</table>

**METHOD AND APPARATUS CONFIGURED
ACCORDING TO A LOGICAL TABLE
HAVING CELL AND ATTRIBUTES
CONTAINING ADDRESS SEGMENTS**

RELATED APPLICATIONS

This is a continuation of application Ser. No. 08/383,752, filed Mar. 28, 1995, now U.S. Pat. No. 5,729,730, issued Mar. 17, 1998.

BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to a method and apparatus for storing, retrieving, and distributing various kinds of data, and more particularly, to an improved database architecture and method for using the same.

2. Art Background

Over the past 30 years, computers have become increasingly important in storing and managing information. During this time, many database products have been developed to allow users to store and manipulate information and to search for desired information. The continuing growth of the information industry creates a demand for more powerful databases.

The database products have evolved over time. Initially, databases comprised a simple "flat file" with an associated index. Application programs, as opposed to the database program itself, managed the relationships between these files and a user typically performed queries entirely at the application program level. The introduction of relational database systems shifted many tasks from applications programs to database programs. The currently existing database management systems comprise two main types, those that follow the relational model and those that follow the object oriented model.

The relational model sets out a number of rules and guidelines for organizing data items, such as data normalization. A relational database management system (RDBMS) is a system that adheres to these rules. RDBMS databases require that each data item be uniquely classified as a particular instance of a 'relation'. Each set of relations is stored in a distinct 'table'. Each row in the table represents a particular data item, and each column represents an attribute that is shared over all data items in that table.

The pure relational model places number of restrictions on data items. For example, each data item cannot have attributes other than those columns described for the table. Further, an item cannot point directly to another item. Instead, 'primary keys' (unique identifiers) must be used to reference other items. Typically, these restrictions cause RDBMS databases to include a large number of tables that require a relatively large amount of time to search. Further, the number of tables occupies a large amount of computer memory.

The object oriented database model, derived from the object-oriented programming model, is an alternative to the relational model. Like the relational model, each data item must be classified uniquely as belonging to a single class, which defines its attributes. Key features of the object-oriented model are: 1) each item has a unique system-generated object identification number that can be used for exact retrieval; 2) different types of data items can be stored together; and 3) predefined functions or behavior can be created and stored with a data item.

Apart from the limitations previously described, both the relational and object oriented models share important limitations with regard to data structures and searching. Both models require data to be input according to a defined field structure and thus do not completely support full text data entry. Although some databases allow records to include a text field, such text fields are not easily searched. The structural requirements of current databases require a programmer to predefine a structure and subsequent date entry must conform to that structure. This is inefficient where it is difficult to determine the structure of the data that will be entered into a database.

Conversely, word and image processors that allow unstructured data entry do not provide efficient data retrieval mechanisms and a separate text retrieval or data management tool is required to retrieve data. Thus, the current information management systems do not provide the capability of integrating full text or graphics data entry with the searching mechanisms of a database.

The separation of database from other programs such as word processors has created a large amount of text and other files that cannot be integrated with current databases. Various database, spreadsheet, image, word processing, electronic mail and other types of files may not currently be accessed in a single database that contains all of this information. Various programs provide integration between spreadsheet, word processing and database programs but, as previously described, current databases do not support effective searching in unstructured files.

The present invention overcomes the limitations of both the relational database model and object oriented database model by providing a database with increased flexibility, faster search times and smaller memory requirements and that supports text attributes. Further, the database of the present invention does not require a programmer to preconfigure a structure to which a user must adapt data entry. Many algorithms and techniques are required by applications that deal with these kinds of information. The present invention provides for the integration, into a single database engine, of support for these techniques, and shifts the programming from the application to the database, as will be described below. The present invention also provides for the integration, into a single database, of preexisting source files developed under various types of application programs such as other databases, spreadsheets and word processing programs. In addition, the present invention allows users to control all of the data that are relevant to them without sacrificing the security needs of a centralized data repository.

SUMMARY OF THE INVENTION

The present invention improves upon prior art information search and retrieval systems by employing a flexible, self-referential table to store data. The table of the present invention may store any type of data, both structured and unstructured, and provides an interface to other application programs such as word processors that allows for integration of all the data for such application programs into a single database. The present invention also supports a variety of other features including hypertext.

The table of the present invention comprises a plurality of rows and columns. Each row has an object identification number (OID) and each column also has an OID. A row corresponds to a record and a column corresponds to an attribute such that the intersection of a row and a column comprises a cell that may contain data for a particular record related to a particular attribute. A cell may also point to another record. To enhance searching and to provide for synchronization between columns, columns are entered as

6,163,775

3

rows in the table and the record corresponding to a column contains various information about the column. This renders the table self referential and provides numerous advantages, as will be discussed in this Specification.

The present invention includes an index structure to allow for rapid searches. Text from each cell is stored in a key word index which itself is stored in the table. The text cells include pointers to the entries in the key word index and the key word index contains pointers to the cells. This two way association provides for extended queries. The present invention further includes weights and filters for such extended queries.

The present invention includes a thesaurus and knowledge base that enhances indexed searches. The thesaurus is stored in the table and allows a user to search for synonyms and concepts and also provides a weighting mechanism to rank the relevance of retrieved records.

An application support layer includes a word processor, a password system, hypertext and other functions. The novel word processor of the present invention is integrated with the table of the present invention to allow cells to be edited with the word processor. In addition, the table may be interfaced with external documents which allows a user to retrieve data from external documents according to the enhanced retrieval system of the present invention.

These and numerous other advantages of the present invention will be apparent from the following description.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a functional block diagram illustrating one possible computer system incorporating the teachings of the present invention.

FIG. **2** is a block diagram illustrating the main components of the present invention.

FIG. **3** illustrates the table structure of the database of the present invention.

FIG. **4** is a flow chart for a method of computing object identification numbers (OID's) that define rows and columns in the table of FIG. **1**.

FIG. **5** is a part of the table of FIG. **2** illustrating the column synchronization feature of the present invention.

FIG. **6** is a flow chart for a method of searching the table of FIG. **2**.

FIG. **7***a* is a flow chart for synchronizing columns of the table of FIG. **2**.

FIG. **7***b* illustrates the results of column synchronization.

FIG. **8***a* illustrates a reference within one column to another column.

FIG. **8***b* illustrates an alternate embodiment for referring to another column within a column.

FIG. **9** illustrates a "Record Contents" column of the present invention that indicates which columns of a particular record have values.

FIG. **10** illustrates a folder structure that organizes records. The folder structure is stored within the table of FIG. **2**.

FIG. **11** illustrates the correspondence between cells of the table of FIG. **2** and a sorted key word index.

FIG. **12** illustrates the "anchors" within a cell that relate a word in a cell to a key word index record.

FIG. **13** illustrates key word index records stored in the table of FIG. **2**.

FIG. **14** illustrates the relationship between certain data records and key word index records.

4

FIG. **15** illustrates the relationship of FIG. **14** in graphical form.

FIG. **16***a* illustrates an extended search in graphical form.

FIG. **16***b* illustrates a further extended search in graphical form.

FIG. **17** illustrates the thesaurus structure of the present invention stored in the table of FIG. **2**.

FIG. **18** illustrates prior art hypertext.

FIG. **19** illustrates the hypertext features of the present invention.

FIG. **20***a* illustrates a character and word box structure of the word processor of the present invention.

FIG. **20***b* illustrates the word and horizontal line box structure of the word processor of the present invention.

FIG. **20***c* illustrates the vertical box structure of the word processor of the present invention.

FIG. **21** illustrates the box tree structure of the word processor of the present invention.

FIG. **22***a* illustrates the results of a prior art sorting algorithm.

FIG. **22***b* illustrates the results of a sorting algorithm according to the present invention.

FIG. **23** illustrates the correspondence between cells of the table of FIG. **2** and a sorted date index.

NOTATION AND NOMENCLATURE

The detailed descriptions which follow are presented largely in terms of algorithms and symbolic representations of operations on data bits within a computer memory. These descriptions and representations are the means used by those skilled in the data processing arts to most effectively convey the substance of their work to others skilled in the art.

An algorithm is here, and generally, conceived to be a self-consistent sequence of steps leading to a desired result. These steps are those requiring physical manipulations of physical quantities. Usually, though not necessarily, these quantities take the form of electrical or magnetic signals capable of being stored, transferred, combined, compared, and otherwise manipulated. It proves convenient at times, principally for reasons of common usage, to refer to these signals as bits, values, elements, symbols, characters, terms, numbers, or the like. It should be borne in mind, however, that all of these and similar terms are to be associated with the appropriate physical quantities and are merely convenient labels applied to these quantities.

Further, the manipulations performed are often referred to in terms, such as adding or comparing, which are commonly associated with mental operations performed by a human operator. No such capability of a human operator is necessary, or desirable in most cases, in any of the operations described herein which form part of the present invention; the operations are machine operations. Useful machines for performing the operations of the present invention include general purpose digital computers or other similar digital devices. In all cases there should be borne in mind the distinction between the method operations in operating a computer and the method of computation itself. The present invention relates to method steps for operating a computer in processing electrical or other (e.g., mechanical, chemical) physical signals to generate other desired physical signals.

The present invention also relates to apparatus for performing these operations. This apparatus may be specially constructed for the required purposes or it may comprise a

6,163,775

**5**

general purpose computer as selectively activated or reconfigured by a computer program stored in the computer. The algorithms presented herein are not inherently related to a particular computer or other apparatus. In particular, various general purpose machines may be used with programs written in accordance with the teachings herein, or it may prove more convenient to construct more specialized apparatus to perform the required method steps. The required structure for a variety of these machines will appear from the description given below.

### DETAILED DESCRIPTION OF THE INVENTION

The present invention discloses methods and apparatus for data storage, manipulation and retrieval. Although the present invention is described with reference to specific block diagrams, and table entries, etc., it will be appreciated by one of ordinary skill in the art that such details are disclosed simply to provide a more thorough understanding of the present invention. It will therefore be apparent to one skilled in the art that the present invention may be practiced without these specific details.

### System Hardware

Referring to FIG. 1, the hardware configuration of the present invention is conceptually illustrated. FIG. 1 illustrates an information storage and retrieval system structured in accordance with the teachings of the present invention. As illustrated, the information storage and retrieval system includes a computer 23 which comprises four major components. The first of these is an input/output (I/O) circuit 22, which is used to communicate information in appropriately structured form to and from other portions of the computer 23. In addition, computer 20 includes a central processing unit (CPU) 24 coupled to the I/O circuit 22 and to a memory 26. These elements are those typically found in most computers and, in fact, computer 23 is intended to be representative of a broad category of data processing devices.

Also shown in FIG. 1 is a keyboard 30 for inputting data and commands into computer 23 through the I/O circuit 22, as is well known. Similarly, a CD ROM 34 is coupled to the I/O circuit 22 for providing additional programming capacity to the system illustrated in FIG. 1. It will be appreciated that additional devices may be coupled to the computer 20 for storing data, such as magnetic tape drives, buffer memory devices, and the like. A device control 36 is coupled to both the memory 26 and the I/O circuit 22, to permit the computer 23 to communicate with multi-media system resources. The device control 36 controls operation of the multi-media resources to interface the multi-media resources to the computer 23.

A display monitor 43 is coupled to the computer 20 through the I/O circuit 22. A cursor control device 45 includes switches 47 and 49 for signally the CPU 24 in accordance with the teachings of the present invention. A cursor control device 45 (commonly referred to as a "mouse") permits a user to select various command modes, modify graphic data, and input other data utilizing switches 47 and 49. More particularly, the cursor control device 45 permits a user to selectively position a cursor 39 at any desired location on a display screen 37 of the display 43. It will be appreciated that the cursor control device 45 and the keyboard 30 are examples of a variety of input devices which may be utilized in accordance with the teachings of the present invention. Other input devices, including for example, trackballs, touch screens, data gloves or other

**6**

virtual reality devices may also be used in conjunction with the invention as disclosed herein.

### System Architecture

FIG. 2 is a block diagram of the information storage and retrieval system of the present invention. As illustrated in the Figure, the present invention includes an internal database 52 that further includes a record oriented database 74 and a free-text database 76. The database 52 may receive data from a plurality of external sources 50, including word processing documents 58, spreadsheets 60 and database files 62. As will be described more fully below, the present invention includes an application support system that interfaces the external sources 50 with the database 52.

To efficiently retrieve information stored in the database 52, a plurality of indexes 54 including a keyword index 78 and other types of indexes such as phonetic, special sorting for other languages, and market specific such as chemical, legal and medical, store sorted information provided by the database 52. To organize the information in the indexes 54, a knowledge system 56 links information existing in the indexes 54.

The organization illustrated in FIG. 2 is for conceptual purposes and, in actuality, the database 52, the indexes 54 and the knowledge system 56 are stored in the same table, as will be described more fully below. This Specification will first describe the structure and features of the database 52. Next, the Specification will describe the index 54 and its implementation for searching the database 52. The Specification will then describe the knowledge system 56 that further enhances the index 54 by providing synonyms and other elements. Finally, the Specification will describe an interface between the external application programs 50 and the database 52, including a novel structured word processor and a novel password scheme.

FIG. 3 illustrates the storage and retrieval structure of the present invention. The storage and retrieval structure of the present invention comprises a table 100. The structure of the table 100 is a logical structure and not necessarily a physical structure. Thus, the memories 26 and 32 configured according to the teachings of the present invention need not store the table 100 contiguously.

The table 100 further comprises a plurality of rows 110 and a plurality of columns 120. A row corresponds to a record while a column corresponds to an attribute of a record and the defining characteristics of the column are stored in a row 108. The intersection of a row and a column comprises a particular cell.

Each row is assigned a unique object identification number (OID) stored in column 120 and each column also is assigned a unique OID, indicated in brackets and stored in row 108. For example, row 110 has an OID equal to 1100 while the column 122 has an OID equal to 101. As will be described more fully below, the OID's for both rows and columns may be used as pointers and a cell 134 may store an OID. The method for assigning the OID's will also be discussed below.

As illustrated in FIG. 3, each row, corresponding to a record, may include information in each column. However, a row need not, and generally will not, have data stored in every column. For example, row 110 corresponds to a company as shown in a cell 130. Since companies do not have titles, cell 132 is unused.

The type of information associated with a column is known as a 'domain'. Standard domains supported in most database systems include text, number, date, and Boolean.

6,163,775

**7**

The present invention includes other types of domains such as the OID domain that points to a row or column. The present invention further supports 'user-defined' domains, whereby all the behavior of the domain can be determined by a user or programmer. For example, a user may configure a 'domain to include writing to and reading from a storage medium and handling operations such as equality testing and comparisons.

According to the present invention, individual cells may be accessed according to their row and column OID's. Using the cell as the unit of storage improves many standard data management operations that previously required the entire object or record. Such operations include versioning, security, hierarchical storage management, appending to remote partitions, printing, and other operations.

### Column Definitions

Each column has an associated column definition, which determines the properties of the column, such as the domain of the column, the name of the column, whether the column is required and other properties that may relate to a column. The table **100** supports columns that include unstructured, free text data.

The column definition is stored as a record in the table **100** of FIG. 3. For example, the "Employed By" column **126** has a corresponding row **136**. The addition or rows that correspond to columns renders the table **100** self-referential. New columns may be easily appended to the table **100** by creating a new column definition record. The new column is then immediately available for use in existing records.

### Dates

Dates can be specified numerically and textually. An example of a numerical date is "11/6/67" and an example of a textual date is "Nov. 6, 1967." Textual entries are converted to dates using standard algorithms and lookup tables. A date value can store both original text and the associated date to which the text is converted, which allows the date value to be displayed in the format in which it was originally entered.

### Numbers

Numeric values are classified as either a whole number (Integer) or fractional number. In the preferred embodiment, Integers are stored as variable length structures, which can represent arbitrarily large numbers. All data structures and indexes use this format which ensures that there are no limits in the system.

Fractional numbers are represented by a <numerator/ denominator> pair of variable length integers. As with dates, a numeric value can store both the original text ("4½ inches") and the associated number (4.5). This allows the numeric value to be redisplayed in the format in which it was originally entered.

### Type Definitions

A record can be associated with a 'record type'. The record type can be used simply as a category, but also can be used to determine the behavior of records. For example, the record type might specify certain columns that are required by all records of that type and, as with columns, the type definitions are stored as records in the table **100**. In FIG. **3**, column **122** includes the type definition for each record. The column **122** stores pointers to rows defining a particular column type. For example, the row **136** is a "Field" type

**8**

column and contains a pointer in a cell **133** to a row **135** that defines "Field" type columns. The "Type Column" **122** of the row **135** points to a type called "Type," which is defined in a row **140**. "Type" has a type column that points to itself.

Record types, as defined by their corresponding rows, may constrain the values that a record of that type may contain. For example, the record type 'Person' may require that records of type 'Person' have a valid value in the 'Name' column, the 'Phone' column, and any other columns. The type of a record is an attribute of the record and thus may change at any time.

### Creating a Unique OID

As previously described, the system must generate a unique OID when columns and rows are formed. FIG. 4 is a flow chart of the method for assigning OID's.

At block **200** of FIG. 4, the CPU **24** running the database program stored in the memory **26** requests a timestamp from the operating system. At block **210**, the system determines whether the received timestamp is identical to a previous timestamp. If the timestamps are identical, block **210** branches to block **220** and a tiebreaker is incremented to resolve the conflict between the identical timestamps. At block **222**, the system determines whether the tiebreaker has reached its limit, and, if so, the system branches to block **200** to retrieve a new time stamp. Otherwise, the system branches to block **214** where the system requests a session identification which is unique to the user session.

In the preferred embodiment, the session identification is derived from the unique serial number of the application installed on the users machine. For certain OID's which are independent of any particular machine, the session identification may be used to determine the type of object. For example, dates are independent of any particular machine, and so an OID for a date may have a fixed session identification.

Returning to block **210**, if the timestamps are not identical, control passes to block **212** where the tiebreaker is set to zero and control then passes to block **214**. As previously described, at block **214**, the system requests a session identification which is unique to the user session. Control then passes to block **216** where the session identification, timestamp and tiebreaker are combined into a bit array, which becomes the OID. Since the OID is a variable length structure, any number of bits may be used, depending on the precision required, the resolution of the operating system clock, and the number of users. In the preferred embodiment, the OID is 64 bits long where the timestamp comprises the first 32 bits, the tiebreaker comprises the next 10 bits and the session identification comprises 22 bits.

The particular type of OID and its length is constant throughout a single database but may vary between databases. A flag indicating which type of OID to be used may be embedded in the header of each database.

### OID Domains

OID domains are used to store OID's, which are pointers to other records. An efficient query can use these OID's to go directly to another record, rather than searching through columns.

If a user wishes to search a column to find a record or records with a certain item in the column, and does not know the OID of the item, the present invention includes a novel technique for determining an OID from the textual description. Conversion from text to an OID may also be necessary

6,163,775

9

when a user is entering information into a record. For example, in FIG. 3, the user may be entering information in the "Employed By" column 126, and wish to specify the text "DEXIS" and have it converted to OID #1100. For this purpose, special columns are required that provide a definition for how the search and conversion is performed.

FIG. 6 is a flow chart for searching the table 100 configured according to the structure illustrated in FIG. 5. At block 150, a user enters text through the keyboard 30 or mouse 45 for a particular column that the user wishes to search. At block 152, the system retrieves the search path for the column to be searched from the information stored in column 146 as illustrated in FIG. 5. Continuing with the above example, a cell 146 in the row 136 contains the search path information for the "Employed By" column 126 of FIG. 3. The search path information for the "Employed By" field indicates that the folders called "\contacts" and "\departments" should be searched for a company with the label "DEXIS."

Returning to FIG. 5, the system searches the table 100 according to the retrieved search path information. For each folder specified in the search path, the routine searches for a record that has an entry in the label column 124 of FIG. 2 that is the same as the text being searched for, and is of the same class, as indicated in column 122 of FIG. 3. Folders will be further described below.

At block 156, the system determines whether it has found any items matching the user's search text. If no items have been found, at block 158, the system prompts the user on the display screen 37 to create a new record. If the user wishes to create a new record, control passes to block 162 and the system creates a new record. At block 164, the OID of the new record is returned. If the user does not wish to create a new record, a "NIL" string is returned, as shown at block 160.

If the system has located at least one item, the system determines whether it has found more than one item, as illustrated in block 166. If only one item has been located, its OID is returned at block 168. If more than one item has been located, the system displays the list of items to the user at block 170 and the user selects a record from the list. At block 172, the OID of the selected record is returned, which, in the above example, is #1100, the OID of the record for the company "DEXIS."

In alternate embodiments, various features may be added to the search mechanism as described with reference to FIG. 6. For example, further restrictions may be added to the search; the search may be related by allowing prefix matching or fuzzy matching instead of strict matching; and the search may be widened by using the 'associative search' techniques described below.

## Two Way Synchronized Links

Records may have interrelationships between interrelated records. For example, a record including data for a company may include information regard employees of that company, as illustrated in row 110 of FIG. 3. Similarly, the employees that work for that company may have a record that indicates, by a pointer, their employer, as illustrated by row 138 of FIG. 3. Thus, the employee column of a company should point to employees whose employer column points to that company. The present invention includes a synchronization technique to ensure that whenever interrelated records are added or removed, the interrelationships between the columns are properly updated.

