2015–1244

———————————

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

———————————

ENFISH, LLC,

*Plaintiff–Appellant*,

v.

MICROSOFT CORPORATION, FISERV, INC., INTUIT, INC.,
SAGE SOFTWARE, INC., and JACK HENRY AND ASSOCIATES, INC.,

*Defendants–Appellees*

———————————

Appeal from the United States District Court for the Central District of California
in case no 2:12-cv-07360-MRP-MRW, Judge Mariana R. Pfaelzer

———————————

## APPELLEES' JOINT RESPONSE BRIEF

———————————

Chad S. Campbell
Dan L. Bagatell
Theodore H. Wimsatt
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012–2788
Phone:    (602) 351–8383
E-mail:    CSCampbell@perkinscoie.com

Amanda J. Tessar
Elizabeth Banzhoff
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, Colorado 80202–5225
Phone:  (303) 291–2357
E-mail:  ATessar@perkinscoie.com

Attorneys for Microsoft Corporation, Fiserv, Inc.,
Intuit, Inc., and Jack Henry and Associates, Inc.

*[counsel for Sage Software, Inc. listed on inside cover]*

October 2, 2015

William J. Brown, Jr.
Matthew K. Wegner
BROWN WEGNER MCNAMARA LLP
2603 Main Street, Suite 1050
Irvine, California 92614
Phone:   (949) 705–0080
E-mail:   bill@bwmllp.com

Attorneys for Sage Software, Inc.

## CERTIFICATES OF INTEREST

Counsel for defendants–appellees Microsoft Corporation, Fiserv, Inc., Intuit, Inc., and Jack Henry and Associates, Inc. certifies the following:

The full names of every party represented by me are:

Microsoft Corporation; Fiserv, Inc.; Intuit, Inc.; Jack Henry and Associates, Inc.

The name of the real parties in interest (if the parties named in the caption are not the real party in interest) represented by me are:

n/a

The names of all parent corporations and any publicly held companies that own 10% or more of the stock of the party represented by me are:

None for Microsoft Corporation, Intuit, Inc., and Jack Henry and Associates, Inc.

Based on the information that is available to Fiserv, Fiserv believes that T. Rowe Price Associates, Inc. ("Price Associates") beneficially owns approximately 33 million shares of Fiserv, Inc. common stock, which amounts to approximately 14% of its outstanding shares.  In filings with Securities and Exchange Commission, Price Associates has indicated that that these securities are owned by various individual and institutional investors for which Price Associates serves as investment adviser with power to direct investments and/or sole power to vote the securities. For purposes of the reporting requirements of the Exchange Act, Price Associates is deemed to be a beneficial owner of such securities; however, Price Associates expressly disclaims that it is, in fact, the beneficial owner of such securities.

The names of all law firms and lawyers that appeared for the parties now represented by me in the trial court or that are expected to appear in this Court are:

### PERKINS COIE LLP

| Jonathan D. Allred | Dan L. Bagatell | Elizabeth J. Banzhoff |
|---|---|---|
| Chad S. Campbell | Lara J. Dueppen | Amy E. Simpson |
| Lauren C. Sliger* | Amanda J. Tessar | Theodore H. Wimsatt |

### POLSINELLI LLP

Wesley D. Hurst (for Jack Henry and Associates, Inc.)


Dated:  October 2, 2015              /s/Chad S. Campbell

                                    Chad S. Campbell

---

* no longer with the firm

Counsel for defendant–appellee Sage Software, Inc. certifies the following:

The full name of every party represented by me is:

Sage Software, Inc.

The name of the real parties in interest (if the parties named in the caption are not the real party in interest) represented by me are:

n/a

The names of all parent corporations and any publicly held companies that own 10% or more of the stock of the party represented by me are:

Sage Software, Inc. is owned by Sage Software Holding, Inc., which in turn is owned by Sage Software North America.  Sage Software North America is ultimately indirectly owned by Sage Group, PLC.

BROWN WEGNER MCNAMARA LLP

William J. Brown, Jr.          Yuanjun Lily Li          Matthew K. Wegner


Dated:  October 2, 2015          /s/William J. Brown, Jr.
                                      William J. Brown, Jr.

# TABLE OF CONTENTS

Certificates of Interest.................................................................................i

Table of Authorities .............................................................................. vii

Table of Abbreviations and Conventions ................................................xi

Related Cases ......................................................................................... xii

Introduction.............................................................................................1

Statement of Issues .................................................................................2

Statement of the Case .............................................................................4

    I.    Enfish's complaint and infringement contentions ....................4

    II.   The district court's claim constructions ....................................6

    III.  Defendants' motions for summary judgment of invalidity.......7

    IV.  Defendants' motion for summary judgment of noninfringement .............9

    V.   Defendants' motion for summary judgment of patent-ineligibility...........9

    VI.  The IPRs................................................................................10

Summary of Argument ..........................................................................11

Argument ...............................................................................................16

    I.    The appealed claims are invalid for claiming abstract subject matter .....16

        A.   The claims are directed to abstract tables.......................16

            1.    The asserted claims are like those found patent-ineligible in past cases ..............................................17

            2.    The claims address fundamental, long-prevalent practices......19

            3.    The claimed "logical table" is conceptual, not physical ..........21

            4.    The claims recite steps and functions that humans can perform mentally or with pen and paper .................................22

B. No limitations transform the claims into more than abstract subject matter ................................................................... 25

C. Enfish's counterarguments are unavailing ....................................... 27

    1. Calling tables "data structures" does not make the concept more concrete .............................................................. 27

    2. Patent-eligibility focuses on the claimed subject matter, not implementation details in the written description ............. 29

    3. This case differs fundamentally from *DDR* ............................... 30

    4. Enfish's non-preemption argument is a red herring ................. 31

II. The district court correctly granted summary judgment that Excel 5.0 anticipated claims 31 and 32 of both patents ........................... 31

A. The parties did not dispute how Excel 5.0 operated—only whether the claims cover that operation, which is a matter of law .. 32

B. Column names can "defin[e]" a column ........................................... 35

C. Enfish failed to preserve its "single table" argument, and in any event pivot columns linked to underlying data on the same spreadsheet qualify as "a logical table" ............................................ 39

D. The pivot function provides "correspondence" between a row and a column with an equivalent OID ...................................... 42

E. Non-pivoting tables satisfied the disputed limitations even if pivot tables did not .......................................................................... 45

III. Claim 17 of the '604 patent is invalid for indefiniteness because the specification does not clearly link any structure to the claimed "means for configuring said memory according to a logical table" ........ 47

IV. The district court correctly granted summary judgment of noninfringement of claim 17 of the '604 patent ..................................... 53

A. The district court correctly refused to broaden the scope of the "means for indexing" beyond the single algorithm that Enfish specified in Exhibit 21 ...................................................................... 53

– v –

B.    The district court correctly found that there were no genuine disputes of material fact and that Defendants were entitled to judgment as a matter of law ............................................................ 57

    1.    ADO.NET does not store extracted key phrases or words in an index stored in a logical table ......................................... 57

    2.    ADO.NET lacks pointers from text cells to an index .............. 59

V.   Microsoft is not estopped from asserting invalidity over Excel 5.0 ........ 61

Conclusion ...................................................................................................... 65

Certificate of Compliance ............................................................................... 66

Certificate of Authority and Proof of Service ................................................ 67

Representative Claims ............................................................................ back cover

# TABLE OF AUTHORITIES

**Cases**                                                                **Pages**

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
  728 F.3d 1336 (Fed. Cir. 2013) ...........................................20, 29, 31

*Alice Corp. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014)..............................9, 16, 17, 19, 20, 25, 26, 27

*Aristocrat Techs. Austl. Pty. Ltd. v. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008) ...........................................................49

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.*,
  73 F.3d 1573 (Fed. Cir. 1996) .............................................................57

*Bettcher Indus., Inc. v. Bunzl USA, Inc.*,
  661 F.3d 629 (Fed. Cir. 2011) .............................................................64

*Bilski v. Kappos*,
  561 U.S. 593 (2010) ...........................................................................31

*Biomedino, LLC v. Waters Techs. Corp.*,
  490 F.3d 946 (Fed. Cir. 2007) .......................................................49, 51

*Blackboard, Inc. v. Desire2Learn, Inc.*,
  574 F.3d 1371 (Fed. Cir. 2009) ..........................................................51

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
  776 F.3d 1343 (Fed. Cir. 2014) ......................................17, 22, 25, 26

*Cybersource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011) ..........................................................22

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014) ..........................................................30

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*,
  412 F.3d 1291 (Fed. Cir. 2005) .....................................................52, 54

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
  758 F.3d 1344 (Fed. Cir 2014) .....................................................27, 28

*ePlus, Inc. v. Lawson Software, Inc.*,
   700 F.3d 509 (Fed. Cir. 2012) ........................................................51

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
   721 F.3d 1330 (Fed. Cir. 2013) ......................................................64

*Function Media, L.L.C. v. Google Inc.*,
   708 F.3d 1310,1318 (Fed. Cir. 2013) .......................................49, 51

*Golden Bridge Tech., Inc. v. Apple Inc.*,
   758 F.3d 1362 (Fed. Cir. 2014) ......................................................40

*Gottschalk v. Benson*,
   409 U.S. 63 (1972).........................................................16, 23, 28

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
   792 F.3d 1363 (Fed. Cir. 2015) ...................16, 20, 22, 25, 27, 30

*Intercontinental Travel Mktg., Inc. v. FDIC*,
   45 F.3d 1278 (9th Cir. 1994) .........................................................40

*Internet Patents Corp. v. Active Network, Inc.*,
   790 F.3d 1343 (Fed. Cir. 2015) ......................................................17

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996).......................................................................32

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
   344 F.3d 1205 (Fed. Cir. 2003) ......................................................52

*Mikkelsen Graphic Eng'g, Inc. v. Zund Am., Inc.*,
   541 F. App'x 964 (Fed. Cir. 2013) .................................................61

*Noah Sys., Inc. v. Intuit Inc.*,
   675 F.3d 1302 (Fed. Cir. 2012) ......................................................49

*O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008) ......................................................33

*Odetics, Inc. v. Storage Tech. Corp.*,
   185 F.3d 1259 (Fed. Cir. 1999) ......................................................60

*OIP Techs., Inc. v. Amazon.com, Inc.*,
　788 F.3d 1359 (Fed. Cir. 2015) ....................................................30, 31

*Planet Bingo, LLC v. VKGS LLC*,
　576 F. App'x 1005 (Fed. Cir. 2014) .....................................................23

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
　135 S. Ct. 831 (2015).............................................................................48

*Transclean Corp. v. Jiffy Lube Int'l, Inc.*,
　474 F.3d 1298 (Fed. Cir. 2007) ...........................................................56

*Triton Tech of Tex., LLC v. Nintendo of Am., Inc.*,
　753 F.3d 1375 (Fed. Cir. 2014) ......................................................48, 51

*Ultramercial, Inc. v. Hulu, LLC*,
　772 F.3d 709 (Fed. Cir. 2014) .......................................................20, 29