10

The system synchronizes interrelated records by adding a "Synchronize With" column 144 to the table 100 as illustrated in FIG. 5. Since the value in the columns defines the relatedness between records, the rows 136 and 139 corresponding to columns contain information within the "Synchronize With" column 144 that indicates which other columns are to be synchronized with the columns corresponding to rows 136 and 139. With reference to FIG. 5, the "Employed By" column 126 is synchronized with the "Employees" column by an OID pointer in the "Synchronize With" column 144 to the "Employees" column, represented by row 139. Similarly, the "Employees" column is synchronized with the "Employed By" column 136 by a pointer in the "Synchronize With" column 144 to the "Employed by" column 134, represented by row 136. Thus, whenever an employee changes companies, such that the employee's "Employed By" column changes, the "Employee" column of the previous employer is updated to eliminate the pointer to the ex-employee and, correspondingly, the addition of the employee in the "Employed By" field of the new employer. Synchronization may need to occur whenever a column is changed, whether by addition or subtraction of a reference to another column, or when entire records are added or eliminated from the table 100.

FIG. 7a is a flow chart for synchronizing records when a user adds or deletes a record. At block 180, the system makes a backup of the original list of references to other rows, which are simply the OID's of those other rows, so that it can later determine which OIDS have been added or removed. Only these changes need to be synchronized. At block 182, the system generates a new list of references by adding or deleting the specified OID. At block 184, the system determines whether the relevant column is synchronized with another column. If it is not, then the system branches to block 186 and the update is complete. If the column is synchronized with another column, the system determines whether it is already in a synchronization routine. If this were not done, the routine would get into an endless recursive loop. If the system is already in a synchronization routine, the system branches to block 190 and update is complete.

Otherwise, the system performs actual synchronization. At block 192, the system finds an OID that has been added or subtracted from the column (C1) of the record (R1) being altered. The system retrieves the record (R2) corresponding to the added or subtracted OID at block 194. The system determines the synchronization column (C2) of the column (C1) at block 196 and locates that field in the added or subtracted OID. For example, if an employer is fired from a job, and the employer's "Employed By" field changed accordingly, the system would look up the value of the "Synchronize With" column 144 for the "Employees" column which is contained in the cell 147 as illustrated in FIG. 5. Since cell 147 points to the "Employed By" field, the system locates the "Employed By" field of the record for the fired employee. At block 198 of FIG. 7a, the located cell, (R2:C2), is updated by adding or subtracting the OID. Continuing with the above example, the "Employed By" field of the employee would be changed to no longer point to the previous employer by simply removing the employer's OID from that field. The system branches back to block 192 to update any other OID additions or subtractions. If the system has processed all of the OID's, then the routine exits as illustrated at blocks 200 and 202.

FIG. 7b illustrates the results of column synchronization of the "Employed By" field and the "Employees" field. As shown, the pointers in the records of these two columns are consistent with one another.

6,163,775

## 11

### Columns Within Columns

A column may contain within it a reference to another column in the same record. For example, a 'name' column may contain a reference to both a 'first name' and a 'last name' column. The value of the 'name' column can then be reconstructed from the values of the other two columns. FIGS. 8a and 8b illustrate two possible implementations for reconstructing a value from one or more columns within the same record.

FIG. 8a illustrates a table 210 that includes a "First Name" column 220, a "Last Name" column 222 and a "Name" column 224. A record 226 for "John Smith" has the first name "John" in the "First Name" column 220 and the last name "Smith" in the column 222. The name field 224 returns the text "The name is John Smith" by referencing the fields in brackets, according to the format <fieldRef field='Column Name'> as shown in column 224.

FIG. 8b employs a variant of the referencing scheme illustrated in FIG. 8a. FIG. 8a illustrates a table 230 that includes a "First Name" column 232, a "Last Name" column 234 and a "Name" column 236. A record 238 for "John Smith" has the first name "John" in the "First Name" column 232 and the last name "Smith" in the column 234. The name field 236 returns the text "The name is John Smith" by referencing the fields by defined variables 'fn' and 'ln' as shown in column 236. The variables are defined according to the format variable:=fieldAt (parameter, 'Column Name') and the variables may be referenced in a return statement as shown in column 236.

### Record Contents

As previously described, a given row may contain values for any column. However, to determine all of the columns that might be used by a record involve scanning every possible column. To avoid this problem, in the preferred embodiment, the table 100 illustrated in FIG. 3 includes a "RecordContents" column that indicates those columns within which a particular record has stored values.

FIG. 9 illustrates the table 100 with a "RecordContents" column 127 that includes pointers to the columns containing values for a particular record. For example, the "Record-Contents" column 127 for row 110 has pointers to the column 124 and a column 125 but does not have a pointer to the column 126 because the row 110 does not have a value for the column 126. As previously described, since every column has a corresponding row that defines the column, the "RecordContents" column 127 has a defining row 129. Like any cell, the cell containing the record contents can be versioned, providing the ability to do record versioning.

### Folders

To provide increased efficiency in managing information, the table 100 includes a data type defined as a folder. FIG. 10 illustrates the structure of a folder. As illustrated in the Figure, the table 100 includes a "Parent Folder" column 240 and a "Folder Children" column 242. A folder has a corresponding record. For example, a folder entitled "Contacts" has a corresponding row 244 as illustrated in FIG. 10. The "Folder Children" column 242 of the "Contacts" folder includes pointers to those records that belong to the folder. Similarly, those records that belong to a folder include a pointer to that folder in the "Parent Folder" column 240.

The folder structure illustrated in FIG. 10 facilitates searching. As previously described, a column may be searched according to a folder specified in the column

## 12

definition. If a folder is searched, the system accesses the record corresponding to the folder and then searches all of the records pointed to by that folder.

Further, the synchronization feature described above may be used to generate the list of items in a folder. For example, in FIG. 10, the 'Folder Parent' and 'Folder Children' columns may be synchronized. When the 'Folder Parent' field 240 for record 138 is set to reference the 'Contacts' folder represented by row 244, the list of items in the 'Contacts' folder ('FolderChildren') is automatically updated to store a reciprocal reference to record represented by row 138 by including its OID, 1100, in the "Folder Children" column 242.

### Text Indexing System

The present invention includes an indexing system that provides for rapid searching of text included in any cell in the table 100. Each key phrase is extracted from a cell and placed in a list format according to a predefined hierarchy. For example, the list may be alphabetized, providing for very rapid searching of a particular name.

FIG. 11 illustrates the extraction of text from the table 100 to a list 250. The list 250 is shown separately from the table 100 for purposes of illustration but, in the preferred embodiment, the list 250 comprises part of the table 100. The list 250 stores cell identification numbers for each word in the list where a cell identification number may be of the format <record OID, column OID >. For example, the word "Ventura" occurs in cells 252, 254 and 256 that correspond to different rows and different columns. The word "Ventura" in the list 250 contains a pointer, or cell identification number, to cells 252, 254 and 256.

Similarly, each cell stores the references to the key phrases within it using 'anchors'. As illustrated in FIG. 12, an anchor contains a location (such as the start and stop offset within the text), and an identification number. Both the text and the anchor are stored in the cell 252. Other kinds of domains also support anchors. For example, graphical images support the notion of 'hot spots' where the anchor position is a point on the image.

As previously described, each key phrase is stored as a record in the database and the OID of the record equals the identification number described with reference to FIG. 12. One column stores the name of the key phrase and another stores the list of cell identification numbers that include that phrase. Key phrases may have comments of their own, which may also be indexed.

The sorted list 250 as illustrated in FIG. 11 is stored as a Folder, as illustrated in FIG. 13. A cell identification field 274 maintains the cells that include the term corresponding to that record. The "Parent Folder" column 240 for each of the terms on the list 250 indicates that the parent folder is an index with a title "Natural." The "Natural" folder has a row 276 that has pointers in the "Folder Children" column 242 to all of the terms in the list 250.

The "Natural" folder corresponds to an index sorted by a specific type of algorithm. Computer programs generally sort using a standard collating sequence such as ASCII. The present invention provides an improvement over this type of sorting and the improved sorting technique corresponds to the "Natural" folder. Records in the "Natural" folder are sorted according to the following rules:

1) A key phrase may occur at more than one point in the list. In particular:

   1a) Key phrases may be permuted and stored under each permutation. For example: 'John Smith' can be

6,163,775

**13**

stored under 'John' and also under 'Smith'. Noise words such as 'a' and 'the' are ignored in the permutation.

1b) Key phrases which are numeric or date oriented may be stored under each possible location. For example: '1984' can be stored under the digit '1984' and also under 'One thousand, nine hundred. . .', and 'nineteen eighty four'.

2) Numbers are sorted naturally. For example, '20' comes after '3' and before '100'.

3) Prefixes in key phrases are ignored. For example, 'The Big Oak' is sorted under 'Big'.

4) Key phrases are stemmed, so that 'Computers' and 'Computing' map to the identical key phrase record.

The preferred embodiment of the routine for generating positions for entering the key phrases into the 'Natural' folder is as follows:

1) Capitalize the key phrase to avoid case sensitivity problems. For example: 'John Smith the 1st' becomes 'JOHN SMITH THE 1ST'.

2) Each word in the key phrases is stemmed using standard techniques. Eg "COMPUTERS" becomes "COMPUT".

3) Permute the key phrase. This results in a new set of multiple key phrases based on the original key phrase. For example 'JOHN SMITH THE 1ST' produces the set {'JOHN SMITH THE 1ST'; 'SMITH THE 1ST JOHN'; 'THE 1ST JOHN SMITH'; '1ST JOHN SMITH THE'}.

4) Noise prefixes are eliminated. In the example above, the third entry, 'THE 1ST JOHN SMITH', is eliminated. If no phrases are left after elimination, the original phrase is used. For example, an entry for 'TO BE OR NOT TO BE' would be preserved even if all noise words were eliminated.

5) For each result, numbers and dates are expanded to all possible text representations, and text representations are converted to numeric. For example: '1ST JOHN SMITH THE' generates the set: {'1ST JOHN SMITH THE'; 'FIRST JOHN SMITH THE'}

6) Finally, each modified key phrase is used to determine the position of a reference to the main key phrase record, and an entry is made in the folder accordingly. For example, '1ST JOHN SMITH THE' is stored between '1' and '2', while 'FIRST JOHN SMIT THE' is stored after 'FIR' and before 'FIS.'

FIG. 22a illustrates the results of a prior art sorting algorithm while FIG. 22b illustrates the results of a sorting algorithm according to the present invention.

### Extracting the Key Phrases

To generate a sorted list, the system must first extract the key phrases or words from the applicable cells. The combination of structured information and text allows various combinations of key phrase extraction to be used. In full text extraction, every word is indexed, which is typical for standard text retrieval systems. In column extraction, the whole contents of the column are indexed which corresponds to a standard database system. According to a third type of extraction, automatic analysis, the contents of the text are analyzed and key phrases are extracted based on matching phrases, semantic context, and other factors. Finally, in manual selection extraction, the user or application explicitly marks the key phrase for indexing.

### Date Indexing System

The date indexing scheme is very similar to the text indexing scheme as previously described. Important dates

**14**

are extracted from the text and added to an 'Important Date' list. Each important date is represented by a 'Important Date' record. The 'Important Date' records are stored in a 'Important Dates' folder, which is sorted by date.

The important dates are extracted from the text. The system may search for numeric dates, such as '4/5/94' or date-oriented text, such as "Tomorrow", "next Tuesday" or "Christmas". FIG. 23 illustrates the correspondence between cells of the table of FIG. 2 and a sorted date index.

Important Date records are assigned special predetermined OIDS since they always have the same identity in any system. Assigning predetermined OID's to dates allows Important Dates to be shared across systems. The predetermined OID is generated by using a special session identification number that signifies that the OID is an Important Date. In this case, the timestamp represents the value of the Important Date itself, not the time that it was created.

### Associative Queries

As previously described, a sorted key word list is generated from the text in cells and list stored in a folder whose records point to the text cells. The associations between the list of records with text and the list of key phrases is two-way since the cells that include text point to the key words. FIG. 14 illustrates this two way correspondence. Each record can point to multiple key phrases, and each key phrase can point to multiple records.

FIG. 15 is a graphical representation of the two way association between records and the key word list. Each record in a plurality of records 298 through 300 may point to one or more important word entries 310 through 312. Similarly, each important word entry may point to one or more records. A single text search involves starting at one node (on either side of the graph) and following the links to the other side. For example, a user may wish to find the records including the word "Shasta." First, the important word index would be accessed to find the word "Shasta" and the records pointed to by this word would then be retrieved. This search is indicated by the arrows 314 and 316 where word "Shasta" corresponds to cell 318. Similarly, a user may wish to locate all of the important words included in a particular record, indicated by the arrows 320 and 322 in FIG. 15.

The search can be extended by repeatedly following the links back and forth to the desired level. FIG. 16a illustrates this concept. As an example, the term "Shasta" may correspond to a dog with extraordinary intelligence such that in one record, "Shasta" is described as a dog and another record, 'Shasta' is described as a genius. If the user wishes to find the words associated with 'Shasta', the system locates "Shasta" in the "Important Words" folder which points to the records including the word "Shasta." In turn, the records pointed to contain pointers to the "Important Words" list for each indexed word in the record. Since "Shasta" appears with "dog" and "genius" in the records, these words are retrieved by the system.

This type of searching may be extended indefinitely. FIG. 16b illustrates an additional level of searching. Continuing with the above example, the word "genius" may occur in records referring to Dirac, and the word "dog" associated with "Checkers," such that the multilevel search illustrated in FIG. 16b results in a retrieval of "Dirac" and "Checkers" when provided with the word "Shasta."

A relevance ranking can be created based on weights associated with each link and type of key word, and the records can be displayed in order of descending relevance.

**A255**

6,163,775

**15**

In the preferred embodiment, if two or more nodes are used as the starting point, the relevance is based on the distance from all nodes. In this way, only nodes which are near all the initial nodes will have a high relevance. Many other relevance rankings apart from distance may be used.

To refine the search, filters can be used to constrain the links that are followed. For example, the search may be filtered such that only the type "Person" is listed such that, in the above example, Shasta will be associated with Dirac but not Checkers.

Knowledge Base and Thesaurus

The present invention includes a knowledge base and thesaurus to further improve searching capabilities.

Each important word record (term) included within the thesaurus contains a pointer to a 'concept' record. Each concept record contains pointers to other concept records, and to the terms that are included within the bounds of that concept. FIG. 17 illustrates the structure of the thesaurus. The table **100** includes a "Parent Concept" column **352**, a "Concept Name" column **354**, a "Synonyms" column **356**, a "More Specific Terms" column **358**, a "More General Terms" column **360** and a "See Also" column **362**. A concept record **350** defines the concept "IBM" and the Synonyms column **356** points to records that are synonymous with IBM, a record **364** with a label field with the value "IBM" and a record **366** with a label field with the value "International Business Machines." The records **364** and **366** have pointers in the "parent concept" field that point to the parent concept record **350**.

The thesaurus structure illustrated in FIG. 17 provides for greater flexibility than exact synonyms. The "More Specific Terms" column **358** of the concept record **350** associated with "IBM" points to a concept record **368** associated with the IBM PC with an assigned weight of 100%, where the weight percentage reflects the similarity between the initial term "IBM" and the related term "IBM PC." Similarly, the "More General Terms" column **360** of the concept record **350** associated with "IBM" points to a concept record **372** associated with Computer Companies with an assigned weight of 60%. The "See also" column points to a record associated with the concept "Microsoft" with a weight of 70%, where the weight percentage reflects the similarity between the initial term "IBM" and the related term "IBM PC."

The Thesaurus illustrated in FIG. 17 enhances the searching mechanisms previously described with reference to FIGS. 14–16b. The system first locates the record associated with a key word and locates the parent concept record pointed to by the key word record. The system may then follow some or all of the pointers in the columns **356**, **358**, **360** and **352** and return of the OID's stored in the 'Concept Name' column **354**.

Since key phrases and concepts are stored as records in this system, any other columns may be used to extend the knowledge and information stored therein. In particular, through the use of OID's, the system can store any kind of relationship, including relationships other than thesaural relationships, between key phrases, concepts and other records.

Application Support

The database of the present invention has been described without reference to its interface with applications that may use the invention as their primary storage and retrieval

**16**

system. As previously described with reference to FIG. **2**, the present database includes an interface to support applications programs. Components in the application support system include external document support, hypertext, document management and workflow, calendaring and scheduling, security and other features.

Further, the present invention includes various user interface components that allow have been developed to provide full access to the structure of the database of the present invention. In particular, a new kind of structured word processor will be presented. The Specification will describe each component of the application support system separately.

External Documents

The present invention supports indexing of external documents. The table **100** stores the filenames of documents, such as word processor documents, where the contents of the files are not directly stored in the database. The documents names may be stored in a column with a specialized "External Document" domain. The external documents may reside in the mass memory **32** or on a multi-source that interfaces with the system through device control **36**.

To index documents external to the table **100**, prior to processing, an external document is converted into a plain text format. Key phrases are then extracted as previously described. In particular, fields in the text can be determined and mapped to fields within the database. For example, a 'Memo' document may contain the text: 'To: John Smith. From: Mary Doc'. This text can be mapped to the fields called 'to' and 'from', and the values of these fields set accordingly. The analysis of the text in this way can be changed for different types of external documents such as memos, legal documents, spread sheets, computer source code and any other type of document. For each extracted key phrase, a start and stop point within the text is determined. A list of anchors of the format previously described, <start, stop, key phrase> is generated by the parser and stored within the table **100** under the external document domain.

Viewing External Documents

When a user views an external document on the display screen **37**, the stored anchors are overlaid on top of the document such that it appears that the external document has been marked with hypertext. When the user clicks the switches **45** or **47** of the mouse **50** on a section of the external document display, the corresponding anchor is determined from the various start and stop coordinates. The OID of the key phrase corresponding to the anchor is stored within the anchor, and can be used for the purposes of retrieving the key phrase record or initiating a query as previously described.

Dynamic Hypertext

The present invention supports Hypertext. Hypertext systems typically associate a region of text with a pointer to another record, as illustrated in FIG. 18. This creates a 'hard-coded' link between the source and the target. When user clicks on the source region, the target record is loaded and displayed. If the target record is absent, the hypertext jump will fail, possibly with serious consequences.

The present system uses a new approach based on a dynamic association between records. In the preferred embodiment, each hypertext region is associated with a key phrase, not a normal record. When the user clicks the

6,163,775

## 17

switches 45 or 47 of the mouse 50 on the source region, all the records associated with the key phrase are retrieved and ranked using any of the associative search techniques previously described. As illustrated in FIG. 19, the application can then display on the display screen 37 either the highest ranked item, or present all the retrieved items and allow the user to pick the one to access.

In certain applications, the user may want to access a single 'default' item. This item can be determined automatically, by picking the item at the top of the dynamically generated list, or manually, by letting the user pick the item explicitly and then preserving this choice in the anchor itself.

### The Generic Word Processor

The database of the present invention includes a novel Structured Word Processor that may be used in conjunction with the table 100.

The structured word processor of the present invention uses the "boxes and glue" paradigm introduced by Donald Knuth in $T_{E}X$. According to this paradigm, a page of text is created by starting with individual characters and concatenating the characters to form larger units, called "boxes," and then combining these boxes into yet larger boxes. FIG. 20a illustrates three character boxes 400, 402 and 404 concatenated to form a word box 406. FIG. 20b illustrates four word boxes 410, 412, 414 and the word box 406 combined to form a horizontal line box 408. Horizontal boxes are used for words and other text tokens that are spaced horizontally inside another box, such as a line (or column width). FIG. 20c illustrates the combination of the horizontal line box 408 with another horizontal line box 424² to form a vertical box 420. Vertical boxes are used for paragraphs and other objects that are spaced vertically inside other boxes, such as page height.

Boxes may be attached to other boxes with "glue." The glue can stretch or shrink, as needed. For example, in a justified sentence, the white space between words is stretched to force the words to line up at the right edge of the column. Glue can be used for between-character (horizontal) spacing, between-word (horizontal) spacing including "tab" glue, that "sticks" to tab markings. Glue may also be used for between-line (vertical) spacing and between-paragraph (vertical) spacing.

When a record of the table 100 is edited, each word and field definition is converted into boxes. The system organizes these boxes into a tree structure of line boxes and paragraph boxes, as illustrated in FIG. 21. Shown there is a record hierarchy 460, corresponding to the hierarchy of a record, and a layout hierarchy 470, corresponding to the hierarchy of a layout such as a document generated according to the word processor described with reference to FIGS. 20a–20c. The record structure hierarchy 460 represents the record structure of the table 100 where a record 462 corresponds to a row in the table 100 and the record 462 includes a plurality of attributes, including attribute 464, that correspond to the columns of the table 100. In turn, the attributes may include a variety of items. For example, the attribute 464 includes text, represented by block 466, field references represented by block 468 and other items as shown.

The layout hierarchy 470 comprises a document 472 which in turn comprises a plurality of pages, including page 474. The page 474 comprises a plurality of paragraphs including paragraphs 430 and 431 and the paragraph 430 comprises a plurality of lines, including lines 432 and 434. The paragraph 431 includes line 436.

## 18

The word processor of the present invention allows the document 472 to be inserted into the record 462 by providing a plurality of boxes, including boxes 438, 440 and 442, common to both the record structure hierarchy 460 and the layout hierarchy 470. For example, the box 438 corresponds to part of the line 432 and comprises part of the text of attribute 464 as illustrated by block 466. Similarly, the box 440 corresponds to part of the line 434 and may comprise a field reference as indicated by block 468. Thus, the shared box structure as illustrated in FIG. 21 allows any type of word processing document to interface with any record in the table 100.

Conceptually, each box is kept as a bitmap, and its height and width are known, so the system displays the tree structure 450 by displaying all of the bitmaps corresponding to the boxes in the tree. If the tree is changed, for example, by adding a new word, only the new word box and a relatively small number of adjacent boxes need be recalculated. Similarly, line breaks or restructuring of a paragraph does not alter most of the word boxes, which may be reused, and only the lineboxes need be recalculated.