*Versata Dev. Grp., Inc. v. SAP Am., Inc.*,
　793 F.3d 1306 (Fed. Cir. 2015) ..............................18, 19, 26, 28, 29

*Va. Innovation Scis., Inc. v. Samsung Elecs. Co*,
　983 F. Supp. 2d 713 (E.D. Va. 2014), *vacated*, 2015 WL 3555700
　(Fed. Cir. June 9, 2015) ........................................................................64

## Statutes

35 U.S.C. § 101 ..........................................................................1, 29, 63

35 U.S.C. § 112 ........................................................................8, 11, 63

35 U.S.C. § 112 ¶ 1 ................................................................................51

35 U.S.C. § 112 ¶ 2 ....................................................................47, 49, 51

35 U.S.C. § 112 ¶ 6 ......................................................7, 47, 48, 51, 54

35 U.S.C. § 254 ......................................................................................53

35 U.S.C. § 311 ......................................................................................61

35 U.S.C. § 311(b) .................................................................................10

35 U.S.C. § 315(c) ................................................................................ 64

35 U.S.C. § 315(e)(2) .............................................................. 3, 61, 63, 64

**Other Authorities**

Fed. R. Civ. P. 56(d) ............................................................................. 9

## TABLE OF ABBREVIATIONS AND CONVENTIONS

A\_\_\_                      joint appendix page \_\_\_

Defendants              all defendants–appellees collectively

Enfish                  plaintiff–appellant Enfish, LLC

IPR                     *inter partes* review

Microsoft               defendant–appellee Microsoft Corporation

'604 patent             U.S. Patent No. 6,151,604

'775 patent             U.S. Patent No. 6,163,775

'###(*xx:yy-zz*)        column *xx*, lines *yy* to *zz* of the '### patent

**RELATED CASES**

No other appeals in or from the same civil action have previously been before this or any other appellate court.  The patents at issue in this appeal were, however, at issue in five *inter partes* reviews before the Patent Trial and Appeal Board (PTAB), and the final written decisions in those cases are now on appeal to this Court in consolidated cross-appeals Nos. 15–1734, –1736, –1737, –1738, –1739, –1740, –1741, –1742, –1816, –1817, –1818, and –1819, captioned *Microsoft Corp. v. Enfish, LLC.*  An affirmance in this case would moot many but not all of the issues in those cases.

Defendants and their counsel are not aware of any other cases pending in this or any other court that will directly affect or be directly affected by the decision in this case.

## INTRODUCTION

Enfish suggests that a respected district judge erred at every turn and seeks to reverse summary judgment rulings that collectively rejected each of its infringement claims on at least two grounds. But the district court correctly ruled that all the asserted claims are invalid because they claim abstract subject matter, that Microsoft's Excel 5.0 software product anticipated claims 31 and 32 of each patent, and that the accused ADO.NET product does not infringe claim 17 of the '604 patent because its indexing approach differs from the claimed "means for indexing" in multiple ways.

If this Court agrees that the claims are invalid under Section 101, it can stop there. Alternatively, it can skip patent-eligibility and affirm on grounds that each appealed claim is invalid for another reason: claims 31 and 32 for anticipation and claim 17 for indefiniteness because, as the PTAB recently found on *inter partes* review (IPR), the '604 patent discloses no structure corresponding to the claimed "means for configuring said memory." Alternatively, this Court can affirm that claims 31 and 32 are anticipated and claim 17 is not infringed and leave claim 17's validity for another day. In the end, Enfish cannot succeed in running the gauntlet it faces.

Enfish also argues that Microsoft should be estopped from asserting that claim 32 of each patent is invalid over the previously on-sale and publicly-used

Excel 5.0 product because the PTAB recently found that Microsoft did not prove those claims invalid over unrelated printed-publication references. But Enfish's theory is a non-starter because statutory estoppel applies only to arguments that could have been raised in an IPR, and challengers in IPRs cannot assert invalidity based on prior-art products. Moreover, IPR estoppel cannot negate an earlier judgment of invalidity, and Enfish's estoppel claim is not ripe at this point.

The judgment should be affirmed.

## STATEMENT OF ISSUES

1.    Enfish's claims focus on abstract concepts: using logical, nonphysical table formats to store data and either indexing the data or using rows to define columns of the table. The claims refer to storage and retrieval on a computer, but the computer and its memory are generic, and no limitations transform the claimed concepts into specific or tangible applications. Did the district court correctly rule that the claims do not recite patent-eligible subject matter?

2.    The district court found claims 31 and 32 of each patent invalid for anticipation by Microsoft's Excel 5.0 product. Enfish's expert did not dispute what Excel 5.0 disclosed; instead, he disputed whether the claims covered what was concededly disclosed. Did the district court correctly find no genuine issue of material fact and that Excel 5.0 anticipated these claims as a matter of law?

3.      As the PTAB found on *inter partes* review, the '604 patent identifies no structure corresponding to the "means for configuring said memory" recited in claim 17.  Is claim 17 invalid for indefiniteness?

4.      At Enfish's behest, the district court construed the structure corresponding to the "means for indexing" of claim 17 of the '604 patent as the structure defined in Figure 21 of Enfish's claim-construction brief.  That structure was a single algorithm with three steps.  Microsoft's ADO.NET product did not satisfy at least two of those steps.  Did the district court correctly grant summary judgment of noninfringement of claim 17?

5.      35 U.S.C. § 315(e)(2) prospectively bars an IPR petitioner from challenging in district court the validity of claims upheld by the PTAB in a final written decision, if the grounds for that challenge were or reasonably could have been raised in the IPR.  The estoppel does not bar defendants from asserting invalidity arguments that could not have been raised in the IPR, and it does not negate previous judgments of invalidity.  Enfish contends that Microsoft may be estopped from asserting invalidity over Excel 5.0, but that argument is not ripe and Microsoft could not and did not assert invalidity over an on-sale and publicly-used *product* in the IPRs.  Should this Court reject Enfish's claim of estoppel?

**STATEMENT OF THE CASE**

## I.    Enfish's complaint and infringement contentions

The original incarnation of Enfish applied for the '604 and '775 patents while developing a commercial database engine called DEXIS.  That company failed in the marketplace, was unable to sell the patents, and went bankrupt. A22342.  Its founder salvaged the patents in bankruptcy and formed the current Enfish as a patent-assertion entity.

In this case, Enfish has sued Microsoft and other software companies that allegedly use Microsoft's ADO.NET software.  ADO.NET is part of a library of software routines used to write programs for Windows® operating systems and is used to translate data from various formats used in different applications into a standard format.

The centerpiece of all claims of both patents is a "logical table" of data organized into two or more "logical rows" (records of individual items) and two or more "logical columns" (attributes shared across multiple items), with identifiers for each row and column.  To this, the five appealed claims add certain limitations. Claim 17 of the '604 patent adds a "means for indexing":

> 17.  A data storage and retrieval system for a computer memory, comprising:
>
> means for configuring said memory according to a logical table, said logical table including:

a plurality of logical rows, each said logical row
including an object identification number (OID)
to identify each logical row, each said logical
row corresponding to a record of information;

a plurality of logical columns intersecting said
plurality of logical rows to define a plurality of
logical cells, each said logical column including
an OID to identify each said logical column;
and

means for indexing data stored in said table.

Claims 31 and 32 of both patents require at least one logical row and logical

column to share an identifier and at least one logical row to include information

defining each logical column.  Claim 31 of the '604 patent is illustrative:

31.  A method for storing and retrieving data in a
computer memory, comprising the steps of:

configuring said memory according to a logical table,
said logical table including:

a plurality of logical rows, each said logical row
including an object identification number (OID)
to identify each said logical row, each said
logical row corresponding to a record of
information;

a plurality of logical columns intersecting said
plurality of logical rows to define a plurality of
logical cells, each said logical column including
an OID to identify each said logical column;
and wherein

at least one of said logical rows has an OID equal
to the OID to a corresponding one of said
logical columns, and at least one of said logical
rows includes logical column information
defining each of said logical columns.

Microsoft's source code and other technical descriptions of ADO.NET have been publicly available for many years.  A3116; A8336-38.  Armed with that information, Enfish's infringement contentions alleged that DataTable objects in ADO.NET were "logical tables" because they could be conceptualized as a spread-sheet of values organized into intersecting rows and columns:

> ADO.NET's DataTable object represents a logical implementation of a table of data.  When you visualize the data values within the table, you have an image of a spreadsheet-like table, with distinct cells for each text, numeric, date/time, or other type of value.

A3111.  As to other limitations, Enfish contended that combinations of multiple DataTables infringed (even though Enfish now contends that the claimed invention requires an entire database to be stored in a single table).  A3152-54.

## II.    The district court's claim constructions

The district court actively managed the case from the outset and ordered claim-construction briefing limited to ten terms soon after Enfish served its in-fringement contentions.  A22331.

In its claim-construction order, the court first construed the claimed "logical table" to mean "a table with a data structure that is logical as opposed to physical, and therefore does not need to be stored contiguously in memory."  A266.  The court rejected various other limitations proposed by both parties.  *Id.*

The court also ruled that the claimed "means for configuring said memory according to a logical table" was subject to 35 U.S.C. § 112 ¶ 6 and the corresponding structure was the algorithm listed in Exhibit 19 to Enfish's claim-construction brief. In so ruling, the court rejected Defendants' argument that the patents' only disclosure of a means to place a logical table into memory was a general-purpose computer with conventional memory and that the patents' other disclosures addressed features that the table should have, not how to configure it into memory. The court reasoned that "the bar for adequacy of structure is low" and that a skilled artisan could "implement a software program and accomplish the [recited] function." A269-70.

The court similarly adopted Enfish's proposal to construe the claimed "means for indexing data stored in [the logical] table" as a means-plus-function element whose corresponding structure was the algorithm listed in Exhibit 21 to Enfish's claim-construction brief. A270. The court did not, however, adopt Enfish's contention that source code submitted with the application for the parent of the '604 patent but omitted in the '604 patent itself constituted additional corresponding structure for the two "means" terms. A272.

## III.  Defendants' motions for summary judgment of invalidity

Defendants were granted leave to submit two invalidity motions: one asserting that Microsoft's Excel 5.0 product anticipated all asserted claims, and the other

– 7 –

contending that three asserted system claims were invalid under 35 U.S.C. § 112 because they recited only one means-plus-function element without any other elements. The court allowed fact and expert discovery regarding the motions. A22343-46.

Defendants' anticipation motion relied on features of the Excel 5.0 product that permitted data tables to be organized into rows and columns stored non-contiguously in memory, uniquely identified rows and columns with numbers or other identifiers, and allowed rows and columns to be added to tables on the fly. As to claims 31 and 32 of both patents, which require a logical row including information defining the logical columns, Defendants relied on header rows that defined corresponding columns and a pivot-table feature that allowed users to enter data (including column-defining information such as column names) in a row and cause the data to appear on the same worksheet as a column. A6918-27.

The district court granted summary judgment that seven asserted method claims were anticipated by Excel 5.0, but it ruled that fact disputes over the "means for configuring said memory" prevented summary judgment of anticipation of four system claims of the '604 patent. A273-88; *see also* A301-08 (denying Enfish's motion for reconsideration). The court agreed with Defendants that claims 1, 2, and 16 of the '604 patent were invalid under Section 112 because they improperly

claimed only a single means-plus-function element by itself.  A289-95.  These
rulings left only one asserted claim standing:  claim 17 of the '604 patent.