To edit the tree structure 450 as illustrated in FIG. 21, a user may click a cursor on a part of the text. The system locates the word box or glue that is being edited by a recursively descending through the tree structure 450.

The word processor supports multiple fonts and special effects such as subscripts, dropcaps and other features including graphic objects. A word in a different font than a base font is in a different box and may have a different height from other boxes on a line. The height of a linebox the height of the largest wordbox within it. Effects within a word can be handled by breaking a word into subboxes with no glue between them. Again, the height of a wordbox is the height of the largest box within it. Graphic objects, such as bitmaps, may be treated and formatted as a fixed width box.

The word processor of the present invention may be used to edit records in the table 100. The text associated with each field in a record can be considered a "paragraph" for the purposes of inter-field spacing, text flow within a field, and other formatting parameters. Storing all the fields in the same way during text-editing allows the movement of text and "flow" to appear natural.

As previously described, the text being edited is divided into fields, with each field corresponding to a column in the underlying database. Unlike a traditional static data entry form, the positions and sizes of the attributes are not fixed but are dynamic and all the features of a word-processor such as fonts and embedded graphics are available to edit the record fields.

Similarly, all of the features of a database such as lookups and mailmerge are available to the word processor. All of the attributes that apply to data entry for a particular field are enforced by the word processor. Such attributes might include a mask (such as ###-####), existence requirements, range and value constraints, etc. The fields can be explicitly labelled, or hidden and implied.

The word processor of the present invention allows existing fields to be added by typing the prefix of a field name and pressing a button. The system then completes the rest of the field name automatically.

The word processor of the present invention supports other database features. For example, new fields can be created by a user by using a popup dialog box. Similarly, references to other records or important words can be added by a dialog box. With particular regard to the table 100 of the present invention, OID references may support fields within

6,163,775

**19**

other fields and a particular field within other fields supports the use of 'templates,' where a template is a list of field references embedded in text. For example, the template "Enter the first name here <fieldref id=firstName> and the last name here <fieldref id=lastName>" would appear to the user as "Enter the first name here: John and the last name here: Doe." Templates allow a user to build dynamic forms quickly and easily without having to use complicated form drawing tools.

The user interface for the word processor of the present invention allows a user to switch between two modes of data entry. The word-processor of the present invention is used for flexible entry into one record at a time, while a columnar view is used for entering data in columns. The user can switch back and forth between these two views with no loss of data and switching from the word processor to the columnar view will cause the fields that were entered in the single item to become the columns to be displayed in the columnar view.

Finally, the 'fields within fields' that are apparent in the word processor view become separated into columns in a columnar view. The user can then make changes in columnar mode, and then, when switching back to the word processor view, the columns become combined once again.

### Passwords

It is often required that access to particular data items be restricted to certain users. In order to apply these restrictions, an information management system must determine the identity of the user requesting access. This is currently done in two ways, physically measuring a unique quality of the uses of requesting information from the user, most current information management systems rely on the second approach, by using 'passwords'. However, to avoid security problems with a password system, three guidelines are applied to passwords:

a) the password should not be made of common words, because an aggressor can use a brute force approach and a dictionary to guess the password;

b) the password should be longer rather than shorter; and

c) the password should be changed often, so that even if is stolen it will not be valid for long.

Finally, a password should never be written down or embedded into a login script and should always be interactive.

According to the present password system, a user's identity is determined through an extensive question and answer session. The responses to certain personal questions very quickly identify the user with high accuracy. Even an accurate mimic will eventually fail to answer correctly if the question and answer session is prolonged.

For example, sample questions might be: 'What is your favorite breakfast cereal?'; 'Where were you in April 1990?' 'What color is your toothbrush?'. These questions are wide ranging and hard to mimic. Furthermore, the correct responses are natural English sentences, with an extremely large solution space, so that a brute force approach is unlikely to be successful.

To improve the effectiveness of the response, an exact matching of user response and stored answer is not required and 'fuzzy' and 'associative' matching can be used according to the synonym, thesaurus and other features of the present invention.

According to the password system of the present invention, the user creates the list of questions and corresponding answers, which are then stored. Because the user has complete control over the questions, the user may find

**20**

the process of creating the questions and answers enjoyable, and as a result, change the questions and answer list more frequently, further enhancing system security.

According to the preferred embodiment, a user creates a list of 50–100 questions and answers that are encrypted and stored. The questions can be entirely new, or can be based on a large database of interesting questions. When the user logs on the system, the system randomly selects one of the questions related to that user and presents the question to the user. The user then types in a response, which is matched against the correct answer. The matching can be fuzzy and associative, as described above. If the response matches correctly, access is allowed.

In an alternate embodiment, more security may be provided by repeatedly asking questions until a certain risk threshold is reached. For example, if the answer to 'What color is your toothbrush?' is the single word 'Red', then brute force guessing may be effective in this one case. In this scenario, repeatedly asking questions will diminish the probability of brute force success.

### Summary

While the invention has been described in conjunction with the preferred embodiment, it is evident that numerous alternatives, modifications, variations and uses will be apparent to those skilled in the art in light of the foregoing description. Many other adaptations of the present invention are possible.

What is claimed is:

1. A data storage and retrieval system for a computer having a memory, a central processing unit and a display, comprising:

means for configuring said memory according to a logical table, said logical table including:

a plurality of cells, each said cell having a first address segment and a second address segment;

a plurality of attribute sets, each said attribute set including a series of cells having the same second address segment, each said attribute set including an object identification number (OID) to identify each said attribute set; and

a plurality of records, each said record including a series of cells having the same first address segment, each said record including an OID to identify each said record, wherein at least one of said records has an OID equal to the OID of a corresponding one of said attribute sets, and at least one of said records includes attribute set information defining each of said attribute sets.

2. The system of claim 1 wherein said attribute set information defines one of said attribute sets to contain information for enabling determination of OIDs from text entry.

3. The system of claim 1 wherein said one of said attribute sets contains information including a search path that references a folder, said folder including a group of records of a similar type.

4. The system of claim 1, wherein said attribute set information defines one of said attribute sets to contain information for synchronizing two attribute sets reciprocally.

5. The system of claim 4 wherein said one of said attribute sets contains information including reciprocal pointers to said two attribute sets.

6. The system of claim 1 wherein:

at least one of said plurality of records includes information defining the type of a different record; and

6,163,775

21

at least one of said plurality of records includes a cell that contains a pointer to said record including record type information.

**7.** The system of claim 1 wherein at least one of said attribute sets defines cells that include a plurality of pointers to other attribute sets within the same record, said pointers indicating those attribute sets within the same record that contain defined values.

**8.** The system of claim 1 wherein at least one of said records is a folder type record, said folder type record including at least one cell that contains data and a plurality of pointers to a plurality of other records included within said folder.

**9.** The system of claim 8 wherein said plurality of other records included within said folder each includes a cell that contains a pointer to said folder type record.

**10.** The system of claim 1 wherein said OID's are variable length and include data related to a session identification number and a timestamp.

**11.** A data storage and retrieval system for a computer having a memory, a central processing unit and a display, comprising:

means for configuring said memory according to a logical table, said logical table including:

a plurality of cells, each said cell having a first address segment and a second address segment;

a plurality of attribute sets, each said attribute set including a series of cells having the same second address segment, each said attribute set including an object identification number (OID) to identify each said attribute set;

a plurality of records, each said record including a series of cells having the same first address segment, each said record including an OID to identify each said record, at least one of said records contains a cell having a pointer to a different record and at least one of said records includes attribute set information defining each of said attribute sets; and

means for searching said table for said pointer.

**12.** The system of claim 11 wherein at least one of said attribute sets defines cells that include a plurality of pointers to other attribute sets within the same record, said pointers indicating those attribute sets within the same record that contain defined values.

**13.** The system of claim 11 wherein at least one of said records is a folder type record, said folder type record including at least one cell that contains data and a plurality of pointers to a plurality of other records included within said folder.

**14.** The system of claim 13 wherein said plurality of other records included within said folder each includes a cell that contains a pointer to said folder type record.

**15.** A data storage and retrieval system for a computer having a memory, a central processing unit and a display, comprising:

means for configuring said memory according to a logical table, said logical table including:

a plurality of cells, each said cell having a first address segment and a second address segment;

a plurality of attribute sets, each said attribute set including a series of cells having the same second address segment, each said attribute set including an object identification number (OID) to identify each said attribute set;

a plurality of records, each said record including a series of cells having the same first address segment, each said record including an OID to identify each

22

said record, at least one of said plurality of records contains a cell having a pointer to a different record and at least one of said plurality of records includes information defining the type of a different record; and

means for searching said table for said pointer.

**16.** A data storage and retrieval system for a computer having a memory, a central processing unit and a display, comprising:

means for configuring said memory according to a logical table, said logical table including:

a plurality of cells, each said cell having a first address segment and a second address segment;

a plurality of attribute sets, each said attribute set including a series of cells having the same second address segment, each said attribute set including an object identification number (OID) to identify each said attribute set; and

a plurality of records, each said record including a series of cells having the same first address segment, each said record including an OID to identify each said record, wherein said OID's are variable length.

**17.** A data storage and retrieval system for a computer having a memory, a central processing unit and a display, comprising:

means for configuring said memory according to a logical table, said logical table including:

a plurality of cells, each said cell having a first address segment and a second address segment;

a plurality of attribute sets, each said attribute set including a series of cells having the same second address segment, each said attribute set including an object identification number (OID) to identify each said attribute set;

a plurality of records, each said record including a series of cells having the same first address segment, each said record including an OID to identify each said record; and

means for indexing data stored in said table.

**18.** The system of claim 17 wherein said indexing means further comprises:

means for searching a plurality of cells within said table for a key word, said searching means capable of searching a attribute set containing unstructured text and a attribute set containing structured data; and

means for inserting into said table a record corresponding to said key word.

**19.** The system of claim 18 wherein:

said inserted record includes a cell that contains a pointer to a searched cell that contains the keyword corresponding to said inserted record; and

said searched cell that contains a keyword corresponding to said inserted record contains a pointer to said inserted record.

**20.** The system of claim 19 wherein said pointer to said searched cell includes the OID's of the attribute set and record defining said searched cell.

**21.** The system of claim 19 wherein said searched cell includes an anchor that marks said key word.

**22.** The system of claim 18 wherein one of said plurality of records of said table includes a folder type record that includes at least one pointer to said key word.

**23.** The system of claim 18 wherein said searching means further includes:

means for searching for every word in a text cell;

means for searching for every entry in a attribute set;

6,163,775

23

means for searching for data based on automatic analysis; and

means for searching for data marked by a user.

24. A data storage and retrieval system for a computer having a memory, a central processing unit and a display, comprising:

means for configuring said memory according to a logical table, said logical table including:

a plurality of cells, each said cell having a first address segment and a second address segment, at least one of said cells includes a pointer to an index record;

a plurality of attribute sets, each said attribute set including a series of cells having the same second address segment, each said attribute set including an object identification number (OID) to identify each said attribute set;

a plurality of records, each said record including a series of cells having the same first address segment, each said record including an OID to identify each said record; and

means for indexing data stored in said table.

25. The system of claim 24 wherein said indexing means further comprises:

means for searching said table for a key word; and

means for creating an index record for said key word, said index record including one or more pointers to a cell in said table that contains said key word.

26. The system of claim 25 further including querying means, said querying means further including:

index look-up means for locating said index record according to the query of a user; and

record retrieval means for retrieving at least one cell in said table pointed to by said located index record.

27. The system of claim 26 wherein said index look-up means includes means for locating said index record pointed to by said at least one retrieved cell.

28. The system of claim 27 wherein said index look-up means and said record retrieval means each includes weighing means for weighing key words and retrieved cells according to pre-defined search criteria.

29. The system of claim 27 wherein said index look-up means and said record retrieval means each includes filtering means for filtering key words and retrieved cells according to pre-defined search criteria.

30. The system of claim 25 wherein said indexing means further includes means for indexing external documents.

31. A method for storing and retrieving data in a computer system having a memory, a central processing unit and a display, comprising the steps of:

configuring said memory according to a logical table, said logical table including:

a plurality of cells, each said cell having a first address segment and a second address segment;

a plurality of attribute sets, each said attribute set including a series of cells having the same second address segment, each said attribute set including an object identification number (OID) to identify each said attribute set; and

a plurality of records, each said record including a series of cells having the same first address segment, each said record including an OID to identify each said record, wherein at least one of said records has an OID equal to the OID of a corresponding one of said attribute sets, and at least one of said records includes attribute set information defining each of said attribute sets.

24

32. The method of claim 31 wherein said attribute set information defines one of said attribute sets to contain information for enabling determination of OIDs from text entry.

33. The method of claim 31 wherein said one of said attribute sets contains information including a search path that references a folder, said folder including a group of records of a similar type.

34. The method of claim 31 wherein said attribute set information defines one of said attribute sets to contain information for synchronizing two attribute sets reciprocally.

35. The method of claim 34 wherein said one of said attribute sets contains information including reciprocal pointers to said two attribute sets.

36. The method of claim 31 wherein:

at least one of said plurality of records includes information defining the type of a different record; and

at least one of said plurality of records includes a cell that contains a pointer to said record including record type information.

37. The method of claim 31 wherein at least one of said attribute sets defines cells that include a plurality of pointers to other attribute sets within the same record, said pointers indicating those attribute sets within the same record that contain defined values.

38. The method of claim 37 wherein at least one of said records is a folder type record, said folder type record including at least one cell that contains data and a plurality of pointers to a plurality of other records included within said folder.

39. The method of claim 38 wherein said plurality of other records included within said folder each includes a cell that contains a pointer to said folder type record.

40. The method of claim 31 wherein said OID's are variable length and include data related to a session identification number and a timestamp.

41. A method for storing and retrieving data in a computer system having a memory, a central processing unit and a display, comprising the steps of:

configuring said memory according to a logical table, said logical table including:

a plurality of cells, each said cell having a first address segment and a second address segment;

a plurality of attribute sets, each said attribute set including a series of cells having the same second address segment, each said attribute set including an object identification number (OID) to identify each said attribute set;

a plurality of records, each said record including a series of cells having the same first address segment, each said record including an OID to identify each said record, wherein at least one of said records has an OID equal to the OID of a corresponding one of said attribute sets, and at least one of said records includes attribute set information defining each of said attribute sets; and

searching said table for said pointer.

42. The method of claim 41 wherein at least one of said attribute sets defines cells that include a plurality of pointers to other attribute sets within the same record, said pointers indicating those attribute sets within the same record that contain defined values.

43. The method of claim 41 wherein at least one of said records is a folder type record, said folder type record including at least one cell that contains data and a plurality of pointers to a plurality of other records included within said folder.

6,163,775

25

**44.** The method of claim **43** wherein said plurality of other records included within said folder each includes a cell that contains a pointer to said folder type record.

**45.** A method for storing and retrieving data in a computer system having a memory, a central processing unit and a display, comprising the steps of:

configuring said memory according to a logical table, said logical table including:

a plurality of cells, each said cell having a first address segment and a second address segment;

a plurality of attribute sets, each said attribute set including a series of cells having the same second address segment, each said attribute set including an object identification number (OID) to identify each said attribute set; and

a plurality of records, each said record including a series of cells having the same first address segment, each said record including an OID to identify each said record, wherein at least one of said records contains a cell that contains a pointer to a different record and at least one of said plurality of records includes information defining the type of a different record; and

searching said table for said pointer.

**46.** A method for storing and retrieving data in a computer system having a memory, a central processing unit and a display, comprising the steps of:

configuring said memory according to a logical table, said logical table including:

a plurality of cells, each said cell having a first address segment and a second address segment;

a plurality of attribute sets, each said attribute set including a series of cells having the same second address segment, each said attribute set including an object identification number (OID) to identify each said attribute set; and

a plurality of records, each said record including a series of cells having the same first address segment, each said record including an OID to identify each said record, wherein said OID's are variable length.

**47.** A method for storing and retrieving data in a computer system having a memory, a central processing unit and a display, comprising the steps of:

configuring said memory according to a logical table, said logical table including:

a plurality of cells, each said cell having a first address segment and a second address segment;

a plurality of attribute sets, each said attribute set including a series of cells having the same second address segment, each said attribute set including an object identification number (OID) to identify each said attribute set;

a plurality of records, each said record including a series of cells having the same first address segment, each said record including an OID to identify each said record; and

indexing data stored in said table.

**48.** The method of claim **47** wherein the step of indexing data stored in said table further comprises:

searching a plurality of cells within said table for a key word, said cells containing unstructured text or structured data; and

inserting a record into said table corresponding to said key words.

**49.** The method of claim **48** wherein:

said inserted record includes a cell that contains a pointer to a searched cell that contains the keyword corresponding to said inserted record; and

26

said searched cell that contains a keyword corresponding to said inserted record contains a pointer to said inserted record.

**50.** The method of claim **49** wherein said pointer to said searched cell includes the OID's of the attribute set and record defining said searched cell.

**51.** The method of claim **49** wherein said searched cell includes an anchor that marks said key word.

**52.** The method of claim **48** wherein one of said plurality of records of said table includes a folder type record that includes at least one pointer to said key word.

**53.** The method of claim **48** wherein said step of searching a plurality of cells within said table for a key word further comprises the steps of:

searching for every word in a text cell;

searching for every entry in a attribute set;

searching for data based on automatic analysis; and

searching for data marked by a user.

**54.** A method for storing and retrieving data in a computer system having a memory, a central processing unit and a display, comprising the steps of:

configuring said memory according to a logical table, said logical table including:

a plurality of cells, each said cell having a first address segment and a second address segment, at least one of said cells includes a pointer to an index record;

a plurality of attribute sets, each said attribute set including a series of cells having the same second address segment, each said attribute set including an object identification number (OID) to identify each said attribute set;

a plurality of records, each said record including a series of cells having the same first address segment, each said record including an OID to identify each said record; and

indexing data stored in said table.

**55.** The method of claim **54** wherein said step of indexing data further comprises the steps of:

searching said table for a key word; and

creating an index record for said key word, said index record including one or more pointers to a cell in said table that contains said key word.

**56.** The method of claim **55** further comprising the steps of:

locating said index record according to the query of a user; and

retrieving at least one cell in said table pointed to by said located index record.

**57.** The method of claim **56** wherein said step of locating said index record further comprises the step of:

locating said index record pointed to by said at least one retrieved cell.

**58.** The method of claim **57** wherein said step of locating said index record further comprises the step of:

weighing key words and retrieved cells according to pre-defined search criteria.

**59.** The method of claim **57** wherein said step of locating said index record further comprises the step of:

filtering key words and retrieved cells according to pre-defined search criteria.

**60.** The method of claim **54** wherein said step of indexing data further comprises the step of:

indexing external documents.

* * * * *

**A261**

1
2
3
4
5
6
7        **UNITED STATES DISTRICT COURT**
8        **CENTRAL DISTRICT OF CALIFORNIA**
9        **WESTERN DIVISION**
10

| | |
|---|---|
| 11  ENFISH, LLC, | Case No. 12-cv-7360-MRP |
| 12        Plaintiff, | **Claim Construction Order** |
| 13      v. | |
| 14 | |
| 15  MICROSOFT CORPORATION; FISERV, INC.; INTUIT, INC.; SAGE | |
| 16  SOFTWARE, INC.; and JACK | |
| 17  HENRY & ASSOCIATES, INC., | |
| 18        Defendant. | |
| 19 | |

20

21                    **I.    Introduction**

22        Enfish, LLC ("Enfish") has asserted U.S. Patent Nos. 6,151,604 and 6,163,775

23  (the '604 and '775 patents) against Microsoft Corp., Fiserv, Inc., Intuit, Inc., Sage

24  Software, Inc., and Jack Henry & Associates, Inc. (collectively "Defendants"). In

25  this Order, the Court construes certain claim terms in dispute.

26              **II.    Principles of Claim Construction**

27        The purpose of claim construction is to determine the meaning and scope of the

28  patent claims alleged to be infringed. *O2 Micro Int'l Ltd. v. Beyond Innovation*

-1-

**A262**

*Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). Claim construction is a pure question of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). For purposes of claim construction, the Court reviews both intrinsic and extrinsic evidence, placing emphasis on the former.

**A. Intrinsic Evidence.**

**i.    Claim Language**

"The words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*¸ 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citation omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. "The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." *Id.* "That starting point is based on the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art." *Id.*

**ii.    Specification**

The specification is "always highly relevant to the claim construction analysis." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995). As Judge Rich wrote shortly after the creation of the Federal Circuit, "the specification . . . is the primary basis for construing the claims." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id*. In such

-2-

1   cases, the inventor's intention as expressed in the specification "is regarded as
2   dispositive." *Id.*

3   ### iii.    Prosecution History

4   The Court also considers the patent's prosecution history, if it is in evidence.
5   "The prosecution history, which we have designated as part of the "intrinsic
6   evidence," consists of the complete record of the proceedings before the PTO and
7   includes the prior art cited during the examination of the patent." *Id.* The patentee
8   created the prosecution history much like the specification in an attempt to explain
9   and obtain the patent, and thus the prosecution history provides evidence about
10  how the PTO and the inventor understood the patent. *Id.* "Yet because the
11  prosecution history represents an ongoing negotiation between the PTO and the
12  applicant, rather than the final product of that negotiation, it often lacks the clarity
13  of the specification and thus is less useful for claim construction purposes." *Id.*
14  "Nonetheless, the prosecution history can often inform the meaning of the claim
15  language by demonstrating how the inventor understood the invention and whether
16  the inventor limited the invention in the course of prosecution, making the claim
17  scope narrower than it would otherwise be." *Id.*

18  **B. Extrinsic Evidence**

19  In addition to using intrinsic evidence, this Court is also authorized to use
20  extrinsic evidence in claim construction. *Phillips*, 415 F.3d at 1317 ("[W]e have
21  . . . authorized district courts to rely on extrinsic evidence . . . ."). Extrinsic
22  evidence "consists of all evidence external to the patent and prosecution history,
23  including expert and inventor testimony, dictionaries, and learned treatises." *Id.*
24  While extrinsic evidence can shed light on claim meaning, it is "less significant
25  than the intrinsic record in determining 'the legally operative meaning of claim
26  language.'" *Id.* (citation omitted). Finally, extrinsic evidence is "unlikely to result
27  in a reliable interpretation of patent claim scope unless considered in the context of
28  the intrinsic evidence." *Id.* at 1319.