## IV.   Defendants' motion for summary judgment of noninfringement

Defendants next obtained leave to move for summary judgment of non-
infringement of claim 17 of the '604 patent based on Enfish's own infringement
contentions.  Defendants' motion relied on the absence of bilateral pointers from
text cells containing important words to the index entries for those words and from
the index entries back to the text cells containing the words.  A9522-26.  That
requirement was part of the construction adopted at Enfish's behest when the court
construed "means for indexing data stored in said table."  The parties stipulated to
a discovery schedule that included further source-code review, expert reports, and
depositions.  Enfish was authorized to request additional discovery under Rule
56(d) if needed, A22348, but it made no such request.

Based on the undisputed operation of ADO.NET, including a diagram of
operation prepared by Enfish's expert, the court found no material fact issues and
granted summary judgment of noninfringement.  A333-45.

## V.   Defendants' motion for summary judgment of patent-ineligibility

Meanwhile, the Supreme Court had decided *Alice Corp. v. CLS Bank
International*, 134 S. Ct. 2347 (2014).  Defendants had raised a patent-ineligibility
defense in their answer, A22307, and the court and parties had discussed the

abstract nature of the claims at the first scheduling conference, A22327-29.  With the law clarified, the district court directed the parties to brief that defense as well. A22349.  After briefing, the court ruled that all the asserted claims were invalid for claiming abstract subject matter.  A309-32.

Enfish appeals from the resulting final judgment, A346-48, but only as to five claims:  claim 17 of the '604 patent and claims 31 and 32 of both patents.

## VI.    The IPRs

After being sued, Microsoft filed petitions for *inter partes* review of both patents-in-suit.  Microsoft petitioned alone, without joinder by or input, contribution, direction, or control from the other defendants.  Because Microsoft did not know which claims Enfish would ultimately assert, Microsoft filed multiple petitions challenging a superset of the claims eventually asserted in the litigation.  As required by 35 U.S.C. § 311(b), the petitions relied solely on prior-art patents and publications, not the previously on-sale and publicly used Excel 5.0 product. Indeed, none of the cited art involved Excel 5.0.

The PTAB initiated review in five cases and, after the district court had already entered final judgment, issued a mixed set of rulings.  Although the PTAB decisions were not before the district court, this Court has granted Enfish's unopposed motions to take judicial notice of the PTAB's decisions.

The PTAB first determined that the claims reciting a "means for configuring said memory"—including claim 17 of the '604 patent—could not be construed because Enfish failed to disclose corresponding structure in the specification. Although that determination would have rendered those claims invalid for indefiniteness in district court, the grounds for cancelling patents in IPRs do not include compliance with Section 112. The PTAB thus terminated proceedings on those claims. A22099-104; A22129-33; A22158-63; A22194-98; A22241-46.

The PTAB also determined that certain claims—including claim 31 of each patent—were invalid for anticipation or obviousness art, but that Microsoft had not shown others—including claim 32 of each patent—were invalid over the cited art. A22106-17; A22136-45; A22166-80; A22200-27; A22250-80; *see also* A22284-99 (denying reconsideration on claim 32 of each patent).

Microsoft and Enfish have cross-appealed from the PTAB's determinations. Those appeals are separate and involve different issues, but affirmance here would moot many issues there.

## SUMMARY OF ARGUMENT

As a matter of law, each appealed claim is invalid on at least two grounds. Moreover, although this Court need not proceed further, the district court correctly granted summary judgment of noninfringement of claim 17 of the '604 patent, and Enfish's assertion of statutory estoppel as to claim 32 of each patent is meritless.

1.    The district court correctly granted summary judgment that the assert-ed claims do not recite patent-eligible subject matter.

The claims are directed to the abstract idea of organizing data into a logical table with intersecting rows and columns, each labeled with an identifier.  Like the concepts this Court has declared abstract in previous cases, using tables to store information is a longstanding, fundamental practice and a task that can be accomplished mentally or with old-fashioned pen and paper.  No claim limitations transform that abstraction into a concrete, patentable invention.  The claims refer to a computer and memory, but they require only a general-purpose computer performing conventional memory operations.  One appealed claim also requires a "means for indexing" and the others require a row to store information defining what the columns contain, but those limitations also merely recite abstract, conceptual approaches to building tables, and they too can be performed mentally or with pen and paper.  In the physical world, the information is stored in an entirely conventional manner.

Enfish's counterarguments are unavailing.  The alleged novelty or utility of the claims, the purported sophistication and insights of the specification, and the asserted character of the claimed table as a new "data structure" do not justify patent protection for the abstract concepts claimed.  The claims do not require any

– 12 –

performance enhancements, and they impermissibly preempt use of the basic concepts claimed.

2.    The district court correctly granted summary judgment that Excel 5.0 anticipated claims 31 and 32 of both patents.

There was no genuine issue of material fact because Enfish did not dispute how Excel 5.0 operated.  The only dispute was whether that operation satisfied the claims.  As a matter of law it did.  Enfish's opposition did not argue that the single worksheet on which Defendants relied showed two logical tables rather than one.  But even if Enfish had preserved that argument, it fails because pivot columns and their underlying data satisfy the district court's construction of "a logical table."  Likewise, a header row of column names qualifies as "logical column information defining each of [the] logical columns" because tables are frequently defined solely by column names dictating what to include and because nothing in the patent or the court's construction requires a row to include all information that might define every column.  Pivot tables also provided the claimed "correspondence" between a row identifier and a column identifier.  In any event, even if pivot tables did not satisfy every limitation, non-pivoting tables with rows of column headers did.

3.    Claim 17 of the '604 patent is also invalid for indefiniteness because, as the PTAB has found, the specification does not clearly link any structure to the claimed "means for configuring said memory according to a logical table."

Because the patent described no physical means for configuring memory, it needed to disclose a specific software algorithm for doing so.  And it did not.  The algorithm posited by Enfish addressed what a *table* needs to include, not how to configure the *memory* used to store the table.  Enfish cannot properly rely on source-code disks submitted with the parent application because those disks were not submitted with the application for the '604 patent itself and because the patent did not clearly link any portions of that code to the claimed function.

4.    The district court properly granted summary judgment of noninfringement of claim 17 of the '604 patent.

Enfish proposed, and the district court adopted, a three-part algorithm as corresponding structure for the "means for indexing data stored in [the] table."  The district court correctly rejected Enfish's expert's attempt to rewrite the algorithm at the summary judgment stage to make half of two steps optional, and it properly excluded algorithms that Enfish drew from source code not included in the application for the '604 patent.

The district court was also correct in ruling that ADO.NET does not infringe because it does not satisfy two elements of the algorithm.  Again there was no genuine fact dispute, only a legal dispute over whether ADO.NET's undisputed operation satisfied the steps.  ADO.NET does not infringe because it does not store extracted key phrases or words in an index stored in a logical table.  Storing point-

ers to text is not the same as storing the text itself. Moreover, ADO.NET does not infringe because it lacks pointers from text cells to an index. The very diagram on which Enfish relies defeats its argument based on pointer "chains."

5.    Microsoft is not and cannot be estopped from asserting invalidity based on its Excel 5.0 product.

To begin with, any statutory estoppel would have no effect on Microsoft's assertion of invalidity based on Excel 5.0 because IPR petitions are limited to claims of invalidity over prior-art *patents and publications* and cannot be based on *products* that were on sale or in public use. Prior-art products and publications describing them are distinct references, and the facts here confirm the wisdom of a clear rule that statutory estoppel is limited to invalidity arguments based on prior-art patents and publications.

Furthermore, the issue is not ripe because Enfish does not contend that Microsoft is currently barred from arguing any grounds at issue here. Enfish does argue that Microsoft may *later* be barred from asserting invalidity based on Excel 5.0 because the district court might find that Microsoft could have argued invalidity based on publications or patents describing that product. But that argument also is not ripe, and any statutory estoppel could not nullify the judicial judgment of invalidity that predated the PTAB's decision.

## ARGUMENT

## I. The appealed claims are invalid for claiming abstract subject matter

The "abstract ideas" exclusion from patent-eligibility "embodies 'the long-standing rule' that '[a]n idea of itself is not patentable.'" *Alice*, 134 S. Ct. at 2355 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).  Under *Alice*, review proceeds in two steps.  Step One "determine[s] whether the claims at issue are directed to … patent-ineligible concepts."  134 S. Ct. at 2355.  If so, Step Two "ask[s] whether the remaining elements, either in isolation or combination with the non-patent-ineligible elements, are sufficient to 'transform the nature of the claim' into a patent-eligible application."  *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015) (quoting *Alice*).

Here, Enfish's claims are plainly directed to abstract concepts, and nothing in the claims transforms them into patent-eligible inventions.

## A. The claims are directed to abstract tables

Claim 17 of the '604 patent recites a means for configuring memory according to a "logical table."  The table need not include more than two logical rows and two logical columns that intersect to form logical cells.  Each row and column must have at least one label called an "OID" (object identification number), but the format is unlimited.  Claim 17 also recites a means for indexing data in the table, but requires nothing else.

Claim 31 of each patent recites the same function of configuring memory according to a "logical table" with logical cells formed by at least two intersecting logical rows and logical columns.  Instead of indexing, these claims require that a row hold information "defining" the columns and a row have an OID label that equals the OID label of a column.  Dependent claims 32 also require that one column hold information to locate OID labels from "text entry."

All these claims are directed to the concepts of organizing data into a logical table with identified columns and rows where one or more rows are used to store an index or information defining columns.  Those concepts are abstract under past precedent and in view of the fundamental, long-prevalent nature of table and index organization, the conceptual nature of the claimed "logical table," and the ability of humans to do equivalent work mentally or with pen and paper.

### 1. The asserted claims are like those found patent-ineligible in past cases

The Supreme Court and this Court have often approached *Alice* Step One through comparisons to past cases.  The claims here are at least as abstract as those invalidated in recent decisions involving data organization, recognition and retrieval.  *See*, *e.g.*, *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) ("[T]he claims of the asserted patents are drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory."); *Internet*

*Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015) ("We agree with the district court that the character of the claimed invention is an abstract idea: the idea of retaining information in the navigation of online forms.").