-3-

**A264**

### III.    Technical Background

The asserted claims in the '604 and '775 patents are directed to methods and systems relating to data storage and retrieval. The invention improves upon prior art information search and retrieval systems by employing a "flexible" and "self-referential" table to store data.

The table of this invention is made up of rows and columns. Each row has an object identification number (OID) and the data therein describes an individual record spanning various attributes. Each column also has an OID and the data therein describes an individual attribute spanning various records.[1] The intersection of a row and a column comprises a cell which may contain data for a particular record. The content of a cell represents attribute data for a particular record. A cell may simply point to another record. To enhance searching and to provide for synchronization between columns, columns are entered as rows in the table. The record corresponding to a column contains information about the column. This renders the table self-referential.

The invention includes an index structure to allow for rapid searches. It also includes a thesaurus and knowledge base to enhance indexed searches. An application support layer includes a word processor, a password system, hypertext, and other functions. The integration of the word processor with the table allows editing cells with the word processor. The table may also be interfaced with external documents. This allows a user to retrieve data from external documents using the enhanced retrieval system of the invention.

//

//

//

---

[1] An illustration is helpful. Consider two students John and Jane. John has a GPA of 3.0, majors in History, and is a freshman. Jane has a GPA of 4.0, majors in Mathematics, and is a sophomore. If one tabulated John and Jane as records represented as rows in a table, and stored all this information about them as attributes in columns, then one would have a basic table. Reading a row left to right narrates the story of John or Jane. Reading the GPA column top to bottom narrates the story of how John and Jane are doing in school.

## IV.    Claim Construction

### A.    "logical table"

The term "logical table" in the claims is followed by an open-ended list of claim elements. Enfish proposes importing limitations such as "self-referential," "appendable columns," and "capable of storing structured and unstructured data and different types of records" into the claim term "logical table" itself. This approach runs the risk of either: (1) depriving some subsequently listed claim element of its independent limiting effect;[2] or (2) importing a limitation from the specification into the claims. The Defendants propose limiting the logical table's data structure to a "sparse matrix." Here, the Court determines that the intrinsic record lacks a clear and unmistakable disclaimer or disavowal. As such, the Court rejects the proposed imported wordsby each party.

Instead, the Court finds that "logical table" refers to "a table with a data structure that is logical as opposed to physical, and therefore does not need to be stored contiguously in memory." This construction is based on the *only* reference in the specification which alludes to the "logical" nature of the table: "The structure of the table 100 is a logical structure and not necessarily a physical structure. Thus, the memories 26 and 32 configured according to the teachings of the present invention need not store the table 100 contiguously." '604 at 6:32-35.

Limiting the logical table to a table which does not need to be stored contiguously in memory does not rise to the level of an *improper* import of a limitation from the specification into the claims. The Court is merely referring to a portion of the specification which explains the concept of "logical" with respect to a table.

*//*

---

[2] Consider Claim 1 of the '604 patent which recites the phrase "logical table including" followed by a list of three claim elements. One of those claim elements is "at least one of said logical rows has an OID equal to the OID of a corresponding one of said logical columns." This claim element itself renders the claimed "logical table" self-referential.

-5-

**B. "a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells"**

The intersection of a logical column and a logical row defines a logical cell. This claim expression is simply a pluralized form of the above statement. The Defendants argue that the word "said" which modifies the phrase "plurality of logical rows" limits the scope of this claim expression so as to exclude "crossword puzzle" type arrangements. Effectively, Defendants argue that the claim expression "columns intersecting said plurality of . . . rows" in light of the specification means "columns intersecting [*each of*] said plurality of . . . rows."

The claim language does not warrant such an import. The plain and ordinary meaning of this individual claim expression covers both tables and crossword arrangements. But some of the claims also contain the claim limitation "logical *table*" which the Court has already construed as "a *table* with a data structure that is logical as opposed to physical, and therefore does not need to be stored contiguously in memory." *Supra* at 5.

Consequently, the Court finds that the plain and ordinary meaning of this expression suffices for claim construction purposes.

**C. "logical column information defining / logical column information defines;" "attribute set information defining / attribute set information defines"**

The relevant claim language recites "*at least one* of said logical rows has an OID equal to the OID of a *corresponding one* of said logical columns, and *at least one* of said logical rows includes logical column information *defining each* of said logical columns." The Court finds that the bolded claim language surrounding the claim term under construction provides useful context for interpreting the disputed claim expressions. To convey a one-to-one mapping between one row and one column, the patentee invokes the phrase "corresponding one of said . . . columns." Consequently, when the patentee refers to "one . . . row[] . . . defining *each of said*

-6-

**A267**

*logical columns*," the implication is clear: at least one fully-populated row is required, *i.e.*, at least one row with values defined for each column. The patentee could have easily, in a manner consistent with the rest of the claim language in the *same* claim, recited "at least one of said logical rows including logical column information defining a ***corresponding one*** of said logical columns." She did not. Consequently, the Court construes the above claim terms as requiring at least one row with values defined for each column.

**D. "a plurality of attribute sets"**

The parties agree that an "attribute set" refers to a column. Defendants' Br. at 12. The Court thus construes "a plurality of attribute sets" as "a plurality of columns" or simply "columns." Defendants argue that this claim term is *indefinite* because it could mean either "columns" or "logical columns." A ruling of indefiniteness requires a showing that the claim term is insolubly ambiguous. Here, the term "a plurality of attribute sets" is hardly ambiguous, let alone insolubly so. To the extent the specification does not support the inventor's possession of columns of the non-logical variety, or does not enable such columns, that is not an issue for claim construction. The Court finds no ambiguity in this claim phrase.

**E. "object identification number"**

The Court finds that the "object identification number" refers to "a unique array of bits assigned to each row and each column in the logical table. The bit length (the number of bits used) is constant throughout a single database but may vary between databases."

The specification section entitled "Creating a Unique OID" explains that various factors, which themselves are bit arrays (like "010101") are *combined* to form the OID, which itself is a bit array. *See, e.g.*, '604 at 8:35-36 ("[T]he session identification, timestamp, and tiebreaker are combined into a bit array, which becomes the OID."). Further, the specification explains, "[The OID's] length is

constant throughout a single database but may vary between databases." *Id.* at 8:44-46.

The Defendants propose construing the OID as a "fixed number." This proposal deviates from the specification. The only thing that is fixed within a single database is the bit length, as captured by the Court's construction. Enfish proposes "a unique identifier . . . having a [constant] bit length throughout a single database *and, when stored as data, serving as a pointer to a row or column*." The italicized portion of Enfish's proposal is redundant, given the Court's construction which leaves no doubt that the OID is "a ***unique*** array of bits assigned ***to each row*** and ***each column*** in the logical table . . . ." The uniqueness of the OIDs to each row and to each column makes it clear that if OIDs are stored as data themselves, they serve as pointers to the corresponding row or column. An explicit definition to this effect is unnecessary.

**F. "each said logical row [column] having [including] an object identification number (OID) to identify each said logical row [column]"**

No construction is necessary for this claim expression in light of the Court's construction of "object identification number."

**G. "wherein at least one of said records has an OID equal to the OID of a corresponding one of said attribute sets."**

Again, no construction is necessary in light of the Court's construction of "attribute sets" and "OID."

**H. "[means for] configuring said memory according to a logical table"**

The Court finds that this claim element is subject to § 112 ¶ 6. The function is "configuring said memory according to a logical table." In Ex. 19, Enfish has *pieced together* various citations from the patent specification and arranged them such that taken together, they constitute the disclosure of an algorithm.

For functional claiming of software, the bar for adequacy of structure is low. Algorithms may be expressed in "any understandable terms including as a

-8-

mathematical formula, in prose, or as a flow chart, *or in any other manner that provides sufficient structure*" for a person of skill in the field to provide an operative software program for the specified function. *See Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011). The Court determines that this disclosure provides sufficient structure for a PHOSITA to implement a software program and accomplish the function of "configuring said memory according to a logical table" as described in the patent.

As such, the scope of the claim term is the structure defined in Exhibit 19 and equivalents thereof.

**I.    "[means for] indexing data stored in said table"**

The Court finds that this claim term is subject to § 112 ¶ 6. The function is "indexing data stored in the logical table." Again, Exhibit 21 satisfies the relaxed requirements of *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011) when it comes to adequate structure. As such, the scope of the claim term is the structure defined in Exhibit 21 and equivalents thereof.

//
//
//
//
/
//
//
//
//
//
//
//
//

**A270**

## V.   Conclusion

| Claim Term | Claim Construction |
|---|---|
| **"logical table"**<br>'604 cl. 1, 2, 16, 17, 31, 32, 46, 47; '775 cl. 31, 32, 47 | "a table with a data structure that is logical as opposed to physical, and therefore does not need to be stored contiguously in memory." |
| **"a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells"**<br>'604 cl. 1, 2, 16, 17, 31, 32, 46, 47 | plain and ordinary meaning |
| **"logical column information defining / logical column information defines;" "attribute set information defining / attribute set information defines"**<br>'604 cl. 1, 2, 31; '775 cl. 31, 32 | "at least one row with values defined for each column" |
| **"a plurality of attribute sets"**<br>'775 cl. 31, 32, 47 | columns |
| **"object identification number"**<br>'604 cl. 1, 2, 16, 17, 31, 32, 46, 47; '775 cl. 31, 32, 47 | "a unique array of bits assigned to each row and each column in the logical table. The bit length (the number of bits used) is constant throughout a single database but may vary between databases." |
| **"each said logical row [column] having [including] an object identification number (OID) to identify each said logical row [column]"**<br>'604 cl. 1, 2, 16, 17, 31, 32, 46, 47 | No construction is necessary for this claim term in light of the Court's construction of "object identification number." |

-10-

**A271**

| Claim Term | Claim Construction |
|---|---|
| **"wherein at least one of said records has an OID equal to the OID of a corresponding one of said attribute sets."**<br>'775 cl. 31, 32 | No construction is necessary in light of the Court's construction of "attribute sets" and "OID." |
| **"[means for] configuring said memory according to a logical table"**<br>'604 cl. 1, 2, 16, 17, 31, 32, 46, 47; '775 cl. 31, 32, 47 | "configuring said memory according to a logical table."<br><br>Exhibit 19 and equivalents thereof. |
| **"[means for] indexing data stored in said table"**<br>'604 cl. 17, 47 | "indexing data stored in said table"<br><br>Exhibit 21 and equivalents thereof. |

IT IS SO ORDERED.

DATED: July 15, 2013

_____
Hon. Mariana R. Pfaelzer
United States District Judge

-11-

**A272**

Link: 129

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ENFISH, LLC,<br><br>            Plaintiff,<br><br>    v.<br><br>MICROSOFT CORPORATION;<br>FISERV, INC.; INTUIT, INC.; SAGE<br>SOFTWARE, INC.; and JACK<br>HENRY & ASSOCIATES, INC.,<br><br>            Defendants. | Case No. 2:12-cv-7360-MRP-MRWx<br><br>**Order Granting in Part and<br>Denying in Part Defendants'<br>Motion for Summary Judgment of<br>Anticipation** |

## I.    INTRODUCTION

Plaintiff Enfish, LLC ("Enfish") has sued Defendants Microsoft Corporation ("Microsoft"), Fiserv, Inc., Intuit, Inc., Sage Software, Inc., and Jack Henry & Associates, Inc. (collectively, "Defendants") for infringement of two patents: U.S. Patent No. 6,151,604 ("the '604 Patent") and U.S. Patent No. 6,163,775 ("the '775 Patent").  Defendants move for summary judgment of invalidity as to Claims 1, 2, 16, 17, 31, 32, 46, and 47 of the '604 Patent and Claims 31, 32, and 47 of the '775

A273

1    Patent as anticipated under 35 U.S.C. § 102 by Microsoft's Excel 5.0 software

2    product.

## II.    TECHNICAL BACKGROUND

4        Electronic databases are tools for managing data stored in a digital computer.

5    Databases allow users to store collections of related data.  In addition to the stored

6    data, a database management system also stores definitional data called metadata.

7    Metadata describes and defines the database, including information about where

8    the data is physically stored on the computer.  Users can interact with data stored

9    in a database management system in different ways.  For example, a user can

10   directly manage stored data in a database management system, or a user may

11   interact with an application or interface that connects to the database management

12   system and provides the stored data or metadata.

13       Depending upon the volume of data stored and the relationships between the

14   data items, different database management systems may be optimal.  In the mid-

15   1990s, relational databases dominated the marketplace.  The relational database

16   model enabled users to view stored data as a collection of interrelated tables,[1]

17   regardless of the amount of memory allocated to each table or the physical location

18   of the stored data.  The relational database model, however, suffered limitations

19   due to the complexity of interrelationships between large numbers of tables with

20   many items of data.  Object-oriented database management systems, and hybrid

21   databases with "object-relational" functionality, allow database storage by

22   relationship with the use of pointers linked to objects.  Object-oriented database

23   management systems have no need to map relational rows and columns, but had

24   other shortcomings, including limited query support.

25       The asserted claims in the '604 and '775 patents are directed to methods and

26   systems relating to data storage and retrieval.  Claims 1, 16, and 17 of the '604

27

28       [1] The nature of the logical table as well as other important aspects of the inventions of the '604 and '775 Patents are described in this Court's Claim Construction Order.  *See* Dkt. No. 86 at 4.

-2-

**A274**

1   Patent are means-plus function claims directed to a data storage system.  Asserted

2   Claims 1 of the '604 Patent claims:

3       A data storage and retrieval system for a computer memory, comprising:

4           means for configuring said memory according to a logical table,

5       said logical table including:

6               a plurality of logical rows, each said logical row having an object

7               identification number (OID) to identify each said logical row, each

8               said logical row corresponding to a record of information;

9               a plurality of logical columns intersecting said plurality of logical

10              rows to define a plurality of logical cells, each said logical column

11              having an OID to identify each said logical column; and wherein

12              at least one of said logical rows has an OID equal to the OID of a

13              corresponding one of said logical columns, and at least one of said

14              logical rows includes logical column information defining each of

15              said logical columns.

16  Independent Claim 16 of the '604 Patent claims the same limitations as

17  Claim 1, but omits the language "and wherein at least one of said logical

18  rows has an OID equal to the OID of a corresponding one of said logical

19  columns, and at least one of said logical rows includes logical column

20  information defining each of said logical columns" (the "row defining

21  column limitation").  Claim 16 instead requires that "said OID's are variable

22  length" (the "variable length OID limitation").  Independent Claim 17 omits

23  the same language from Claim 1 and includes an additional "means for

24  indexing data stored in said table" (the "indexing limitation").

25      Claim 31 is a method claim.  Asserted Claim 31 of the '604 Patent claims the

26  method that embodies the means-plus-function Claim 1.  Claim 31 claims a

27  "method for storing and retrieving data in a computer memory," rather than a

28  system from data storage and retrieval, and includes one step of "configuring said

-3-

**A275**

memory according to a logical table," wherein the logical table includes the same claim elements described in Claim 1.  Independent Claim 46 of the '604 Patent claims the method that embodies the means-plus-function Claim 16 by omitting the row defining column limitation instead requiring the variable length OID limitation.  Independent Claim 47 likewise claims the method that embodies means-plus-function Claim 17, omitting the same language and adding the indexing limitation.

The asserted dependent claims of the '604 Patent, Claims 2 and 32, each add the claim limitation "wherein said logical column information defines one of said logical columns to contain information for enabling determination of OIDs from text entry" (the "text entry limitation") to respective Claims 1 and 31.

The asserted claims of the '775 Patent are similarly directed to methods for storing and retrieving data, but focus on the cells, addresses, attribute sets, and records within the logical table.  Independent Claim 31 claims:

> A method for storing and retrieving data in a computer system having a memory, a central processing unit and a display, comprising the steps of:
>
> > configuring said memory according to a logical table, said logical table including:
> >
> > > a plurality of cells, each said cell having a first address segment and a second address segment;
> > >
> > > a plurality of attribute sets, each said attribute set including a series of cells having the same second address segment, each said attribute set including an object identification number (OID) to identify each said attribute set; and
> > >
> > > a plurality of records, each said record including a series of cells having the same first address segment, each said record including an OID to identify each said record, wherein at least one of said records has an OID equal to the OID of a corresponding one of said attribute

-4-

1    sets, and at least one of said records includes attribute set information

2    defining each of said attribute sets.

3  Claim 32 is dependent on Claim 31 and also adds the text entry limitation.

4  Independent Claim 47 is identical to Claim 31 except that it omits row defining

5  column limitation and includes the indexing limitation.

6    On July 15, 2013, the Court construed nine claim terms from the '604 and '775

7  Patents. See Claim Construction Order, Dkt. No. 86. The Court declined to import

8  several limitations from the specification into the construction of the claim terms.

9  Relevantly, the Court found that the term "logical table" was not limited to tables

10  that were self-referential, contained appendable columns, and were capable of

11  storing both structured and unstructured data as well as different types of records.

12  The Court also refused to limit the terms "logical table" and the pluralities of

13  intersecting columns and rows to either a sparse matrix or a dense matrix.

14                    **III.    LEGAL STANDARD**

15          **A. Summary Judgment**

16    The Court shall grant summary judgment if there is no genuine dispute as to

17  any material fact, as supported by facts on the record that would be admissible in

18  evidence, and if the moving party is entitled to judgment as a matter of law. FED.

19  R. CIV. P. 56.; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v.*

20  *Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In order to grant summary

21  judgment, the Court must identify material facts by reference to the governing

22  substantive law, while disregarding irrelevant or unnecessary factual disputes.

23  *Anderson*, 477 U.S. at 248. The Court must view facts and draw reasonable

24  inferences in favor of the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378

25  (2007). If there is any genuine dispute about a material fact such that a reasonable

26  jury could return a verdict for the nonmoving party, summary judgment cannot be

27  granted. *Id.* If the party moving for summary judgment does not bear the burden

28  of proof as to a particular material fact, the moving party need only give notice of

the absence of a genuine issue of material fact so that the non-moving party may come forward with all of its evidence. *Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1307–08 (Fed. Cir. 2006).

### B. Invalidity under Anticipation

A patent claim is anticipated under 35 U.S.C. § 102(b) if it was "described in a printed publication in this country . . . more than one year prior to the date of application for patent in the United States." "[A]n anticipation analysis has two parts: first, the disputed claim terms are construed, then the construed claims are compared to the prior art. *Regents of Univ. of Minnesota v. AGA Med. Corp.*, 717 F.3d 929, 939–40 (Fed. Cir. 2013). Comparing the construed claim terms with the prior art is a question of fact. *Zenith Elecs. Corp. v. PDI Commun. Sys.*, 522 F.3d 1348, 1356–57 (Fed. Cir. 2008). Each and every limitation of the construed claim must be found in a single prior art reference. *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1322 (Fed. Cir. 2012). Because an issued patent is presumed valid under 35 U.S.C. § 282, the party moving for finding of invalidity bears the burden of showing that each asserted claim is anticipated by clear and convincing evidence. *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009).

Since each claim in a patent is entitled to "an independent presumption of validity," every claim "stands or falls independent of the other claims." *Continental Can Co. U.S.A. v. Monsanto Co.*, 948 F.2d 1264, 1266–67 (Fed. Cir. 1991). Accordingly, in order to anticipate a dependent claim, the prior art reference must show every limitation of both the dependent claim and every limitation of the independent claim from which it depends. A means plus function claim "is anticipated by a prior art reference if that reference discloses all elements of the claimed invention, including means-plus-function structures or their equivalents." *Regents of Univ. of Minnesota*, 717 F.3d at 940. Therefore, a means plus function claim is anticipated only if the prior art reference discloses any

-6-

1  structure encompassed by the means plus function claim and the structure performs

2  the same function recited in the claim.  *See In re Guess*, 347 F. App'x 558, 560

3  (Fed. Cir. 2009) ("A means-plus-function limitation encompasses all of the

4  structures in the specification that perform the recited function.  Thus, for

5  anticipation purposes, a prior art reference that discloses any of the structures

6  encompassed by the means-plus-function clause anticipates that claim.").

7  **IV.    DISCUSSION**

8  **A. Microsoft's Excel 5.0 is admissible, relevant prior art to the '604 and '775**

9  **Patents**

10  The '604 and '775 Patents issued from continuation applications claiming

11  priority to U.S. Patent App. No. 08/383,752, issued as U.S. Patent No. 5,729,730.