*Versata Development Group, Inc. v. SAP America, Inc.*, 793 F.3d 1306 (Fed. Cir. 2015), is particularly instructive. There the patent claimed a new way to organize and retrieve data to price products. The prior art had relied on a database of pricing information with several large normalized tables, typically housed on a mainframe computer. *Id.* at 1311-12. The patent taught how to calculate prices on a laptop without multiple tables housed on a mainframe. *Id.*; *see* U.S. Pat. No. 6,553,350 at 2:20-55, 3:20-22, 4:27-32, 9:41-12:3 & Figs. 1 & 5. The improvement relied on a "denormalized" table of customers and products arranged into hierarchies of purchasing organizations and product groups:

FIG. 5

This Court recognized that "[u]sing organization and product group hierarchies to determine a price is an abstract idea that has no particular concrete or tangible form or application" and "is a building block, a basic conceptual framework for organizing information, similar to the claims [in prior cases]." 793 F.3d at 1333-34. The Court rejected arguments that the claims were "technological" or that "they use[d] fewer tables and searches than prior-art software" because the claims themselves did not require better performance compared to the prior art. *Id.* at 1336. Although the claims recited new hierarchies of products and organizations, those concepts were too abstract. *Id.*

The claims here also recite conceptual frameworks for organizing information. Even the "self-referential" tables required by some claims are recited broadly, requiring only two or more rows and columns that are labeled and one or more rows to store column-defining information or index entries. Using rows to store such information is an abstract idea comparable to the use of product and organizational hierarchies in *Versata*. And although Enfish's patents allege that the disclosed approach can lead to improved searching, flexibility, and smaller memory requirements, the claims do not require such performance improvements.

### 2.    The claims address fundamental, long-prevalent practices

"At step one of the *Alice* framework, it is often useful to determine the breadth of the claims in order to determine whether the claims extend to cover a

'fundamental … practice long prevalent in our system ….'" *Intellectual Ventures*, 792 F.3d at 1369.  Claims directed to such fundamental practices are abstract.  *See Alice*, 134 S. Ct. 2355-56 (intermediated settlement is a "fundamental economic practice," a "method of organizing human activity"); *Intellectual Ventures*, 792 F.3d at 1370 ("Tailoring information based on the time of day of viewing is also an abstract, overly broad concept long-practiced in our society."); *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1347-48 (Fed. Cir. 2013) ("generating tasks based on rules to be completed upon the occurrence of an event" was an abstract concept and fundamental practice).

Here, the Court may take notice, and the record below established without contradiction, that people have been organizing information into tables with iden-tified rows and columns and using indexing to accelerate retrieval of such informa-tion for centuries.  A320-21, A326; A11350-68.  As drafted, the asserted claims are broad enough to encompass the fundamental practices of table-and-index-based data organization used in virtually every field of human endeavor.

Such claims have repeatedly been found to be abstract at *Alice* Step One, even when additional limitations prevent them from extending to every aspect of the fundamental practice in question and even when some limitations are allegedly novel.  *Alice*, 134 S. Ct. at 2354; *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014) ("We do not agree with Ultramercial that the addition of

merely novel or non-routine components to the claimed idea necessarily turns an abstraction into something concrete.").

### 3.    The claimed "logical table" is conceptual, not physical

The claims recite "logical tables" composed of "logical rows" and "logical columns."  The "logical table" is itself an abstraction.  Under the district court's construction, which Enfish has not appealed, a "logical table" is "a table with a data structure that is logical as opposed to physical, and therefore does not need to be stored contiguously in memory."  A266.  The construction reflects the specification's teaching that a "logical table" is a wholly conceptual arrangement of information that requires no particular physical arrangement:

> The storage and retrieval structure of the present invention comprises a table 100 [in Figure 3].  The structure of the table 100 is a logical structure and not necessarily a physical structure.  Thus, the memories 26 and 22 configured according to the teachings of the present invention need not store the table 100 contiguously.

'604(6:30-34).

Enfish has consistently relied on the amorphous, conceptual nature of a "logical table" to advance its infringement theory, contending, for example, that the accused "ADO.NET[ ] DataTable object represents a logical implementation of a table of data" and that "[w]hen you visualize the data values within the table, you have an image of a spreadsheet-like table, with distinct cells for each text, numeric, date/time, or other type of value."  A3144.  Enfish's technical expert confirmed the

conceptual nature of a "logical table," saying: "I think that the notion of a logical table now is a question of what you conceptually consider a logical table." A11343-47. Lead named inventor Wlaschin similarly declared that the claims "include a logical table in which rows, columns, and cells are not required to be organized in a particular manner." A10940.

### 4. The claims recite steps and functions that humans can perform mentally or with pen and paper

The ability to use pen and paper or mental work to perform functions that a claim assigns to a computer is another indication of abstractness. *Intellectual Ventures*, 792 F.3d at 1368-69 (claimed calculations held unpatentable where they "'could still be made using a pencil and paper' with a simple notification device, even in real time"). "[C]omputational methods which can be performed *entirely* in the human mind are the types of methods that embody the 'basic tools of scientific and technological work' that are free to all … and reserved exclusively to none." *Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011). This principle holds even when the claimed functions are allegedly new or technical. *Content Extraction*, 776 F.3d at 1347 ("concept of data collection, recognition, and storage" were abstract functions that "humans have always performed"; rejecting argument that claims were concrete because "human minds are unable to process and recognize the stream of bits" from a scanner).

For example, in *Gottschalk v. Benson*, the Supreme Court rejected as abstract a claim to converting binary coded decimals into pure binary numbers even though it included steps requiring manipulation of a recirculating shift register (a type of computer storage element):

> (1)    storing the binary coded decimal signals in a reentrant shift register,
>
> (2)    shifting the signals to the right by at least three places, until there is a binary '1' in the second position of said register,
>
> … and
>
> (7)    shifting the signals to the right by at least three positions in preparation for a succeeding binary '1' in the second position of said register.

409 U.S. at 73.  The Court relied on humans' ability to carry out the same computation performed by the shift register.  *Id.* at 67 ("The conversion of BCD numerals to pure binary numerals can be done mentally ….").  Thus, the fact that a computer could do a better, faster, or more efficient job than a human does not affect the analysis.  *See also Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1008 (Fed. Cir. 2014) (rejecting argument that real-world games required handling "millions" of preselected numbers as the claimed steps "also can be 'done mentally'").

Here, ordinary experience confirms that humans can create tables with pen and paper that include multiple intersecting rows and columns with identifying labels.  Spreadsheets, accounting ledgers, restaurant menus, logarithmic tables,

attendance rolls, team rosters, and inventory charts are just a few examples.  Figure 3 confirms that pen and paper could be used to store column defining names in a header row (see highlighted row 108) or to give the same label to both a column and a row that holds defining information about the column (see highlighted row 136 and column 126):

FIG. 3

| | OBJECT ID | TYPE [# 101] | [#1012] LABEL | ADDRESS [#1013] | EMPLOYED BY [#1019] | TITLE [#1033] | AUTHOR [#1032] |
|---|---|---|---|---|---|---|---|
| 108 | OBJECT ID | TYPE [# 101] | [#1012] LABEL | ADDRESS [#1013] | EMPLOYED BY [#1019] | TITLE [#1033] | AUTHOR [#1032] |
| 110 | #1100 | #1020 [COMPANY] | DEXIS | 117 EAST COLORADO | | N/A | N/A |
| 138 | #1101 | #1010 [PERSON] | SCOTT WLASCHIN | | #1100 [DEXIS] | N/A | N/A |
| | #1118 | #1030 [BOOK] | | | | | #1122 |
| | #1122 | #1050 [MEMO] | | | | | #1122 |
| | #1127 | #1060 [DOCUMENT] | | C:\WORD\ PROJ.DOC | | PROJECT PLAN | #1101 |
| 136 | #1019 | # 210 [FIELD] | EMPLOYED BY | | | | |
| 135 | # 210 | # 111 [TYPE] | COLUMN | | | | |
| 140 | # 111 | # 111 [TYPE] | TYPE | | | | |

Figure 14 likewise confirms that humans can use rows of a paper table to hold an index to keywords:



FIG. 14

## B.    No limitations transform the claims into more than abstract subject matter

Proceeding to *Alice* Step Two, none of the limitations in the appealed claims, taken alone or together, contain an inventive concept that transcends the abstract ideas to which the claims are drawn.  Although the claims recite computer "memory," the memories described and claimed are the conventional sort found in any general-purpose computer, '604(4:49-52), and such conventional elements cannot transform a claim into eligible subject matter.  *Alice*, 134 S. Ct. at 2359-60; *Intellectual Ventures*, 792 F.3d at 1368 ("[A] database, a user profile … and a communication medium, are all generic computer elements.").

The remaining limitations are equally non-transformative.  They recite steps or functions performed by configuring the generic memory for a logical table and do not tie down those underlying abstract ideas to anything concrete.  As explained above, the "logical table" is a pure abstraction with no particular organization or physical structure required.  It therefore fails as a transformative concept.  There was also nothing inventive in discontiguous storage.  As Enfish itself noted, conventional electronic databases relied on discontiguous storage before the alleged invention.  A20004-05.  The claims also recite the assignment of OID labels (identifiers) to the logical columns and logical rows, but the use of identifiers to point to or retrieve items in a database was a well-known, generic, and abstract concept.  *Id.*; '604(1:66-2:1); *see Content Extraction*, 776 F.3d at 1348 ("use of a scanner or

– 25 –

other digitizing device to extract data from a document was well-known" and inadequate under *Alice* Step Two).

Finally, the claims include limitations requiring either (1) a "means for indexing," construed to require using one or more rows to store key-words and pointers as an index of data in the table, or (2) making the claimed table "self-referential" in that one or more rows store information defining the columns of the table. Those limitations do not transform the claims into something concrete or tangible for three reasons:

- First, they still describe abstract conceptual approaches to building logical tables and indexes. The rows storing key-words, pointers or column information are themselves logical, abstract and conceptual. Nothing concrete is required. *See Versata*, 793 F.3d at 1333-34 (under *Alice* Step Two, limitations requiring "hierarchies" were "inherent in the abstract idea of determining a price using organization and product group hierarchies").

- Second, the limitations merely require a generic computer to perform conventional computing functions such as storing information or pointers in the row of a table. *See Content Extraction*, 776 F.3d at 1348 ("There is no 'inventive concept' in CET's use of a generic scanner and computer to perform well-understood, routine, and conventional activities commonly used in industry."). Computers have long used header rows to store defining column names, A284; A326;

A7621, and Enfish conceded that discontiguous table storage and the use of

pointers were conventional.  A20004-05.[1]

- Third, the limitations can be performed mentally or with pen and

paper, as illustrated by the patents' figures.  *See Intellectual Ventures*, 792 F.3d at

1368 (in *Alice* Step Two, discounting limitations that "could still be made using a

pencil and paper").

Simply put, combining one abstract concept with another does not transform

the claims into something concrete or tangible.  And once the abstract ideas and

conventional elements are removed from the claims, nothing inventive is left.

## C.    Enfish's counterarguments are unavailing

Enfish raises a litany of counterarguments, none persuasive.

### 1.    Calling tables "data structures" does not make the concept more concrete

Throughout its brief, Enfish calls the claimed tables "data structures."  But

data structures are just sets of information organized according to pre-set rules.  By

definition, they are abstract and unpatentable unless the claim applies them in a

concrete, transformative way.  For example, in *Digitech Image Technologies, LLC

v. Electronics for Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir 2014), the claims recited

---

[1] The IPR prior art also confirms that generic computers can store column
definitions and indexes in the rows of a table.  A22250-53.

a method for creating a data structure consisting of "an 'improved device profile' that describes spatial and color properties of a device within a digital image processing system." *Id.* at 1347. Although the data structure was complex and new, the method was abstractly drawn to information, not to a specific process on a physical device:

> The above claim recites a process of taking two data sets and combining them into a single data set, the device profile. The two data sets are generated by taking existing information—*i.e.*, measured chromatic stimuli, spatial stimuli, and device response characteristic functions—and organizing this information into a new form. The above claim thus recites an ineligible abstract process of gathering and combining data that does not require input from a physical device.