12  The parent application has a filing date of March, 28, 1995.  First Amended

13  Complaint, Dkt. No. 30, Exs. A–B.  Accordingly, under 35 U.S.C. 102(b), Excel

14  5.0 qualifies as prior art if the system was "in public use or on sale in this country,

15  more than one year prior to the date of the application for patent in the United

16  States."

17  Microsoft sells Excel software as part of its Office package of software, which

18  also includes Microsoft Word, PowerPoint, and other programs.  In late 1993,

19  Microsoft announced and began advertising its Excel 5.0 product.  Statement of

20  Uncontroverted Facts and Conclusions of Law In Support of Defendants' Motion

21  for Summary Judgment of Anticipation Based On Excel 5.0 ("Microsoft SOF"),

22  ¶ 9–11, Dkt. No. 131; Declaration of Theodore Wimsatt ("Wimsatt Decl.") at Ex.

23  1, Dkt. No. 132.  On January 6, 1994, Microsoft issued a press release stating that

24  Excel 5.0 "went to manufacturing on Dec. 17, 1993, and has begun shipping."

25  First Declaration of Michael Pizzo ("First Pizzo Decl.") at Ex. 3, Dkt. No. 134.

26  Hundreds of thousands of copies of Excel shipped on or before January 6, 1994.

27  *Id*.  The manufactured units included nine floppy diskettes containing the Excel 5.0

28  software.  Microsoft SOF, ¶ 14; Wimsatt Decl. at Ex. 6; First Pizzo Decl., ¶¶ 20–

-7-

22, 33 and Exs. 5–7.  The units shipped at that time met "existing orders for" Excel 5.0 "automatic upgrades," which had been offered to customers in late 1993.  First Pizzo Decl. at Ex. 3; *see also* Microsoft SOF, ¶ 17; Wimsatt Decl. at Ex. 1.  In addition, Excel 5.0 was scheduled to "be generally available" to the public "by the end of January [1994]."[2]  First Pizzo Decl. at Ex. 3.  Consistent with the 1993 release to manufacturing and the 1994 shipment to customers, the initial Excel 5.0 diskettes were marked with a 1993 copyright notice and the manuals show a 1994 copyright notice.  Microsoft SOF, ¶¶ 11–16; Wimsatt Decl. at Ex. 3.

The Excel 5.0 diskettes contained sample files, which included a sample database called "Northwind."  Microsoft SOF, ¶ 15.  The Northwind database included data stored as part of an Excel spreadsheet and contained a header row with column names.  *Id*.; First Pizzo Decl. ¶¶ 33, 38–39; Corrected First Declaration of Stephen Gray ("First Gray Decl."), ¶ 86, Dkt. No. 137.  The Excel 5.0 product also shipped with a User Guide that included instructions on the use and capabilities of the Excel 5.0 software and provided screen capture images from the program.  First Pizzo Decl. ¶¶ 35–37.[3]  The advertisements, products, press release, and publications together conclusively establish that Excel 5.0 was on sale in the U.S. by January 6, 1994.

---

[2] Microsoft also provided or sold the Excel 5.0 product to reviewers, who used Excel 5.0 and published reviews before the March 28, 1994 critical date.  Microsoft SOF, ¶ 18; Wimsatt Decl. at Ex. 2; First Pizzo Decl. at Ex. 4 (offering a review from the March 15, 1994 edition of PC Magazine, Vol. 13, No. 5, titled "An In-Depth Look, Excel 5.0 Extends Both Features and Usability").  Although alone the reviews would be insufficient to show that Excel 5.0 was on sale prior to the priority date, the magazine reviews further support Defendants' uncontradicted evidence showing that prior sales occurred.

[3] Enfish objects to the admissibility of the "Excel materials" submitted by Defendants in support of their motion.  Enfish states that the Excel materials are inadmissible hearsay.  The Excel diskettes, user manual, and packaging are self-authenticating documents under FED. R. EVID. 902(7).  *See, e.g.*, *ACCO Brands, Inc. v. PC Guardian Anti-Theft Prods., Inc.*, 592 F. Supp. 2d 1208, 1219 (N.D. Cal. 2008).  The submitted magazine articles are also self-authenticating under FED. R. EVID. 902(6).  Defendants offer testimony establishing Microsoft's press release as a record of a regularly conducted activity, and the press release is thus an exception to the hearsay rule.  *See* FED. R. EVID. 803(6).  Enfish's attempt to contradict Defendants' evidence as to the release date of Excel 5.0, however, is inadmissible hearsay.  Enfish cannot rely on a user edited website to create a factual dispute about the availability date of the Excel product.  At best, Enfish's evidence shows that Microsoft Office Professional, a different software product package, was in development in January 1994 and was officially released on June 2, 1994.

-8-

**A280**

1    Enfish suggests that some possibility exists that the sales made on and before

2    January 6, 1994 were "beta" shipments or sales subject to non-disclosure

3    agreements and the sales are therefore insufficient to qualify as sales under

4    § 102(b).  Enfish's blanket statements about being aware of beta testing in the

5    software industry are insufficient to show that the large volume of sales of Excel

6    5.0 was an experimental use.  *See SmithKline Beecham Corp. v. Apotex Corp.*, 365

7    F.3d 1306, 1317 (Fed. Cir. 2004) ("[O]nce the challenger of the patent has proven

8    by clear and convincing evidence that the invention was in public use before the

9    critical date, the burden of production shifts to the patentee to provide sufficient

10    evidence to create a genuine issue of material fact that the use qualifies as

11    experimental.")  In addition, Enfish's statement merely suggests that press may

12    have received beta versions of Excel software prior to the December

13    manufacturing date, which does not create a material issue of fact with respect to

14    the December manufacturing and January sales.

15    Enfish also makes much of the fact that Excel 5.0 is not a database management

16    technology.  But whether Excel 5.0 is equivalent to Enfish's invention, or even

17    analogous art, does not affect the anticipation inquiry.  "[T]he question whether a

18    reference is analogous art is irrelevant to whether that reference anticipates."  *In re*

19    *Schreiber*, 128 F.3d 1473, 1478 (Fed. Cir. 1997).  The sole question for the Court

20    is whether Excel 5.0 anticipates the *claims* of the '604 and '775 Patents, not the

21    invention as Enfish describes it.  *See State Contracting & Eng'g Corp. v. Condotte*

22    *Am., Inc.*, 346 F.3d 1057, 1068 (Fed. Cir. 2003) (""[A] reference will [] anticipate

23    if it explicitly or inherently discloses every limitation recited in the claims.'")

24    (citing *In re Schreiber*, 128 F.3d at 1478).

25    **B. Excel 5.0 anticipates every element of method Claims 31, 32, 46, and 47 of**

26    **the '604 Patent**

27    Each of the asserted method claims of the '604 Patent contain the claim

28    limitations directed to configuring memory "according to a logical table" with (1)

-9-

1  logical rows, each with identifying OIDs and corresponding to a record and (2)

2  logical columns, each with identifying OIDs, and intersecting the logical rows.

3  Excel 5.0 anticipates each of these limitations as well as the row defining column

4  limitation, the text entry limitation, the variable length OID limitation, and the

5  indexing limitation of each respective asserted method claim.

6      **1.  All claims: the logical row limitation**

7      Excel 5.0 created database tables in which data was entered, stored, and edited.

8  Microsoft SOF, ¶ 22.  Excel 5.0 displayed as a logical table with a plurality of

9  logical rows and logical columns.  *Id.* ¶ 15.  A row number displayed on the left

10  side of the logical table, and unique primary keys, as shown in the sample

11  Northwind database, could be used to distinguish each row from other rows in the

12  logical table. Microsoft SOF, ¶ 48.  In the Northwind table, each row contains a

13  unique primary key as a number corresponding to an ORDER_ID.  *Id.* ¶ 15.  Each

14  row of the table in the Northwind database corresponds to a record of information

15  for each order recorded in the table.  *Id.*  The Court construed OID to mean "a

16  unique array of bits assigned to each row and each column in the logical table. The

17  bit length (the number of bits used) is constant throughout a single database but

18  may vary between databases."  The unique primary keys and the row numbers

19  meet the requirements of the Court's construction.  The ORDER_IDs entered in

20  the Northwind database[4] are each the same length, or number of bits, and each

21  ORDER_ID is unique.[5]  The row numbers each require two bytes of storage, and

22  are used to sort and store the row record.  Microsoft SOF, ¶¶ 33–40.

23

24

25

26      [4] The fact that it is the sample database, and not the Excel program itself, does not change the anticipation

27  inquiry.  The single prior art reference in this case is the Excel 5.0 product, including the software, user manuals, and tutorial databases.

    [5] Enfish's expert asserts that he was able to alter the ORDER_ID in the Northwind database so that two

28  different rows displayed the same ORDER_ID.  The altered database, however, is not the prior art reference being considered; the original Excel 5.0 product is.

-10-

### 2. All claims: the logical column limitation

Excel 5.0 displayed as a logical table with a plurality of logical rows and logical columns.  Microsoft SOF, ¶ 15.  A column letter displayed at the top of the logical table, and unique column headings, as shown in the sample Northwind database, could be used to distinguish each column from other columns in the logical table.  *Id*. ¶ 15.  The unique column headings and the column numbers meet the requirements of the Court's construction.  The column headings of values of successive years are the same bit length, and each heading would be unique.  The fact that Excel 5.0 allowed a user to enter both fixed and variable length column headings does not preclude Excel 5.0 from meeting this limitation.  It is enough that the prior art system was capable of operating in and was used in a manner that anticipates the claims.  *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1319 (Fed. Cir. 2009); *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1326 (Fed. Cir. 2003).  The column numbers also each require two bytes of storage, and are used to sort and store the row record.  Microsoft SOF, ¶¶ 33–40.

Enfish's argument that row and column numbers are not "assigned" to the row records because the row or column number changes as records or columns are added and deleted is inconsistent with the Court's construction.  The Court declined to adopt Enfish's construction requiring that the OID be "fixed," and will not interpret the word "assigned" to incorporate a construction it previously rejected.

### 3. Claim 31: the row defining column limitation

Claim 31 includes the row defining column limitation, "wherein at least one of said logical rows has an OID equal to the OID of a corresponding one of said logical columns, and at least one of said logical rows includes logical column information defining each of said logical columns."

The first part of the row defining column limitation requires that at least one row and at least one column share the same OID.  Excel 5.0 featured a pivot table

-11-

1    function, which allowed a spreadsheet column to be created from information
2    entered in a row on the same or a different spreadsheet. *Id*. ¶ 65. Any column
3    created using the pivot table function would share the same unique primary key or
4    header as the row used to create it.

5         The second part of the row defining column limitation requires that at least one
6    row contain column defining information. Tables in Excel 5.0 allowed a header
7    row to contain column names that defined the type of data entered in each column.
8    Microsoft SOF, ¶ 63. Furthermore, the Northwind database shows a column
9    header row, where row 1 of the table includes column names that define the type of
10    information stored in the column. *Id*. ¶ 64.

11         **4. Claim 46: the variable length OID limitation**

12         Claim 16 instead requires that "said OID's are variable length" (the "variable
13    length OID limitation"). Although the row number and column numbers in Excel
14    5.0 were constant in length, the primary keys and column headers could be, and
15    were, of variable lengths. The Northwind database shows two tables, an
16    "employee" table using an employee number of three digits (three bytes) as a
17    primary key, and the "order" table using an ORDER_ID of five digits (five bytes)
18    as a primary key. Microsoft SOF, ¶¶ 15, 43, 49–50. The primary keys, which
19    serve as OIDs in the Northwind database, may be of variable length.

20         **5. Claim 47: the indexing limitation**

21         Claim 47 includes the indexing limitation. At Enfish's urging, the Court did not
22    construe the term "indexing" in its Claim Construction Order and instead only
23    construed the required structure for the mean-plus-function limitation. The Court
24    now adopts the plain and ordinary meaning of the term "indexing" as its
25    construction. Indexing therefore requires organizing data to enable searching.

26         Excel 5.0 includes several indexing tools. The software creates an "Index
27    Record" by generating cell records, each for a limited number of rows, and the
28    index record collects the cell records to allow users to look up particular cells in

the worksheet.  Microsoft SOF, ¶ 57.  Excel 5.0's auto-filter function allowed a

user to select columns, allowing the software to populate a drop down menu.  The

user selected key words, and Excel filtered and displayed rows containing the

selected key words.  *Id.* ¶ 58.  The "Index" function permitted a user to point to a

particular part of the table and rapidly retrieve stored data stored using row and

column numbers. *Id.* ¶ 59.  Each of these functions organized records or data to

allow searching of the table, thereby meeting the indexing limitation.

### 6. Claim 32: the text entry limitation

Claim 32 depends from Claim 31 and includes the text entry limitation, which

requires that one column contains information to determine OIDs from text entry.

Excel 5.0 included a find function.  By selecting a column and entering text, users

could search a column for key words. The Northwind database includes a

"ORDER_DATE" column.  Using the find function on the ORDER_DATE

column to enter a date in the text portion of the query window, returned the row

number of the record entry and allowed the user to locate invoice records for that

date.  Microsoft SOF, ¶ 67.  The text entry feature of the find function allowed the

use of a column with text entry to locate OIDs.

## C. Excel 5.0 anticipates every element of method Claims 31, 32, and 47 of the '775 Patent

Each of the asserted method claims of the '775 Patent contain the claim

limitations directed to configuring memory "according to a logical table" with (1) a

plurality of cells with a first and second address segment; (2) attribute sets, or

columns, including cells with the same second address segment and each with a

unique OID; and (3) records, or rows, including cells with the same first address

segment and each with a unique OID.  These claim limitations are identical to the

row and column limitations in every asserted method claim of the '604 Patent, but

with the additional requirement of address segments corresponding to row and

column location.

-13-

**A285**

1     Excel 5.0 tables contain cells formed by the intersections of the columns and

2    rows of the logical table. Each cell's location in the table may be identified by row

3    and column numbers. Microsoft SOF, ¶¶ 33–39. In R1C1 formatting, the call

4    address appears as a first segment corresponding to the row number and as a

5    second segment corresponding to the column number. *Id.* The row numbers and

6    column numbers serve as a way to both find and reference a cell in an Excel 5.0

7    table and therefore function as first and second address segments. *Id.* ¶¶ 36, 38,

8    40.

9     Claim 31 includes the row defining column limitation. Claim 32 is dependent

10   on Claim 31 and also adds the text entry limitation. Independent Claim 47

11   includes the indexing limitation. Excel 5.0 meets each of those additional

12   limitations as discussed above.

13   **D. Excel 5.0 does not anticipate every element of means-plus-function Claims**

14      **1, 2, 16, and 17 of the '604 Patent**

15     The Court construed each of the asserted means-plus-function claims as

16   described in Exhibit 19 of Enfish's Opening Claim Construction Brief. Dkt. Nos.

17   73, Ex. 19 and 86. The Court further construed Claim 17 as described in Exhibit

18   21 of Enfish's brief. Dkt. No. 73, Ex. 21, 86. "A patented invention is anticipated

19   by a prior art reference if that reference discloses all elements of the claimed

20   invention, including means-plus-function structures or their equivalents." *Regents*

21   *of Univ. of Minnesota v. AGA Med. Corp.*, 717 F.3d 929, 940 (Fed. Cir. 2013).

22     The structure required for the "means for configuring" is a general purpose

23   computer or similar device that includes a central processing unit and a memory.

24   Excel 5.0 was designed for, installed on, and used on general purpose computers

25   with at least a processor and memory.

26     The algorithm required for the "means for configuring" has four steps. Enfish

27   contends that triable issues of fact exist as to the first three steps of the algorithm.

28     //

-14-

1    Step (1) requires creating a logical table of rows/records and columns/attribute

2    sets capable of storing "different kinds of records" contiguously or discontiguously

3    in computer memory.  The construction adopted by the Court states that different

4    types of information entered into different columns constitutes different "kinds" of

5    records.  The Northwind database contains different columns, including order

6    numbers, customer numbers, and shipping address.  Microsoft SOF, ¶ 15.  Further,

7    Excel 5.0 stored data discontiguously in memory.  *Id*. ¶ 28.  Excel 5.0 performs

8    step (1) of the algorithm.

9    Step (2) requires assigning fixed or variable length OIDs to rows and columns,

10   where the OIDs stored as data can act as a pointer to the associated row or column.

11   In Excel 5.0 and its samples databases, row numbers and primary keys are assigned

12   to rows, and column numbers and column headings are assigned to columns.

13   Primary keys and column headings may be variable lengths across databases.

14   However, Enfish raises a triable issue of fact that Defendants' evidence does not

15   show the existence of an OID pointer whose value refers directly to an associated

16   row or column.

17   Step (3) requires storing information about each column in one or more rows,

18   "rendering the table self-referential," and permitting the creation of new column

19   definition rows to append new columns to the table.  The presence of a row

20   containing column headers that define the information in the columns may render a

21   table self-referential.  Under the Court's construction, a table is rendered self-

22   referential when rows are added to the table that correspond to the data stored in a

23   column.  The row of column headers does not correspond to the data stored in one

24   column, and a triable issue of fact remains as to whether Excel 5.0 performs step

25   (3) of the algorithm.

26   Material issues of facts remains as to whether Excel 5.0 performs steps (2) and

27   (3) of the algorithm for the "means for configuring" of Claims 1, 2, 16, and 17 of

28   the '604 Patent, and those claims are therefore not anticipated.

-15-

# V.    CONCLUSION

Having read and considered the briefs and arguments of the parties, the Court concludes that Claims 31, 32, 46, and 47 of the '604 Patent and Claims 31, 32, and 47 of the '775 Patent are anticipated under 35 U.S.C. § 102 by Microsoft's Excel 5.0 software product.  The Court finds that disputed issues of material fact exist as to whether steps (2) and (3) of the algorithm for the configuring step of the means-plus-function Claims 1, 2, 16, and 17 are performed by the Excel 5.0 product.

The Court therefore **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment of Anticipation.

IT IS SO ORDERED.

DATED: March 31, 2014

_____
Hon. Mariana R. Pfaelzer
United States District Judge

-16-

**A288**

Link: 298

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| ENFISH, LLC,<br>          Plaintiff,<br>          v.<br>MICROSOFT CORPORATION;<br>FISERV, INC.; INTUIT, INC.; SAGE<br>SOFTWARE, INC.; and JACK<br>HENRY & ASSOCIATES, INC.,<br>          Defendants. | Case No. 2:12-cv-07360-MRP-MRW<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON INELIGIBILITY UNDER 35 U.S.C. § 101** |

**A309**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.     Introduction

Plaintiff Enfish, LLC ("Enfish") has sued Defendants Microsoft Corporation ("Microsoft"), Fiserv, Inc., Intuit, Inc., Sage Software, Inc., and Jack Henry & Associates, Inc. (collectively, "Defendants") for infringement of two patents: U.S. Patent Nos. 6,151,604 ("the '604 Patent") and 6,163,775 ("the '775 Patent").[1]  In an order issued March 31, 2014, the Court invalidated claims 1, 2, and 16 of the '604 patent as single means claims prohibited by 35 U.S.C. § 112(a).  *See Enfish, LLC v. Microsoft Corp.*, 9 F. Supp. 3d 1126 (C.D. Cal. 2014).  In a separate order issued March 31, 2014, the Court invalidated claims 31, 32, 46, and 47 of the '604 patent and claims 31, 32, and 47 of the '775 patent as anticipated under 35 U.S.C. § 102.  *See Enfish, LLC v. Microsoft Corp.*, No. 2:12-cv-07360, 2014 U.S. Dist. LEXIS 46523 (C.D. Cal. Mar. 31, 2014).

Defendants move for summary judgment on the basis that all asserted claims are unpatentable under 35 U.S.C. § 101.[2]  For the reasons set forth in this order, the Court grants the motion.

## II.     Background

The abstract of the patents provides a clear explanation of the invention.  *See* '604 Patent, Abstract.  The patents are directed to an information management and database system.  The patents improve upon prior art by employing a flexible, self-referential table to store data.  This table is composed of rows and columns.  Each column and each row has an object identification number ("OID").  Rows correspond to records and columns correspond to attributes.  The intersection of a row and column comprises a cell, which may contain information for a particular record relating to a particular attribute.  A cell also may simply point to another

---

[1] Both patents are continuations of application Ser. No. 08/383,752 filed Mar. 28, 1995, and their specifications are substantively the same.  For consistency, the Court will cite to the specification of the '604 patent.

[2] In this order, the Court uses the term "patentable" to refer to subject matter eligibility under § 101.

-1-

**A310**

1   record.  Columns are entered as rows in the table. The record corresponding to a

2   column contains information about the column, rendering the table self-referential.

3   The invention includes an index structure to allow for searching.  A key word

4   index contains text from each cell in the table.  This index is itself stored in the

5   table.  Text cells in the table contain pointers to entries in the index, and the index

6   contains pointers to the cells.  This arrangement provides for extended inquiries.

7   *See* '604 Patent, 2:66–3:6.

8   ### III.    Standard for Summary Judgment

9   The Court shall grant summary judgment if there is no genuine dispute as to

10  any material fact, as supported by facts on the record that would be admissible in

11  evidence, and if the moving party is entitled to judgment as a matter of law.  Fed.

12  R. Civ. P. 56; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v.*

13  *Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Ineligibility under § 101 is a

14  question of law. [3]  *In re Comiskey*, 554 F.3d 967, 975 (Fed. Cir. 2009).  The Court

15  may appropriately decide this issue at the summary judgment stage.

16  ### IV.    Ineligibility Under 35 U.S.C. § 101

17  Section 101 of the Patent Act defines patentable subject matter: "Whoever

18  invents or discovers any new and useful process, machine, manufacture, or

19  composition of matter, or any new and useful improvement thereof, may obtain a

20  patent therefor, subject to the conditions and requirements of this title."  35 U.S.C.