*Id.* at 1351.

Enfish's "self-referential" "logical tables" are ineligible collections of information that are tied to nothing other than the conventional memory of a general-purpose computer. The steps for creating them could be done mentally or with pen and paper. *Benson* too dealt with claims that referred to data structures consisting of bits in a shift register. 409 U.S. at 67. Although the claimed sequence for shifting them was novel and somewhat different from "the ordinary arithmetic steps a human would use," the approach was unpatentable because it was abstract and could be done mentally without a computer. *Id.*; *see also Versata*, 793 F.3d at 1335 ("Courts have examined claims that required the use of a com-

puter and still found that the underlying, patent ineligible invention could be performed via pen and paper or in a person's mind.").

### 2. Patent-eligibility focuses on the claimed subject matter, not implementation details in the written description

Enfish asserts that the written description discloses new and nonobvious details about the self-referential logical table addressed in some of the claims and that when the disclosed approach is followed, better database performance supposedly results. Contrary to Enfish's suggestion, the alleged benefits of the preferred embodiment are disputed. The dispute is irrelevant here, however, because the claims require no performance benefits and are drafted in abstract form.

"[T]he important inquiry for a § 101 analysis is to look to the claim[s]," not the written description. *Accenture*, 728 F.3d at 1345. "[T]he complexity of the implementing software or the level of detail in the specification does not transform a claim reciting only an abstract concept into a patent-eligible system or method." *Id.* (observing that although the specification of the asserted patent "contains very detailed software implementation guidelines, the system claims themselves only contain generalized software components arranged to implement an abstract concept on a computer"); *Versata*, 793 F.3d at 1336.

Nor does it matter whether an abstract idea is new or useful. *Ultramercial*, 772 F.3d at 714-16 (rejecting argument that abstract ideas for using web servers on the internet were patent eligible because "they [we]re new ideas, not previously

well known, and not routine activity"). The appealed claims require a generic computer memory arranged to hold a logical table that stores indexing information or column-defining information in one or more rows. Even if those ideas were new (and they were not), they are abstract and can be implemented on a general-purpose computer.

### 3.    This case differs fundamentally from *DDR*

Enfish's reliance on *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-58 (Fed. Cir. 2014), is misplaced because there, unlike here, the claims were not directed to a longstanding, fundamental concept and were not comprised of steps or functions that could be performed mentally or with pen and paper. DDR's patents claimed a solution for making a webpage appear as though the user was still on an original website even when following a link to a third party's site. *Id.* The majority found that to be a concrete solution to a new problem created by the Internet. *Id.* Later cases have clarified that *DDR* does not apply to claims addressed to fundamental practices and steps or functions that can be performed mentally or with pen and paper. *Intellectual Ventures*, 792 F.3d at 1371 ("The patent claims here do not address problems unique to the Internet, so *DDR* has no applicability."); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) (distinguishing *DDR* because the claims "do not rely on a 'computer network operating in its normal, expected manner'").

### 4.    Enfish's non-preemption argument is a red herring

Finally, Enfish argues that the claims are not abstract because they do not preempt every database application.  That reasoning is backward.  The question is not whether the claims preempt all uses of tables.  What matters is whether the claims do enough to tie down their coverage of the abstract ideas that they recite. *See OIP Technologies*, 788 F.3d at 1362-63 ("[T]hat the claims do not preempt all price optimization or may be limited to price optimization in the e-commerce setting do not make them any less abstract."); *Accenture*, 728 F.3d at 1345 ("[A]s the Supreme Court stated in *Bilski*, limiting the application of an abstract idea to one field of use does not necessarily guard against preempting all uses of the abstract idea."). The asserted claims here do not limit their reach to any particular database application that makes use of the abstract idea of a logical table with rows that store indexing or column defining information.  They impermissibly claim the abstract concepts themselves.

## II.    The district court correctly granted summary judgment that Excel 5.0 anticipated claims 31 and 32 of both patents

Enfish contends that summary judgment of anticipation of claims 31 and 32 of both patents was improper due to a supposed fact dispute over whether Excel 5.0 disclosed "a logical table" wherein

> at least one of said logical rows has an OID equal to the
> OID to a corresponding one of said logical columns, and

> at least one of said logical rows includes logical column
> information defining each of said logical columns.[2]

In particular, Enfish says a jury should decide whether (a) the pivot-table feature

and its underlying data constitute two "logical tables" rather than one; (b) a header

row that names the columns in a table includes information "defining" the col-

umns; and (c) the pivot-table feature creates a column and corresponding row with

equivalent identifiers.  But the parties did not dispute how Excel 5.0 operated, only

whether that operation satisfied the claim language.  The disputes were thus mat-

ters of law for the court to resolve, not matters of fact for Enfish and its experts to

argue to jurors.  And the district court correctly granted summary judgment.

### A.   The parties did not dispute how Excel 5.0 operated—only whether the claims cover that operation, which is a matter of law

Enfish repeatedly accuses the district court of ignoring the summary judg-

ment standard and discounting the testimony of Dr. Jagadish.  But Dr. Jagadish did

not dispute what Excel 5.0 disclosed and how it operated; instead, he disputed

whether that undisputed functionality fell within the scope of the claim language.

And the meaning and scope of claim terms is a matter for courts, not jurors, to

decide.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996); *see*

--------------------

[2] The quoted language appears in claim 31 of the '604 patent.  Claim 32 of that patent incorporates claim 31, and Enfish agrees that claims 31 and 32 of the '775 patent contain equivalent limitations.

*O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360-62 (Fed. Cir. 2008) (district court erred in allowing parties to argue scope of critical "only if" limitation to jury).

   None of the issues Enfish raises is factual. Enfish does not deny that Excel 5.0 had a pivot-table feature that would take information entered in a row on either the same or a different spreadsheet and place it in a column with the same header label. For example, Defendants pointed to the following live functional worksheet based on a sample pivot table and underlying data shipped with Excel 5.0:

Defendants' expert explained, and Dr. Jagadish did not dispute, that if a user added a "Housewares" row to the raw data, Excel 5.0 would automatically add a column with the heading "Housewares" linked to the raw data:



Enfish tries to dispute whether this pivoting function occurs in "a logical table," whether the column names "defin[ed] each of said logical columns," and whether any row identifier was also an identifier or a "corresponding" column. But these are legal disputes over the meanings of "a logical table," "defining" a column, and "corresponding" to a column—not factual disputes over what Excel 5.0 was designed to do. Enfish and Dr. Jagadish were not entitled to argue claim

scope to a jury.  Instead, it was the district court's job to resolve those issues as a matter of claim construction.

## B.     Column names can "defin[e]" a column

Enfish concedes (at 43) that a row of an Excel 5.0 table could be used as a header row containing the names of each column and does not dispute that Excel automatically distinguished header rows from data rows of the same table.  *See* A7625; A7003.  Instead, Enfish contends that headers identifying the type of information to be entered and stored in a column do not "define" the column, and hence a row of column names can never qualify as "logical column information defining each of said logical columns."  But that is not a question of fact, and Enfish is wrong as a matter of law.

Enfish acknowledges that nothing in the district court's construction of the "row defining column" limitation required more than a column name.  That construction required only that at least one row be fully populated with information defining each column.  A267-68.  Moreover, nothing in the specification says a header row cannot be used to "define" columns.  To the contrary, the specification provides a non-exclusive list of possible column-defining information and refers to the "name of the column" as an example of something that defines it by determining its properties:

> Each column has an associated column definition, which determines the properties of the column, *such as* the domain of the column, *the name of the column*, whether the column is required and other properties that may relate to the column.

'604(7:10-13).

The column-defining information in a row need not include every property of a column. Claim 31 requires that "at least one of said logical rows includes column information defining each of said logical columns." It does not say a row must include *all* information *fully* defining each column. Indeed, it permits two or more rows to define a column, in which case a single row will *not* fully define the column. A header row indicating the type of data in each column certainly provides some information defining the column and may, depending on the table-designer's preference, be the entire definition.

Figure 3 supports this reading. It includes a header row 108 (highlighted) in which the cell at the top of each column contains a label describing the data in that column:

FIG. 3

| OBJECT ID | TYPE [# 101] | [#1012] LABEL | ADDRESS [#1013] | EMPLOYED BY [#1019] | TITLE [#1033] | AUTHOR [#1032] |
|---|---|---|---|---|---|---|
| #1100 | #1020 [COMPANY] | DEXIS | 117 EAST COLORADO | | N/A | N/A |
| #1101 | #1010 [PERSON] | SCOTT WLASCHIN | | #1100 [DEXIS] | N/A | N/A |
| #1118 | #1030 [BOOK] | | | | | #1122 |
| #1122 | #1050 [MEMO] | | | | | #1122 |
| #1127 | #1060 [DOCUMENT] | | C:\WORD\ PROJ.DOC | | PROJECT PLAN | #1101 |
| #1019 | # 210 [FIELD] | EMPLOYED BY | | | | |
| # 210 | # 111 [TYPE] | COLUMN | | | | |
| # 111 | # 111 [TYPE] | TYPE | | | | |

The patent describes this header row as containing column-defining information. '604(6:39-41) ("[A] column corresponds to an attribute of a record and the defining characteristics of the column are stored in a row 108."). Some of the header cells include a pointer to information about the column, but that information is not in the column-defining header row itself. Moreover, the upper-left cell includes only the label "OBJECT ID," yet the patent makes clear that row 108 defines each column. *See id.* If the column name "OBJECT ID" qualifies as column-defining information, then so does a header row of column names.[3]

---

[3] The "FIELD" and "TYPE" entries in the bottom three rows of column 122 do not change the analysis. Column 122, entitled "TYPE," lists row types—for

(footnote continued on next page)

Figure 10 also supports this construction.  As in Figure 3, the top row of Figure 10 is a header row storing column names as column-defining information:

FIG. 10

DEFINITIONS FOR FOLDER RELATED COLUMNS

| OBJECTID | #101 [TYPE] | #2 [LABEL] | #301 [PARENT FOLDER] | #320 [FOLDERCHILDREN] |
|---|---|---|---|---|
| #301 | FIELD | PARENT FOLDER | NA | NA |
| #320 | FIELD | FOLDERCHILDREN | NA | NA |
| #1100 | COMPANY | DEXIS | #1070 [CONTACTS] | NA |
| #1101 | PERSON | SCOTT WLASCHIN | #1070 [CONTACTS] | NA |
| #1070 | FOLDER | CONTACTS | NA | 1100 [DEXIS]; 1101 [SCOTT WLASCHIN]; 1102 [LOUISE WANNIER]; ETC. |

138~

244~

240    242    FOLDERCHILDREN IN USE AS AN ATTRIBUTE OF A FOLDER OBJECT

The two rows beneath help define columns 240 and 242 by including the headers "PARENT FOLDER" and "CHILD FOLDER."  But those rows contain no more information than appears in the header row and do not point to information in any other row.  The only other entry in those rows is "FIELD," which merely indicates that the rows are column-defining rows and does not provide any additional infor-

---

example "COMPANY" information in row 110 and "PERSON" information in row 138.  *See* '604(7:51-57).  But claim 31 does not address row types, which are a distinct feature addressed in dependent claim 36.  If anything, row 136 undermines Enfish's argument because it serves as a column-definition record, yet the only information it contains besides a row-type designator is the column name "EMPLOYED BY."

mation about column definitions themselves. This confirms that a row of column names qualifies as column-defining information even though a column may also have other defining information.