21  § 101.  Section 101 defines four broad categories of patentable inventions:

22  processes, machines, manufactures, and compositions of matter.  "Congress took

23

24  [3]  In an order issued today by this Court in *California Institute of Technology v. Hughes
    Communications, Inc.* (*Caltech*), No. 2:13-cv-7245, slip op. at 3 n.6 (C.D. Cal. Nov. 3, 2014), the

25  Court discusses the applicability of the clear and convincing evidence standard to § 101
    inquiries.  Federal Circuit precedent requires courts to apply the standard to § 101 challenges.

26  *See Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1339 (Fed. Cir. 2013), *vacated sub nom.
    WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014).  Despite misgivings about the

27  standard's relevance to § 101, the Court must follow binding precedent.  The Court therefore
    notes that the parties have identified no material disputed facts.  The parties dispute only the

28  legal conclusions drawn from the facts.

-2-

A311

1  this permissive approach to patent eligibility to ensure that ingenuity should

2  receive a liberal encouragement." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010)

3  (internal quotation marks omitted). But § 101 does not encompass all products of

4  human effort and discovery. Laws of nature, physical phenomena, and abstract

5  ideas are not patentable. *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980).

6  These exceptions are well established. *See, e.g.*, *Chakrabarty*, 447 U.S. at 309;

7  *Diamond v. Diehr*, 450 U.S. 175, 185 (1981); *Parker v. Flook*, 437 U.S. 584, 600

8  (1978) (Stewart, J., dissenting); *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972);

9  *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948); *Le Roy v.*

10  *Tatham*, 55 U.S. 156, 175 (1853).

11    On occasion, the Federal Circuit has described § 101 as a "coarse eligibility

12  filter," barring only "manifestly abstract" inventions and leaving §§ 102, 103, and

13  112 as the finer sieves. *See Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1341,

14  1354 (Fed. Cir. 2013*), vacated sub nom. WildTangent, Inc. v. Ultramercial, LLC*,

15  134 S. Ct. 2870 (2014).   But in the Supreme Court's last few terms, it has

16  indicated that patentability is a higher bar. *See Alice Corp. Pty. Ltd. v. CLS Bank*

17  *Int'l*, 134 S. Ct. 2347, 2334–35 (2014); *Ass'n for Molecular Pathology v. Myriad*

18  *Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013); *Mayo Collaborative Servs. v.*

19  *Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293–94 (2012); *Bilski*, 130 S. Ct. at

20  3230–31.  As noted by Judge Mayer of the Federal Circuit, a "robust application"

21  of § 101 ensures "that patent protection promotes, rather than impedes, scientific

22  progress and technological innovation." *I/P Engine, Inc. v. AOL Inc.*, 576 F.

23  App'x 982, 996 (Fed. Cir. 2014) (nonprecedential) (Mayer, J., concurring).

24    The concern underlying § 101 is preemption: the idea that allowing a patent on

25  the invention will impede innovation more than it incentivizes it.  Of course, a

26  court should not overstate this concern.  By definition, every patent preempts an

27  area of technology.  A patentee with a groundbreaking invention is entitled to

28

1   monopolize a segment of technology, subject to the limits of the Patent Act.[4]  The

2   court must be wary of litigants who exaggerate preemption concerns in order to

3   avoid developing innovative workarounds.  *See McRO, Inc. v. Sega of America,,*

4   *Inc.*, No. 2:12-cv-10327, 2014 WL 4749601, at *7 (C.D. Cal. Sept. 22, 2014) (Wu,

5   J.) ("[W]e must be wary of facile arguments that a patent preempts all applications

6   of an idea. It may often be easier for an infringer to argue that a patent fails § 101

7   than to figure out a different way to implement an idea, especially a way that is less

8   complicated." (internal quotation mark omitted)).  Nonetheless, § 101 prevents

9   patentees from too broadly claiming a building block of research and development.

10   Building blocks include basic tools of mathematics or formulas describing

11   preexisting natural relationships.  *See Mayo*, 132 S. Ct. 1296–97; *Benson*, 409 U.S.

12   at 68, 72.  But "a novel and useful structure created with the aid of knowledge of

13   scientific truth" may be patentable.  *Mackay Radio & Tel. Co. v. Radio Corp. of*

14   *America*, 306 U.S. 86, 94 (1939).

15       Concerns over preemption have called into question when, if ever, computer

16   software is patentable.  A basic truth is that algorithms comprise computer

17   software and computer codes.  *See* J. Glenn Brookshear, *Computer Science: An*

18   *Overview* 2 (6th ed.  2000) ("A machine-compatible representation of an algorithm

19   is called a **program**.  Programs, and the algorithms they represent, are collectively

20   referred to as **software**.").  But Supreme Court precedents make clear that "a

21   scientific truth, or the mathematical expression of it, is not a patentable invention."

22   *Benson*, 409 U.S. at 67.  In light of this principle, the Supreme Court has heavily

23   scrutinized algorithms and mathematical formulas under § 101.  *See, e.g.*, *Flook*,

24   437 U.S. at 594–95 (finding unpatentable mathematical formula for updating alarm

25

26   [4] Justice Stevens in *Parker v. Flook*, 437 U.S. 584 (1978), expressed skepticism at the notion of

27   preemption as a § 101 concern, perhaps for this reason.  *Id.* at 590 n.11 ("[T]he formula [in
*Benson*] had no other practical application; but it is not entirely clear why a process claim is any

28   more or less patentable because the specific end use contemplated is the only one for which the
algorithm has any practical application.").

limits); *Benson*, 409 U.S. at 71–72 (finding unpatentable mathematical formula for converting binary-coded decimal to pure binary). In early § 101 decisions on computer technology, the Supreme Court suggested that Congress, rather than courts, should determine whether software is patentable. *See Flook*, 437 U.S. at 596 ("It is our duty to construe the patent statutes as they now read, in light of our prior precedents, and we must proceed cautiously when we are asked to extend patent rights into areas wholly unforeseen by Congress."); *Benson*, 409 U.S. at 73 ("If these programs are to be patentable, considerable problems are raised which only committees of Congress can manage, for broad powers of investigation are needed, including hearings which canvass the wide variety of views which those operating in this field entertain.").

But intervening precedents and Congressional action have demonstrated that software is patentable. In *Diamond v. Diehr*, 450 U.S. 175 (1981), the Supreme Court found patentable a method claim implementing a mathematical formula on a computer. *See Diehr*, 450 U.S. at 179 n.5, 192–93 (finding patentable claim on "method of operating a rubber-molding press for precision molded compounds with the aid of a digital computer"). More recently, in *Alice Corp. Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014), the Supreme Court again suggested that software is patentable. *See id.* at 2359 (suggesting that software which improves function of a computer may be patentable).[5] Moreover, the America Invents Act mentions "computer program product[s]" in a section discussing tax strategy patents. *See* Leahy-Smith America Invents Act, 112 P.L. 29, § 14, 125 Stat. 284, 327–28 (2011). This section implicitly affirms software as eligible subject matter. *See* Mark J. Patterson & M. Andrew Pitchford, *First to File*, 47 Tenn. B.J. 14, 16 (November 2011) ("[T]ax strategies are no longer patentable, but

---

[5] The Supreme Court also stated, somewhat cryptically, that "many computer-implemented claims are **formally** addressed to patent-eligible subject matter." *Alice*, 134 S. Ct. at 2359 (emphasis added). It is unclear whether this statement explicitly approves of software patents or merely notes that some eligible patents on industrial processes happen to recite computers.

-5-

**A314**

1    . . . computer implemented methods and computer program products (e.g.,

2    software) have been implicitly affirmed as patentable subject matter."); *see also*

3    *Bilski*, 561 U.S. at 595 (noting that courts should not "violate the canon against

4    interpreting any statutory provision in a manner that would render another

5    provision superfluous"); *Cal. Inst. of Tech. v. Hughes Commc'ns, Inc.* (*Caltech*),

6    No. 2:13-cv-7245, slip op. at 12–15 (C.D. Cal. Nov. 3, 2014)

7    　　The aftermath of *Alice* tells a different but misleading story about software

8    patentability.  *Alice* brought about a surge of decisions finding software patents

9    ineligible.  *See, e.g.*, *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir.

10    2014) (invalidating claim addressed to a "transaction performance guaranty"

11    performed on a computer); *Digitech Image Techs., LLC v. Elec. for Imaging, Inc.*,

12    758 F.3d 1344, 1349, 1351 (Fed. Cir. 2014) (invalidating method claim for

13    generating and combining data sets for device profile); *Eclipse IP LLC v. McKinley*

14    *Equip. Corp.*, No. 8:14-cv-742, 2014 WL 4407592 (C.D. Cal. Sept. 4, 2014)

15    (invalidating claims reciting methods for communications).  Despite this flurry of

16    § 101 invalidations, in reality, *Alice* did not significantly increase the scrutiny that

17    courts must apply to software patents.  It held only that an ineligible abstract idea

18    does not become patentable simply because the claim recites a generic computer.

19    *See Alice*, 134 S. Ct. at 2360 ("[T]he claims at issue amount to 'nothing

20    significantly more' than an instruction to apply the abstract idea of intermediated

21    settlement using some unspecified, generic computer. Under our precedents, that is

22    not '*enough*' to transform an abstract idea into a patent-eligible invention."

23    (citations omitted)).  Courts must not extend the reach of *Alice* too far, lest they

24    read in § 101 limitations that do not exist.  *Cf. Bilski*, 561 U.S. at 603 ("This Court

25    has not indicated that the existence of these well-established exceptions gives the

26    Judiciary *carte blanche* to impose other limitations that are inconsistent with the

27    text and the statute's purpose and design.").  In evaluating the patentability of

28    computer software, courts must continue to rely on the Supreme Court's long line

-6-

**A315**

1  of § 101 precedents.  *Alice*'s holding is only a small part of evaluating

2  patentability.

3      Other than its narrow holding, *Alice* reaffirmed that courts must evaluate patent

4  eligibility using the two-part test applied in *Mayo Collaborative Services v.*

5  *Prometheus Laboratories, Inc.*, 132 S. Ct. 1289 (2012).  First, a court must ask if

6  the claim is "directed to one of those patent-ineligible concepts": a law of nature,

7  physical phenomenon, or abstract idea.  *Alice*, 134 S. Ct. at 2355.  Second, if the

8  claim is directed to one of these concepts, the court must ask "[w]hat else is there

9  in the claims before us?"  *Mayo*, 132 S. Ct. at 1297.  This second step determines

10  whether there is an "inventive concept" that "ensure[s] that the patent in practice

11  amounts to significantly more than a patent upon the [ineligible concept] itself."

12  *Alice*, 134 S. Ct. at 2355.  These steps are broadly stated and, without more, would

13  be difficult to apply.  Although the two-part test was created in *Mayo*, pre-*Mayo*

14  precedents offer guidance in applying the steps.

15      **A.    The First Step of *Mayo***

16      At the first step of *Mayo*, the court must identify whether a claim is directed to

17  an abstract idea.  To do so, the court must identify the purpose of the claim—in

18  other words, determine what the claimed invention is trying to achieve—and ask

19  whether that purpose is abstract.  For example, in *Alice*, the court concluded that

20  the claims were directed to mitigating settlement risk using a third party, but the

21  claims recited more.  The claims outlined an entire process, including creating

22  shadow records, obtaining from an exchange institution a start-of-the-day balance,

23  and so on.  *See Alice*, 134 S. Ct. at 2359.  But these steps were meant to achieve

24  the purpose of mitigating settlement risk.  The Supreme Court took the same

25  approach in *Bilski* and *Mayo* by characterizing the claims in terms of the

26  inventions' purposes: hedging risk and applying a natural law, respectively.  *See*

27  *Bilski*, 561 U.S. at 611; *Mayo*, 132 S. Ct. at 1296–97.

28

-7-

**A316**

1    Characterization of a claim is essential to the § 101 inquiry.  In *Diamond v.*

2    *Diehr*, 450 U.S. 175 (1981), the dispute boiled down to *what* the majority and

3    dissent were evaluating for abstractness.  *See id.* at 206 (Stevens, J., dissenting)

4    (faulting majority for characterizing claim by its purpose, which was "constantly

5    measuring the actual temperature inside a rubber molding press").  The *Diehr*

6    majority took the correct approach by asking what the claim was trying to achieve,

7    instead of examining the point of novelty.  *Id.* at 207.  Courts should recite a

8    claim's purpose at a reasonably high level of generality.  Step one is a sort of

9    "quick look" test, the purpose of which is to identify a risk of preemption and

10    ineligibility.  If a claim's purpose is abstract, the court looks with more care at

11    specific claim elements at step two.

12    At step one, prior art plays no role in the analysis.  The court does not filter out

13    claim elements found in prior art and evaluate the remaining elements for

14    abstractness.  *See Caltech*, slip op. at 18–21; *but see McRO*, 2014 WL 4749601 at

15    *9 (claims must be evaluated in light of prior art because such art is "understood,

16    routine, conventional activity").  Using prior art to filter out elements revives the

17    point-of-novelty approach of *Parker v. Flook*, 437 U.S. 584 (1978), which was

18    rejected by *Diehr. See Diehr*, 450 U.S. at 189 (noting that novelty "is of no

19    relevance" when determining patentability); *Flook*, 437 U.S. at 586–87 (filtering

20    out claim elements using prior art and focusing only on point of novelty).[6]  The

21    Supreme Court did not revive *Flook*'s methodology in *Bilski*, *Mayo*, or *Alice*.

22

---

23    [6] Justice Stevens' dissent in *Diehr* is proof that the Supreme Court abandoned this methodology.

24    Justice Stevens faults the majority for not focusing on the point of novelty—that is, what the patentee newly invented, as opposed to what the patentee borrowed from the prior art. *See*

25    *Diehr,* 50 U.S. at 211–12 (Stevens, J., dissenting) ("[I]f the only concept that the inventor claims to have discovered is not patentable subject matter, § 101 requires that the application be rejected

26    without reaching any issue under § 102; for it is irrelevant that unpatentable subject matter -- in that case a formula for updating alarm limits -- may in fact be novel.  Proper analysis, therefore,

27    must start with an understanding of what the inventor claims to have discovered -- or

28    phrased somewhat differently -- what he considers his inventive concept to be.").

1    Using prior art at step one also impermissibly conflates the two steps of *Mayo*.

2    Of course, at step two, courts must remember that reciting purely conventional

3    activity will not save a claim, and claim elements found in prior art may

4    occasionally, though not always, constitute conventional activity. *Mayo*, 132 S. Ct.

5    at 1298. But at step one, the court neither identifies nor disregards conventional

6    activity. That inquiry occurs only at step two.

7    Once the court has identified a claim's purpose, it must determine whether that

8    purpose is abstract. This task is difficult, especially with regard to computer

9    software. Because software is necessarily intangible, accused infringers can easily

10    mischaracterize and oversimplify software patents. *Cf. Oplus Techs. Ltd. v. Sears*

11    *Holding Corp.*, No. 12-cv-5707, 2013 WL 1003632, at *12 (C.D. Cal. Mar. 4,

12    2013) ("All software *only* 'receives data,' 'applies algorithms,' and 'ends with

13    decisions.'"). To avoid this trap, courts should rely on Supreme Court precedents

14    to help determine whether a claim is abstract. Recent precedents have suggested

15    longstanding, fundamental practices may be abstract. For example, in *Bilski v.*

16    *Kappos*, 561 U.S. 593 (2010), the Supreme Court invalidated a claim addressed to

17    hedging risk, a fundamental economic practice long in use. *See id.* at 611.

18    Similarly, in *Alice*, the Supreme Court invalidated a claim addressed to a

19    computerized method of intermediated settlement because the idea was

20    longstanding. *See Alice*, 134 S. Ct. at 2356 (noting intermediated settlement is a

21    fundamental economic concept and a building block of the economy).

22    Longstanding practices are often the building blocks of future research and

23    development. Patents on these practices would significantly impede productive or

24    inventive activity, to the detriment of society. Section 101 ensures that patents

25    remain an incentive for inventors without stifling too much development.

26    **B.    The Second Step of *Mayo***

27    If the court finds the claim's purpose abstract at step one, it must then determine

28    whether there is an inventive concept that appropriately limits the claim, such that

1    the claim does not preempt a significant amount of inventive activity.  In

2    performing the second step of analysis, the court must be wary of making

3    patentability "a draftsman's art," *Flook*, 437 U.S. at 593, but inevitably, drafting

4    plays a key role.  Patents that claim inventions too broadly or prohibit a vast

5    amount of future applications are suspect.  *See Benson*, 409 U.S. at 68; *O'Reilly*,

6    56 U.S. at 113.  Thus, the second step should provide "additional features that

7    provide practical assurance that the process is more than a drafting effort designed

8    to monopolize [the ineligible concept] itself."  *Mayo*, 132 S. Ct. at 1297.  A claim

9    cannot avoid this preemption concern by limiting itself to a particular technological

10   environment.  *See Alice*, 134 S. Ct. at 2358 (noting that limiting an abstract idea to

11   computer implementation did not mitigate preemption concerns).

12      With this concern in mind, the court must disregard "well-understood, routine,

13   conventional activity" at step two.  *Mayo*, 132 S. Ct. at 1299.[7]  A conventional

14   element may be one that is ubiquitous in the field, insignificant or obvious.  *See*

15   *Mayo*, 132 S. Ct. at 1298 ("Purely 'conventional or obvious' '[pre]solution

16   activity' is normally not sufficient to transform an unpatentable law of nature into a

17   patent eligible application of such a law."); *Diehr*, 450 U.S. at 191–92 ("Similarly,

18   insignificant postsolution activity will not transform an unpatentable principle into

19   a patentable process.")*.*  A conventional element may also be a necessary step,

20   which a person or device must perform in order to implement the abstract idea.

21   For example, the claim elements in *Mayo* recited steps that all doctors needed to

22   perform in order to apply the natural law.  *See Mayo*, 132 S. Ct. at 1298 ("Anyone

23   who wants to make use of these laws must first administer a thiopurine drug and

24   measure the resulting metabolite concentrations, and so the combination amounts

25   to nothing significantly more than an instruction to doctors to apply the applicable

26   laws when treating their patients.").  As discussed above, conventional elements do

27

28

---

[7] This Court will refer to this concept as "conventional elements."

-10-

1  not constitute everything in the prior art, although conventional elements and prior
2  art may overlap.  *But see McRO*, 2014 WL 4749601 at *9–11 (using prior art to
3  identify conventional elements).

4      The court must also consider the claim elements as a combination.  A
5  combination of conventional elements may be unconventional and therefore
6  patentable.  *See Diehr*, 450 U.S. at 188 ("[A] new combination of steps in a
7  process may be patentable even though all the constituents of the combination
8  were well known and in common use before the combination was made.").  Courts
9  should consider all elements as part of the "ordered combination," even those
10  elements which, in isolation, appear abstract.  *See Diehr*, 450 U.S. at 189 n.12.

11                                      **V.    Discussion**

12      Enfish has asserted eight claims from the '604 patent and three claims from the
13  '775 patent.  At step one, the Court determines that all of the asserted claims are
14  addressed to abstract ideas.  At step two, the Court determines that the claim
15  limitations do not supply an inventive concept that sufficiently limits the scope of
16  the claims.  Therefore, all asserted claims are unpatentable.

17      **A. Step One: The Asserted Claims Are Directed to Abstract Ideas**

18      All asserted claims of the '604 and '775 patents are directed to abstract ideas.
19  Every claim has a similar purpose: storing, organizing, and retrieving memory in a
20  logical table.  Memory represents data or information.[8]  For millennia, humans
21  have used tables to store information.  *See* Martin Campbell-Kelly et al., *The*
22  *History of Mathematical Tables: From Sumer to Spreadsheets* 19 (Oxford 2003)
23  (showing example of ancient Mesopotamian table for year 1295 B.C.); *see also id.*
24  at 86 (showing example of life table from seventeenth-century England).  Tables
25  continue to be elementary tools used by everyone from school children to scientists
26  and programmers.  Tables are a basic and convenient way to organize information

27  _____

28  [8] It is also irrelevant whether the information is represented by binary digits—information is
information, regardless of the form.

-11-

**A320**

1   on paper; unsurprisingly, they are a basic and convenient way to organize

2   information on computers. *Cf. id.* at 324 ("[A] writing surface affords the property

3   of organizing information in a two-dimensional grid, and therefore tables can be

4   viewed almost as a historical inevitability . . . [that] would arise spontaneously in

5   any civilization where a writing surface was used. . . . The screen of a personal-

6   computer shares the two-dimensional character of a writing surface."). A patent on

7   the pervasive concept of tables would preempt too much future inventive activity.

8       The fact that the patents claim a "logical table" demonstrates abstractness. The

9   term "logical table" refers to a logical data structure, as opposed to a physical data

10  structure. *See* Claim Construction Order at 7, Dkt. No. 86 ("[A logical table has] a

11  data structure that is logical as opposed to physical, and therefore does not need to

12  be stored contiguously in memory."). Under this construction, it does not matter

13  how memory is physically stored on the hardware. In essence, the claims capture

14  the ***concept*** of organizing information using tabular formats. As such, the claims

15  preempt a basic way of organizing information, without regard to the physical data

16  structure. There can be little argument that a patent on this concept, without more,

17  would greatly impede progress.

18      Given these observations, the Court determines that the claims are addressed to

19  the abstract purpose of storing, organizing, and retrieving memory in a logical

20  table. This abstract purpose does not become tangible because it is necessarily

21  limited to the technological environment of computers. *See Alice*, 134 S. Ct. at

22  2358 ("[M]ere recitation of a generic computer cannot transform a patent-ineligible

23  abstract idea into a patent-eligible invention."). Tellingly, in *Alice*, the Supreme

24  Court defined the purpose of the claims as achieving intermediated settlement; it

25  did not define the purpose of the claims as achieving intermediated settlement

26  using a computer. *See Alice*, 134 S. Ct. at 2356–57. When a claim recites a

27  computer generically, the Court should ignore this element in defining the claim's

28  purpose.