Enfish's counterarguments are misguided. Dr. Jagadish's opinions about how to construe "defining" a column were extrinsic evidence that the district court was not required to credit when construing the claims. Even if relevant to claim construction, they were not factual evidence that could defeat summary judgment. Dr. Gray's testimony that certain databases require identifying the data type as well as the column name when defining a new column was also beside the point. The issue is not whether other column-defining information can exist, but whether claim 31 requires a row to include all possible column-defining information. Similarly, Excel's optional "Table Definition" tool merely shows that other information such as whether the data are numbers or characters may help define a portion of a table. It does not suggest that a header row does not supply column-defining information as that term is used in the '604 patent.

**C.    Enfish failed to preserve its "single table" argument, and in any event pivot columns linked to underlying data on the same spreadsheet qualify as "a logical table"**

The claims require a method of configuring "a logical table" in memory such that "at least one of said logical rows has an OID equal to the OID of a corresponding one of said logical columns." Enfish contends it is not enough for a com-

bination of tables to have that configuration collectively, but Defendants did not rely on a combination of tables. Defendants relied on a single logical table on a single worksheet with both pivot columns and the underlying data.

Enfish argues that the worksheet on which Defendants relied shows two separate tables (a pivot table and a data table), rather than one table. But Enfish waived this argument by failing to argue the lack of a single table in its opposition to Defendants' summary judgment motion. *See* A8469-99. Dr. Jagadish's declaration adverted to the issue only briefly and when discussing a different issue: whether Excel satisfied step 3 of the algorithm for the "means for configuring said memory," which is not in claims 31 and 32. A8806-07. Enfish first pressed its no-single-table argument regarding claims 31 and 32 in a motion for reconsideration, and motions for reconsideration are insufficient to revive an abandoned issue for appeal. *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1369 (Fed. Cir. 2014) ("An argument made for the first time in a motion for reconsideration comes too late and is ordinarily deemed waived."); *Intercontinental Travel Mktg., Inc. v. FDIC*, 45 F.3d 1278, 1286 (9th Cir. 1994) ("Raising an issue for the first time in a motion to reconsider is not considered adequate preservation of the issue at a summary judgment stage.").

Even if preserved, Enfish's argument fails because it is merely semantics. Just as a chart may contain sub-charts, a table may contain sub-tables. In this case,

the worksheet had two parts:  the pivot columns and the underlying data rows linked to them.  The two parts qualified as a single logical table because the pivoting portion and the raw-data portion were logically related and even appeared in a unified matrix of sequentially numbered, intersecting rows and columns.  The district court's unappealed construction of "a logical table" demands no more:  it requires only "a table with a data structure that is logical as opposed to physical, and therefore does not need to be stored contiguously in memory."  A271.

Enfish notes that in the original exemplar spreadsheet shipped with Excel 5.0, the pivot columns and source data were on different worksheets.  To illustrate the software's functionality, Defendants' expert copied the source data into the same worksheet as the pivot columns.  A7721-22.  But the claims require only a *logical* table, not a *physically contiguous* table.  Moreover, Excel 5.0's pivot-table feature undisputedly was designed to allow the pivot columns and their underlying data to appear on the same worksheet, in one combined table.  A7003-04; A7721-25; A22350.

Microsoft's documentation was not contrary.  It simply said "[t]he data in this Microsoft Excel list … is summarized in this pivot table."  A8904.  Nothing in that description suggests that the pivot table and its linked data cannot qualify as a single logical table.  The documentation also said "[s]elected field names from the source list or table … are used to organize data in the pivot table," A7627, but that

hardly suggests that the source data and the pivot column that link to and reorganize those data are not a single logical table.  Nor did Defendants' expert testify otherwise.  He merely said "I think [the combination] could be seen as a table. … Others might see it as multiple tables.  I'm not sure."  A20628.  That did not create a fact dispute because claim scope is not a question of fact for experts to dispute.

### D.    The pivot function provides "correspondence" between a row and a column with an equivalent OID

Apart from a row defining a column, Claim 31 requires that "at least one of said logical rows has an OID equal to the OID to a corresponding one of said logical columns."  This limitation requires only one row to have one OID equal to one OID of one corresponding column.  Excel 5.0's pivot-table feature allowed a row of data to be pivoted into a column, and in that case the identifier of a row became the heading and identifier of the corresponding pivot column.  A7630-33; A22350.  This exemplar table shows just that:



See A283-84.

Enfish argues that this equality is "superficial" and that the district court "did not address true 'correspondence,'" but Enfish is wrong. The "Housewares" column of the pivot table certainly "corresponds" to the "Housewares" row of the data: the column is created by taking the data from the row and rearranging it according to the parameters selected for the pivot table. And "Housewares" certainly equals "Housewares." Enfish suggests this label provides no definitional information, but it ignores that "Housewares" defines the type of data in the row and the column: data in both the row and the column refer to a sale of housewares. A7630-32. Enfish also suggests there is no "programmatic" link between columns

and their headers because "Housewares" is a label for the user. But Enfish is inventing a nonexistent limitation. Moreover, headers *are* "programmatically" linked to their associated data in that a header continues to correspond to associated data even when the row is flipped and rearranged. A7721-24; A22350.

Enfish next contends that row and column identifiers cannot be "OIDs." Enfish first notes that some rows in the exemplar table's data have the same identifier ("Produce" or "Dairy"). But the limitation does not require every row and column of a table to have corresponding OIDs; it requires only one match. Here, only one row and one column are labeled "Housewares," so that heading/identifier is unique. The same would be true any time the user added a new row for a new product category, automatically creating a new corresponding column in the pivot table headed by the same unique identifier.

Enfish also complains that row and column names cannot be OIDs because they may vary in length, but there are two answers. First, although the district court's construction of OID required a constant bit-length within a database, it allowed bit-lengths to vary across databases. A271. Excel 5.0 was flexible and allowed variable-length row and column labels, but users were free to adopt their own fixed-length conventions—*x* letters for product categories, *y* digits for employee numbers, etc.—and did so. A6984-85; A6996-98; A7571-72. Second, the district court's requirement of a fixed bit-length within a database was mistaken.

Nothing in the claims refers to a fixed bit-length OID, and the specification makes clear that "[s]ince the OID is a variable length structure, any number of bits may be used." '604(8:37-38). Numerous figures show OIDs with different lengths within the same table. *See* '604 Figs. 3, 5, 7b, 9, 10, 13, 14. And claim 46 of the '604 patent *requires* OIDs of "variable length." One passage of the written description does state that "[t]he particular type of OID and its length is [sic] constant through-out a database but may vary between databases." '604(8:44-46). But that passage is grammatically muddled and appears to relate to the preceding "preferred embo-diment," '604(8:40-43).

### E.    Non-pivoting tables satisfied the disputed limitations even if pivot tables did not

Even if the pivot function did not anticipate, non-pivoting tables did. Al-though the district court did not reach this issue, Defendants' papers explained that Excel 5.0 tables typically had column names defining every column in the first (header) row. A6957-59, A6966-68; A7561-63; A7568-69. This exemplar table illustrates the point:



A6997. This table indisputably is one table. Moreover, the ordinal numbers of the rows and columns serve as OIDs, with row 1 having an OID of 1 and column 1 also having an equal OID of 1. And row 1 "corresponds" to column 1 because row 1 holds the name defining column 1. It does not matter whether row 2 corresponds to column 2 because claims 31 and 32 require only "one of said logical rows [to] ha[ve] an OID equal to the OID to a corresponding one of said logical columns."

During prosecution of the parent of the '604 patent, the examiner determined that a table with row and column numbers just like this example satisfied the same OID equality and correspondence limitations. A1915-16 (citing rows and cols. 5-18 in U.S. Patent No. 5,359,724). The applicants did not contest this reasoning, instead distinguishing the reference on unrelated grounds. A1966-67. Enfish cannot escape the same logic now.

### III. Claim 17 of the '604 patent is invalid for indefiniteness because the specification does not clearly link any structure to the claimed "means for configuring said memory according to a logical table"

Even if claim 17 covers patent-eligible subject matter, this Court can and should affirm its invalidity on an alternative ground: indefiniteness under former 35 U.S.C. § 112 ¶ 2.

Claim 17 recites a "means for configuring said memory according to a logical table." The parties agreed that this term was governed by 35 U.S.C. § 112 ¶ 6 and that the claimed function was to configure a logical table structure in computer memory beginning with creating the table in memory in the first place. A523-24; A2109-10. The main dispute was whether the specification disclosed structure corresponding to the "means for configuring said memory." Microsoft argued that the specification merely disclosed a general-purpose computer without any algorithm explaining how to create the table in memory, rendering the term indefinite. A524-26. Enfish collected bits and pieces from the specification in Exhibit 19 to its brief, argued that they collectively described the types of memory that could be used and the structure of the logical table, and contended that the resulting "algorithm" constituted structure corresponding to the claimed means. A2110-11. Enfish also urged the court to defer to the PTO's supposed finding that the claims comported with Section 112 ¶ 6. A2111-12.

The district court agreed with Enfish. Although the court recognized that Exhibit 19 merely "*pieced together* various citations from the patent specification" (emphasis original), it concluded that the resulting "algorithm" qualified as corresponding structure because it constituted "sufficient structure for a PHOSITA to implement and accomplish the function of 'configuring said memory according to a logical table' as described in the patent." A269-70. By contrast, when the PTAB revisited the issue on IPR, it concluded that the cited portions of the specification "describe an already-formed table having generic characteristics, such as columns, rows, identifiers, and a header row," not an "algorithm or computer program for forming this table," leaving *no* structure clearly linked to the claimed function and rendering the term unconstruable. A22158-63.

This Court reviews the district court's construction and definiteness determination *de novo* because they relied entirely on intrinsic evidence. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). And it should hold that the PTAB was correct and the district court was incorrect.

Section 112 ¶ 6 allows a patentee to avoid indefiniteness by limiting the scope of a means-plus-function element to "the corresponding structure … described in the specification and equivalents thereof." To gain that benefit, however, the patent must disclose corresponding structure with "particularity" and "clearly link" it to the stated function. *Triton Tech of Tex., LLC v. Nintendo of*

*Am., Inc.*, 753 F.3d 1375, 1378-79 (Fed. Cir. 2014); *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311-12 (Fed. Cir. 2012). If the specification does not do so, the applicant has not "particularly point[ed] out and distinctly claim[ed] the invention," and the claim is invalid under 35 U.S.C. § 112 ¶ 2. *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 948 (Fed. Cir. 2007).