-12-

**B. Step Two: Additional Limitations Do Not Supply Sufficiently Inventive Concepts**

Because the claims are addressed to an abstract idea, the Court must determine whether the claims contain additional limitations that amount to an inventive concept. The claims do not. Instead, the claims recite conventional elements. These elements, when viewed individually or in a combination, do not sufficiently cabin the claims' scope.

**i.    Claim 47 of the '604 Patent Recites No Inventive Concept**

The Court begins by analyzing claim 47 of the '604 patent, which is representative of the patents in general. It recites

[a] method for storing and retrieving data in a computer memory, comprising the steps of:

configuring said memory according to a logical table, said logical table including:

a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information;

a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column; and

indexing data stored in said table.

These limitations comprise a series of conventional elements. "[C]onfiguring said memory according to a logical table" simply means storing computer information, possibly for later retrieval. The purpose of all tables is to store information for later retrieval. As such, this limitation is conventional because it recites the obvious purpose of all tables. The "logical table" element merely indicates that the table can store memory non-contiguously. Non-contiguous memory allocation is the concept of storing a program in various parts of the memory. The concept of

-13-

1  non-contiguous memory is ubiquitous in the art and therefore conventional.  *See*

2  D.M. Dhamdhere, *Operating Systems: A Concept-Based Approach* 213 (2d ed.

3  2006) ("In the noncontiguous memory allocation model, several non-adjacent

4  memory areas are allocated to a process."); Robert C. Daley & Jack B. Dennis,

5  *Virtual Memory, Processes, and Sharing in MULTICS* 309 (May 5, 1968),

6  *available at* http://users.soe.ucsc.edu/~sbrandt/221/Papers/History/daley-

7  cacm68.pdf ("Paging allows noncontiguous blocks of main memory to be

8  referenced as a logically contiguous set of generalized addresses.").  The recitation

9  of rows and columns is also conventional, because these elements are necessary to

10  create a table.  *See Mayo*, 132 S. Ct. at 1298.  The recitation of OIDs is likewise

11  conventional.  As the specification makes clear, OIDs assigned to rows and

12  columns are used for "exact retrieval."  '604 Patent, 2:1.  Certainly, OIDs are

13  helpful for computers to locate information, especially because computers store

14  large amounts of information.  But OIDs are essentially labels for each column and

15  each row.  *See* '604 Patent, Fig. 3; 6:47–48 ("[T]he OID's for both rows and

16  columns may be used as pointers.").  Using the labels to locate information is a

17  basic concept that humans have long employed.  Indeed, labels are often the easiest

18  way to locate information in a table.[9]  Efficient location of data is an unremarkable

19  feature of a data storage system, especially in the computing age.

20

21

22  _____

23  [9] Take, for example, the following table:

24

| Name | Age | Height |
|------|-----|--------|
| Abby | 27 | 5'11" |
| Ben | 42 | 5'8" |
| Carla | 39 | 5'5" |

25

26

27  To locate Carla's age, one would look at the appropriate row label (Carla) and the appropriate
column label (Age) to locate the cell that provides the appropriate information, which is 39.  To

28  locate Ben's height, one would look at the row labeled Ben and the column labeled Height to
find the answer, which is 5'8".  OIDs may operate in this manner.

-14-

1    Likewise, the limitation of "indexing data stored in said table" is not an

2  inventive concept.  The Court has construed "indexing" to mean "organizing data

3  to enable searching."  *Enfish*, 2014 U.S. Dist. LEXIS 46523 at *22.  Humans

4  engaged in this sort of indexing long before this patent, and the claim does not put

5  forth an innovative and unconventional method of indexing.  A bare recitation of

6  an indexing limitation does not make this abstract idea patentable.  Finally, the

7  recitation of computer memory does nothing more than limit the abstract idea to a

8  technological environment.  This is not enough to make an abstract idea patentable.

9  *See Alice*, 134 S. Ct. at 2358.

10        **ii.        Claim 17 of the '604 Patent Recites No Inventive Concept**

11    The same analysis applies to claim 17 of the '604 patent.  Claim 17 is drafted in

12  a means-plus-function format and recites:

13    A data storage and retrieval system for a computer memory, comprising:

14        means for configuring said memory according to a logical table, said logical

15        table including:

16            a plurality of logical rows, each said logical row including an object

17                identification number (OID) to identify each said logical row, each

18                said logical row corresponding to a record of information;

19            a plurality of logical columns intersecting said plurality of logical rows to

20                define a plurality of logical cells, each said logical column including

21                an OID to identify each said logical column; and

22        means for indexing data stored in said table.

23  This claim differs from claim 47 in two ways: it claims a "means for configuring"

24  and a "means for indexing," each of which covers an algorithm described in the

25  specification.  The Court first determines whether the "means for configuring"

26  limitation recites an inventive concept.  It then determines whether the "means for

27  indexing" limitation recites an inventive concept.

28

-15-

**A324**

1    The "means for configuring" limitation does not recite an inventive concept.

2  "Means for configuring" covers a four-step algorithm:

3    1. Create, in a computer memory, a logical table that need not be stored

4    contiguously in the computer memory, the logical table being comprised of

5    rows and columns, the rows corresponding to records, the columns

6    corresponding to fields or attributes, the logical table being capable of

7    storing different kinds of records.

8    2. Assign each row and column an object identification number (OID) that,

9    when stored as data, can act as a pointer to the associated row or column and

10    that can be of variable length between databases.

11    3. For each column, store information about that column in one or more

12    rows, rendering the table self-referential, the appending, to the logical table,

13    of new columns that are available for immediate use being possible through

14    the creation of new column definition records.

15    4. In one or more cells defined by the intersection of the rows and columns,

16    store and access data, which can include structured data, unstructured data,

17    or a pointer to another row.

18  *See* Claim Construction Order at 8–9. This algorithm does not constitute an

19  inventive concept. The first step recites the creation of a logical table that need not

20  be stored contiguously in computer memory. As discussed above, non-contiguous

21  memory allocation is a basic idea in computing and is therefore conventional. As

22  the Court also discussed above, creating a logical table on a computer is an abstract

23  concept that is not patentable without something more. The second step recites

24  two conventional elements: assigning OIDs and allowing for OIDs that may vary

25  in length across databases ("variable-length OIDs"). As discussed with regard to

26  claim 47, assigning OIDs is a conventional step. Variable-length OIDs are

27  likewise conventional. The element merely allows OIDs across databases to

28  comprise a different number of bits, "depending on the precision required." *See*

-16-

'604 Patent, 8:38–39.  Varying the length of identifying labels, whether on a computer or otherwise, is a basic concept, and this limitation merely acknowledges the reality that computers can assign a different numbers of bits to OIDs.

The third step recites the conventional element of creating columns from information stored in rows, in order to render the table self-referential.  A table is self-referential if each column is defined by information stored in one or more of the table's rows.  Enfish's Opp'n to Non-Infringement at 11–12, Dkt. No. 280. Figure 3 of the '604 patent shows one example of this: column 126 has the definition "Employed By," which corresponds to row 136.  *See* '604 Patent, Fig. 3; '604 Patent, 7:16–19 ("The column definition is stored as a record in the table **100** of FIG. 3.  For example, the 'Employed By' column **126** has a corresponding row **136**. The addition [of] rows that correspond to columns renders the table **100** self-referential.").  But this step is written broadly, and it encompasses more than this example.  The step also encompasses tables where a single row defines the type of information contained in each column.  *See supra* at 14 n.9 (showing table where the first row defines the type of information—name, age, and height—contained in each column); Enfish's Opp'n to Non-Infringement at 11–12 (arguing that single row that contains information for each column satisfies the third step of the algorithm).  Of course, a vast majority of tables use a row to define the type of information contained in each column. This concept is ubiquitous and ancient.  *See* Campbell-Kelly et al., *supra* at 217 (showing table from 1871 where the first row defines the type of information contained in each column). This concept is conventional in hand-drawn tables, and equally conventional in computerized tables.[10]  Finally, the fourth step does not add any unconventional element.  Storing

---

[10] Enfish rightly criticizes Defendants for employing the pencil-and-paper test.  As Enfish correctly observes, "[v]irtually every patent application, covering every type of technology known to man, can be illustrated and conceptualized.  If that were enough to render a patent ineligible under § 101, the patent system would be eviscerated."  Enfish's § 101 Opp'n at 21, Dkt. No. 299. But as noted by this Court in *Caltech*, "[t]he pencil-and-paper test is a stand-in for

-17-

and accessing data is the basic purpose of tables. The step gives examples of the types of data that cells may store, but the step does not limit cell contents to these types of data only. The concept of storing data is inherent in the concept of tables, and it is therefore conventional.

All four steps of the algorithm are conventional, and as an ordered combination, they remain conventional. The algorithm creates a table with labeled rows and columns, where one row defines the type of information in each column. This is the description of a purely conventional table, and nothing more. Nothing in this algorithm sufficiently limits the scope of the claim.

As with the "means for configuring" limitation, the "means for indexing" limitation recites no inventive concept. "Means for indexing" covers a three-step algorithm:

1. Extract key phrases or words from the applicable cells in the logical table.

2. Store the extracted key phrases or words in an index, which is itself stored in the logical table.

3. Include, in text cells of the logical table, pointers to the corresponding entries in the index, and include, in the index, pointers to the text cells.

*See* Claim Construction Order at 9. The first two steps are the essence of indexing. Extracting key phrases and storing these phrases in an index are steps that are necessary for indexing. As a result, they are purely conventional. The fact that the index is stored in the logical table itself does not sufficiently limit the scope of the claim. The logical table is an obvious place to store an index for the same logical table, much like the back of a textbook is an obvious place to store an index for

---

another concern: that humans engaged in the same activity long before the invention of computers." *Caltech*, slip op. at 30. In this case, it just so happens that humans created tables using writing utensils on writing surfaces. As such, a relevant question is whether an inventor could patent the recited elements if they were implemented in a hand-drawn table. This question is not the same as pencil-and-paper analysis. This question simply reflects the idea that tables have been used by humans for millennia, outside of the computing context.

-18-

**A327**

that textbook.  The third step is likewise conventional.  An index's purpose is to point to the location of information, and it is unremarkable for the cells to contain information pointing back to the index, in order to aid in further data retrieval.  Again, an inventor could not patent a hand-drawn table with pointers from a text cell to an index, and this concept remains unpatentable when applied to a computer.  This concept is not sufficiently inventive enough to cabin the claims, because it would preclude inventors from performing a basic step to maximize the potential of indices.  Viewing these steps as an ordered combination adds nothing, because the algorithm as a whole represents a conventional process of indexing.

Viewing claim 17 as an ordered combination does not change the result.  Claim 17 describes how to store information in a table and use an index to find information in that table.  These ideas in combination are purely obvious, conventional activity.  Therefore, claim 17 is unpatentable.

### iii.  The Other Asserted Claims Add Only Conventional Elements to the Substance of Claims 17 and 47 of the '604 Patent

The other asserted claims add little to the substance of claims 17 and 47.  Claims 16 and 46 of the '604 patent requires OIDs to be of variable length, but this limitation is insignificant and conventional.  As discussed above, varying the length of identifying labels, whether on a computer or otherwise, is a basic concept.  This limitation simply acknowledges the reality that computers may assign a different numbers of bits to different labels.  Viewing the claims' elements as a combination adds nothing: the result is a conventional table for storing and retrieving information, implemented on a computer.  Claims 16 and 46 are therefore unpatentable.

Claims 1, 2, 31, and 32 of the '604 patent and claims 31 and 32 of the '775 patent likewise recite a conventional element: requiring a single row in the database that defines all the columns.  *See* Claim Construction Order at 6–7 ("[T]he implication is clear: at least one fully-populated row is required, *i.e.*, at

-19-

**A328**

least one row with values defined for each column."); Enfish's § 101 Opp'n at 20, Dkt. No. 299.  As discussed above, a common concept in tables is a fully populated row defining the information in each column.  This concept was accomplished in tables created long before computers.  Implementing this idea on a computer is so obvious as to be conventional.  *See Mayo*, 132 S.Ct. at 1298 ("Purely 'conventional or obvious' '[pre]solution activity' is normally not sufficient to transform an unpatentable law of nature into a patent eligible application of such a law.").  As with the variable length OIDs, the Court's analysis of the claim as a combination does not change the Court's conclusion.  The combination of elements in the claims results in an unremarkable table, implemented on a computer.  These claims, too, are unpatentable.

Claim 47 of the '775 patent is substantively identical to claim 47 of the '604 patent.  The claim uses synonyms to describe the invention and recites conventional elements, such as a computer system and cells having address segments.  Enfish does not argue that claim 47 of the '775 patent adds any concept which makes it uniquely patentable.  Thus, claim 47 is also unpatentable.

### C. When Are Computer Inventions Applying Longstanding Concepts Patentable?

Enfish's asserted claims are unpatentable because they apply longstanding concepts about storing information in tables to the technological environment of computers.  But this does not mean that every software invention that uses longstanding concepts is unpatentable.  To satisfy § 101, software inventions just need something sufficiently more than a recitation of a longstanding concept.

To understand this idea, imagine three computer programs directed at a longstanding concept: determining the best series of moves in a chess game.  The first program calculates moves through a "brute force" method—that is, it determines the best moves by testing various moves.  A claim for this program is unpatentable.  Chess players have long used some form of brute force calculation

-20-

1   to determine their subsequent moves.  The fact that a computer can perform brute

2   force calculations faster than humans is irrelevant.  Rapid processing of data is a

3   generic function of computers.

4       The second chess program determines future moves by considering various

5   factors, such as the safety of the king, the development of pieces, and the number

6   of pieces each side has.  Again, a claim for this program would be unpatentable

7   without something more.  Chess players have long used these factors to evaluate

8   positions in chess games.  A claim for this program takes fundamental ideas about

9   chess and has a computer apply them.  Again, it is irrelevant that a computer may

10  apply these ideas more effectively than a human.

11      The third chess program determines future moves by evaluating various factors,

12  just like the second program.  But this third program does more.  It allocates

13  different amounts of computer memory to different factors, and it reallocates

14  memory at different stages of the game, as some factors become more important

15  and others less important.  A claim for this program is patentable.  The claim is not

16  merely addressed to an abstract idea.  It is addressed to an inventive computing

17  concept: dynamic memory allocation.  The claim's computer elements are not

18  generic.  Rather, the claim recites a modern, computer-specific concept to solve the

19  modern, computer-specific problem of scarce memory.  Although the claim

20  implements longstanding ideas about chess, computing concepts form a significant

21  part of the claim.  The combination of these chess ideas and computing concepts

22  constitutes patentable subject matter.

23      In contrast to this last example, tables are an age-old solution to an age-old

24  problem.  Tables are a basic building block of research and development and are

25  not patentable.  This remains true when tables are implemented on computers.

26  Undoubtedly, tables improve data storage on a computer, but only inasmuch as

27  tables improve data storage when used in *any* technological environment.  Patent

28  law should not protect inventions that do nothing more than implement

-21-

**A330**

1   longstanding ideas (like tables) to solve computing problems (like data storage)
2   when those problems predate computing.  But patents should encourage inventors
3   to create new computing solutions to today's computing problems.

### VI.   Conclusion

4   The Court today decides that Enfish's asserted claims are unpatentable.  This
5   determination does not mean that the invention is valueless.  Many useful
6   inventions are unpatentable, despite the tremendous effort that went into their
7   creation.  But usefulness is not the current standard for patentability, and the Court
8   must follow the principles established by the Supreme Court.  *See McRO*, 2014
9   WL 4749601 at *12 ("[T]he revolutionary nature of an abstract idea does not
10  weigh in favor of patentability.").

11  The Court is mindful of the fact that inventors are the casualty of courts'
12  evolving § 101 jurisprudence.  The filing date for Enfish's patents is March 5,
13  1998.  Only a few months after this date, the Federal Circuit created a generous
14  standard for patentability, holding a process was patentable if it created a "useful,
15  concrete, and tangible result."  *State St. Bank & Trust Co. v. Signature Fin. Group*,
16  149 F.3d 1368, 1375 (Fed. Cir. 1998).  For years, patentees relied on this low bar
17  when writing their applications to the Patent and Trademark Office.  But the rules
18  changed in *Bilski*, *Mayo*, and *Alice*.  Many inventors drafted their patents for an
19  age of patent law that no longer exists, and inventors have suffered the
20  consequences of shifting jurisprudence.

21  Predictability and stability are crucial for a successful patent system, and courts
22  bear the responsibility for developing a consistent § 101 standard by earnestly
23  following the guidance of higher courts.  Based on the Supreme Court's
24  precedents, this Court concludes that all asserted claims are unpatentable.
25  Therefore, the Court grants the Defendants' motion for summary judgment.

26  //
27  //

-22-

**A331**

1   //

2   //

3   IT IS SO ORDERED.

4

5   DATED: November 3, 2014

6                                    Hon. Mariana R. Pfaelzer
                                     United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**A332**

1  **JS-6**

2  Link: 262

3

4

5

6

7

8  **UNITED STATES DISTRICT COURT**

9  **CENTRAL DISTRICT OF CALIFORNIA**

10  **WESTERN DIVISION**

11

12  ENFISH, LLC,  |  Case No. 2:12-cv-7360-MRP-MRWx

13      Plaintiff,

14      v.  |  **ORDER GRANTING**
     **DEFENDANTS' MOTION FOR**
15  MICROSOFT CORPORATION;  |  **SUMMARY JUDGMENT ON**
     **NONINFRINGEMENT AS TO**
16  FISERV, INC.; INTUIT, INC.; SAGE  |  **CLAIM 17**

17  SOFTWARE, INC.; and JACK

18  HENRY & ASSOCIATES, INC.,

19      Defendants.

20

21

22

23

24

25

26

27

28

**I.    Introduction**

Plaintiff Enfish, LLC ("Enfish") has sued Defendants Microsoft Corporation, Fiserv, Inc., Intuit, Inc., Sage Software, Inc., and Jack Henry & Associates, Inc. (collectively, "Defendants") for infringement of two patents: U.S. Patent Nos. 6,151,604 ("the '604 Patent") and 6,163,775 ("the '775 Patent").  In an order issued March 31, 2014, the Court concluded that claims 1, 2, and 16 of the '604 patent are single-means claims invalid under 35 U.S.C. § 112.  *See* 9 F. Supp. 3d 1126 (C.D. Cal. 2014).  In a separate order issued March 31, 2014, the Court invalidated claims 31, 32, 46, and 47 of the '604 patent and claims 31, 32, and 47 of the '775 patent as anticipated under 35 U.S.C. § 102.  *See* No. 2:12-cv-7360, 2014 U.S. Dist. LEXIS 46523 (C.D. Cal. Mar. 31, 2014).  In an order issued November 3, 2014, the Court found all asserted claims unpatentable under 35 U.S.C. § 101.  *See* No. 2:12-cv-7360, 2014 WL 5661456 (C.D. Cal. Nov. 3, 2014).

Defendants move for summary judgment on noninfringement as to claim 17 of the '604 patent on the basis that no version of ADO.NET performs all the recited limitations.  For the reasons set forth in this order, the Court grants the motion.

**II.    Background**

The '604 patent recites claims directed to storing computer memory in a logical table.  The patent employs a flexible, self-referential table to store data.  The table is composed of rows and columns.  Each column and each row has an object identification number ("OID").  Rows correspond to records and columns correspond to attributes.  The intersection of a row and column comprises a cell, which may contain information for a particular record relating to a particular attribute.  A cell also may point to another record.  Columns are entered as rows in the table.  The record corresponding to a column contains information about the column, rendering the table self-referential.  The invention includes an index structure to allow for searching.  A key word index contains text from each cell in the table.  This index is itself stored in the table.  Text cells in the tables contain

-1-

pointers to entries in the index, and the index contains pointers to the cells, which provides for extended inquiries.  *See* '604 Patent, 2:66–3:6.

Claim 17 of the '604 Patent is a means-plus-function claim directed to a data storage system.  It claims:

A data storage and retrieval system for a computer memory, comprising:

means for configuring said memory according to a logical table, said logical table including:

a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information;

a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column; and

means for indexing data stored in said table.

The Court construed the required structures for "means for configuring said memory according to a logical table" and "means for indexing data stored in said table" in its claim construction order.  *See* Claim Construction Order, Dkt. No. 86.

### III.   Legal Standard

#### A. Summary Judgment

The Court shall grant summary judgment if there is no genuine dispute as to any material fact, as supported by facts on the record that would be admissible in evidence, and if the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  In order to grant summary judgment, the Court must identify material facts by reference to the governing substantive law, while disregarding irrelevant or unnecessary factual disputes. *Anderson*, 477 U.S. at 248.  If there is any genuine dispute about a material fact such that a reasonable jury could return a verdict for the nonmoving party,

-2-

**A335**

1  summary judgment cannot be granted.  *Id.*  The Court must view facts and draw

2  reasonable inferences in favor of the nonmoving party.  *Scott v. Harris*, 550 U.S.

3  372, 378 (2007).  If the party moving for summary judgment does not bear the

4  burden of proof as to a particular material fact, the moving party need only give

5  notice of the absence of a genuine issue of material fact so that the non-moving

6  party may come forward with all of its evidence.  *See Celotex*, 477 U.S. at 325.

7  **B. Infringement**

8  Patent infringement is governed by 35 U.S.C. § 271.  Subsection (a) of this

9  section provides:

10  Except as otherwise provided in this title, whoever without authority makes,

11  uses, offers to sell, or sells any patented invention, within the United States or

12  imports into the United States any patented invention during the term of the

13  patent therefor, infringes the patent.