Here, the '604 patent describes no particular *physical* computer structure for configuring the memory to have a logical table structure—only a general-purpose computer or one that can be programmed with software. '604(4:59-5-4). The specification thus must disclose a detailed software algorithm for performing the function. *See Function Media, L.L.C. v. Google Inc.*, 708 F.3d 1310,1318 (Fed. Cir. 2013); *Aristocrat Techs. Austl. Pty. Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1332-33 (Fed. Cir. 2008). It does not.

To fill the hole, Enfish posited the following four-step algorithm:

> 1. Create, in computer memory, a logical table that need not be stored contiguously in the computer memory, the logical table being comprised of rows and columns, the rows corresponding to records, the columns corresponding to fields or attributes, the logical table being capable of storing different kinds of records. …
>
> 2. Assign each row and column an object identification number (OID) that, when stored as data, can act as a pointer to the associate row or column and that can be of variable length between databases. …
>
> 3. For each column, store information about that column in one or more rows, rendering the table self-referential,

> the appending, to the logical table, of new columns that
> are available for immediate use being possible through
> the creation of new column definition records. …
>
> 4. In one or more cells defined by the intersection of the
> rows and columns, store and access data, which can
> include structured data, unstructured data, or a pointer to
> another row. …

A2516-22 (supporting citations omitted). But the problem with both the supposed

algorithm and the excerpts patched together to support it is that they focus on how

to outfit the *table* with OIDs, rows, and columns, not how to configure the *memory*

used to store the table. The claimed function requires configuring the *memory* that

will hold the table, not defining what the table will include, and the specification

recites no algorithm clearly linked to performing the memory-configuring function.

Although Enfish's Step 1 says to "[c]reate, in computer memory, a logical

table that need not be stored contiguously in computer memory," the specification

nowhere explains just what should configure the memory to create the table and

how. All we know from the specification is that the table need not be stored in

contiguous memory. '604(6:33-35). The patent contains no affirmative disclosure

of how the memory should be allocated and otherwise configured, much less speci-

fic steps to follow to create the table structures in memory. Steps 2-4 add nothing,

as they merely describe the OIDs, rows, columns within an *existing* table, not how

to configure the memory to *create* and *hold* the table. *See* A22158-63 (PTAB

decision).  Moreover, none of the cited passages is clearly linked to the claimed function.

The district court suggested that "the bar for adequacy of structure is low" and that a skilled artisan would know how to write software to "configure said memory according to a logical table."  A269-70.  But this Court strictly requires a specific algorithm clearly linked to the claimed function.  Although the algorithm may appear in prose, a flow chart, or a formula, it must be explicit and clearly tied to the claimed function.  *See*, *e.g.*, *Triton*, 753 F.3d at 1378-79 (recital of "numerical integration" did not provide requisite step-by-step procedure for integrating); *Function Media*, 708 F.3d at 1318-19 (no algorithm provided for "means for transmitting"); *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382 (Fed. Cir. 2009) (inadequate description of "means for assigning").  No such algorithm was provided here.  Whether a skilled artisan would know how to configure memory is irrelevant.  The issue is not enablement under Section 112 ¶ 1, but compliance with Section 112 ¶ 6 and definiteness under Section 112 ¶ 2.  And although we read patents from the perspective of a skilled artisan, knowledge of a skilled artisan cannot substitute for actual disclosure in the patent itself.  *Triton*, 753 F.3d at 1379; *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 519-20 (Fed. Cir. 2012); *Biomedino*, 490 F.3d at 953.

Enfish has suggested that the indefiniteness was cured by source-code disks submitted with the application for the parent of the '604 patent and excerpted in Exhibit 20 to its claim-construction brief.  A2112-13 (citing A2524-39).  Not so. When the inventors applied for the parent '730 patent, they proposed to incorporate by reference five source-code disks.  The examiner objected, and the applicants removed their reference to the disks.  A1973.  The application for the '604 patent made no mention of the source-code disks, and the disks were never submitted during prosecution of the '604 application.  Although the '604 patent incorporated the '730 application by reference, the '730 application no longer included the disks.  Moreover, "material incorporated by reference cannot provide the corresponding structure necessary to satisfy the definiteness requirement for a means-plus-function clause."  *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1301 (Fed. Cir. 2005).  Furthermore, even if the previously-appended code counted, it was still inadequate because the '604 specification did not clearly link any portions of it to the claimed function.  *See Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1218-19 (Fed. Cir. 2003) (references to software appended to same patent did not provide corresponding structure because they did not link that code to claimed function).

Enfish tried to salvage the situation after it filed this lawsuit by "correcting" the '730 patent to have it refer to the source code.  But certificates of correction do

not apply to causes of action arising before issuance.  35 U.S.C. § 254.  Moreover,

even with the "correction," neither the '730 patent nor the '604 patent links any

portion of the code to the "means for configuring said memory."

## IV.   The district court correctly granted summary judgment of noninfringement of claim 17 of the '604 patent

In granting summary judgment of noninfringement of claim 17, the district

court correctly hoisted Enfish by its own petard.  Enfish proposed the three-part

algorithm in Exhibit 21 to its claim-construction brief as corresponding structure

for the "means for indexing data stored in [the] table."  The district court properly

held Enfish to that algorithm and correctly granted summary judgment because

ADO.NET did not satisfy at least two of those elements.

### A.   The district court correctly refused to broaden the scope of the "means for indexing" beyond the single algorithm that Enfish specified in Exhibit 21

Enfish's claim-construction brief proposed a single "structure disclosed in

the specification that performs indexing data stored in the logical table":  the algo-

rithm listed in Exhibit 21.  A2123.  As Enfish told the district court in opposing the

Excel 5.0 motion, Exhibit 21 disclosed one algorithm, namely:

> 1.  Extract key phrases or words from the applicable cells
> in the logical table.

> 2.  Store the extracted key phrases or words in an index,
> which is itself stored in the logical table.

> 3.  Include, in text cells of the logical table, pointers to the corresponding entries in the index, and include, in the index, pointers to the text cells.

A8482; *see* A2541-49.  Enfish did accuse Defendants' construction of "fail[ing] to account for all but one of the types of indexing that are disclosed in the patent," but that was because Defendants limited the corresponding structure to the specific steps at '604(12:12-13:36), whereas Enfish manufactured a more generalized algorithm from passages throughout the patent.  And although the chart in Enfish's brief vaguely referred to "one or more of the algorithms" in Exhibit 21, A2123, Exhibit 21 nevertheless plainly proposed a single three-step algorithm.  The district court adopted that single algorithm as the sole structure corresponding to the "means for indexing."  A270, A272.

Enfish also asked the court to include software algorithms set out in Exhibit 22, but the district court correctly refused.  As with the "means for configuring said memory," Enfish derived those algorithms from source code that the inventors originally submitted to the PTO when applying for the parent '730 patent but later withdrew from that file.  A2551-70.  But as explained above (at 52), that code was not included in the application for the '604 patent.  Moreover, even if the code had remained in the '730 file, generally incorporating a parent application that in turn generally refers to source code does not provide the specific identification of corresponding structure needed to satisfy Section 112 ¶ 6.  *See Default Proof*, 412 F.3d

at 1301.  The district court did not err in excluding Exhibit 22 from the corresponding structure.  Enfish complains (at 64 n.8) that Defendants and the court ignored Enfish's supplemental brief regarding the source code, but Defendants filed a full-fledged rebuttal, A2628-34, and the court's rejection of both Exhibit 20 and Exhibit 22 shows that its rulings were deliberate, not an oversight.

Enfish also contends that the district court ignored Dr. Jagadish's testimony in determining the corresponding structure, but Enfish did not present his or any expert's testimony at the claim-construction stage.  Enfish brought in Dr. Jagadish only at the *summary judgment* stage, when, in an effort to salvage its sole remaining claim, it tried to reinterpret Exhibit 21 as making half of both Step 2 and Step 3 optional.  In effect, Enfish and Dr. Jagadish rewrote those steps as follows:

> 2.  Store the extracted key phrases or words in an index, ~~which is itself stored in the logical table~~.  …
>
> 3.  Include~~, in text cells of the logical table, pointers to the corresponding entries in the index, and include,~~ in the index, pointers to the text cells.  …

*See* A10589-90.  But Enfish was not entitled to backtrack from its own construction simply because that construction led to defeat.  If Enfish considered portions Steps 2 and 3 optional because some disclosed embodiments did not require them, the time to say so was at claim construction, not after Defendants had relied on the existing construction in moving for summary judgment.  Even treating Enfish's argument as a belated motion for reconsideration, the district court did not abuse

its discretion in holding Enfish to its prevailing claim construction position. *Cf.*

*Transclean Corp. v. Jiffy Lube Int'l, Inc.*, 474 F.3d 1298, 1306-07 (Fed. Cir. 2007)

("Transclean should not be permitted to reverse course this late in the proceedings

simply because it now realizes its litigation strategy was unsuccessful.").

In fact, moreover, every embodiment in the specification is consistent with

the italicized portions. As to Step 2, every index described in the patent stores in

the logical table *both* actual copies of key-words extracted from text cells *and*

pointers to the text cells where the words appear—not pointers alone as Enfish

supposes. '604(12:16-26 & Fig. 11, 12:26-40 & Fig. 12, 12:42-13:6 & Fig. 13,

14:10-19 & Fig. 14); *see also* A340 (summary judgment order); A11264-66

(Defendants' reply brief). As to Step 3, every embodiment described in the patent

includes bi-directional pointers in the text cells that *both* point back to the index

entries *and* point from the index to the text cells. '604(2:66-3:4, 12:16-40 & Figs.

11 & 12, 14:12-17 & Fig. 14, 14:18-54 & Figs. 15, 16a & 16b); *see* A11254-57

(Defendants' reply).[4]  Creative expert and inventor testimony could not expand the

---

[4] Enfish cites testimony of a Microsoft expert in the IPRs, but that testimony addressed Figure 11 in isolation. The patent makes clear that Figures 12 and 13 elaborate on the operation of Figure 11, *see* '604(12:27-49), and the specification describes "anchors" in the text cells that include both the positions of key terms *and* an OID that points back to the corresponding copy of the term in the index.

actual disclosure of corresponding structure in the patent itself, nor could it take back Enfish's own prevailing construction earlier in the case.

## B. The district court correctly found that there were no genuine disputes of material fact and that Defendants were entitled to judgment as a matter of law

Summary judgment of noninfringement followed from the claim construction and the undisputed structure of ADO.NET. Because Enfish has not appealed the district court's rulings regarding equivalence, the only issue is literal infringement, and the judgment of noninfringement must be affirmed if this Court agrees *either* that ADO.NET does not store key words or phrases in a logical table *or* that ADO.NET does not use bi-directional pointers. Enfish argues that fact issues precluded summary judgment on both grounds, but as the district court recognized, there was no genuine dispute over how ADO.NET works. Instead, the dispute was whether that undisputed operation satisfied the court's claim construction—a matter of law. "Where, as here, the parties do not dispute any relevant facts regarding the accused product … the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment." *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996).