14  There are two steps for determining infringement.  "First, the asserted claims

15  must be interpreted by the court as a matter of law to determine their meaning and

16  scope."  *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir.

17  1995).  Then, "[i]n the second step, the trier of fact determines whether the claims

18  as thus construed read on the accused product."  *Id.*  The Court construed certain

19  claim terms in its July 15, 2013 order.  *See* Claim Construction Order, Dkt. No. 86.

20  An accused product must meet the "all elements" test, under which "an accused

21  product or process is not infringing unless it contains each limitation of the claim,

22  either literally or by an equivalent."  *Freedman Seating Co. v. Am. Seating Co.*,

23  420 F.3d 1350, 1358 (Fed. Cir. 2005).

24  An accused product can infringe a claim literally or under the doctrine of

25  equivalents.  Under a theory of literal infringement, "every limitation set forth in a

26  claim must be found in an accused product, exactly."  *Southwall*, 54 F.3d at 1575.

27  For a product to infringe under the doctrine of equivalents, "any differences

28  between the claimed invention and the accused product must be insubstantial."

-3-

**A336**

1   *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1346 (Fed. Cir.

2   2013).  The plaintiff may demonstrate insubstantiality "by showing on a limitation

3   by limitation basis that the accused product performs substantially the same

4   function in substantially the same way with substantially the same result as each

5   claim limitation of the patented product." *Crown Packaging Tech., Inc. v. Rexam*

6   *Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir.  2009).

7       Courts must construe means-plus-function claims according to 35 U.S.C.

8   § 112 ¶ 6, which states that such a claim "shall be construed to cover the

9   corresponding structure, material, or acts described in the specification and

10  equivalents thereof."  Therefore, "[l]iteral infringement of a claim limitation in

11  means-plus-function format 'requires that the relevant structure in the accused

12  device perform the identical function recited in the claim and be ***identical*** or

13  ***equivalent*** to the corresponding structure in the specification.'" *Welker Bearing*

14  *Co. v. PHD, Inc.*, 550 F.3d 1090, 1099 (Fed. Cir. 2008) (emphasis added) (quoting

15  *Applied Med. Research Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 (Fed.

16  Cir. 2006)).  An accused device is equivalent under § 112 ¶ 6 if the differences

17  between it and the disclosed structure are insubstantial.  *Welker*, 550 F.3d at 1099.

18  An equivalent under § 112 ¶ 6 may "perform[ ] the same function as the disclosed

19  structure, in substantially the same way, with substantially the same result."

20  *Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 941 (Fed. Cir.

21  2013).   Analysis for § 112 ¶ 6 equivalence resembles analysis for the doctrine of

22  equivalents.  In fact, "when the accused technology was known at the time of

23  patenting and the functions are identical, the structural equivalence inquiry under

24  § 112 and the structural equivalence portion of the doctrine of equivalents are

25  coextensive." *Ring & Pinion Serv. Inc. v. ARB Corp. Ltd.*, 743 F.3d 831, 835 (Fed.

26  Cir. 2014).

27      Infringement is a question of fact.  *See Brilliant Instruments*, 707 F.3d at 1344;

28  *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1268 (Fed. Cir. 1999)

-4-

("Whether an accused device infringes a § 112, ¶ 6 claim as an equivalent is a question of fact.").

## IV.    Discussion

Defendants argue that ADO.NET does not infringe claim 17 because it meets neither the "means for indexing" limitation nor the "means for configuring" limitation.  To begin with, the Court notes there are genuine issues of material fact as to the "means for configuring" limitation.[1]  However, based on the Court's construction of the "means for indexing" limitation, ADO.NET does not literally infringe claim 17.  ADO.NET also does not infringe claim 17 under the doctrine of equivalents.

### A. Construction of the "Means for Indexing" Limitation

The parties first dispute the meaning of the Court's construction for the "means for indexing" limitation.  The Court construed the required structure for this means-plus-function limitation as "the structure defined in Exhibit 21 [of Enfish, LLC's Opening Claim Construction Brief] and equivalents thereof."  *See* Claim Construction Order at 9.  Exhibit 21 assembles various parts of the specification to describe a structure that performs steps listed under a subheading "Algorithm":

1. Extract key phrases or words from the applicable cells in the logical table.

2. Store the extracted key phrases or words in an index, which is itself stored in the logical table.

3. Include, in text cells of the logical table, pointers to the corresponding entries in the index, and include, in the index, pointers to the text cells.

Enfish contends that the Court adopted its proposed structure for the means-plus-function claim, which was "[t]he computer programmed to perform ***one or***

[1] Defendants argue that Enfish never disclosed its theory in its infringement contentions that ADO.NET's DataColumnCollection was a column-defining row for purposes of claim 17's "means for configuring" limitation.  The Court finds that Defendants were on notice of this theory when Enfish disclosed that the DataColumnCollection was a column-defining row for purposes of claim 1 of the '604 Patent, which contains the identical "means for configuring" limitation.  *See* Dkt. No. 84-2 at 9.

*more of the algorithms* disclosed in the specification and described in Exhibit 21." Enfish LLC's Opening Claim Const. Br. at 20, Dkt. No. 73 (emphasis added). Microsoft insists that the exhibit discloses three steps for a single algorithm and that a product infringes the claim only if it performs all three steps.

This confusion arises because Exhibit 21 describes only one algorithm, while Enfish's proposed construction suggests the exhibit contains multiple algorithms. The Court now clarifies that Exhibit 21 discloses only one algorithm with multiple steps. The Court construed the structure for the "means for configuring" limitation in the same manner, even though Enfish had proposed that the required structure need only perform one step listed in Exhibit 19. *Compare* Enfish's Claim Const. Br. at 7 (proposing that structure for "means for configuring said memory according to a logical table" was "[t]he computer programmed to perform one or more of the algorithms disclosed in the specification and described in Exhibit 19"), *with* Claim Construction Order at 9 ("As such, the scope of the claim term is the structure defined in Exhibit 19 and equivalents thereof."), *and* 2014 U.S. Dist. LEXIS 46523 at *25 ("The algorithm required for the 'means for configuring' has four steps."). The Court sees no reason to construe the "means for indexing" limitation and Exhibit 21 differently. Therefore, to meet the "means for indexing" limitation, an accused structure must perform all three steps of the algorithm.

**B. ADO.NET Does Not Meet the "Means for Indexing" Limitation**

ADO.NET fails to perform steps two and three of the algorithm for the "means for indexing" limitation. First, ADO.NET does not store extracted key phrases or words in an index in the logical table. Second, ADO.NET does not "include, in text cells of the logical table, pointers corresponding to the entries in the index, and include, in the index, pointers to the text cells." Therefore, ADO.NET does not perform the "means for indexing" limitation and does not infringe claim 17.

     **i.**    **ADO.NET Does Not Store Extracted Key Phrases or Words in an Index**

ADO.NET fails to meet the second step of the algorithm because it does not store extracted key phrases or words. This step requires the index structure to hold a copy of the extracted key phrase or word. There can be no reasonable dispute about the meaning of this step. As the specification makes clear, "[e]ach key phrase is extracted from a cell and stored in a list format" and "the list may be alphabetized, providing for very rapid searching of a particular name." '604 Patent, 12:12–15. Figure 11 also demonstrates that the index structure holds a copy of the indexed word or phrase in a list. *See* '604 Patent, fig. 11; *see also* '604 Patent, 12:22–26 ("For example, the word 'Ventura' occurs in cells **252**, **254** and **256** that correspond to different rows and different columns. The word 'Ventura' in the list **250** contains a pointer, or cell identification number, to cells **252**, **254**, and **256**."). Thus, to satisfy step two, ADO.NET must store copies of key phrases or words in an index.

Both parties agree that ADO.NET does not store copies of words in an index. But Enfish contends that ADO.NET satisfies step two because ADO.NET's index references the locations of text cells. *See* Enfish's Opp'n  to Defs.' Mot. for S.J. at 16 ("ADO.NET stores these keys by reference in the index, which is itself stored in the logical table."); *see also* Defs.' SOF ¶¶ 32, 34, Dkt. No. 263-1. But storing the location of a text cell is not the same as storing a copy of the text, as required by step two. Enfish's argument conflates step two and step three of the algorithm. Enfish's argument is essentially that the index "stores" key phrases and words by having pointers to text cells. *See* Enfish's Opp'n at 17 (arguing "ADO.NET accesses the stored keys in its index using a pointer"); Decl. of H.V. Jagadish ¶¶ 101–105, 129–32 (under seal); Black Tr. at 170:9-18, Dkt. 282-10. But step three explicitly requires the index to have pointers to text cells. Enfish's interpretation of step two is incorrect because it renders some of step three's

-7-

**A340**

1    language superfluous.  In light of the specification, the only reasonable reading of

2    step two is that the index must store a copy of the text itself.  Because ADO.NET

3    does not have an index that stores copies of text, ADO.NET does not meet the

4    algorithm's second step.

5       **ii.    ADO.NET Does Not Have Pointers from Text Cells to the Index**

6      ADO.NET also fails to meet the third step of the algorithm, which requires the

7    structure to "include, in text cells of the logical table, pointers corresponding to the

8    entries in the index, and include, in the index, pointers to the text cells."  Enfish's

9    primary argument is that under step three of the "means for indexing" algorithm, a

10   text cell does not need to contain a pointer to the index.  In other words, Enfish

11   argues the first half of step three is optional.  This argument is wrong.  Under the

12   Court's adopted construction, each part of every step is essential.  This means-

13   plus-function limitation covers only structures that meet all parts of all three steps

14   of the algorithm.

15      In the alternative, Enfish argues that there is a genuine dispute about whether

16   ADO.NET's text cells contain pointers to the index.  Enfish concedes that

17   ADO.NET does not contain pointers directly from the text cells to the index.

18   Instead, Enfish shows the presence of multiple pointers which, via a circuitous

19   route, lead from the StringStorage object eventually to the Red-Black Tree index

20   (represented by the numbered circles):

21      *//*

22      *//*

23      *//*

24      *//*

25      *//*

26      *//*

27      *//*

28      *//*

-8-

1

2      
       Figure 5

3

4

5

6

7

8

9   Enfish Opp'n at 23.  Again, there is no factual dispute between the parties, who

10  both agree on how ADO.NET operates.  The dispute remains over claim

11  construction.  The question is whether the string of pointers depicted above

12  satisfies the third step of the algorithm.  Based on the specification of the '604

13  patent, a string of pointers cannot satisfy the third step.  The specification shows

14  only structures with text cells containing pointers that point directly to entries in

15  the index.  *See* '604 Patent, Fig. 14, Fig. 15, 14:10–67.  The specification does not

16  depict a string of pointers that eventually leads to the index.  The specification

17  discloses only structures where a single pointer corresponds to an index entry.

18     In light of this fact, it is clear that ADO.NET does not meet the algorithm's

19  third step.  As depicted above in Figure 5, the text cells "George," "Annette," and

20  "Toru" contain no pointers directly to index entries.  In fact, the text cells contain

21  no pointers at all.  As Defendants correctly observe, the dotted blue arrows do not

22  begin in specific text cells, as required by the third step, but rather in the

23  StringStorage object.  The StringStorage object represents ***multiple text cells***, as

24  confirmed by Enfish's own expert.  *See* Decl. of H.V. Jagadish ¶ ¶ 112, 113, 117.

25  Because the StringStorage object is not a text cell itself, a pointer starting in the

26  StringStorage object cannot satisfy the algorithm's third step.

27     ADO.NET also does not meet the third step's requirement that a pointer ***directly***

28  correspond to an index entry.  Figure 5 above does not show a single pointer

-9-

**A342**

1  corresponding to an index entry.  Instead, Figure 5 shows a pointer that

2  corresponds to the DataTable object, which has a pointer that corresponds to the

3  Index, which has a pointer that corresponds to the Index Tree, which has a pointer

4  that corresponds to the Red-Black Tree.  Although the string of pointers ends in the

5  Red-Black Tree, there is no single pointer directly from a text cell to an index

6  entry.  Under the proper construction of "means for indexing," no reasonable jury

7  could find that this string of pointers satisfies the algorithm's third step.

8  ### iii.    ADO.NET Is Not an Equivalent Structure Under § 112 ¶ 6

9  Although ADO.NET is not an identical structure for the "means for indexing"

10  limitation, the Court must also decide whether ADO.NET is an equivalent structure

11  under § 112 ¶ 6.  As a matter of law, it is not.  Defendants correctly observe that

12  112 ¶ 6 equivalence does not require the accused device to have an equivalent to

13  each algorithm step.  *See Odetics*, 185 F.3d at 1268.  The question then is whether

14  the differences between ADO.NET and the disclosed structure are insubstantial.

15  Because ADO.NET's indexing structure operates in a substantially different way

16  from the disclosed structure, ADO.NET is not an equivalent under § 112 ¶ 6.

17  When performing equivalence analysis, courts must consider the context of an

18  invention in determining whether an accused structure is substantially different.

19  *See IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1436 (Fed. Cir.

20  2000).  The differences between ADO.NET and the disclosed structure are

21  substantial because ADO.NET lacks important and beneficial elements of the

22  disclosed structure.  With regard to the invention's key word index, the

23  specification repeatedly mentions the benefit of storing key phrases in an index.

24  *See* '604 Patent, 12:10–15 ("The present invention includes an indexing system

25  that provides for rapid searching of text included in any cell in the table **100**.  Each

26  key phrase is extracted from a cell and stored in a list format according to a

27  predefined hierarchy. For example, the list may be alphabetized, providing for very

28  rapid searching of a particular name.").  The specification provides no evidence

-10-

that referencing the location of a text cell achieves the same benefits.  More

significantly, pointers from the text cells to the index are critical for extended

queries.  Extended queries are an important benefit of the invention.  *See* '604

Patent, Abstract ("The table includes an index structure for extended queries.");

'604 Patent, 14:13–18 ("The associations between the list of records with text and

the list of key phrases is two-way since the cells that include text point to the key

words. . . . Each record can point to multiple key phrases, and each key phrase can

point to multiple records.").  ADO.NET's lack of such pointers is a crucial

difference because these pointers are critical for a benefit of the invention.

These key differences show that ADO.NET does not perform its function in

substantially the same way as the disclosed structure.  When an accused device

lacks elements that represent the disclosed structure's significant benefits, the

accused device should not be a 112 ¶ 6 equivalent.

**C. ADO.NET Does Not Infringe Under the Doctrine of Equivalents**

ADO.NET does not infringe under the doctrine of equivalents.  As discussed

above, ADO.NET cannot meet the "means for indexing" limitation because it is

neither a corresponding nor equivalent structure.  Therefore, ADO.NET fails the

all-elements test and cannot infringe claim 17 under the doctrine of equivalents.

*See Ring*, 743 F.3d at 835 ("[W]hen the accused technology was known at the time

of patenting and the functions are identical, the structural equivalence inquiry

under § 112 and the structural equivalence portion of the doctrine of equivalents

are coextensive.").

**D. Enfish Has Shown No Basis for Distinguishing Between Versions of
ADO.NET**

Enfish argues that the Court, at most, should grant summary judgment only as

to the ADO.NET version discussed in Defendants' motion—4.5.1.  But Enfish

misapprehends burdens at the summary judgment stage.  If the moving party does

not have the burden of proof at trial, "the burden on the moving party may be

-11-

**A344**

1   discharged by 'showing' -- that is, pointing out to the district court -- that there is

2   an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S.

3   at 325.  Enfish has not shown any material differences between ADO.NET

4   versions.  Enfish makes only a conclusory statement that "Microsoft's code and

5   documentation show[ ] that substantive differences exist between different

6   versions."  Enfish Opp'n at 25; *see* Decl. of H.V. Jagadish ¶ ¶ 137–40.  Despite

7   having the opportunity, Enfish has not pointed to any differences between versions

8   of ADO.NET that would change a noninfringement analysis.  Because Enfish has

9   failed to show any genuine issue of material fact, the Court's analysis applies to all

10   accused versions of ADO.NET.

11                     **V.    Conclusion**

12      Because ADO.NET fails to meet the "means for indexing" limitation, the Court

13   grants Defendants' Motion for Summary Judgment on Noninfringement as to

14   Claim 17 of the '604 Patent.

16      IT IS SO ORDERED.

18   DATED: November 20, 2014

19                            Hon. Mariana R. Pfaelzer

20                            United States District Judge

-12-

**A345**

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10
11

| | |
|---|---|
| ENFISH, LLC, | Case No. CV12-7360 MRP (MRWx) |
| Plaintiff, | **FINAL JUDGMENT** |
| v. | |
| MICROSOFT CORPORATION; FISERV, INC.; INTUIT, INC.; SAGE SOFTWARE, INC.; and JACK HENRY & ASSOCIATES, INC., | |
| Defendants. | |

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Final Judgment

**A346**

1    Plaintiff Enfish, LLC ("Enfish") filed this lawsuit against Defendants

2  Microsoft Corporation; Fiserv, Inc.; Intuit, Inc.; Sage Software, Inc.; and Jack Henry

3  & Associates, Inc. (collectively, "Defendants"), alleging that each Defendant had

4  infringed U.S. Patent Nos. 6,151,604 and 6,163,775 (the "'604 and '775 patents).

5  [Dkts. 1 & 30]  Each Defendant answered, asserting defenses and declaratory

6  judgment counterclaims that it has not infringed the '604 or '775 patents and that

7  both patents are invalid.  [Dkts. 33, 35, 37, 39 & 41]

8    By orders entered on March 31, November 11 and November 21, 2014 (Dkts.

9  241, 242, 303 and 306), this Court granted summary judgment in Defendants' favor

10  on all asserted claims in the '604 and '775 patents as follows:  (i) claims 31, 32, 46

11  and 47 of the '604 patent and claims 31, 32 and 47 of the '775 patent are invalid for

12  anticipation by the prior art; (ii) claims 1, 2 and 16 of the '604 patent are invalid

13  under 35 U.S.C. § 112(f); (iii) claims 1, 2, 16, 17, 31, 32, 46 and 47 of the '604 patent

14  and claims 31, 32 and 47 of the '775 patent are invalid under 35 U.S.C. § 101; and

15  (iv) Defendants have not infringed claim 17 of the '604 patent.

16    Accordingly, the Court hereby ORDERS, ADJUDGES AND DECREES

17  THAT:

18    1.    Pursuant to the Court's Order, final judgment against Enfish shall be

19        entered in favor of each Defendant as a prevailing party;

20    2.    Enfish's Complaint, as amended, and all of its asserted causes of action

21        are dismissed with prejudice and Enfish shall recover nothing in this

22        action;

23    3.    Defendants' respective counterclaims for a declaration that the asserted

24        claims of the '604 and '775 patents are invalid are granted;

25    4.    Defendants' respective counterclaims for a declaration that each

26        Defendant has not infringed the'604 patent are granted as to claim 17;

27    5.    Except as expressly granted above, Defendants' respective

28        counterclaims and defenses are dismissed without prejudice as moot.

1    6.    Pursuant to Federal Rule of Civil Procedure 54(d)(1) and Local Rules

2        54-2 and 54-3, Defendants are entitled to recover their costs incurred in

3        this action; and

4    7.    Any request by Defendants for an award of attorneys' fees and related

5        nontaxable expenses under Federal Rule of Civil Procedure 54(d)(2)

6        shall be made pursuant to Local Rule 54-10.

7    Because no claims are remaining in this action, the Court expressly directs the

8  Clerk to enter this Final Judgment as set forth above pursuant to Federal Rule of Civil

9  Procedure 58.

10

11  DATED:  November 26, 2014

12                           The Honorable Mariana R. Pfaelzer

                              United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT
ENFISH, LLC v. MICROSOFT CORPORATION, 2015-1244

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by COOLEY LLP, Attorneys for Plaintiff-Appellant to print this document.  I am an employee of Counsel Press.

On July 10, 2015, Counsel for Plaintiff-Appellant has authorized me to electronically file the foregoing **Brief for Plaintiff-Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

Chad S. Campbell
(principal counsel)
cscampbell@perkinscoie.com
Dan L. Bagatell
dbagatell@perkinscoie.com
Theodore H. Wimsatt
twimsatt@perkinscoie.com
Perkins Coie LLP
2901 N. Central Avenue
Suite 2000
Phoenix, AZ 85012
602-351-8000

Elizabeth M. Banzhoff
ebanzhoff@perkinscoie.com
Amanda D.W. Tessar
atessar@perkinscoie.com
Perkins Coie LLP
1900 Sixteenth Street
Suite 1400
Denver, CO 80202
303-291-2397

William J. Brown
(principal counsel)
bill@bwmllp.com
Yuanjun Lily Li
lli@bwmllp.com
Matthew K. Wegner
mwegner@bwmllp.com
Brown Wegner McNamara LLP
2603 Main Street
Suite 1050
Irvine, CA 92614
949-705-0080

Two paper copies will also be mailed to above principal counsel when paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies of the confidential brief will be filed with the Court within the time provided in the Court's rules.

July 10, 2015                                      /s/ Robyn Cocho
                                                   Robyn Cocho
                                                   Counsel Press

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  X   The brief contains 13,989 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____  The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  X   The brief has been prepared in a proportionally spaced typeface using MS Word 2013 in a 14 point Times New Roman font or

_____  The brief has been prepared in a monospaced typeface using ___ _____in a ___ characters per inch_____ font.

Dated:  July 10, 2015          COOLEY LLP

By /s/ Orion Armon_____
                  Orion Armon

Attorneys for Plaintiff-Appellant