### 1. ADO.NET does not store extracted key phrases or words in an index stored in a logical table

Step 2 requires "[s]tor[ing] the extracted key phrases or words in an index, which is itself stored in the logical table." Enfish concedes that ADO.NET does

not store text keys themselves in an index stored in a logical table. Instead, Enfish contends (at 66-67) that (a) ADO.NET's tables store *pointers* to the key phrases or words and (b) storing the pointers should be deemed to constitute storing the phrases or words they point to even though the words and phrases are actually stored elsewhere. Enfish dubs this "storage by reference." But ADO.NET does not "store the extracted key phrases or words in an index, which is itself stored in the logical table itself." A9524; A9541; A9594-95. That precludes infringement.

Although Enfish tries to manufacture a fact dispute, there was only a legal dispute over whether ADO.NET's undisputed operation satisfies Step 2. As drafted by Enfish itself, Step 2 requires the extracted key words or phrases *themselves* to be stored in the index that is in turn stored within the logical table. Words or phrases stored separately from the index and table are not stored within the index and table. Moreover, as the district court noted, it is Step 3 that describes inclusion of pointers within the index. Enfish argues that the pointers in Step 3 point to text *cells* rather than text itself, but that is irrelevant. What matters is that pointers are distinct from the information they point to, and storing pointers to text in a table is not the same as storing the text itself in the table. Even if storing a pointer to text could be deemed equivalent to storing the text itself, Enfish has abandoned all equivalence arguments on appeal, and in any event failed to show equivalence below. A343-44.

## 2.    ADO.NET lacks pointers from text cells to an index

The district court was also correct in granting summary judgment that ADO.NET does not satisfy Step 3's requirement of bi-directional pointers, i.e., not only pointers in the index to the text cells, but also pointers within text cells back to the corresponding entries in the index.

As the district court recognized, A342, there was no genuine fact dispute, only a debate over claim scope. Enfish does not contend that ADO.NET's text cells contain pointers that point directly to an index. Instead it argues (at 69-70) that ADO.NET relies on a "chain" of "multiple pointers" leading from a String-Storage object and that when this multi-pointer "path" (in blue) is "traversed," it eventually leads back to an index (in green) as a matter of "pointer math":

Figure 4

A10625.

But as the district court observed, the argument is flawed from the outset because the StringStorage object containing the first pointer represents *multiple* text cells, not any particular text cell (e.g., "George" in row 1 or "Toru" in row 3). A342 (citing Dr. Jagadish). Moreover, the StringStorage object contains no pointer to the Red-Black Tree (in green) that supposedly constitutes the claimed index. Instead, according to Enfish itself, the StringStorage contains a pointer to a DataTable that in turn points to an Index that in turn points to an Index Tree that in turn points to the Red-Black Tree. Finally, there is no link from "George" to index entry "1" or from "Toru" to index entry "3."

Again, Enfish had no viable literal infringement theory, and it makes no equivalence argument on appeal. Enfish's Summary of Argument suggests in passing (at 17) that pointer chains are equivalent to bi-directional pointers, but its brief nowhere explains why the differences are insubstantial. In any event, the correct equivalence inquiry would be whether ADO.NET's entire "means for indexing" is insubstantially different from the entire algorithm in Exhibit 21. *See Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1268 (Fed. Cir. 1999) ("The individual components, if any, of an overall structure that corresponds to the claimed function are not claim limitations. Rather, the claim limitation is the overall structure corresponding to the claimed function."). Enfish made no such equivalence argument below and makes none here. *See* A343-44; A11260-62.

– 60 –

## V.    Microsoft is not estopped from asserting invalidity over Excel 5.0

Enfish argues that if this case is remanded, Microsoft may be estopped from asserting invalidity based on Excel 5.0.  That argument is both mistaken and premature.

Statutory estoppel cannot bar Microsoft from asserting invalidity over the on-sale and publicly-used Excel 5.0 *product* because statutory estoppel applies only to grounds that Microsoft "raised or reasonably could have raised during th[e] inter partes review," 35 U.S.C. § 315(e)(2), and under 35 U.S.C. § 311 IPR review is limited to prior-art *patents and printed publications*.  This Court has recognized this principle in *inter partes* reexaminations, and it should adopt the same rule here.  *See Mikkelsen Graphic Eng'g, Inc. v. Zund Am., Inc.*, 541 F. App'x 964, 967-68, 973-74 (Fed. Cir. 2013) (estoppel provision for *inter partes* reexaminations of "limited relevance" where defendant relied on video showing operation of system and European patent application describing system).

 Enfish asserts (at 56) that "estoppel applies if Microsoft could have included Excel 5.0 in its IPR petitions using only printed publications," but Enfish cites no authority for that proposition, and it makes no sense.  A prior-art product and publications describing that product are distinct references.  Anticipation by an on-sale or publicly-used product can be shown by an exemplar of the product, testimony about the product, documents describing the product, and combinations

thereof.  In contrast, anticipation by a printed publication requires disclosure of every limitation in that single publication.  Congress has limited IPRs and reexaminations to patents and publications because the PTO is used to reviewing written references and less well-suited to evaluate the broader range of evidence and issues that arise in evaluating prior-art products.

Enfish's rule is as impractical as it is legally wrong.  Enfish would ask if a petitioner could have asserted invalidity using printed publications describing a product.  But that would require a complex, fact-intensive analysis of when each document was published, what elements each publication disclosed, whether the petitioner should have been required to pursue a complicated, multi-reference obviousness argument, and so forth.  This case exemplifies the problem.  Microsoft submitted a lengthy declaration describing Excel 5.0's functionality because the product was complex and some details were not clear from the manuals and other corroborating documents.  A7551-78.  Microsoft also submitted a live version of the software for the district court to examine and relied on that in its motion papers and at the hearing.  A6952-61; A6984-7004; A7019; A20202-06; A22350.  Moreover, one cited document (the *Developer's Kit*) did not qualify as prior art because it was published less than a year before Enfish's effective filing date and was used only as evidence of the on-sale product's capability.  A7635-36.  Rather than compelling district courts to wade into a morass, this Court should adopt the clear,

straightforward rule compelled by the statute:  Section 315(e)(2) can only bar anti-cipation and obviousness arguments based on prior-art patents and publications.

Furthermore, the issue is not ripe now.  Enfish does not urge estoppel regarding invalidity under Sections 101 or 112.  Nor does Enfish contend that Microsoft is currently barred from arguing anticipation by Excel 5.0 on appeal. And for good reason.  Under the statute, the PTAB's *later* decision that a *different* prior-art reference did not anticipate claim 32 of each patent could hardly nullify or moot the district court's *earlier* final judgment that those claims were anticipated by Excel 5.0.  Any statutory estoppel applies only prospectively ("petitioner[ ] may not assert") and only "in a civil action … or in a proceeding before the International-al Trade Commission," not in *appeals* from *previous* final district court judgments or ITC determinations.  35 U.S.C. § 315(e)(2).

If this Court affirms here, statutory estoppel will be moot.  But even if this Court were to remand on claim 32 of each patent, addressing statutory estoppel would still be premature.  To begin with, in a separate docket Microsoft has appealed the adverse portions of the PTAB's final written decisions, and this Court may reverse or vacate the decisions, eliminating any possible basis for estoppel. Moreover, Enfish concedes that the current record is inadequate to determine whether statutory estoppel applies:  Enfish seeks a remand for factual findings.

Rather than reaching out to decide a hypothetical, unripe issue, this Court should wait until it has a concrete estoppel ruling before it.

In any event, Enfish is wrong in suggesting that a PTAB ruling of no invalidity results in immediate estoppel and can nullify an earlier judicial determination of invalidity on different grounds. As to timing, Section 315(e)(2) carries forward the statutory estoppel of old Section 315(c) for *inter partes* reexaminations, and in *Bettcher Industries, Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 642-48 (Fed. Cir. 2011), this Court held that the estoppel under old Section 315(c) applied only after all appeal rights have been exhausted. Although the statute has now been restructured, the very legislative history that Enfish cites (at 55) indicates that the America Invents Act "preserves" the previous estoppel.

No case law supports Enfish's position. Enfish relies primarily (at 54) on passing dictum in a later-vacated district court decision that primarily addressed other issues. *See Va. Innovation Scis., Inc. v. Samsung Elecs. Co*, 983 F. Supp. 2d 713, 753 (E.D. Va. 2014), *vacated*, 2015 WL 3555700 (Fed. Cir. June 9, 2015). And Enfish misreads *Fresenius USA, Inc. v. Baxter International, Inc.*, 721 F.3d 1330 (Fed. Cir. 2013). There this Court held that its affirmance of the PTO's cancellation of Baxter's patent claims in a reexamination required dismissal of Baxter's infringement claims even though Baxter had previously won a damages verdict. The Court's reasoning, however, was that the district court's damages

award was not final when the claims were cancelled because this Court had remanded for further proceedings when it reviewed the district court's original judgment. Although the PTO's invalidity ruling ultimately nullified the damages award there, that was so because the damages award was not final. This Court never suggested that the PTO can re-validate claims that a district court has previously invalidated on one ground merely by ruling that those claims are not invalid on a different ground.

Finally, Enfish errs in suggesting (at 58) that Microsoft's co-defendants should be estopped. Statutory estoppel is limited to petitioners, their privies, and real-parties-in-interest. The co-defendants were not parties to the IPRs; they did not control, direct, or pay for the IPRs; and they are not corporate affiliates of Microsoft. They certainly are entitled to their day in court.

## CONCLUSION

The judgment should be affirmed.

Respectfully submitted,

PERKINS COIE LLP

by /s/Chad S. Campbell
        Chad S. Campbell

Counsel for Microsoft Corporation,
Fiserv, Inc., Intuit, Inc., and
Jack Henry and Associates, Inc.

BROWN WEGNER MCNAMARA LLP

by /s/William J. Brown, Jr.
        William J. Brown, Jr.

Counsel for Sage Products, Inc.

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 13,988 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2010 and 14-point Times New Roman type.

Dated:  October 2, 2015.                    /s/Chad S. Campbell

                                            Chad S. Campbell

**CERTIFICATE OF AUTHORITY AND PROOF OF SERVICE**

I certify that I have the authority of my co-counsel William J. Brown, Jr. to file this brief with their electronic signatures.

In accordance with Federal Rule of Appellate Procedure 25 and Federal Circuit Rule 25, I further certify that I caused this brief to be served via the Federal Circuit's CM/ECF system on counsel of record for all parties.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:  October 2, 2015.

                                                    /s/Chad S. Campbell
                                        Chad S. Campbell

## REPRESENTATIVE CLAIMS

17.  A data storage and retrieval system for a computer memory, comprising:

means for configuring said memory according to a logical table, said logical table including:

a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information;

a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column; and

means for indexing data stored in said table.

31.  A method for storing and retrieving data in a computer memory, comprising the steps of:

configuring said memory according to a logical table, said logical table including:

a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information;

a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column; and wherein

at least one of said logical rows has an OID equal to the OID to a corresponding one of said logical columns, and at least one of said logical rows includes logical column information defining each of said logical columns.

32.  The method of claim 31 wherein said logical column information defines one of said logical columns to contain information for enabling determination of OIDs from text entry.